In The Matter Of:

## *Cohen vs. World Financial Group*

---

## *Jordan Destin*

October 08, 2013

---

**Tiffany Alley Global Reporting & Video**

3348 Peachtree Road

Tower Place 200, Suite 700

Atlanta, GA 30326

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


MICHAEL B. COHEN,
individually and on
behalf of other persons
similarly situated who
were employed by WORLD
FINANCIAL GROUP, INC.      CIVIL ACTION FILE
and/or any other entities  NO. 1:13-CV-1092-CAP
affiliated with or
controlled by WORLD
FINANCIAL GROUP, INC.,

          Plaintiff,

vs.

WORLD FINANCIAL GROUP,
INC. and/or other
entities affiliated with
or controlled by World
Financial Group, Inc.,

          Defendant.



VIDEO DEPOSITION OF JORDAN DESTIN
            October 8, 2013
               10:25 a.m.
            Buckley & Klein
      1230 Peachtree Street, N.E.
         Promenade II, Suite 900
            Atlanta, Georgia
    Valerie N. Almand, RPR, CRR, CCR-B-531
     Terry Wetz, Legal Video Specialist

.

```
 1                    INDEX OF EXHIBITS

 2    DEFENDANTS'

 3    EXHIBIT           DESCRIPTION              PAGE

 4    #1      Notice of Deposition of            7

 5            Jordan Destin

 6    #2      Amended Notice of Deposition       7

 7            of Jordan Destin

 8    #3      Second Amended Notice of           7

 9            Deposition of Jordan Destin

10    #4      Exhibit H, a/k/a resume of         7

11            Mr. Destin

12    #5      Defendant World Financial          7

13            Group, Inc.'s First

14            Interrogatories to Putative

15            Opt-In Plaintiff Jordan

16            Destin

17    #6      Defendant World Financial          7

18            Group, Inc.'s First Request

19            For Production of Documents

20            to Putative Opt-In Plaintiff

21            Jordan Destin

22    #7      Plaintiff Jordan Destin's          7

23            Responses to Defendants'

24            Request For Interrogatories

25
```

```
 1              DESCRIPTION OF EXHIBITS (cont'd)

 2    #8        Plaintiff Jordan Destin's              7

 3              Responses to Defendants'

 4              Request For Interrogatories

 5    #9        Plaintiff Jordan Destin's              7

 6              Responses to Defendants'

 7              First Request For the

 8              Production of Documents

 9    #10       Plaintiff Jordan Destin's              7

10              Supplemental Responses to

11              Defendants' First Request

12              For the Production of Documents

13    #11       Exhibit P a/k/a tax documents      203

14              of Jordan Destin

15    #12       Class Action Complaint            210

16    #13       WFG Associate Membership           45

17              Agreement (WFG001503-526)

18    #14       e-mail dated 27 June 2013         181

19              from Ambinder to Destin

20    #15       First Notice of Consent to        185

21              Join

22    #16       e-mail dated June 27, 2013        216

23              from Ambinder to JHosier72@

24              Yahoo.com

25
```

```
 1                 DESCRIPTION OF EXHIBITS (cont'd)

 2    #17        e-mail dated August 12, 2013       217

 3               from Ambinder to JHosier72@

 4               Yahoo.com

 5    #18        Court Order                        219

 6    #19        Amended FLSA Collective Action     229

 7               Complaint

 8    #20        Exhibit J, a/k/a                   284

 9               "Welcoming e-mail"

10    #21        Declaration of Mr. Destin          286

11

12                 INDEX OF EXAMINATION

13    By Mr. Black                        Page 8

14    By Mr. Wolfe                        Page 311

15

16

17

18

19

20

21

22

23

24

25
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiff:

 3            STEVEN E. WOLFE, Esquire

 4            EDWARD D. BUCKLEY, Esquire

 5            DANIEL M. KLEIN, Esquire

 6            Buckley & Klein, LLP

 7            Promenade II, Suite 900

 8            1230 Peachtree Street N.E.

 9            Atlanta, Georgia  30309

10            404.781.1100

11            -and-

12            SUZANNE LEEDS, Attorney at Law

13            MICHAEL A. TOMPKINS, Esquire

14                (for time noted)

15            Virginia & Ambinder, LLP

16            111 Broadway, Suite 1403

17            New York, NY  10006

18            212.943.9080

19    On behalf of the Defendant:

20            RICHARD W. BLACK, Esquire

21            Littler Mendelson, P.C.

22            1150 17th Street NW

23            Suite 900

24            Washington, D.C.  20036

25            202.423.2151
```

```
 1    APPEARANCES OF COUNSEL (cont'd)

 2    On behalf of the Defendant:

 3            BRADLEY E. STRAWN, Esquire

 4            LISA A. SCHRETER, Attorney at Law

 5            Littler Mendelson, P.C.

 6            3344 Peachtree Road, N.E.

 7            Suite 1500

 8            Atlanta, Georgia  30326-4803

 9            404.233.9339

10    Also Present:   Julie Mackoff, WFG (for time noted)

11                    Robert G. Brunton, WFG (for time

12                       noted)

13    Legal Video Specialist:  Terry Wetz

14

15            (Pursuant to OCGA 15-14-37 (a) and (b) a

16    written disclosure statement was submitted by the

17    court reporter to all counsel present at the

18    deposition and is attached hereto.)

19

20

21

22

23

24

25
```

```
 1              (Defendants' Exhibit 1, Defendants' Exhibit

 2   2, Defendants' Exhibit 3, Defendants' Exhibit 4,

 3   Defendants' Exhibit 5, Defendants' Exhibit 6,

 4   Defendants' Exhibit 7, Defendants' Exhibit 8,

 5   Defendants' Exhibit 9 and Defendants' Exhibit 10

 6   marked)

 7              THE VIDEOGRAPHER:  And we are on the

 8   record, the time is approximately 10:25 a.m.  This

 9   is the beginning of Tape 1 of the videotaped

10   deposition of Jordan Destin in the matter of Cohen

11   versus World Financial Group.  Today's date is

12   October 8, 2013.  My name is Terry Wetz, Legal Video

13   Specialist.

14              Would counsel present please identify

15   themselves and who they represent for the record.

16              MR. BLACK:  Richard Black from the Littler

17   Mendelson firm representing defendant World

18   Financial Group.

19              MR. STRAWN:  Brad Strawn from Littler

20   Mendelson representing defendant World Financial

21   Group.

22              MR. WOLFE:  Steve Wolfe from Buckley &

23   Klein for the plaintiffs.

24              MS. LEEDS:  Suzanne Leeds from the law firm

25   Virginia & Ambinder for the plaintiffs.
```

```
 1            MR. BUCKLEY:  Edward Buckley from Buckley &
 2     Klein for the plaintiffs.
 3            MR. KLEIN:  Daniel Klein from Buckley &
 4     Klein for the plaintiffs.
 5            MR. BRUNTON:  Bob Brunton, Vice-President,
 6     Chief Litigation Counsel, World Financial Group,
 7     Inc.
 8            MS. MACKOFF:  Julie Mackoff, Assistant
 9     General Counsel, TransAmerica.
10            THE VIDEOGRAPHER:  Thank you, Counsel.
11            Would the court reporter please swear the
12     witness.
13               JORDAN CHRISTOPHER DESTIN,
14     having been duly sworn, was examined and testified
15     as follows:
16                       EXAMINATION
17     BY MR. BLACK:
18         Q.  Good morning, Mr. Destin.
19         A.  Good morning, sir.
20         Q.  Thank you for coming today.  My name is
21     Richard Black.  I am an attorney who represents the
22     defendant in this lawsuit, World Financial Group.
23            If you would, would you please state your
24     full name for the record.
25         A.  My full name is Jordan Christopher Destin.
```

1        Q.   How do you spell your last name?

2        **A.   Destin, D as in Delta, ES, T as in Tom, I,**

3   **N as in Nancy.**

4        Q.   Have you ever used any other names or

5   aliases, Mr. Destin?

6        **A.   No.**

7        Q.   And during the course of the deposition

8   today I'll be asking you questions, and I'd like to,

9   if it's all right with you, just to set out some

10   ground rules at the start of the deposition, okay?

11       **A.   Okay.**

12       Q.   It's important that both of us speak out

13   loud when giving answers.  All of the words that are

14   said today will be transcribed by the court reporter

15   sitting to my left and your right.  It's very

16   important that if I ask you a question that you want

17   to respond to with a yes or no answer, that you give

18   me an audible yes or no as opposed to a nod or a

19   shake of the head, because that can't be

20   transcribed, okay?

21       **A.   Okay.**

22            MR. WOLFE:  Rich, can I interrupt for a one

23   second?

24            MR. BLACK:  Yes, Steve.

25            MR. WOLFE:  Are we going to reserve

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

 1  objections except to form of the question and

 2  responsiveness of the answer and privilege?

 3          MR. BLACK:  Yeah, I think that's right,

 4  Steve.  My general practice is not to engage in long

 5  speaking objections.

 6          MR. WOLFE:  Mine as well.

 7          MR. BLACK:

 8          MR. WOLFE:  Just wanted to make sure I

 9  didn't have to.

10  BY MR. BLACK:

11      Q.  Mr. Destin, during the course of the

12  deposition if I ask you a question, I'm entitled to

13  all of your knowledge responsive to the question, so

14  I'd ask that you provide me with all of the

15  information you have that responds to a particular

16  question, okay?

**17      A.  Yes.**

18      Q.  If I ask you a question during the course

19  of the day that you don't understand, please feel

20  free to ask for clarification.  If you don't ask for

21  clarification, I will understand that you did

22  understand my question.  Is that agreeable?

**23      A.  Yes.**

24      Q.  If at any point during the deposition you

25  think of additional information that you did not

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1    recall when I asked a question earlier, feel free to

2    let me know that and I'm happy to return to an

3    earlier question.  I just ask that you don't do that

4    in the middle of a pending question, okay?

**5        A.  Yes.**

6        Q.  If at any point during the proceedings

7    today you need a break, just let us know.  We will

8    take some breaks during the course of the day,

9    including I would imagine a break for lunch.  I just

10   simply again ask that if you ask for a break, don't

11   do so during the pendency of a question, or if you

12   do, we will wait until you've answered the question

13   fully, okay?

**14       A.  Okay.**

15       Q.  Mr. Destin, are you currently taking any

16   medications or any other substance that you believe

17   would inhibit your ability to either understand my

18   questions or to answer them truthfully?

**19       A.  No, sir.**

20       Q.  And can you think of any other reason why

21   you may not be able to either understand my

22   questions or answer them truthfully today?

**23       A.  No, sir.**

24       Q.  And you understand that you are under oath

25   today, correct?

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1          **A.   Yes, sir.**

2          Q.   Mr. Destin, when did you first find out

3    that you would have your deposition taken in this

4    case?

5          **A.   When I got in touch with the law firm.**

6          Q.   Okay.  And what law firm are you referring

7    to?

8          **A.   I'm referring to the Binder [sic] law firm**

9    **in New York.**

10         Q.   Okay.  That's Virginia & Ambinder?

11         **A.   Yes, sir.**

12         Q.   And you say when you first got in touch

13   with Virginia & Ambinder you were told you would

14   have your deposition taken?

15              MR. WOLFE:  I'm just going to object.

16   Obviously he can't answer what they told him, based

17   on privilege.

18              MR. BLACK:  Understood.

19   BY MR. BLACK:

20         Q.   Well, let me know:  When was the first time

21   that you were in contact with the Virginia &

22   Ambinder law firm?

23         **A.   June of 2013.**

24         Q.   June of 2013?

25         **A.   Yes, sir.**

1       Q.  Do you remember what day in June of 2013

2   you first made contact with Virginia & Ambinder?

3       **A.  I don't remember.**

4       Q.  Was it in the beginning of June, the middle

5   or the end?

6       **A.  The end of June.**

7       Q.  And how did you learn of Virginia &

8   Ambinder?

9       **A.  By e-mail.**

10      Q.  By e-mail from whom?

11      **A.  From them.**

12      Q.  You received an e-mail from Virginia &

13  Ambinder?

14      **A.  Correct.  It was solicitation.**

15      Q.  And to what e-mail address was that sent?

16      **A.  Jordan.Destin@Yahoo.com.**

17      Q.  And do you recall who the e-mail was

18  specifically from?  Was it from an individual as

19  opposed to the law firm generally?

20      **A.  It was from the law firm.**

21      Q.  And do you still have that e-mail?

22      **A.  I sure do, yes, sir.**

23      Q.  Have you provided it to your attorneys in

24  this lawsuit?

25      **A.  I didn't feel the need to.**

```
 1        Q.  Do you know whether that type of document

 2   was requested by World Financial Group for you to

 3   produce?

 4        A.  I've been asked to provide as much document

 5   as possible, yes, sir.

 6        Q.  My question was:  Do you know whether the

 7   e-mail solicitation that you received is among the

 8   types of documents you were asked to produce in this

 9   case?

10        MR. WOLFE:  Answer the question, but don't

11   discuss anything that lawyers said to you or you

12   said to lawyers.

13        A.  Okay.  I'm sorry, repeat the question one

14   more time.

15   BY MR. BLACK:

16        Q.  Sure.  My question was:  Do you know

17   whether the e-mail solicitation that you received is

18   among the type of documents you have been asked to

19   produce in this case?

20        A.  Yes.

21        Q.  Is that a yes, you understand that it was?

22        A.  So I understand that yes, I've been asked

23   to provide documents regarding that case, basically.

24        Q.  Okay.

25        A.  In that e-mail.
```

```
1        Q.  And my question is about the e-mail

2   solicitation.

3        A.  Okay.

4        Q.  Just so we're clear.

5        A.  Uh-huh.

6        Q.  You understand, correct, that that e-mail

7   solicitation that you received was among the sorts

8   of documents you were asked to provide to World

9   Financial Group in this case, correct?

10        A.  Yes, correct.

11        Q.  But you have not done so.

12        A.  Correct, yes.

13            MR. BLACK:  Steve, obviously we'd like to

14   receive the e-mail solicitation.  I think it's

15   responsive to document requests numbers 3 and 4 to

16   Mr. Destin.

17            MR. WOLFE:  We'll look at it.

18            MR. BLACK:  Thanks.

19   BY MR. BLACK:

20        Q.  All right.  So returning back, you told me

21   that you received an e-mail solicitation from the

22   Virginia & Ambinder firm in late June; is that

23   right?

24        A.  Correct.

25        Q.  And what did you do, if anything, when you
```

1    received that e-mail solicitation?

2         **A.  I read over the e-mail, make sure it was**

3    **legit, and I responded to the e-mail.  It was either**

4    **by phone call or by e-mail, but I -- I called them.**

5         Q.  You called the law firm?

6         **A.  Yes.**

7         Q.  Okay.

8              MR. WOLFE:  So I don't derail you, I'm

9    going to make an objection, obviously, to him

10   talking about the contents of anything he said to

11   the firm or anything they said to him after that.

12             MR. BLACK:  Okay.

13   BY MR. BLACK:

14        Q.  Why did you call the law firm?

15        **A.  To find out more about exactly what was the**

16   **case about.**

17        Q.  Were you seeking legal representation when

18   you called them or were you asking just to find out

19   more about the lawsuit?

20        **A.  Well, actually, to be honest with you,**

21   **both.**

22        Q.  You said that you read the solicitation to

23   make sure it was legit.

24        **A.  Yes.**

25        Q.  What did you do in that capacity?  How did

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1   you make sure it was legit?

 2       A.   I looked up the firm on line, the law firm,

 3   just to make sure they have a U.S. address.

 4       Q.   Anything else?

 5       A.   I just phoned directly.

 6       Q.   When you called Virginia and Ambinder who

 7   did you speak to, if anyone?

 8       A.   Mr. Lloyd Ambinder.

 9       Q.   How soon after receiving the e-mail

10   solicitation did you call Mr. Ambinder?

11       A.   48 hours, two days.

12       Q.   And for how long did you speak to

13   Mr. Ambinder the first time you spoke to him?

14       A.   About 20 minutes.

15       Q.   Did you have any subsequent conversations

16   with Mr. Ambinder about the lawsuit and before you

17   filed a consent to participate in the lawsuit?

18       A.   No.

19       Q.   So you had a single call with Mr. Ambinder

20   that lasted about 20 minutes?

21       A.   Correct.

22       Q.   And then you signed a consent to

23   participate in the lawsuit?

24       A.   I give my deposition, and basically they

25   sent me the deposition over by e-mail so I can take
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1   a look at it, make sure everything that I mentioned

 2   was right, and --

 3          MR. WOLFE:  Jordan, just stop for a moment.

 4   I think he misunderstood the question, but be that

 5   as it may, obviously he can't talk about what was

 6   said to him or what he said to the law firm.

 7          MR. BLACK:  I'm not going to ask him

 8   either.

 9          MR. WOLFE:  That includes e-mails.

10   BY MR. BLACK:

11      Q.  You said you gave your deposition, and just

12   so you and I have a common understanding today, the

13   proceeding that we're engaged in today is what we

14   commonly refer to as a deposition.  It's a situation

15   where a court reporter transcribes while I ask

16   questions and you give me answers.

17      A.  Okay.

18      Q.  Did you mean to say that you provided a

19   declaration?

20      A.  Yes, sir.

21      Q.  Okay.

22      A.  Over the phone.

23      Q.  All right.  And just so I have the events

24   correct in my mind, you received the solicitation,

25   called Mr. Ambinder, had about a 20-minute
```

1    conversation.

**2        A.   Yes.**

3        Q.   After which you received a declaration --

**4        A.   Yes.**

5        Q.   -- to review.

**6        A.   Okay.**

7        Q.   Is that right?

**8        A.   Yes.**

9        Q.   And you reviewed that declaration and

10   signed it?

**11       A.   Yes.**

12       Q.   Okay.  When you signed that declaration did

13   you understand you were signing it under oath?

**14       A.   Yes, sir.**

15       Q.   And do you recall at some point that you

16   also signed a form to opt in or consent to join this

17   lawsuit as a party?

**18       A.   Yes, sir.**

19       Q.   Was that before or after you read over and

20   signed the declaration?

**21       A.   It was after.**

22       Q.   When you signed the declaration did you

23   have any understanding of how it might be used in

24   the lawsuit?

25            MR. WOLFE:  Objection.  You can answer the

1    question, Jordan, if you understood that, separate

2    and apart from anything that you understood from

3    talking to any of the lawyers.

4          A.  I understood the importance of it, yes.

5          Q.  And what was that?

6          A.  Well, to represent the case of the workers

7    for World Financial Group.

8          Q.  When you say case of the workers, what

9    workers are you referring to?

10         A.  I'm referring to whoever worked for that

11   company that he didn't get paid.

12         Q.  Were there particular positions that you

13   are seeking to represent?

14         A.  Well, I would represent trainee associate

15   and associate of the World Financial Group company.

16         MR. WOLFE:  I'd interpose an objection

17   there to the extent that question calls for a legal

18   conclusion.

19         MR. BLACK:  Okay.

20   BY MR. BLACK:

21         Q.  Any other positions?

22         A.  I didn't know the whole -- you know, the

23   whole different position of the company, so I will

24   talk only from what I know and from the position I

25   will be familiar of, so yes.

1      Q.  And that's trainee associate and associate?

**2      A.  Right.**

3      Q.  All right.  Mr. Destin, I asked you earlier

4   at the very start of the proceeding when you were

5   first notified that you would have to attend your

6   deposition in this case, and I think we may have

7   gotten a little sidetracked because you were

8   confusing the term deposition and declaration.  So

9   understanding that by deposition I mean today's

10  proceeding, when did you first learn that you would

11  need to travel to Atlanta and participate in a

12  deposition?

**13      A.  About two weeks ago.**

14      Q.  And how did you find out?

**15      A.  Through the law firm, Lloyd Ambinder.**

16      Q.  And so about two weeks ago would put us at

17  about the 24th of September.  Does that sound about

18  right to you?

**19      A.  Yes, sir.**

20      Q.  And before the 24th of September you had

21  not been notified that you would need to appear for

22  deposition, correct?

**23      A.  Correct.**

24      Q.  And during the course of the deposition

25  today, Mr. Destin, I may show you some documents.

1        A.  Okay.

2        Q.  And sometimes before I do I will hand a

3    copy to the court reporter, she will mark it as an

4    exhibit, and then I will say something to you like:

5    Mr. Destin, I'm showing you what has been marked as

6    exhibit, and I'll say a number.

7        A.  Okay.

8        Q.  And when I give them to you I may ask you

9    some questions about them.

10       A.  Okay.

11       Q.  Before you came in the room I asked the

12   court reporter to premark some documents, so I'd

13   like to show you some documents now, if I can, okay?

14       A.  Okay.

15       Q.  Mr. Destin, I am showing you what has been

16   marked as Deposition Exhibit 1.  And this is a

17   notice of deposition to Jordan Destin dated, if you

18   look at page 3, on August 21st.  And this originally

19   set your deposition for October 1st of 2013.

20           My question is simple:  Have you ever seen

21   this document before today?

22       A.  No, sir.

23       Q.  Mr. Destin, I want to show you another

24   document.  This document has been marked as

25   Deposition Exhibit Number 2.  And my question about

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    this document is the same as the last.  Can you tell

 2    me if you've ever seen this document before today?

 3    This is a deposition notice dated September 11th.

 4    That date is on the third page, also noticing your

 5    deposition for Tuesday, October 1st.  Have you ever

 6    seen this document before today?

 7         A.  No, sir.

 8         Q.  And lastly, I want to show you what's been

 9    marked as Exhibit Number 3, Mr. Destin.  This is the

10    Second Amended Notice of Deposition of Jordan

11    Destin.  This document is dated September 26th.

12         A.  Okay.

13         Q.  And sets the date of your deposition for

14    today, Tuesday, October 8th.  Before today had you

15    ever seen this document?

16         A.  No, sir.

17         Q.  Have you ever had your deposition taken in

18    any other proceeding, Mr. Destin?

19         A.  No.

20         Q.  Have you ever offered testimony under oath

21    in a court of law?

22         A.  No, sir.

23         Q.  Or in any arbitration proceeding?

24         A.  No, sir.

25         Q.  Before agreeing to participate in this
```

```
 1    lawsuit had you ever been a party to any other

 2    lawsuit, either as a plaintiff or as a defendant?

 3         A.  No, sir.

 4         Q.  Have you ever participated in any sort of

 5    class action or putative collection action under the

 6    Fair Labor Standards Act?

 7         A.  No.

 8         Q.  Do I understand your testimony correctly to

 9    be that you've never been sued by anyone?

10         A.  Correct, sir.

11         Q.  And have you ever declared bankruptcy?

12         A.  No, sir.

13         Q.  Have you ever been arrested?

14         A.  No, sir.

15         Q.  Mr. Destin, what is your date of birth?

16         A.  REDACTED   1989.

17         Q.  And where were you born?

18         A.  Orleans, France.

19         Q.  And for how long between your birth -- for

20    how long after your birth did you reside in France?

21         A.  Until 17 years of age.

22         Q.  And you are currently 24.

23         A.  Correct.  I moved to the United States, I

24    was 18.

25         Q.  All right.  And help me, my math is not
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

 1    triggering this early.  What year did you come to

 2    the U.S.?

 **3         A.  2008.**

 4         Q.  2008.

 **5         A.  Yes.**

 6         Q.  Where do you currently reside?

 **7         A.  Las Vegas, Nevada.**

 8         Q.  Can you give me your current address?

 **9         A.  Of course, REDACTED                     89031, Las**

**10    Vegas, Nevada.**

11         Q.  And for how long did you lived at that

12    address?

**13         A.  About two years.**

14              MR. WOLFE:  I should have said this, but

15    the portions of the transcript with his e-mail and

16    personal address, we'd like those designated

17    confidential.

18              MR. BLACK:  I understand.  I think there's

19    a procedure in the protective order that designates

20    it after the fact.

21              MR. WOLFE:  Okay, sorry.

22              MR. BLACK:  Not a problem.

23    BY MR. BLACK:

24         Q.  You said for about two years?

**25         A.  Yes.**

```
 1        Q.  All right.  And do you own or rent that

 2   property?

 3        A.  I own it.

 4        Q.  Is that a property that you've had on the

 5   market at some point in the last year or two?

 6        A.  Yes.

 7        Q.  Do you still own it, though?

 8        A.  Yes.

 9        Q.  Is it still on the market?

10        A.  Yes.

11        Q.  And where did you reside before you resided

12   at REDACTED             ?

13        A.  I resided REDACTED               North

14   Las Vegas.

15        Q.  And for how long did you reside at that

16   address?

17        A.  About -- I'm just trying to come back --

18   about a year.

19        Q.  Did you own or rent that property?

20        A.  I rented.

21        Q.  And so between sometime in 2011 and the

22   present you've lived at the REDACTED        address,

23   and the year prior to that you lived at the REDAC
                                                  TED

24   REDACTED          address.

25        A.  Yes.
```

1        Q.  Are there any other addresses at which you

2    have resided in Las Vegas?

3        **A.  Yes, I lived six months, it was a condo,**

4    **I'm sorry, I can't recall the address off the top of**

5    **my head.  I was there six months, and I was in**

6    **between** REDACTED

7        Q.  Was it REDACTED                                    ?

8        **A.  No, that's another property I own.**

9        Q.  Okay.  And was it REDACTED

10   REDACTED   ?

11       **A.  That's another property I own, but I never**

12   **lived there.**

13       Q.  When did you purchase the REDACTED

14   REDACTED    address?

15       **A.  July 2012.**

16       Q.  When did you purchase the REDACTED

17   address?

18       **A.  November 2012.**

19       Q.  Are you renting those properties currently?

20       **A.  Yes.**

21       Q.  Are there any other properties that you

22   own --

23       **A.  No.**

24       Q.  -- besides the REDACTED         address?

25       **A.  No, sir.**

1      Q.   And did any of the prior questions refresh

2   your recollection about the address at which you

3   resided between REDACTED                              ?

4        **A.   I can't recall the address.**

5        Q.   You still can't recall the address?

6        **A.   Yeah, yeah, the -- I didn't stay there long**

7   **enough to remember.**

8        Q.   It was still in Las Vegas?

9        **A.   It was still in Las Vegas, yes.**

10       Q.   At some point you lived in New York; is

11   that right?

12       **A.   Yes, sir.**

13       Q.   When you first came to the United States

14   where did you reside?

15       **A.   I lived in Orlando, Florida.**

16       Q.   And for how long did you live in Orlando?

17       **A.   About three months.**

18       Q.   Where did you move after that?

19       **A.   I moved to New York.**

20       Q.   New York City?

21       **A.   New York City, yes.**

22       Q.   And for how long did you live in New York

23   City?

24       **A.   I lived in New York City for about a year.**

25       Q.   And where did you move after you lived in

```
 1    New York City?

 2         A.   I moved to Australia, Sidney.

 3         Q.   You lived in Melbourne?

 4         A.   Yes, Melbourne and Sidney, correct.

 5         Q.   And you went to school in Australia?

 6         A.   I did go to school, yes.

 7         Q.   Where did you go to school in Australia?

 8         A.   I went to Brighton University.

 9         Q.   How long?

10         A.   I went there for six months.

11         Q.   Did you earn a degree?

12         A.   Associate degree.

13         Q.   After that six months did you move back to

14    the United States?

15         A.   Yes, I -- I was in Australia for a year.

16         Q.   Okay.

17         A.   Six months in Sidney, six months in

18    Melbourne, and then I moved back to the United

19    States, Las Vegas, Nevada.

20         Q.   What prompted your move to Australia?

21         A.   I'm sorry?

22         Q.   What prompted your move to Australia?

23         A.   What do you mean?

24         Q.   What was the reason for moving to

25    Australia?
```

```
 1          A.  I needed a change.

 2          Q.  And then after your year in Australia you

 3   returned and then you moved to Las Vegas?

 4          A.  Correct.

 5          Q.  Where you have been since.

 6          A.  Yes.

 7          Q.  Mr. Destin, how many different e-mail

 8   addresses do you have?

 9          A.  As far as today?  One.

10          Q.  What is that e-mail address?

11          A.  Jordan.Destin@Yahoo.com.

12          Q.  At one time did you have an e-mail address

13   JordanDestin@gmail.com?

14          A.  Yes, sir.

15          Q.  Do you no longer have that e-mail address?

16          A.  I no longer have that e-mail address.

17          Q.  Is it that you no longer use it or you have

18   taken steps to eliminate the address?

19          A.  I took steps to eliminate the e-mail

20   address.

21          Q.  That is, you contacting Google and asked to

22   have it eliminated?

23          A.  Yes, sir.

24          Q.  When did you do that?

25          A.  About two years ago.
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1          Q.  So in the 2011 timeframe?

 2          A.  Yes.

 3          Q.  Was it early, late 2011, do you recall?

 4          A.  Late 2011.

 5          Q.  What prompted you to contact Google to ask

 6     to have that e-mail address eliminated?

 7          A.  Oh, I just deleted it.

 8          Q.  Was that before or after your association

 9     with World Financial Group?

10          A.  It was after my association with World

11     Financial Group.

12          Q.  Do you recall whether at any time you

13     utilized that e-mail address in connection with

14     World Financial Group --

15          A.  Yes.

16          Q.  -- in any way?

17          A.  I recall I used my personal e-mail address,

18     so it was gmail.

19          Q.  If I understand correctly, during -- we're

20     going to talk much more, in much more detail about

21     your association with World Financial Group.  As I

22     understand it, during the time that you were

23     associated with World Financial Group you used your

24     personal e-mail, that is JordanDestin@gmail.com.

25          A.  Yes, sir.
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1          Q.  But after you stopped your association with

2     World Financial Group you took steps to have that

3     e-mail account eliminated, correct?

4          **A.  Yes, sir.**

5          Q.  When you had it eliminated did you take any

6     steps to preserve any of the e-mails that were a

7     part of that account, either e-mails you had

8     received or sent?

9          **A.  No, sir.**

10          Q.  Since the time that you became an opt-in

11     plaintiff in this lawsuit have you done anything to

12     contact Google to see if any of those e-mails are

13     recoverable still?

14          **A.  Yes, sir.**

15          Q.  You have.

16          **A.  Uh-huh.**

17          Q.  When did you do that?

18          **A.  About last week.**

19          Q.  How did you go about contacting Google?

20          **A.  By e-mail.**

21          Q.  Do you remember, was there a particular

22     person at Google that you contacted?

23          **A.  No, it's just the regular service, when you**

24     **go into your gmail services you can try to recover**

25     **an e-mail address.  But if it's been too long, they**

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1    just don't recover it.

 2         Q.  And so your testimony is that last week you

 3    tried to recover your original Google mail or gmail

 4    address.  Did you receive any response from Google?

 5         A.  No, they just told me directly, We can't

 6    recover anything.

 7         Q.  So you did receive a response.

 8         A.  Yes.

 9         Q.  The response was, We can't recover it.

10         A.  Correct, yes.

11         Q.  After receiving that message from Google

12    did you take any other steps to see if there was the

13    possibility of trying to recover it?

14         A.  No.

15         Q.  Did you -- at the same time that you had

16    that gmail address you also had the

17    JordanDestin@Yahoo.com address, correct?

18         A.  Yes, sir.

19         Q.  Was there ever any occasions when you may

20    have communicated between those two addresses or

21    communicated in a way where you copied the other

22    address?

23         A.  I don't recall.

24         Q.  The response that you received from Google,

25    how was that communicated to you?
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1        A.   Directly from the website.

 2        Q.   Did you receive an e-mail from them?

 3        A.   No, it was not an e-mail, it was directly

 4   from the website.  When you try to log in and you

 5   try to enter your information to recover your e-mail

 6   address they told me directly my account has been

 7   deleted and it's no longer recoverable.

 8        Q.   I understand that you received that message

 9   directly from the website.  When you tried to find

10   out about recovering the e-mail did you take any

11   steps to try to contact anyone particular at Google

12   to see if you could recover that information?

13        A.   No, sir, I did not.

14        Q.   The JordanDestin@Yahoo.com address, did you

15   ever use that during the time that you were

16   associated with World Financial Group for anything

17   related to World Financial Group?

18        A.   No, sir.

19        Q.   Since the time that you have joined this

20   lawsuit as an opt-in plaintiff have you taken steps

21   to check your Jordan Destin@Yahoo.com address to see

22   if there were any e-mails relating to World

23   Financial Group?

24        A.   Yes, sir.

25        Q.   How did you go about doing that?
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1        A.   Keyword, and history of e-mail, sent
 2   e-mail.
 3        Q.   What keyword or keywords do you use?
 4        A.   World Financial Group.
 5        Q.   Others?  Any others?
 6        A.   Financial product.
 7        Q.   Any others?
 8        A.   No, sir.
 9        Q.   Did you conduct any key word searches using
10   the names of anyone with whom you might have been
11   associated while you were associated with World
12   Financial Group?
13        A.   I did look up names.
14        Q.   What names did you look up?
15        A.   Aline, A-L-I-N-E, Laura, L-A-U-R-A,
16   Christian, Jennifer.
17        Q.   Any others?
18        A.   No.
19        Q.   And it is your testimony today that despite
20   those key word searches you did not find any e-mail
21   at all that related to your association with World
22   Financial Group?
23        A.   Yes, sir.
24        Q.   Besides the two e-mail addresses that we've
25   talked about, are there any other e-mail addresses
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    that you have had in the last three years?

 2        A.   I had a Jordan.Destin@aol.com.

 3        Q.   When did you have that address?

 4        A.   I can't recall.  2010, it would be.

 5        Q.   Did you ever use that address for anything

 6    related to World Financial Group?

 7        A.   I do not recall, sir.

 8        Q.   Maybe that you did and you can't recall, or

 9    you do not recall doing so?

10        A.   Maybe I did and I cannot recall.

11        Q.   With regard to that account, have you done

12    anything to search that e-mail account to see if you

13    have any e-mails related to World Financial Group?

14        A.   I didn't contact AOL, no.

15        Q.   And did you try to access that e-mail

16    account online to see if it was still accessible?

17        A.   It's no longer accessible.

18        Q.   In the last -- since July of this year when

19    you opted into this lawsuit have you tried to access

20    it for the specific purpose of trying to locate any

21    e-mails related to World Financial Group?

22        A.   I tried to log in to see if the e-mail was

23    still valid, and it's no longer valid.

24        Q.   But you didn't contact AOL in the same way

25    that you contacted Google.
```

1       A.  No, sir.

2       Q.  Why not?

3       A.  I didn't just go into it any further with

4   AOL.

5       Q.  Mr. Destin, during the time that you were

6   associated with World Financial Group did you have a

7   personal computer?

8       A.  Yes, sir.

9       Q.  And what type of personal computer was

10  that?

11      A.  It was Toshiba.

12      Q.  Was that a desktop or a laptop?

13      A.  It was a laptop.

14      Q.  Do you still have that laptop?

15      A.  No, sir.

16      Q.  Do you remember when you acquired that

17  laptop?

18      A.  When I was required the laptop?

19      Q.  When did you acquire it?

20      A.  Oh, 2009.

21      Q.  And when did you cease to have that laptop?

22      A.  2011.

23      Q.  Do you recall when in 2011 that you

24  discarded that laptop?

25      A.  I would say mid 2011, August, July.

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

 1          Q.   When you discarded that laptop did you save

 2     the hard drive?

 3          **A.   Yes, sir.**

 4          Q.   Do you still have the hard drive?

 5          **A.   I kept informations, yes.**

 6          Q.   The Toshiba laptop that you discarded for

 7     which you kept the hard drive, is that the computer

 8     through which you would have conducted -- strike

 9     that.

10          The Toshiba laptop that we're talking

11     about, is that the computer that you would have used

12     to have accessed the three e-mail accounts we've

13     been discussing, that is the AOL account, the gmail

14     account and the Yahoo account?

15          **A.   Primarily, yes.**

16          Q.   You said primarily.  Were there other

17     computers that you used to access those accounts?

18          **A.   My teammate computer.**

19          Q.   When you say your teammate, who are you

20     referring to?

21          **A.   It could be Aline, it could be**

22     **Ms. Jennifer, Christian as well.**

23          Q.   These are all individuals whom you have

24     said had some association with World Financial Group

25     as well?

```
 1        A.   Correct.

 2        Q.   You mentioned Laura earlier too.  Might you

 3   have used her computer?

 4        A.   No.

 5        Q.   So just Aline, Jennifer and Christian?

 6        A.   Yes, sir.

 7        Q.   With regard to the hard drive that we just

 8   talked about a minute ago, as I understand you still

 9   have possession of the hard drive?

10        A.   I still have the file and documents like

11   pictures, music, whatever was on that Toshiba, it

12   got transferred to my external hard drive, so yes.

13        Q.   When did you transfer that?

14        A.   Before I sell the computer.

15        Q.   And when you transferred it did you

16   transfer the contents of the entire hard drive?

17        A.   I transferred everything I could keep.

18        Q.   Did you transfer e-mail files when you did

19   that?

20        A.   No, sir.

21        Q.   When you say you transferred it, you

22   transferred it to what?

23        A.   External hard drive.

24        Q.   What type of external hard drive?

25        A.   It's called Passport hard drive, one
```

```
 1   gigabyte.

 2        Q.  And you still have that?

 3        A.  Yes, sir.

 4        Q.  Since July of 2013 when you became an

 5   opt-in plaintiff in this case have you done anything

 6   to search the contents of that Passport hard drive,

 7   external hard drive, to see if there's any

 8   information on there related to World Financial

 9   Group?

10        A.  Yes, sir.

11        Q.  When did you do that?

12        A.  It was -- I've done it within the last few

13   weeks.  It was in August, September.

14        Q.  And walk me through what you did to search

15   that external hard drive for documents related to

16   World Financial Group.

17        A.  So key words mainly, such as World

18   Financial Group, scanned document.  Any information

19   relevant to the case, I was looking for.

20        Q.  When you say key words, did you search for

21   the same key words you identified earlier or were

22   there any --

23        A.  Yes, sir.

24        Q.  -- different ones that you used?

25        A.  No.
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1        Q.   The same key words?

**2        A.   Yes.**

3        Q.   Did you specifically search for e-mail on

4    that --

**5        A.   Yes, sir.**

6        Q.   -- Passport hard drive?

**7        A.   Yes, sir.**

8        Q.   Did you find any e-mail at all?

**9        A.   No.**

10       Q.   You said that you had discarded the -- or I

11   guess sold the Toshiba laptop in the middle of 2011?

**12       A.   Yes, sir.**

13       Q.   Did you obtain a new computer when you did

14   that?

**15       A.   Not right away, but yes, I did obtain a**

**16   computer.**

17       Q.   When did you obtain a computer?

**18       A.   About two months later.**

19       Q.   Do you recall when that was?

**20       A.   September 2011.**

21       Q.   What type of computer was that?

**22       A.   I bought a -- an HP.**

23       Q.   Is that a desktop or a laptop?

**24       A.   A laptop, sir.**

25       Q.   Do you still have that?

```
 1        A.   No, sir.

 2        Q.   For how long did you have that HP laptop?

 3        A.   About six months.

 4        Q.   And did the -- during the time you had the

 5   HP laptop did that overlap at all with the time that

 6   you were associated with World Financial Group?

 7        A.   No, sir.

 8        Q.   Tell me when your relationship with World

 9   Financial Group terminated.

10        A.   June 2011.

11        Q.   And so you didn't acquire the HP laptop

12   until after that?

13        A.   Yes, sir.

14        Q.   Did you transfer any of the files from the

15   Toshiba laptop onto the HP laptop?

16        A.   Yes, the document I was able to save such

17   as pictures, music, photos, I transferred to my new

18   computer.

19        Q.   This is the information from your Passport

20   hard drive?

21        A.   Yes, sir.

22        Q.   Was that Passport hard drive the only hard

23   drive that you used to pull information off of the

24   Toshiba laptop?

25        A.   Yes, sir.
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1        Q.   And do you have a -- do you currently have

2    a computer?

3        **A.   No.**

4        Q.   You have no computer at all?

5        **A.   Well, I have a computer, but it's not --**

6    **that's not mine.**

7        Q.   Okay.   What do you mean by that?

8        **A.   It's my wife's computer.**

9        Q.   Do you use that computer?

10       **A.   Yeah, I do.**

11       Q.   Since the time that you joined this lawsuit

12   as an opt-in plaintiff in July of 2013 have you

13   searched that computer for any information or

14   documents relating to your association with World

15   Financial Group?

16       **A.   Yes, sir.**

17       Q.   And did you find anything?

18       **A.   No, sir.**

19       Q.   Do you have a home phone number?

20       **A.   No.**

21       Q.   Did you have a home phone number at the

22   time that you were associated with World Financial

23   Group?

24       **A.   No, sir.**

25       Q.   And when I say home phone number I mean --

1   I think maybe you've interpreted that as a land

2   line.

3      **A.   Correct.**

4      Q.   So if I understand correctly, dating back

5   to the time before you were associated with World

6   Financial Group through the present, you've not had

7   a land line.

8      **A.   Yes, sir, correct.**

9      Q.   You've only had a cell phone?

10      **A.   Yes, sir.**

11      Q.   And as I understand it, you've identified

12   to us the cell phone that you had during the time

13   that you were associated with World Financial Group

14   was a telephone for which the service provider was

15   Cricket; is that right?

16      **A.   Yes, sir.**

17      Q.   Do you recall what kind of phone that was?

18      **A.   Standard phone.  I can't recall the brand,**

19   **no, I can't even recall the brand, to be honest with**

20   **you.**

21      Q.   And was that the only phone that you had

22   during the time period that you were associated with

23   World Financial Group?

24      **A.   That would be the only phone I had, yes,**

25   **sir.**

1     Q.  And I've asked you a number of questions

2  today with regard to the period during which you

3  were associated with World Financial Group, and let

4  me just make sure we set that out at the onset.

5          Do you recall that you signed an Associate

6  Membership Agreement in early October of 2010.

7     **A.  I did sign paperwork.**

8     Q.  Do you recall the date?

9     **A.  I can't recall the date, sir.**

10         (Plaintiffs' Exhibit 13 marked)

11  BY MR. BLACK:

12     Q.  Mr. Destin, I'm just showing you what's

13  been marked as Exhibit 13.  And I will represent to

14  you that this is a copy of an Associate Membership

15  Agreement.  And if you flip -- let me mention one

16  thing to you.  On some of the documents that I'll

17  show you today you will note that there are some --

18  there's a numbering system on some of these.

19     **A.  Okay.**

20     Q.  Those are documents that World Financial

21  Group has produced as part of this litigation.

22     **A.  Okay.**

23     Q.  If you look in the bottom right-hand corner

24  on this very first page of the document you'll see a

25  reference to WFG_001503.  Do you see that?

```
 1        A.  Yes, sir.

 2        Q.  That's what we refer to as a Bates number.

 3        A.  Okay.

 4        Q.  So during the course of the deposition if I

 5   show you a document that has been produced by World

 6   Financial Group, I may refer you to those Bates

 7   numbers.  It allows us to allow you to quickly refer

 8   to a page of a document, okay?

 9        A.  Okay.

10        Q.  If you would, would you turn to the Bates

11   number WFG_001521, please.  And if you look at that

12   page, does that reflect your electronic signature

13   and a date of October 9th, 2010?

14        A.  It's my name.

15        Q.  Okay.  Do you recall signing an Associate

16   Membership Agreement, electronically or otherwise?

17        A.  I do not recall, sir.

18        Q.  You may have, you just don't recall?

19        A.  Correct.

20        Q.  That is your name, though, correct?

21        A.  Yes, yes.

22        Q.  Take a look also, if you will, at page

23   WFG_001515.  And here there is another electronic

24   signature above the line print name.  That is, in

25   fact, your name, correct?
```

1       A.  Correct.

2       Q.  And above signature, that is your name?

3       A.  Yes, sir.

4       Q.  And the date here is October 9th of 2010,

5   correct?

6       A.  Correct.

7       Q.  And as I understand it, Mr. Destin, you're

8   not testifying that you didn't enter into an

9   associate management agreement, you just don't

10  recall?

11      A.  Yes, sir, correct.

12      Q.  Does this document help refresh your

13  recollection at all as to the timeframe during which

14  you were associated with World Financial Group?

15      A.  It does bring back information, yes.

16      Q.  All right.  And is it the case that your

17  association with World Financial Group began in or

18  about October of 2010?

19      A.  It started actually in September of 2010.

20      Q.  All right.  Despite the fact that this

21  agreement is dated October.

22      A.  Yes, sir, correct.

23      Q.  And how did you become associated with

24  World Financial Group in September of 2010?

25      A.  Well, I responded to an on-line posting for

 1   a job position in marketing.

 2        Q.   Where was that posted?

 3        A.   On Craig's List.

 4        Q.   Do you recall who had made that posting?

 5        A.   Yes.

 6        Q.   Who?

 7        A.   Aline.

 8        Q.   And what is Aline's last name?

 9        A.   B-A-L-A.

10        Q.   And Aline had, as I understand it, put what

11   you understood to be a job posting on Craig's List?

12        A.   Yes, sir.

13        Q.   From marketing?

14        A.   Yes, sir.

15        Q.   And you responded to that?

16        A.   Yes, sir.

17        Q.   And when you responded to that did you

18   respond directly to Aline?

19        A.   I sent an e-mail out to the person who

20   wrote the post, so yes.

21        Q.   You learned at that point that that was

22   Aline?

23        A.   Yes.

24        Q.   Do you have any information, Mr. Destin, to

25   suggest that World Financial Group corporate had

1    posted that Craig's List ad?

**2          A.   The name World Financial Group wasn't**

**3    mentioned.**

4          Q.   The name World Financial Group wasn't even

5    mentioned.

**6          A.   It wasn't even mentioned.**

7          Q.   And so my question was:  Do you have any

8    information to suggest that World Financial Group,

9    the corporate entity, had posted that Craig's List

10   ad?

**11         A.   No, sir.**

12         Q.   When you got in touch with Aline did she

13   tell you that World Financial Group, the corporate

14   entity, had posted that Craig's List ad?

**15         A.   No, sir.**

16         Q.   Did anyone ever tell you that World

17   Financial Group, the corporate entity, had posted

18   that Craig's List ad?

**19         A.   I can't recall, but no.**

20         Q.   When you responded to that ad did you speak

21   to anyone at World Financial Group corporate?

**22         A.   Corporate?**

23         Q.   Yes.

**24         A.   No, sir.**

25         Q.   Have you ever spoken to anyone at World

```
 1    Financial Group corporate?

 2         A.   Can you define corporate for me?

 3         Q.   Sure.  Do you understand that World

 4    Financial Group is a company?

 5         A.   Of course.

 6         Q.   Do you understand that World Financial

 7    Group's headquarters is located in Georgia?

 8         A.   Yes, sir.

 9         Q.   It's located in Johns Creek, Georgia?

10         A.   Yes, sir.

11         Q.   And that company has corporate officers and

12    employees?

13         A.   Uh-huh.

14         Q.   My question to you is:  Have you ever

15    spoken to any corporate officers or employees of

16    World Financial Group?

17         A.   Yes, sir.

18              MR. WOLFE:  Objection, calls for a legal

19    conclusion.

20    BY MR. BLACK:

21         Q.   To whom did you speak?

22         A.   I spoke to the lady who's in charge of the

23    maintenance of the website to reset your password

24    and user name.

25         Q.   Do you remember her name?
```

1        A.  I don't know, sir.

2        Q.  Aside from the lady in charge of

3    maintenance of the World Financial Group website,

4    have you spoken to anyone else at World Financial

5    Group corporate?

6        A.  Corporate, no, sir.

7        Q.  All right.  The lady in charge of

8    maintenance of the website, what was the purpose of

9    your interaction with her?

10        A.  When I was logged out from my account on

11    World Financial Group, I was actually -- I had to

12    call her and reset the password and reset all the

13    information to be able to log back in.

14        Q.  And was that the sole purpose of your call?

15        A.  Yes, sir.

16        Q.  Was she able to help you with that?

17        A.  Yes, sir.

18        Q.  Was there only one call to her or were

19    there multiple calls?

20        A.  There was only one call.

21        Q.  And during -- how long did that call last?

22        A.  15 minutes.

23        Q.  During that 15-minute call did the -- and

24    I'm calling her this simply because we don't have a

25    name -- did the lady in charge of maintenance of the

1    World Financial Group website provide any

2    instruction to you on how you were to function in

3    your capacity as an associate with World Financial

4    Group?

**5        A.  No, sir.**

6        Q.  Did she provide any instruction on any

7    duties that you were to undertake?

**8        A.  No, sir.**

9        Q.  Have you ever had an e-mail communication

10   with anyone at World Financial Group corporate?

**11       A.  I received a welcome e-mail.**

12       Q.  And I think you produced that e-mail,

13   correct?

**14       A.  Yes, sir.**

15       Q.  Aside from that e-mail have you had any

16   e-mail correspondence with anyone at World Financial

17   Group corporate?

**18       A.  No, sir.**

19       Q.  And we'll take a look at that e-mail, but

20   as I recall that e-mail simply welcomed you to World

21   Financial Group as an independent contractor,

22   correct?

**23       A.  It was a welcome e-mail, correct.**

24       Q.  And did that e-mail provide any direction

25   or instruction to you on how you were to carry out

 1   any responsibilities or duties during your

 2   association with World Financial Group?

 **3        A.  Not that e-mail, no.**

 4        Q.  And you didn't have any other e-mail

 5   communications, correct?

 **6        A.  No, sir.**

 7        Q.  And you had no telephone communications

 8   other than the one 15-minute call with the lady who

 9   maintains the World Financial Group website,

10   correct?

**11        A.  With corporate?**

12        Q.  Correct.

**13        A.  Yes, sir.  That was the only phone call.**

14        Q.  All of your other communications relating

15   to World Financial Group were with individuals

16   located in Las Vegas?

**17        A.  In Las Vegas and California, sir.**

18        Q.  Who in California did you interact with?

**19        A.  Ms. Laura Chang and Mr. Don Chang, husband**

**20   and wife.**

21        Q.  And how were they affiliated with World

22   Financial Group, if you know?

**23        A.  They were my CEO of marketing.**

24        Q.  Did you say CEO?

**25        A.  CEO marketing supervising, if I can recall**

1   the title, CEO marketing.

2        Q.  Other than that, other than Laura and Don,

3   pardon me, did you have any communications with

4   anyone associated with World Financial Group outside

5   of Las Vegas?

6        A.  Outside of Las Vegas, no.

7        Q.  If you would, please take a look at page

8   WFG_001506 of this document that I have before you,

9   which is Exhibit Number -- I should have said this

10  at the start.  This has been marked as Exhibit

11  Number 13.

12       A.  Okay.

13       Q.  The reason that it's been marked 13, it's a

14  bit out of order from the first three that I've

15  shown you, is we had some marked prior to the

16  deposition, but I wanted to show you this to try and

17  help your recollection.  So this will be marked 13,

18  and the next time I show you a document we may go

19  back to 4.  I just don't want to confuse you.

20       A.  Okay.  No problem.

21       Q.  So this document, WFG_001506, there's

22  information here regarding you, some personal

23  information, correct?

24       A.  Yes, sir.

25       Q.  Do you recall providing personal

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    information to World Financial Group?

 2         A.  Yes, sir.

 3         Q.  Do you recall completing this profile?

 4         A.  Yes, sir.

 5         Q.  And this is a part of the Associate

 6    Membership Agreement, correct?

 7         A.  Yes, sir.

 8         Q.  And I asked you earlier whether you had

 9    completed an Associate Membership Agreement.  Does

10    this help refresh your recollection at all as to

11    whether you, in fact, completed an Associate

12    Membership Agreement?

13         A.  Yes.

14         Q.  Do you recall in addition to completing an

15    Associate Membership Agreement you also paid an

16    amount of $100 to become a member of World Financial

17    Group?

18         A.  Yes, sir.

19         Q.  And you paid that amount after you

20    responded to the Craig's List ad that was posted by

21    Aline, correct?

22         A.  It took about three weeks.

23         Q.  You understood that to become associated

24    with World Financial Group you would have to

25    complete the Associate Membership Agreement and
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    submit the payment of $100; is that right?

 2        A.   Yes.

 3        Q.   And you did that.

 4        A.   Yes.

 5        Q.   At the time that you entered into the

 6    associate management agreement, membership

 7    agreement, would you have read the document before

 8    you signed it?

 9        A.   I read the document.

10        Q.   Did you understand it?

11        A.   Not the whole content, but yes.

12        Q.   Did you seek out any clarification of parts

13    that you didn't understand?

14        A.   I did.

15        Q.   You did?

16        A.   Uh-huh.

17        Q.   From whom?

18        A.   From whoever was above me, so people in my

19    team.

20        Q.   Do you recall specifically who it was that

21    you sought out information about parts of the

22    Associate Membership Agreement that you wanted

23    clarification for?

24        A.   The person was named Christian.

25        Q.   Is that Christian Nga?
```

1        A.  Yes, N-G-A.

2        Q.  Now, who was the individual associated with

3   World Financial Group who recruited you to become a

4   member of World Financial Group?

5        A.  Aline.

6        Q.  It was Aline.

7        A.  Yes, sir.

8        Q.  But you sought out information from

9   Christian with regard to the Associate Membership

10  Agreement?

11       A.  Yes.

12       Q.  Do you recall specifically what you asked

13  Christian about in this agreement?

14       A.  Well, I wanted to know what was the company

15  exactly about.

16       Q.  What did Christian tell you?

17       A.  Well, basically he told me that you're a

18  financial advisor, and you sell product, financial

19  product.  You recruit people, and you're under the

20  World Financial Group business.

21       Q.  I'm sorry, what was the last thing?

22       A.  You're under the World Financial Group

23  umbrella, so you're under the company name.

24       Q.  And Christian told you that you were a

25  financial advisor?

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1          A.  Yes.

2          Q.  Did you understand that in order to sell

3    any securities or financial products you needed to

4    become licensed?

5          A.  I didn't know at the time.

6          Q.  Did Christian lead you to believe that you

7    could sell financial services products or securities

8    without a license?

9          A.  He told me it was possible to join the

10   company, regardless of having your license or not.

11         Q.  That is, it was possible to become a member

12   of World Financial Group, whether you were licensed

13   or not?

14         A.  Yes, sir.

15         Q.  Why did you join World Financial Group?

16         A.  I was interested in the marketing side of

17   it, and I wanted to get to know more about the

18   company itself.

19         Q.  And you understood that by becoming a

20   member you could learn more about the company?

21         A.  Yes.

22         Q.  Did you understand that by becoming a

23   member you could possibly at some point become

24   licensed and sell securities?

25         A.  Yes.

1      Q.  Did you understand that by becoming a

2    member at some point you might be able to become

3    licensed and to sell insurance products?

4      **A.  Well, yes.**

5      Q.  And did you understand that whether you

6    became licensed or not is entirely up to you?

7      **A.  No.**

8      Q.  You did not?

9      **A.  I did know it was only up to me.**

10     Q.  What did you think?

11     **A.  Well, the company, what I've been told was**

12   **the company would help you -- provide you all the**

13   **tools, provide you everything you need for you to be**

14   **licensed.**

15     Q.  When you say the company would provide

16   tools, who told you that?

17     **A.  The same people I worked with.**

18     Q.  That is Aline?

19     **A.  Aline, Christian.**

20     Q.  Christian.

21     **A.  Uh-huh.  People I would refer to.**

22     Q.  I just want to make sure that when we refer

23   to this we're referring to a complete list.  So

24   Aline, Christian, you mentioned Jennifer.

25     **A.  Jennifer, she was another associate.**

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1          Q.   What did you understand Aline's role to be

 2    with World Financial Group?

 3          A.   I wasn't quite sure in the beginning, but

 4    she talked me through it, and she basically wanted

 5    me to join as soon as possible.  It was really pushy

 6    at the beginning.

 7          Q.   She pushed you hard to join?

 8          A.   Her and the other people too.

 9          Q.   Did you understand what her role was; that

10    is, was she also an associate?

11          A.   I didn't know what title she had at the

12    beginning.

13          Q.   Did you come to understand what her title

14    was eventually?

15          A.   Yes.

16          Q.   What was her title?

17          A.   Associate.

18          Q.   And Christian, did you come to understand

19    that he was an associate?

20          A.   I came to an understanding that he was a

21    marketing agent, a senior marketing.

22          Q.   Senior marketing director?

23          A.   Yes, sir, senior marketing director.

24          Q.   And Jennifer, did you come to an

25    understanding of what her role was?
```

```
 1          A.   An associate.

 2          Q.   Are you familiar with the term upline?

 3          A.   No, sir.

 4          Q.   The individual who recruited you was Aline,

 5    correct?

 6          A.   Yes, sir.

 7          Q.   Did you have an understanding of who

 8    recruited her?

 9          A.   Yes, sir.

10          Q.   Who was that?

11          A.   Christian.

12          Q.   Did you have an understanding of who

13    recruited Jennifer?

14          A.   I'm not sure.

15          Q.   Did you have an understanding of who

16    recruited Christian?

17          A.   Yes, his name Stefan.

18          Q.   Do you remember his last name?

19          A.   M-U-S-S-A.

20          Q.   Stefan Mussa?

21          A.   Yes.

22          Q.   Do you have any understanding what his role

23    was?

24          A.   Not clearly, not clearly.

25          Q.   At the time that you signed the Associate
```

1    Membership Agreement and became a member of World

2    Financial Group did any of Aline, Christian or

3    Jennifer tell you that by signing the agreement you

4    were becoming an employee of World Financial Group?

5        **A.   No.  I've just been told I will join the**

6    **company.**

7        Q.   But no one told you you were becoming an

8    employee, correct?

9        **A.   I don't recall.**

10       Q.   You have been an employee of other

11   companies, correct?

12       **A.   Yes, sir.**

13       Q.   You were an employee of Macy's.

14       **A.   Yes, sir.**

15       Q.   You were an employee of Abercrombie &

16   Fitch.

17       **A.   Yes, sir.**

18       Q.   You're currently an employee of Expedia.

19       **A.   Yes, sir.**

20       Q.   At the time that you became associated with

21   those companies were you required to fill out

22   certain federal paperwork for tax purposes that one

23   would fill out as an employee?

24       **A.   Yes, sir.**

25       Q.   Were you asked to fill out that information

Cohen vs. World Financial Group        Jordan Destin        10/08/2013

1    for World Financial Group?

**2        A.  I don't remember.**

3        Q.  You can't recall one way or the other?

**4        A.  I don't remember, I don't.**

5        Q.  We talked earlier about whether you

6    understood you could sell securities or financial

7    products.

**8        A.  Uh-huh.**

9        Q.  Was it your understanding that the sales of

10   securities and insurance was through entities other

11   than World Financial Group?

**12       A.  Well, we talked me through it that World**

**13   Financial Group was actually the middle man, and**

**14   that we had vendors.  We were representing, you**

**15   know, products, and we were basically trying to sell**

**16   those products, like TransAmerica, World Life.**

17       Q.  But the products were not from World

18   Financial Group, correct?

**19       A.  But they were represented by World**

**20   Financial Group.**

21       Q.  Understood.  But you said there was a third

22   party, correct?

**23       A.  It was a third party, correct.**

24       Q.  If you would, take a look at page WFG

25   001510.  And I want to direct your attention to the

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

 1    second paragraph on this page.  Do you see the

 2    language where it says, quote, Whereas, the

 3    Associate desires to become a member of WFG's

 4    independent sales force (hereinafter referred to as

 5    "World Financial Group" and further defined herein)

 6    which will be composed of a group of independent

 7    contractors ("members") who enter into agreements

 8    with WFG pursuant to which they become authorized to

 9    engage in the business of selling products including

10    insurance and other financial Products and Services,

11    as defined herein offered by WFG, end quote, and it

12    goes further.

13              Do you see that paragraph?

**14         A.   No, I'm sorry, actually.**

15         Q.   It's the second paragraph right there.

**16         A.   Oh, there you go.   Okay.**

17         Q.   And what I just read into the record were

18    the first three and a half lines.

**19         A.   Okay.**

20         Q.   And my question to you is:  At the time you

21    signed this did you understand that by joining World

22    Financial Group you were becoming -- you were

23    essentially joining an independent sales force?

24              MR. WOLFE:  Objection.

**25         A.   No, I didn't know.**

1      Q.   Did you talk to either Christian or Aline

2   about what your role was with World Financial Group?

3      **A.   Well, they told me what to do.**

4      Q.   Okay.

5      **A.   And how to do things.**

6      Q.   Okay.  So they told you what to do and how

7   to do things?

8      **A.   Correct.**

9      Q.   Do you have any information to suggest or

10   to demonstrate that anyone from World Financial

11   Group corporate, whether a corporate officer or

12   employee, was providing information instructing you

13   on what to do?

14      **A.   I can -- yeah, I could provide you**

15   **information.**

16      Q.   What evidence do you have of that?

17      **A.   I mean, the knowledge I got about the**

18   **product, the sales technique that World Financial**

19   **Group was asking their workers to apply and the**

20   **recruiting part as well, you know.**

21      Q.   And as I understand it, unless I

22   misunderstood your testimony, you've only had one

23   communication with anyone associated with World

24   Financial Group corporate, and that was with the

25   woman who maintains the website, correct?

1        **A.   Correct, yes.**

2        Q.   All of your other communications were with

3    Aline and Christian and Jennifer, the folks that you

4    referred to as your teammates, correct?

5        **A.   Yeah, correct, and people representing the**

6    **brand.**

7        Q.   And my question to you is:  As you sit here

8    today can you identify for me any WFG corporate

9    officer or employee who instructed those individuals

10   to provide instructions to you about the work that

11   you should do?

12       **A.   No.**

13       Q.   Take a look at the next page, WFG_001511.

14   And I want to direct your attention to the paragraph

15   that is letter C, okay.  And you testified that you

16   had reviewed this and understood it or, to the

17   extent you didn't understand it, sought

18   clarification from Christian, correct?

19       **A.   Correct.**

20       Q.   Paragraph C says, quote, as a member of WFG

21   the associate is not an employee of WFG.  Instead,

22   the associate's relationship with WFG is that of an

23   independent contractor.

24            Do you see that?

25       **A.   I do see that.**

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1        Q.  Okay.  Was there anything about that
 2   statement that you didn't understand when you signed
 3   this agreement?
 4            MR. WOLFE:  Objection.
 5        A.  I don't even know what an independent
 6   contractor would be.
 7        Q.  This made clear to you, however, that you
 8   were not an employee of World Financial Group,
 9   correct?
10            MR. WOLFE:  Objection.
11        A.  It wasn't really clear to me, no.
12        Q.  Is there -- what is unclear about the
13   sentence that reads, quote, As a member of WFG the
14   associate is not an employee of WFG, end quote?
15            MR. WOLFE:  Objection.
16        A.  Well, it says I'm an independent
17   contractor, and I don't even know what an
18   independent contractor would be.
19        Q.  Right.  But I'm focusing on this first
20   sentence.  My question to you is:  Tell me what is
21   unclear about a sentence that reads, quote, As a
22   member of WFG the associate is not an employee of
23   WFG.
24            MR. WOLFE:  Objection.
25        A.  I don't know.
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1        Q.  As you sit here today and read that

2    sentence, does that not make clear to you that by

3    the terms of this agreement you were not an employee

4    of WFG?

5            MR. WOLFE:  Objection.

6        **A.  Even if I read it today, still doesn't make**

7    **it clear, because the work I provided for this**

8    **company, I was definitely an employee.**

9        Q.  Well, you say you were definitely an

10   employee.  Why is that?

11       **A.  Because I was required to show up at work**

12   **every day.  I had to follow a certain sales**

13   **technique for the guidelines of the company.  From**

14   **my understanding an independent contractor is not --**

15   **that's not what a person is supposed to be doing.**

16   **An independent contractor is a company that -- is a**

17   **person that actually own his own business, correct?**

18   **So I did not own my own business.**

19       Q.  A moment ago you testified that you didn't

20   know what an independent contractor is.

21       **A.  Right.  At the time, yeah.**

22       Q.  Oh, you now have an understanding about

23   this?

24       **A.  Yeah.**

25       Q.  How have you gained that understanding?

```
 1        A.  I looked it up on line to see information.

 2        Q.  What did you look up on line?

 3        A.  Well, the meaning of an independent

 4   contractor, and I am myself as of today an

 5   independent contractor too.

 6        Q.  In what business?  Your real estate

 7   business?

 8        A.  Yes, sir.

 9        Q.  That's Destin & Lucas?

10        A.  Yes, sir.

11        Q.  And what website did you go to to look up

12   what an independent contractor is?

13        A.  Dictionary.

14        Q.  And what is your understanding of what an

15   independent contractor is?

16        A.  Is a person that owns his own business, his

17   own product, his own tools, his own client.

18   Basically a person that is able to run his own

19   business on his own.

20        Q.  Anything else?

21        A.  The person that's able to run his own

22   business without the say of somebody above.

23        Q.  Anything else?

24        A.  That would be it.

25        Q.  You mentioned that you believed you were an
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   employee because you were required to show up to

 2   work.

 3        A.   Yes, sir.

 4        Q.   Who required you to show up to work?

 5        A.   Christian.

 6        Q.   Anyone else?

 7        A.   Mr. Don Chang.

 8        Q.   Anyone else?

 9        A.   Aline.

10        Q.   Anyone else?

11        A.   Stefan.

12        Q.   Anyone else?

13        A.   Whoever important, more important was in

14   the office, you know.  They were always referring to

15   us being at the office, on time, attend the team

16   meetings.

17        Q.   The group that you just mentioned,

18   Christian, Don, Aline and Stefan, those were the

19   individuals who required you to show up to work?

20        A.   Yeah.

21        Q.   And by that, you mean show up to the

22   office?

23        A.   Yes, sir.

24        Q.   And I asked you earlier if you knew what

25   their roles were and you told me that they had
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   different titles, I think.  All of them were

 2   associates except for Christian who you identified

 3   as a senior marketing director?

 4        A.  Yes, sir.

 5        Q.  And Stefan, as I understand it, as I

 6   understand it, Stefan recruited him?

 7        A.  I believe so.

 8        Q.  You mentioned Don Chang, correct?

 9        A.  Yes.

10        Q.  And you say Don Chang was one of the

11   individuals who required you to show up?

12        A.  Yes.

13        Q.  When did Mr. Chang tell you to show up to

14   the office?

15        A.  Whenever we had a presentation, so whenever

16   Mr. Don Chang was coming in town, he was really

17   specific about the importance of being in the

18   office, you know, because that's the major part of

19   the day where you spent your day basically and where

20   you do, you know, cold calling.  So whenever he was

21   in town he was requiring his team to be present at

22   work, over the phone too.

23        Q.  Do you know if Don Chang was an employee of

24   World Financial Group?

25             MR. WOLFE:  Objection.
```

1          **A.   I don't know.**

2          Q.   Do you know if Christian is an employee of

3     World Financial Group?

4              MR. WOLFE:   Objection.

5          **A.   Yes.**

6          Q.   You do?

7          **A.   Yes.**

8          Q.   You know that he's an employee of World

9     Financial Group?

10         **A.   I know that he's representing World**

11    **Financial Group for sure.**

12         Q.   I didn't ask you that.  My question is:  Do

13    you know that Christian is an employee of World

14    Financial Group?

15         **A.   I don't know.**

16         Q.   Did Don Chang ever tell you that he was an

17    employee of World Financial Group?

18         **A.   I don't recall.**

19         Q.   Did Christian ever tell you that he was an

20    employee of World Financial Group?

21         **A.   I don't recall.**

22         Q.   When you say you don't recall, you don't

23    recall Christian ever telling you that?

24         **A.   Right, I don't recall that.**

25         Q.   Do you recall Aline ever telling you that

1   she was an employee of World Financial Group?

**2        A.   No, sir.**

3        Q.   Do you recall Jennifer ever telling you

4   that she was an employee of World Financial Group?

**5        A.   No.**

6        Q.   And has any individual who's either a

7   corporate officer or employee of World Financial

8   Group corporate ever instructed you to show up at

9   the office --

10             MR. WOLFE:   Objection.

11   BY MR. BLACK:

12        Q.   -- or to attend any meetings?

**13        A.   I don't know.**

14        Q.   You only had a single interaction with

15   anyone from World Financial Group corporate,

16   correct?

**17        A.   Yes, correct.**

18        Q.   Earlier you referred to teammates, and I

19   think you referred to Christian and Jennifer and

20   Aline.  Would you also consider Don Chang one of

21   your teammates?

**22        A.   I would consider him as my -- the biggest**

**23   supervisor I could talk to.**

24        Q.   Okay.  Do you know if Mr. Chang had anybody

25   above him in his World Financial Group hierarchy?

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1          A.  I wouldn't know.

2          Q.  During the time that you were associated

3     with World Financial Group did you ever hear the

4     term hierarchy to refer to any group within World

5     Financial Group?

6          A.  No, sir.

7          Q.  And you've never heard the term upline?

8          A.  No, sir.

9          Q.  Did you ever recruit anybody to join World

10    Financial Group?

11         A.  Yes, sir.

12         Q.  Who?

13         A.  His name is Thibaud, T-H-I-B-A-U-D.

14         Q.  Thibaud Lucas?

15         A.  Yes, sir.

16         Q.  Anyone else?

17         A.  That would be all.

18         Q.  How did you recruit Thibaud Lucas?

19         A.  I gave him the sales speech and the

20    recruiting part, and I told him that it was a great

21    company to work for.

22         Q.  When did you recruit Thibaud Lucas?

23         A.  It was in 2010, so I would say late 2010,

24    around December.

25         Q.  It was within a month or so of when you

1   yourself became affiliated with World Financial

2   Group, correct?

3        **A.  Yes, sir.**

4        Q.  And when you recruited Mr. Lucas did you

5   tell him that he would be employed by World

6   Financial Group?

7        **A.  I did not tell him that he would be**

8   **employed by World Financial Group.**

9        Q.  What did you tell him his role would be?

10       **A.  Well, I told him that he would be**

11   **representing the company and the sales product as**

12   **well, and his role would probably be a financial**

13   **advisor, as much as I thought I was.**

14       Q.  Just so I'm clear, you thought you were a

15   financial advisor?

16       **A.  Yes, sir.**

17       Q.  When you became a member of World Financial

18   Group and understood that you were a financial

19   advisor did you do anything to undertake -- strike

20   that.

21           When you became affiliated with World

22   Financial Group and thought you were a financial

23   advisor did you do anything to research whether

24   there were any federal regulatory requirements

25   around providing financial advice as a financial

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   advisor?
 2        A.  No, sir.
 3        Q.  Did you do anything to determine whether
 4   you needed to be licensed?
 5        A.  Well, I did go to class.
 6        Q.  My question was:  Did you do anything to
 7   find out whether you had to become licensed to
 8   become a financial advisor?
 9        A.  No, sir.
10        Q.  And did Mr. Lucas sign an Associate
11   Membership Agreement?
12        A.  I believe so.
13        Q.  And for how long was Mr. Lucas affiliated
14   with World Financial Group?
15        A.  Nothing longer than I was, so maybe less
16   than a year.
17        Q.  Now, you have earlier today indicated that
18   your affiliation with World Financial Group ended in
19   or about June of 2011; is that right?
20        A.  Yes, sir.
21        Q.  How did that end?
22        A.  I just -- well, I couldn't keep working for
23   them anymore because I never got paid, first of all,
24   and also because I could not manage both of my job
25   together.
```

1      Q.  You were also working at Abercrombie &

2   Fitch?

3      **A.  Correct.**

4      Q.  And you said because you hadn't been paid?

5      **A.  Yes, sir.**

6      Q.  When you became a member of World Financial

7   Group did any of Aline, Christian, Jennifer or any

8   other teammate that you may have had told you that

9   you would be paid on either an hourly or salaried

10  basis?

11     **A.  No, I don't recall.**

12     Q.  Did you have an understanding that you

13  would be paid on either an hourly or a salaried

14  basis?

15     **A.  Well, as I was required to be at a certain**

16  **place at a certain time every day of the week, I was**

17  **expecting then yes, I will definitely get paid for**

18  **that.**

19     Q.  So when you became affiliated with World

20  Financial Group you thought you were going to

21  receive either a salary or an hourly wage?

22     **A.  Right, because when I replied to the**

23  **position it was an actual job position.**

24     Q.  Did the posting that you responded to list

25  a salary or hourly rate?

1        A.  No, sir.

2        Q.  And you contacted Aline with regard to that

3   position, correct?

4        A.  Yes, sir.

5        Q.  When you contacted her did she promise you

6   either an hourly rate or a salary?

7        A.  No.

8        Q.  Did you ask her whether you would receive

9   an hourly rate or a salary?

10        A.  I don't recall that.

11        Q.  After you became affiliated with World

12   Financial Group and did not receive an hourly rate

13   or a salary did you complain to any of Christian or

14   Aline or Jennifer that you were not receiving an

15   hourly rate or a salary?

16        A.  I did talk to my supervisor about that,

17   yes.

18        Q.  Who are you referring to as your

19   supervisor?

20        A.  Christian.

21        Q.  You spoke to Christian about the fact that

22   you were not receiving either an hourly rate or a

23   salary?

24        A.  Yes, sir.

25        Q.  And what did Christian tell you?

1      **A.  He told me that's the way it works at World**

2      **Financial Group.**

3          Q.  He told you that you do not earn a salary

4      or an hourly rate if you are a member of World

5      Financial Group.

6          **A.  He told me that the most of the money you**

7      **could make would be on the product you sell and the**

8      **people you recruit.**

9          Q.  And did you understand that unless you were

10     licensed you could not sell products, therefore

11     could not earn a commission on those products?

12         **A.  I didn't know that.**

13         Q.  You didn't know that at the time.

14         **A.  That's correct.**

15         Q.  Did you learn that later?

16         **A.  Yes, sir.**

17         Q.  Did you learn that from Christian?

18         **A.  I learned that from other people in the**

19     **offices.**

20         Q.  When did you learn that, and by "that," I

21     mean relative to your having joined World Financial

22     Group, signed up as a member.  When after you signed

23     up did you learn that?

24         **A.  About a month and a half, I'd say, two**

25     **months.**

1     Q.  So you joined in, I think you say that your

2   affiliation started in September, the document

3   indicates that -- and when I say document I'm

4   referring to the AMA -- has a date of October.  But

5   it would have been sometime before the end of 2010

6   that you learned that the only way that you could

7   earn a commission in connection with your membership

8   with World Financial Group was to become licensed to

9   sell either securities or insurance products, and

10  then to receive a commission based on those sales,

11  correct?

**12     A.  Yes.**

13     Q.  You continued to be affiliated with World

14  Financial Group for another seven -- six, seven

15  months after that, until June of 2011, correct?

**16     A.  Yes, sir.**

17     Q.  Why did you remain affiliated with World

18  Financial Group if you learned in late 2010 that you

19  were not going to be earning either an hourly rate

20  or a salary?

**21     A.  Because I've been told everything I would**

**22  be selling, I will get -- basically get the**

**23  commission out of it and get paid for the product I**

**24  sold, even if I'm not licensed yet, I could still**

**25  apparently sell the product and get the name of**

1    another associate on it.  So the person above me,

2    basically.

3         Q.  So the person above you told you that you

4    could get a commission even if you weren't licensed.

5         A.  Well, they told me that once I get my

6    license then I will get my commission paid.

7         Q.  I see.  But you understood that until you

8    were licensed you would not be paid either an hourly

9    rate, a salary, or a commission, correct?

10        A.  That's what I learned after, yes.

11        Q.  All right.  And you continued your

12   affiliation with World Financial Group in hopes that

13   you would become licensed?

14        A.  Yes.

15        Q.  Did you ever become licensed?

16        A.  No, sir.

17        Q.  When you first became a member of World

18   Financial Group and were an associate did you have a

19   discussion with anyone associated with World

20   Financial Group about whether you would receive

21   weekly or monthly compensation on a regular basis?

22        A.  No, I don't remember that.

23        Q.  If you would, take a look at the next page,

24   WFG_001512, please.  And I'm looking at the section

25   Roman numeral III titled Associate's Compensation,

 1    and letter A says, quote, the associate acknowledges

 2    and understand that the associate earns income only

 3    from the sale of the products and services and no

 4    income is earned by or paid to associate for

 5    recruiting period.  The associate's sole

 6    compensation under and during the term of this

 7    agreement shall be commissions paid by, or caused to

 8    be paid by, WFG pursuant to this agreement and paid

 9    in the manner provided in, and subject to the terms

10    and conditions contained therein, those associate

11    agreement guidelines and commission schedules which

12    are published by World Financial Group from time to

13    time, period end quote.  Did you see that?

**14         A.   Yes, sir.**

15         Q.   Was there anything you didn't understand

16    about that when you signed this agreement and became

17    a member of World Financial Group?

18              MR. WOLFE:  Objection.

**19         A.   No, I don't remember reading this part.**

20         Q.   Mr. Destin, awhile back we were talking

21    about, believe it or not, your cell phone.

**22         A.   Okay.**

23         Q.   I want to return to that, if I can.

**24         A.   Uh-huh.**

25         Q.   The phone that you had when you were

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

 1    associated with World Financial Group, that is the

 2    phone that you had through Cricket?

 **3         A.  Yes, sir.**

 4         Q.  For how long did you have that phone?  Did

 5    it span the entire period when you were associated

 6    with World Financial Group or was it only part of

 7    the time?

 **8         A.  I definitely kept the same phone number**

 **9    from the beginning until the end.**

10         Q.  What's that phone number?

**11         A.  I can't recall the number, sir.**

12         Q.  Do you have a different phone number now?

**13         A.  Yes, sir.**

14         Q.  And when you say you kept the same phone

15    number, for example I've had the same phone number

16    for many years but have changed providers.

**17         A.  Yeah.**

18         Q.  Is it the case that you kept the same phone

19    number and the same provider throughout the entire

20    time that you were associated with World Financial

21    Group?

**22         A.  No, sir.  Well, hold on, let me rephrase**

**23    that.  During the time I was at World Financial**

**24    Group I did not change phone number, I did not**

**25    change provider.**

1      Q.   Okay.  So between roughly September of 2010

2   and June of 2011 you had your phone service with

3   Cricket the entire time.

**4      A.   Yes, sir.**

5      Q.   The phone that you had with Cricket, do you

6   recall when you discarded it?

**7      A.   No, I don't.**

8      Q.   Was that in the last year?  Was it prior to

9   that?

**10      A.   I have my new phone number since August of**

**11   2012, so it's been about a year and two months.**

12      Q.   The phone that you had, what did you do

13   with it when you got your new phone?

**14      A.   I just stopped it.**

15      Q.   Do you still have the phone?

**16      A.   No.**

17      Q.   You hesitated there.  Are you sure that you

18   don't have it still?

**19      A.   I -- no, it was not -- it was a basic**

**20   phone, so I threw it away.**

21      Q.   Do you recall when you threw it away?

**22      A.   No, I don't recall that, sir.**

23      Q.   Before you threw it away did you have any

24   of the information from that phone transferred to a

25   new phone?

1     A.  Beside my contact, I mean, the most

2     important contacts, that would be all.

3         Q.  So you had your contacts transferred from

4     your Cricket phone to your new phone?

5         A.  Uh-huh.  Well, I did manually, so yes, I

6     kept contacts.

7         Q.  And this new phone you referred to that you

8     got in August 2012, is it the phone you still have?

9         A.  Yes, sir.

10        Q.  During the time that you were associated

11    with World Financial Group did you use your cell

12    phone to make any calls that related to your

13    association with World Financial Group?

14        A.  Yes, sir.

15        Q.  What kind of calls?

16        A.  Phone calls to customer, potential

17    customer.  Phone calls to potential recruits, phone

18    calls to my marketing director, to my recruiter.  It

19    was my main phone, so I was using this phone for

20    personal use and workwise too, businesswise.

21        Q.  And you would use that phone for that

22    purpose both when you were at what you've described

23    as the office in Las Vegas and when you were at

24    home?

25        A.  Yes, sir.

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1        Q.  And just to be clear, the activities that

2   you talked about earlier, that is marketing

3   financial services products, attempting to sell

4   financial services products, that's something that

5   you did at home as well using your cell phone?

6        **A.  Yes, sir.**

7        Q.  And something you would also do via your

8   cell phone from the road, that is maybe you weren't

9   either at the office or at home?

10       **A.  Right.**

11       Q.  The time that you were in the, what you've

12   described as the office, was that time largely spent

13   on meetings or was it spent making telephone calls?

14       **A.  A lot of meetings, a lot of telephone**

15   **calls, a lot of one-on-one.**

16       Q.  You say a lot of one-on-one.

17       **A.  Yes.**

18       Q.  Was that one-on-one -- tell me what you

19   mean by one-on-one.

20       **A.  So one-on-one with customers, and as well**

21   **with recruits, because one doesn't go without the**

22   **other.**

23       Q.  That is you were both trying to sell

24   something to individuals and try to recruit them to

25   join World Financial Group at the same time?

1      A.  Correct, sir.

2      Q.  Now, to the extent that you were calling

3   someone with a World Financial Group product and

4   recruit them to join World Financial Group, you

5   understood that you were trying to have them become

6   employees of World Financial Group or to become

7   members of World Financial Group?

8           MR. WOLFE:  Objection.

9      A.  I didn't know the difference.

10     Q.  Did you understand that to the extent that

11  you could recruit others to join World Financial

12  Group that that might inure to your financial

13  benefit down the road?

14     A.  That was the whole purpose of it.

15     Q.  What did you understand that benefit to be?

16     A.  Well, the benefit is bigger the team is,

17  more job you can have to supervise the team, maybe

18  less sales to make, but basically recruiting as many

19  people, as much people as possible, was goal number

20  one.

21     Q.  You understood that if you had -- were able

22  to recruit individuals who then were below you, that

23  to the extent they became licensed and sold

24  products, whether it be securities or insurance, you

25  may derive some financial benefit from that?

1        A.  Yes, sir.

2        Q.  And did you actively try to recruit people?

3        A.  Yes, sir.

4        Q.  When you recreated people what, if

5    anything, did you tell them about how they might be

6    compensated?

7        A.  We did talked about it, because it will be

8    a main question that people would ask.

9        Q.  What did you tell them?

10       A.  That it would be later on commission based.

11       Q.  Did you tell them -- strike that.

12           How soon after you became associated with

13   World Financial Group did you start recruiting

14   people?

15       A.  As soon as possible.

16       Q.  So within days of becoming affiliated?

17       A.  Right.  Well, at least within the first

18   month, yes.

19       Q.  All right.

20       A.  Because we have what we call the 3/3/30,

21   which is three sales, three recruit, within 30 days,

22   for you to move up from trainee associate to regular

23   associate.

24       Q.  And who told you about that?  Was it your

25   teammates in Las Vegas?

1        A.   Everyone.

2        Q.   When you say everyone.

3        A.   I mean, let me clarify that, the people

4   that I will work with, they will explain me that is

5   the main goal when you first start to join the

6   company.

7        Q.   And when you were recruiting individuals to

8   join World Financial Group did you represent to them

9   that they would receive an hourly wage or a salary?

10       A.   It was not part of the sales speech.

11       Q.   In fact, you didn't tell anyone that,

12  correct?

13       A.   Correct.

14       Q.   The cell phone that you had via Cricket,

15  did you use it to text at all?

16       A.   I don't know.

17       Q.   Do you recall whether you used any texting

18  abilities to -- strike that.

19            Do you recall whether you sent or received

20  any texts that related to your association with

21  World Financial Group?

22       A.   Yes, sir.

23       Q.   You did.

24       A.   Yes.

25       Q.   With whom did you text?

Cohen vs. World Financial Group        Jordan Destin              10/08/2013

```
 1        A.  So it will be the clients, people

 2   interested in -- to meeting with me, potential

 3   recruits, people that would like to join the

 4   company, and as well with whoever I worked with.

 5        Q.  At any point since you've joined the

 6   lawsuit in July of 2013 have you contacted Cricket

 7   to see whether the text messages or the

 8   identification of any calls that you made are

 9   recoverable?

10        A.  I did contact them, yes.

11        Q.  When did you contact Cricket?

12        A.  That was around July 2013.

13        Q.  July 2013 was right as you joined the case,

14   correct?

15        A.  Right, July -- during the late summer,

16   yeah, summertime 2013.

17        Q.  And who at Cricket did you contact?

18        A.  I just went into the store directly.

19        Q.  And did you speak to someone?

20        A.  Yes.

21        Q.  What did you ask them?

22        A.  I asked them if it was possible to recover

23   information from my cell phone that I no longer

24   have.

25        Q.  What prompted you to do that?
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1          A.   What do you mean?

2          Q.   What prompted you to go to Cricket in July

3     of 2013 and ask whether it was possible to recover

4     information from your Cricket cell phone?

5          A.   Well, I was trying to get as many

6     information as possible.

7          Q.   As much information as possible about what?

8          A.   World Financial Group.

9          Q.   Were you asked to do that?

10         A.   Well, I asked to recover as many

11    information as possible.

12         Q.   And this was in July of 2013?

13         A.   It was this summer, yes, so late July.

14         Q.   And what did Cricket tell you?

15         A.   That it was not recoverable.

16         Q.   And you went to a store front, correct?

17         A.   Yes.

18         Q.   Did you ever contact Cricket at the

19    corporate level to -- or corporate customer service

20    to see whether you could recover any information

21    from a prior cell phone?

22         A.   No, sir, I did not try to do that.

23         Q.   Do you maintain any personal websites or

24    blogs, Mr. Destin?

25         A.   No.

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1        Q.  Have you ever?

 2        A.  Are you referring to social network?

 3        Q.  I'm not, I just mean any private website --

 4        A.  No, sir.

 5        Q.  -- or any blog website.

 6        A.  No, sir.  I had a business website for my

 7   company currently, but I no longer have it.

 8        Q.  Was that for Destin & Lucas?

 9        A.  Yes, sir.

10        Q.  But you no longer have a website for

11   Destin & Lucas?

12        A.  Yes, I need to reinstate the website again.

13        Q.  When did the website fail to function?

14        A.  June 2013.

15        Q.  And you simply haven't updated it?

16        A.  Yes, correct.

17        Q.  Other than the Destin & Lucas website are

18   there any other websites, either a personal or a

19   business nature, that you have or have maintained?

20        A.  No, sir.

21        Q.  You do use social media, correct?

22        A.  Yes.

23        Q.  You have a Facebook page?

24        A.  Yes, sir.

25        Q.  Your Facebook handle is Frenchie From
```

```
 1    Vegas; is that right?
 2         A.   That would be me.
 3         Q.   Do you maintain a MySpace page?
 4         A.   No.
 5         Q.   Do you have a Twitter account?
 6         A.   No, I don't have a Twitter account.
 7         Q.   You have a LinkedIn profile?
 8         A.   I used to have one.
 9         Q.   How long ago did you -- well, when did you
10    have a LinkedIn account?
11         A.   I had a LinkedIn account last year when I
12    put myself in business.
13         Q.   Okay.
14         A.   Actually, it was -- it was last year.
15         Q.   You created a LinkedIn page.
16         A.   Yes, sir.
17         Q.   And affiliated yourself on that page with
18    Destin & Lucas?
19         A.   Yes, sir.
20         Q.   For how long have you had your Facebook
21    account?
22         A.   About four years now.
23         Q.   So you had the Facebook account while you
24    were affiliated with World Financial Group?
25         A.   Yes, sir.
```

```
 1          Q.  Did you use your Facebook account in any

 2    way in connection with your association with World

 3    Financial Group, that is either to locate or recruit

 4    individuals --

 5          A.  No, sir.

 6          Q.  -- who may be customers?

 7          A.  No, sir.

 8          Q.  So your testimony is that your Facebook

 9    account has always been entirely separate and

10    distinct from anything having to do with World

11    Financial Group.

12          A.  Because it is personal matter, yes.

13          Q.  Are you Facebook friends with any person

14    that -- with whom you had an association through

15    World Financial Group?

16          A.  Yes.

17          Q.  With whom?

18          A.  Aline.

19          Q.  Anyone else?

20          A.  That's it.

21          Q.  For how long have you been friends with

22    Aline on Facebook?

23          A.  Since I started at World Financial Group,

24    so -- it's going to be about three years now.

25               MR. WOLFE:  Rich, before you launch into
```

1   the next big topic, it's around noon and I ate

2   early, which means I'm going to be grouchy.  When we

3   get to a convenient stopping point.

4              MR. BLACK:  If we can go off the record.

5              THE VIDEOGRAPHER:  Stand by, please.  We're

6   off the record, the time is 12:00.

7              (Off-the-record discussion)

8              (Mr. Brunton exits)

9              THE VIDEOGRAPHER:  And we're back on the

10  record, the time is 12:01.

11  BY MR. BLACK:

12       Q.  Are you friends on Facebook with anyone who

13  you recruited as a customer or as a member of World

14  Financial Group?

15       **A.  Yes, sir.**

16       Q.  Whom?

17       **A.  Thibaud.**

18       Q.  Thibaud Lucas?

19       **A.  Yes, sir.**

20       Q.  Anyone else besides Mr. Lucas?

21       **A.  That's it.**

22       Q.  During the last three or four years,

23  Mr. Destin, have you been a member of any local

24  associations, whether it be business groups or

25  religious groups?

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1        A.   No, sir.

 2        Q.   You haven't belonged to a church or a

 3   synagogue or mosque or anything like that?

 4        A.   No, sir.

 5        Q.   And you've not belonged to any social clubs

 6   or social organizations?

 7        A.   No, sir.

 8        Q.   Any business groups having to do with

 9   either real estate or any other type of business?

10        A.   No, sir.

11        Q.   We talked earlier about your HP laptop.

12   What kind of computer do you currently have, if any?

13   You mentioned that it was your wife's computer.

14        A.   Right, right.  It is currently a Gateway.

15        Q.   Gateway?

16        A.   Gateway, I'm sorry.

17        Q.   Is it a laptop?

18        A.   Yes.

19        Q.   Have you searched that laptop for any

20   information relating to World Financial Group?

21        A.   Yes, sir, I did.

22        Q.   Did you find anything?

23        A.   Nothing.  Well, I'm sorry, if I can just

24   interrupt pretty quick.  I was able to recover my

25   tax return.
```

1     Q.  A tax return?

2     **A.  Yes, a tax return.**

3     Q.  Which tax return are you referring to?

4     **A.  The year I worked at World Financial Group,**

5     **which was 2000 -- well, yep, the return for 2011.**

6     Q.  All right.  And that tax return, as I

7     recall, I know you produced that, that tax return

8     doesn't have any information from World Financial

9     Group on it, correct?

10    **A.  Correct.**

11    Q.  So it doesn't necessarily relate to World

12    Financial Group, but you located that document using

13    that computer in connection with this lawsuit, is

14    that your testimony?

15    **A.  Yes.**

16    Q.  The phone that you currently have, is it a

17    smart phone?

18    **A.  It is a smart phone, yes.**

19    Q.  What kind of phone is it?

20    **A.  It's a Samsung Galaxy S3.**

21    Q.  And you've had that since August 2012?

22    **A.  Yes, sir.**

23    Q.  I understand that you've had it since

24    August 2012.  Have you used it for anything related

25    to your association with World Financial Group?  And

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1   before you answer, I am not asking you to reveal any

2   communications that you may have had with your

3   lawyers about World Financial Group.

**4         A.  No, sir.**

5         Q.  At any point in the last three years,

6   Mr. Destin, have you maintained a diary?

**7         A.  No, sir.**

8         Q.  Electronic or paper?

**9         A.  (Shakes head negatively.)**

10         Q.  Have you maintained a journal of any sort?

**11        A.  No, sir.**

12         Q.  Have you maintained a calendar of any sort?

**13        A.  No, sir.**

14         Q.  During the timeframe when you had an

15   association with World Financial Group did you

16   maintain any kind of electronic calendar, either on

17   a phone or on a computer?

**18        A.  It was definitely a calendar, yes.**

19         Q.  You did.

**20        A.  Yes.**

21         Q.  And where was that?  That was --

**22        A.  It was like a paper version, so like it**

**23   wasn't actually an agenda.**

24         Q.  You maintained a paper calendar --

**25        A.  Right.**

1        Q.  -- during the time you were associated with

2    World Financial Group.

3        **A.  Yes.**

4        Q.  Do you still have that calendar?

5        **A.  I don't, sir.**

6        Q.  Did you throw it away at some point?

7        **A.  Yes.**

8        Q.  Do you recall when you did that?

9        **A.  When I moved out.**

10       Q.  When you moved out of what address?

11       **A.  Of the condo, I can't recall the address.**

12   **It was 2011.**

13       Q.  This is the condo -- I'm sorry, I didn't

14   mean to speak over you.  Go ahead.

15       **A.  Yes, 2011 when I moved out, that's when I**

16   **discard a lot of paperwork.**

17       Q.  This is the condo that you were in between

18   when you were at ^REDACTED          and at ^REDACTED

19   ^REDAC , right?
       TED

20       **A.  Yes, sir, correct.**

21           MR. BLACK:  Okay.  Why don't we go ahead

22   and take a break.  How long do you want to take a

23   break for, Steve?

24           MR. WOLFE:  What's enough time for everyone

25   to eat.

```
 1              THE VIDEOGRAPHER:  We are off the record,

 2    the 12:06, this is the end of tape 1.

 3              (Recess)

 4              (Mr. Tompkins enters)

 5              THE VIDEOGRAPHER:  And we are back on the

 6    record.  The time is 1:25.  This is the beginning of

 7    Tape 2 of the videotaped deposition of Jordan

 8    Destin.  You may continue, sir.

 9    BY MR. BLACK:

10       Q.  All right, Mr. Destin, we took a break for

11    lunch, and I would like to continue asking you some

12    questions this afternoon, okay?

13       A.  Okay.

14       Q.  Mr. Destin, what, if anything, did you do

15    to prepare for your deposition today?

16       A.  I learned more about the case, what it

17    involved.

18              MR. WOLFE:  Let me just -- Jordan, when

19    you're answering these questions don't discuss

20    anything --

21              THE WITNESS:  Of course.

22              MR. WOLFE:  -- any conversations you had

23    with attorneys.

24              THE WITNESS:  Of course.

25    BY MR. BLACK:
```

1          Q.   Okay.  You said you learned more about the

2     case and what it involved?

3          A.   Correct.

4          Q.   Anything else?

5          A.   Not really.

6          Q.   Did you meet with your counsel to prepare

7     for your deposition today?

8          A.   Define counsel for me, counsel.

9          Q.   I'm sorry?

10          A.   Can you restate the question?

11          Q.   Oh, sure.  Did you meet with your counsel

12     or your lawyers today to prepare for your

13     deposition?

14          A.   Yes, sir.

15          Q.   When did you meet with them?

16          A.   This morning.

17          Q.   And prior to this morning had you ever met

18     your lawyers in person?

19          A.   No.

20          Q.   And who did you meet with this morning?

21          A.   I've met with Mr. -- well, to reclarify

22     everything, I've met my lawyers yesterday night when

23     I got to Atlanta.

24          Q.   All right.

25          A.   Okay.  This morning I met with Mr. -- at

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1     the very end of the table, I'm sorry, I forgot his

2     name.

3          Q.  Tompkins?

4          A.  Correct.

5          Q.  So you met with Mr. Tompkins this morning?

6          A.  Correct.

7          Q.  To prepare for your deposition?

8          A.  No, it was just part of the -- he was in

9     the room.

10         Q.  Why don't you tell me who all you met with

11    this morning and then I can ask you questions about

12    that.

13         A.  Well, this morning I obviously met with

14    Mr. Steven.

15         Q.  Mr. Wolfe?

16         A.  Yeah, Mr. Wolfe, Steven Wolfe.

17         Q.  All right.  Anyone else?

18         A.  Suzanne Leeds.

19         Q.  Anyone else?

20         A.  Lloyd Ambinder.

21         Q.  Anyone else?

22         A.  The gentleman sitting at the table, I'm

23    sorry, his name.

24         Q.  Mr. Buckley?

25         A.  Mr. Buckley, that's right.

```
 1            MR. BUCKLEY:  Note, I'm the only person he

 2   called a gentleman.

 3            MR. BLACK:  Duly noted for the record.

 4            MR. WOLFE:  Which one of us is supposed to

 5   be offended by that?

 6   BY MR. BLACK:

 7       Q.  So as I understand it, you met this morning

 8   with Mr. Tompkins, Mr. Wolfe, Ms. Leeds,

 9   Mr. Ambinder and Mr. Buckley; is that right?

10       A.  Yes.

11       Q.  For how long did you meet with them?

12       A.  About an hour and a half, two hours.

13       Q.  Was anyone else present when you were

14   meeting with those individuals?

15       A.  No, sir.

16       Q.  You said that you met your counsel for the

17   first time in person last night; is that right?

18       A.  Yes, sir.

19       Q.  Who did you meet last night?

20       A.  Mr. Lloyd Ambinder.

21       Q.  Did you spend any time preparing for your

22   deposition with Mr. Ambinder last night?

23       A.  I did.

24       Q.  For how long?

25       A.  About an hour.
```

1        Q.   Where did you meet?

2        **A.   In the office over here.**

3        Q.   You met at Buckley & Klein?

4        **A.   Yes, correct.**

5        Q.   Do you remember what time you met?

6        **A.   6:30.**

7        Q.   And when you met with Mr. Ambinder last

8    night was anyone else present?

9        **A.   Suzanne Leeds.**

10        Q.   Ms. Leeds was present?

11        **A.   Yes, and Mr. Wolfe as well.**

12        Q.   All right.  So as I understand it, you met

13    with Mr. Wolfe, Ms. Leeds and Mr. Ambinder last

14    night for about an hour and then this morning met

15    separately for an hour and a half to two hours with

16    Mr. Tompkins, Mr. Wolfe, Ms. Leeds, Mr. Ambinder and

17    Mr. Buckley; is that right?

18        **A.   Yes, sir.**

19        Q.   Were there any other lawyers you've met

20    with to prepare for your deposition today either in

21    personally or over the phone?

22        **A.   No, sir.**

23        Q.   Did you review any documents to prepare for

24    your deposition today?

25        **A.   Yes, sir.**

1        Q.   What documents did you review?

**2        A.   The complaint that was filed under my name.**

3        Q.   So the complaint that was filed with your

4   name on the front?

**5        A.   Yes, correct.**

6        Q.   And I will ask you about that later.  That

7   is something I will refer to as the proposed amended

8   complaint.  Did you understand there was a complaint

9   previously filed in this lawsuit?

**10        A.   Yes, sir.**

11        Q.   Did you look at that complaint to prepare

12   for your deposition?

**13        A.   Yes.**

14        Q.   So you looked at the original complaint?

**15        A.   Uh-huh, yes, sir.**

16        Q.   You also looked at the proposed amended

17   complaint?

**18        A.   Which is mine, yes.**

19        Q.   Did you look at any other documents?

**20        A.   Beside the document I provided myself, no.**

21        Q.   Besides the documents that you provided as

22   part of the lawsuit, did you look at anything else

23   besides the original complaint and the proposed

24   amended complaint?

**25        A.   No, sir.**

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1        Q.  And when you said the documents that you

2    provided, are you referring to the documents that

3    you provided to your counsel as part of the lawsuit?

4        **A.  Yes, sir.**

5        Q.  What were those documents?

6        **A.  The welcome e-mail and the different books**

7    **I was required to purchase when I joined the**

8    **company.**

9        Q.  Anything else?

10       **A.  No.**

11       Q.  We received a resume from you.  Did you

12   review your resume to prepare for your deposition

13   today?

14       **A.  No.**

15       Q.  We also received some W-2s for you.

16       **A.  Yes.**

17       Q.  Did you review those to prepare for your

18   deposition today?

19       **A.  I did take a look at it this morning, yes.**

20       Q.  So that the original complaint, the

21   proposed amended complaint, the welcome e-mail and

22   what you've referred to as books that you were

23   required to purchase.  Those are the documents that

24   you looked at to prepare for your deposition?

25       **A.  Yes, sir.**

1          Q.   And we talked earlier today about your

2    search for e-mails and electronic documents.   In the

3    last day or two prior to your deposition did you go

4    back again to look and see whether any of those

5    documents existed?

6          **A.   Yes, sir.**

7          Q.   What did you do?

8          **A.   I just again looked through my e-mail, my**

9    **wife's computer, my hard drive, external hard drive.**

10   **That's about it.**

11         Q.   When did you do that?

12         **A.   This weekend, Saturday.   Saturday and**

13   **Sunday.**

14         Q.   And when you say e-mail, are you talking

15   about your Yahoo account?

16         **A.   Yes.**

17         Q.   The other two accounts, as I understand it,

18   you're not -- you told us you're not able to access

19   them.

20         **A.   Correct.**

21         Q.   And I take it that that search did not

22   yield anything else?

23         **A.   Correct.**

24         Q.   We were talking right before the break

25   about calendars, and you told me that you maintained

1    a hard copy calendar, correct?

**2          A.  Yes.**

3          Q.  Is that still your practice, to maintain a

4    hard copy calendar?

**5          A.  Yes, sir.**

6          Q.  All right.  And did you keep one for 2013?

**7          A.  I have one for 2013 for my business, yes.**

8          Q.  And you kept one in 2012?

**9          A.  I was not in business in 2012 until the end**

**10   of the year, so I did not have one in 2012.**

11         Q.  And the 2011 calendar I believe you

12   testified you threw away at some point?

**13         A.  Yes, sir.**

14         Q.  That was in the beginning of 2012?

**15         A.  That was when I moved out, which is summer**

**16   2011.**

17         Q.  You mentioned earlier, you're married; is

18   that right?

**19         A.  Yes, sir.**

20         Q.  When did you get married?

**21         A.  I got married back in January 2011.**

22         Q.  So right in the middle of your affiliation

23   with --

**24         A.  I'm sorry, January 2012.  What a huge**

**25   mistake, I'm sorry about that.**

1      Q.  We'll keep that confidential.

2      **A.  Right, please.**

3      Q.  So after your affiliation with World

4   Financial Group.

5      **A.  Yes, sir.**

6      Q.  And Mr. Destin, did you talk to anyone

7   other than your counsel in an attempt to prepare for

8   your deposition or to refresh your recollection with

9   regard to any facts that might relate to your

10  association with World Financial Group?

11     **A.  No, I didn't talk to anybody about**

12  **preparation for the deposition.**

13     Q.  When's the last time you spoke to

14  Christian?

15     **A.  The last time I worked for World Financial**

16  **Group, so it was about three years ago.**

17     Q.  When's the last time you spoke to Aline?

18     **A.  I spoke to Aline about in July, August of**

19  **this year.**

20     Q.  When's the last time you spoke to Don

21  Chang?

22     **A.  Three years ago.**

23     Q.  When's the last time you spoke to Laura

24  Chang?

25     **A.  Three years ago.**

1      Q.  I've seen a reference to someone named

2   Laura Wong.  Is that the same person as Laura Chang

3   or is that two different people?

4      **A.  I don't know, to be honest with you.  I**

5   **would say the person named Laura is based out of**

6   **Anaheim, California.  And I've been told her last**

7   **name was Chang.**

8      Q.  During the time that you were associated

9   with World Financial Group were you in contact with

10  only one Laura?

11     **A.  I was in contact with only one Laura, yes,**

12  **sir.**

13     Q.  When is the last time you spoke to

14  Jennifer?

15     **A.  Three years ago.**

16     Q.  And I believe I asked you earlier if you

17  knew the last names of some of these folks, and I

18  think we got them for everybody but Jennifer.  Do

19  you recall Jennifer's last name?

20     **A.  I do not, no.**

21     Q.  Can you describe Jennifer to us?

22     **A.  Yep, in her 40s, very nice lady, larger**

23  **size lady, very nice, very nice lady.  And I believe**

24  **she was a teacher at the same time she was working**

25  **for World Financial Group.**

 1        Q.   It was not uncommon that folks who were

 2   associated with World Financial Group at the same

 3   time you were had other jobs, other full-time

 4   associations, correct?

 **5        A.   Correct.**

 6        Q.   Would you say that was more often the case

 7   than not?

 **8        A.   For the people I got to talk to were**

 **9   working in my team, they had a second job.**

10        Q.   They did.

**11   A.   Yes.**

12        Q.   And some of those jobs are full-time,

13   correct?

**14        A.   I would not know.**

15        Q.   When you spoke to Aline in July or August,

16   did that have anything to do with your deposition

17   here today?

**18        A.   I was trying to recover a document from**

**19   her.**

20        Q.   What document were you trying to recover

21   from her?

**22        A.   Anything related to World Financial Group,**

**23   e-mail, phone calls, any.**

24        Q.   And were you able to recover anything from

25   her?

1       **A.  Only thing I was able to recover was the**

2    **welcome e-mail.**

3        Q.  So the welcome e-mail, Aline provided that

4    to you?

5       **A.  Yes, sir.**

6        Q.  Were there any other documents or

7    information that Aline was able to provide to you?

8       **A.  No, sir.**

9        Q.  When you spoke to Aline did you tell her

10   why you were trying to locate documents relating to

11   World Financial Group?

12      **A.  No.**

13       Q.  Did she ask?

14      **A.  No.**

15       Q.  You simply -- did you make contact with

16   her?

17      **A.  Yes.**

18       Q.  How did you reach her?

19      **A.  Facebook.**

20       Q.  Did you send her a private message?

21      **A.  Yes.**

22       Q.  And do you recall what it is you asked her?

23      **A.  Yes, I requested to have any document that**

24   **would pertain to my employment with World Financial**

25   **Group at the time.**

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1        Q.  Did you -- I'm sorry, go ahead?

 2        A.  Anything with my name on it.

 3        Q.  Did she respond to you?

 4        A.  Yes.

 5        Q.  How quickly did she respond to you?

 6        A.  Three days.

 7        Q.  And did she ask you any questions about why

 8   you were looking for that information?

 9        A.  No.

10        Q.  Do you know if Aline is still associated

11   with World Financial Group?

12        A.  I'm not sure.

13        Q.  How did Aline provide you with the welcome

14   e-mail?

15        A.  She had access.  I think she had a copy of

16   all my record, everything that was being sent out,

17   and sent it.  She probably would be the one who

18   kept, you know, most of the information.

19        Q.  And did she tell you that the only thing

20   she had was that welcome e-mail?

21        A.  Yes.

22        Q.  And in what format did she provide that to

23   you?  Did she give you a hard copy?  Did she send it

24   to you by e-mail?

25        A.  She forwarded to me the e-mail, the
```

```
 1   original e-mail.

 2        Q.  Had anyone asked you to reach out to Aline

 3   to gather information?

 4        A.  No, sir.

 5        Q.  You did that entirely on your own?

 6        A.  Yes, sir.

 7        Q.  Have you spoken to anyone about your

 8   deposition other than your counsel?

 9        A.  No, sir.

10        Q.  And you're currently represented by

11   counsel, correct?

12        A.  Yes, sir.

13        Q.  And do you understand that all the lawyers

14   that you met with this morning represent you?

15        A.  Yes, sir.

16        Q.  And so three different law firms, correct?

17        A.  Correct.

18        Q.  Buckley & Klein.

19        A.  Uh-huh.

20        Q.  Virginia & Ambinder?

21        A.  Uh-huh.

22        Q.  And Leeds Brown law?

23        A.  Yes, sir.

24        Q.  Now, other than your counsel have you

25   spoken to anyone about this case since you have
```

 1   learned about it?

 **2        A.  No, sir.**

 3        Q.  And just to be clear, I asked you a minute

 4   ago -- I asked you a minute ago if you had spoken to

 5   anybody about your deposition.  So my question now

 6   is:  Have you spoken to anyone about this case?

 **7        A.  No, sir.**

 8        Q.  Is it the case that you've not made any

 9   effort to try and convince anyone to participate in

10   this case or join this case?

**11        A.  I just don't have -- I'm not in touch with**

**12   the people I used to work with beside Aline.**

13        Q.  Have you made any effort to try and locate

14   them to recruit them to join the case?

**15        A.  I -- well, I don't recall their last names,**

**16   so it was hard for me to initiate a research.  But**

**17   no, beside Aline I didn't speak to anybody.**

18        Q.  My question was -- I understand you've not

19   spoken to anyone -- have you made any effort to try

20   and locate anybody to try to talk to them about

21   joining the case?

**22        A.  No, I didn't.**

23        Q.  Are you aware, Mr. Destin, that World

24   Financial Group at some point served a set of

25   written interrogatories that were questions directed

```
 1    to you that we asked you to answer?
 2         A.   Of course.
 3         Q.   When did you become aware of that?
 4         A.   That you would ask me questions?
 5         Q.   No, let me be clear.  I am asking you
 6    questions today in the format of a deposition.
 7         A.   Correct.
 8         Q.   My question was:  Are you aware that at
 9    some point during your affiliation with this case
10    that World Financial Group has provided to your
11    counsel a set of written questions that we have
12    asked you to answer?
13         A.   Yes.
14         Q.   When did you become aware of those?
15         A.   When I replied to the e-mail, so it was
16    when I started filling out paperwork for the case,
17    so about a month or two ago.
18         Q.   So about two months ago you became aware
19    that there were written questions directed to you?
20         A.   Right.  I wouldn't even say more than a
21    month ago, let's say a month ago.
22         Q.   A month ago.
23         A.   A month ago, yeah.  Because I think the
24    questions were the last document that were sent out.
25         Q.   And are you aware that in addition to those
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   written questions that World Financial Group also

 2   provided to your counsel a set of requests for

 3   documents that were provided to you?

 4        A.  Yes.

 5        Q.  Did you find out about those for the first

 6   time around the same time you found out about the

 7   written questions?

 8        A.  Yes, sir.

 9        Q.  And who provided to you?

10        A.  The questions were provided to me by

11   Ms. Suzanne Leeds.

12        Q.  And how about the requests for documents?

13   Who provided those to you?

14        A.  Same thing, Suzanne Leeds.

15        Q.  About a month ago, correct?

16        A.  Yes.

17        Q.  Mr. Destin, I'm showing you what has been

18   marked as Exhibits 5 and 6 in your deposition today,

19   and I'd like to focus your attention on Exhibit 5

20   for the time being, if I can.

21        A.  Okay.

22        Q.  Can you take a look at this document and

23   tell me if you recognize it?

24        A.  It's a civil action, yes, with my name on

25   it.
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1     Q.  And this, I will represent to you, is a set

2     of the request for production of documents that were

3     provided to your counsel from World Financial Group.

4     Do you recall, is this the document that you saw

5     about a month ago?

6         **A.  I've seen this document, yes, sir.**

7     Q.  And you've told us a few minutes ago that

8     you recalled receiving requests for documents about

9     a month ago.  Is this the document that you recall

10    seeing?

11        **A.  I received a lot of documents, to be honest**

12    **with you.  Yeah, that would be the one, that would**

13    **be the document.**

14    Q.  All right.  And take a look at Exhibit 6,

15    if you will, the second document that I handed to

16    you.  And my question about this document is the

17    same.  I will represent to you this is a set of

18    written interrogatories, which are what I was

19    referring to a few minutes ago when I mentioned

20    written questions, that were provided to your

21    counsel by World Financial Group.  Is this the

22    document that you recall seeing about a month ago?

23    I'm looking at Exhibit 5 now.

24        **A.  Oh, I'm sorry.**

25    Q.  Not a problem.  Or no, I'm sorry, no, I

1    just screwed you up.  Exhibit 6.

**2          A.  To me they look the same, to be honest with**

**3    you.**

4          Q.  Exhibit 6 was the one I was just asking

5    that question about.

6               MR. WOLFE:  6 is the document request?

7               MR. BLACK:  6 is the interrogatories.

8               MR. WOLFE:  Okay.

**9          A.  I can't recall exactly when I saw this**

**10   document, yes.**

11         Q.  But you have seen this document before

12   today?

**13         A.  Yes, uh-huh.**

14         Q.  Mr. Destin, I'm showing you what's been

15   marked as Exhibit 7.

**16         A.  Okay.**

17         Q.  This, I will represent to you, is a copy of

18   responses to interrogatories that were provided to

19   World Financial Group by your counsel.

**20         A.  Okay.**

21         Q.  Can you take a look at this document and

22   tell me if you have ever seen this?

**23         A.  I've seen this document, yes.**

24         Q.  You have.

**25         A.  Yes.**

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1        Q.  And have you ever been asked, Mr. Destin,

 2   to review this document and then signed a

 3   verification under oath that the answers in this

 4   document are correct?

 5        A.  They asked me to verify the document and to

 6   make sure everything was correct.  But no, I didn't

 7   sign a waiver or I didn't sign anything like that.

 8        Q.  You weren't asked to sign a verification

 9   that everything was correct?

10        A.  I was required to sign the deposition --

11   not the deposition, I'm sorry, the documents if they

12   were correct.  But I didn't sign anything on the

13   side beside the document itself.

14        Q.  Okay.  When you say sign the documents,

15   what are you referring to?

16        A.  The complaint, I believe, the actual

17   document with my name on it.

18        Q.  Oh, I see, okay.  I'm talking -- the

19   complaint with your name on it is something separate

20   and apart from the document I'm showing you right

21   now.

22        A.  Okay.

23        Q.  The document I'm showing you now is what we

24   commonly refer to as discovery requests.

25        A.  Okay.
```

```
 1        Q.   And these are discovery responses.
 2        A.   Okay.
 3        Q.   And so my question is:  This document that
 4   I put in front of you is Exhibit 7.
 5        A.   Uh-huh.
 6        Q.   Which are described in the caption as
 7   Plaintiff Jordan Destin's Responses to Defendants'
 8   Requests for Interrogatories.
 9        A.   Correct.
10        Q.   My question is:  Has anyone ever asked you
11   to sign a sworn verification that the answers that
12   are contained in this document are accurate?
13        A.   No, sir.
14        Q.   And Mr. Destin, are you aware that the
15   responses that are included in this document were
16   untimely served on World Financial Group such that
17   any objections that you might have had to these were
18   waived?
19             MR. WOLFE:  Objection.
20        A.   I --
21             MR. WOLFE:  Don't answer the question if
22   you learned anything about it by conversations with
23   attorneys.
24        A.   I wasn't aware of it.
25   BY MR. BLACK:
```

```
 1        Q.  Okay.  You weren't aware that your counsel

 2   served these late and waived the objections?

 3        A.  No, sir.

 4            MR. WOLFE:  Objection.

 5   BY MR. BLACK:

 6        Q.  Mr. Destin, I'm showing you what's been

 7   marked as Exhibit 8.  Can you take a look at this

 8   document, tell me if you ever seen it before?

 9        A.  Yes, sir.

10        Q.  You have seen this before?

11        A.  I've seen this before.

12        Q.  When did you see this?

13        A.  When it was sent to me by e-mail.

14        Q.  This document with the answers included

15   were sent to you by e-mail?

16        A.  Yes.

17        Q.  Who sent them to you by e-mail?

18        A.  Ms. Suzanne Leeds.

19        Q.  Do you recall when they were sent to you by

20   e-mail?

21        A.  Again, it was within the same timeframe of

22   the last two months, I'd say.  I can't recall the

23   exact day.

24        Q.  Take a look, if you will, at the very

25   last -- I'm sorry, third to last page of this
```

```
 1   document.  It is the page numbered 13.
 2       A.  Okay.
 3       Q.  And this document right above the signature
 4   line has a date of October 2nd, 2013, do you see
 5   that?
 6       A.  Uh-huh, yes.
 7       Q.  Does that refresh your recollection at all
 8   as to when you may have seen this document?
 9       A.  I -- again, I've seen a lot of documents
10   that looks exactly the same one to another.  What I
11   can tell you is it was definitely in the last two
12   months.  As of the day, I can't tell you exactly.
13       Q.  And I want to ask you the same question
14   about this document that I asked you about Exhibit
15   6, which was the -- I'm sorry, Exhibit 7 which was
16   the other set of interrogatories, and that is:  At
17   any time have you been asked --
18       A.  I'm sorry.  There you go.  Okay.
19       Q.  At any time have you been asked by anyone
20   to review this document and to sign a sworn
21   verification that the answers in it are correct?
22       A.  I was asked to review the document, but I
23   wasn't asked to sign any waiver.
24       Q.  You said sign any --
25       A.  Waiver or nothing.
```

1      Q.  Okay.  I didn't mean a waiver.

2      **A.  Well, well --**

3      Q.  My question is I understand that you were

4   asked to review it.

5      **A.  Correct.**

6      Q.  Did anyone ever ask you to sign a sworn

7   verification attesting to the fact that the answers

8   in the document were true and correct under oath?

9      **A.  No, sir.**

10     Q.  Take a look, if you will, at page 4 of this

11  document, Mr. Destin.  And I'm going to ask you

12  about a number of the interrogatories that were

13  interposed to you.

14     **A.  Okay.**

15     Q.  And I will be referring to your response.

16     **A.  Okay.**

17     Q.  All right?  And when I refer to the

18  interrogatories, I will refer to them by number.

19  And if you look at the top of this first page,

20  number 4, you'll see a number 1 at the top of the

21  page, do you see that?

22     **A.  Correct.**

23     Q.  That would be Interrogatory Number 1.  So

24  we'll follow that cadence as we walk through the

25  document, okay?

```
 1        A.  Okay.

 2        Q.  Interrogatory 1 asks that you identify each

 3   person known or believed by you to have personal

 4   knowledge of any of the facts at issue or involved

 5   in the action.  And by action, we mean the lawsuit.

 6        A.  Okay.

 7        Q.  In response to this, the response reads,

 8   quote, plaintiff states that all similarly situated

 9   employees of defendant, Defendants' managers and

10   owners would have knowledge or information relevant

11   to the allegations set forth in the complaint.

12          Do you see that?

13        A.  I do.

14        Q.  The phrase all similarly situated employees

15   of defendant, who do you mean by that?

16          MR. WOLFE:  Objection.

17        A.  Okay, where is my response?  Because I lost

18   you, I'm sorry.

19        Q.  Yes, sir.  It is right here, and I was

20   referring to this phrase right here, all similarly

21   situated employees of defendant.  Who do you mean by

22   that, that phrase?

23          MR. WOLFE:  Objection.

24        A.  Well, it would be people I worked with.

25        Q.  And by that, you mean people like Christian
```

1    and Aline and Jennifer?

2        **A.   But is the question asking me are they**

3    **aware of the current lawsuit?**

4        Q.   The question was asking you to identify

5    anyone who you think has personal knowledge of any

6    of the facts at issue or involved in the action or

7    any of the events underlying the allegations in the

8    complaint, the answer, which is the document that

9    World Financial Group filed in response, or any

10   other pleading in the lawsuit.  So essentially

11   asking you to identify people who you believe have

12   personal knowledge of facts germane to your lawsuit.

13       **A.   I mean, unless they had it from me, I would**

14   **not know anybody else.**

15       Q.   Okay.  So when you say all similarly

16   situated employees of defendant, we're talking about

17   the people you talked about earlier?

18       **A.   I'm talking about the people I represent.**

19       Q.   Okay.  Who do you represent?

20           MR. WOLFE:  Objection.

21       **A.   The workers.   The workers.**

22       Q.   Just generally any workers who you believe

23   were employees of World Financial Group?

24       **A.   Yes, sir.**

25           MR. WOLFE:  Same objection.

```
 1   BY MR. BLACK:

 2        Q.  Can you identify any of them by name?

 3        A.  Beside the people I gave you the name of, I

 4   can't recall first and last name for the others.

 5        Q.  So you would include in that group Aline,

 6   am I right about that?

 7            MR. WOLFE:  Objection.

 8        A.  I would include people who worked, yes, for

 9   World Financial Group.

10   BY MR. BLACK:

11        Q.  My question was specific to Aline.

12        A.  Yes.

13        Q.  You would include Aline in that group?

14        A.  Yeah.

15            MR. WOLFE:  Objection.

16   BY MR. BLACK:

17        Q.  And you would include Christian in that

18   group?

19            MR. WOLFE:  Same objection.

20        A.  Yeah.

21   BY MR. BLACK:

22        Q.  You include Laura Chang in that same group?

23            MR. WOLFE:  Same objection.

24        A.  Yes.

25        Q.  You include Don Chang in that group?
```

```
 1              MR. WOLFE:  Same objection.
 2         A.  I'm not sure if Don Chang is involved in
 3    World Financial Group.  I'm not sure if he actually
 4    has a title.
 5    BY MR. BLACK:
 6         Q.  What do you mean by that?
 7         A.  Well, from my knowledge he's been in the
 8    company through his wife, so he was not officially
 9    part of the company.
10         Q.  Your testimony is you don't know that Don
11    Chang is officially associated with World Financial
12    Group?
13         A.  Correct.
14         Q.  If he were associated with World Financial
15    Group, that is if he signed an Associate Membership
16    Agreement, would he be one of the individuals that
17    you're seeking to represent?
18              MR. WOLFE:  Objection.
19         A.  Well, to me he's been since the beginning
20    because he was the one giving me the direction of,
21    you know, how to do my job, and again he was the
22    highest person I could refer to, if needed.
23         Q.  So my question is:  Is Don Chang among the
24    individuals who you believe is a similarly situated
25    employee of defendant?
```

```
 1              MR. WOLFE:  Objection.

 2        A.  My answer would be yes.

 3        Q.  And Jennifer would be as well?

 4        A.  Yes, sir.

 5              MR. WOLFE:  Same objection.

 6   BY MR. BLACK:

 7        Q.  You identify someone in this interrogatory

 8   answer named Stephanie.  Who is that?

 9        A.  Stefan, I'm sorry, it's Stefan, the person

10   I told you about earlier.

11        Q.  All right.  So Stephanie should be Stefan,

12   the person --

13        A.  It should be Stefan, a male person.

14        Q.  And I believe you identified Stefan as the

15   person who recruited Christian, correct?

16        A.  Correct.  They were working together.  So

17   I'm not sure about who recruited who, but they were

18   definitely working in the same office and they were

19   getting directive from the same -- them two.

20        Q.  They were getting directive from Don Chang?

21        A.  Laura Chang and Don Chang, yes.

22        Q.  And is it your understanding that the

23   direct -- to use your word -- directions that were

24   being given to the folks with whom you were

25   associated in Las Vegas were being handed down from
```

1    Laura Chang and Don Chang?

**2         A.   I'm assuming, yes, that they were under the**

**3    same.**

4         Q.   And Laura Chang and Don Chang were the

5    individuals that you noted earlier required

6    attendance at meetings?

**7         A.   Yes.**

8         Q.   And who I think you also said required that

9    you follow a certain strategy in how you approached

10   potential customers or recruits?

**11        A.   Yes, sir.**

12        Q.   Is it fair to say that any of the

13   requirements that you felt were imposed on your

14   relationship with World Financial Group, you believe

15   those came from Don and Laura Chang?

**16        A.   Not necessarily.  It came from the whole**

**17   office.**

18        Q.   Came from the whole office.  They were

19   located in California, correct?

**20        A.   Right, they were in California, so whenever**

**21   they came in town we had a meeting with them.  I**

**22   actually went to Anaheim myself to have a personal**

**23   meeting with them myself too.  But the whole office**

**24   was following the same directives.**

25        Q.   And those were the directives that were

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    coming down from Don and Laura?

 2        A.  Don and Laura was -- they were all CEO

 3    marketing, so they were the direct people I had in

 4    my team.  Regarding the other teams in the same

 5    office, I believe the different CEO directors.

 6        Q.  I see.  So when you say "your team in the

 7    office," who was a part of your team in the office?

 8    Was it Aline and Christian, Jennifer and Stefan?

 9        A.  Yes.

10        Q.  Anyone else?

11        A.  It was all the people, yes, we were about

12    15.  15 members in the team in total.  I just can't

13    recall the names of everybody else.

14        Q.  Was it your understanding that those

15    individuals were, to use your term, part of a team

16    because they had in effect been recruited by people

17    within that team?

18        A.  Yes.

19        Q.  And the other, again to use your term,

20    teams that were in Las Vegas, was it your

21    understanding those people were a part of those

22    teams because they had been recruited by others in

23    those teams?

24        A.  Well, they were basically all working by

25    team.  So we each -- each and every single team had
```

1   their own office, so we were basically going by

2   teams.  So I kind of knew who was with who, in what

3   team, but yeah, our team was under Laura Chang and

4   then Christian and Stefan, and follow the same

5   pattern.

6        Q.  Okay.  That in effect was the hierarchy

7   with your team was Laura and Don at the top, Stefan,

8   Christian, Aline, you.

9        A.  There you go.

10       Q.  Do you know if anyone was in that hierarchy

11  higher than Don and Laura?

12       A.  I've -- I had a name given to me, Tom Lu.

13       Q.  Tom Lu?

14       A.  Uh-huh.  Which I don't believe I've never

15  met -- I don't think I've ever met him.

16       Q.  All of the individuals -- let me strike

17  that.

18            Are you aware of anyone who was higher in

19  the hierarchy than Tom Lu?

20       A.  No.

21       Q.  Do you have any information to suggest that

22  Tom Lu was a corporate officer of World Financial

23  Group?

24            MR. WOLFE:  Objection.

25       A.  No, sir.

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1   BY MR. BLACK:

 2       Q.  Do you have any information as you sit here

 3   today to suggest that Tom Lu was employed by World

 4   Financial Group in Johns Creek, Georgia?

 5           MR. WOLFE:  Objection.

 6       A.  I don't know.

 7       Q.  That's true for everyone else in the

 8   hierarchy too, correct?

 9       A.  Correct.

10       Q.  And with regard to the individuals we just

11   talked about, Tom Lu down through Don and Laura and

12   the others, do you have any information to suggest

13   that World Financial Group in Johns Creek, Georgia

14   was providing those requirements and directions that

15   they were then sharing with you?

16       A.  Of course.

17       Q.  What evidence do you have that that was the

18   case?

19       A.  Well, the name of World Financial Group was

20   in our offices, all the documents that were provided

21   by us was World Financial Group, the list of client

22   we are to call, the list of people we could recruit

23   was provided by World Financial Group, the books we

24   had to buy, the nametag, everything was named World

25   Financial Group.
```

1       Q.   You said the list of individuals you were

2    to call was provided by World Financial Group?

3       **A.   Yes.   Well, it was -- the name World**

4    **Financial Group was on the paper.**

5       Q.   Aw, I see.   But you don't know who provided

6    that list, correct?

7       **A.   No, sir.**

8       Q.   That list may well have been provided by

9    someone in your hierarchy, correct?

10      **A.   Yes, sir.**

11      Q.   In fact, one of the things that you were

12   doing in relation to your association with World

13   Financial Group was to try and develop your own list

14   of contacts, correct?

15      **A.   I was trying to create a team, yes.**

16      Q.   You were trying to create a team by

17   recruiting others to join World Financial Group?

18      **A.   Yes, sir.**

19      Q.   So that there would, in this hierarchy,

20   there would be folks who then were reporting up to

21   you, so to speak, correct?

22      **A.   Yes, correct.**

23      Q.   And that was something you started to do

24   immediately, or very close thereafter to joining

25   World Financial Group.

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1        A.  Correct.

 2        Q.  You had at least one individual who you

 3   recruited, right, Thibaud Lucas.

 4        A.  Yes, sir.

 5        Q.  And at any point were you contacted by

 6   World Financial Group at the corporate level,

 7   anybody located in Johns Creek, to give you specific

 8   instructions that you were then to provide to

 9   Thibaud Lucas?

10        A.  No, sir.

11        Q.  The information that you provided to

12   Thibaud, was that information that you had been

13   provided by those up from you, meaning Aline or

14   Stefan or Christian or Don or Tom?

15        A.  Yes, sir.

16        Q.  You understood -- you understood that by

17   becoming associated with World Financial Group if

18   you could, as you just put it, recruit a team and

19   that team could become licensed and you were to

20   become licensed, that you could then obtain

21   commissions based on either your sales or the sales

22   of the people under you, correct?

23        A.  Yes.

24        Q.  And that was, in fact, what you were trying

25   to achieve?
```

1          A.   That was my goal.

2          Q.   Did you also encourage the folks -- you had

3     one recruit, Mr. Thibaud Lucas.  Did you encourage

4     Mr. Lucas to also recruit so that he in turn would

5     have people below him?

6          A.   Yes, sir.

7          Q.   And that was also for the purpose of

8     allowing him to obtain commissions were he to become

9     licensed and the people below him were to become

10    licensed, correct?

11         A.   Correct.

12         Q.   When you were talking to Mr. Lucas about

13    recruiting did you tell him anything about what he

14    should say to folks he was recruiting about how they

15    would be compensated?

16         A.   Well, not about compensation.  Well, it was

17    part of the sales training, obviously.  So the sales

18    pitch was you sell the product but you also recruit.

19    And in that recruiting part you also have commission

20    questions or, you know, compensation also.

21         Q.   And as any part of that training, did any

22    part of that training talk about telling recruits

23    that they would be paid an hourly wage for their

24    work?

25         A.   No, sir.

1        Q.   Did any part of that training involve

2    telling recruits that they would be paid a salary

3    for anything that they did associated with World

4    Financial Group?

5        **A.   No, sir.**

6        Q.   All of the information that was received

7    talked about being able to receive commissions if

8    someone were to become licensed, correct?

9        **A.   Correct.**

10       Q.   And you provided the understanding that you

11   wouldn't receive anything until you were, in fact,

12   licensed, correct?

13       **A.   Correct.**

14       Q.   The training that you mentioned, was that

15   provided by someone up from you in your hierarchy?

16       **A.   Yes, sir.**

17       Q.   Who provided that?

18       **A.   Christian.**

19       Q.   And when Christian provided this training

20   were you the only person who received the training

21   or was the training more of a group training?

22       **A.   It was a group training at first, but when**

23   **you a trainee, so when you just join the company,**

24   **for about two or three weeks they will basically**

25   **show you how to do a presentation.  So he was the**

1    one putting the most pressure on me at the time.

2        Q.   And let me ask this:  What was the focus of

3    your, again, to use your term, team, with regard to

4    selling either financial services products or

5    insurance?  Was the focus on financial services, was

6    the focus on financial planning, was it on insurance

7    sales?  What was the focus?

8        A.   Different financial product.  The most

9    important one was life insurance, definitely a big

10   one, and recruiting.

11       Q.   So life insurance and recruiting --

12       A.   Yes.

13       Q.   -- were the two most important things that

14   were discussed in any training that you received

15   with regard to either your attempt to become

16   licensed and then sell or to recruit.

17       A.   Yes.

18       Q.   Do you know whether other, again to use

19   your term, teams, have different focuses; that is,

20   whether other teams might be focused on the

21   financial services and securities side of selling

22   and recruiting?

23       A.   One of my team member, teammate, focused

24   on, I believe the product was called Lifelock.

25       Q.   Who was that?

1       A.   Jennifer.

2       Q.   So someone within your own team --

3       A.   Yes.

4       Q.   -- had a different focus in terms of what

5   she was doing with the effort she was making than

6   even you did.

7       A.   That's right.

8       Q.   Within your same team did others also have

9   a different focus?

10      A.   Yes.

11      Q.   Who else had a different focus?

12      A.   Christian.

13      Q.   What was Christian's focus?

14      A.   Recruiting.

15      Q.   So Christian was not really focused on

16   selling anything, he was focused on recruiting

17   others.

18      A.   Correct.

19      Q.   How about others on your team?  Did they

20   have a different focus?

21      A.   Stefan will be the same focus, it will be

22   recruiting and sales.

23      Q.   And sales, was he --

24      A.   Life insurance.

25      Q.   Life insurance.

1      **A.  Life insurance.**

2          Q.  Did you ever have occasion to talk to

3    somebody on any of the other teams that you say were

4    there in Las Vegas?

5      **A.  Yes, couple of times.**

6          Q.  Did you understand that they, people within

7    those groups, had different focuses?

8      **A.  They had different focuses, yes.**

9          Q.  And that would change -- those different

10   focuses would dictate the kind of the nature of what

11   you were doing, correct?  In other words, if you're

12   focused on selling life insurance as opposed to

13   simply being focused on recruiting, as opposed to

14   simply being focused on securities, each person

15   might be doing something different then, correct?

16     **A.  Correct.  But the team goal for each -- I**

17   **should not say each and every team, but most of the**

18   **team I got in touch with, the goal was to sell life**

19   **insurance because it was one of the best products we**

20   **had at World Financial Group, and to recruit.**

21   **Recruit was something we could not avoid, like we**

22   **could not go by a day without talking about**

23   **recruiting.**

24         Q.  Do you know whether the -- were you

25   provided with recommendations on how to recruit?

1          **A.  Of course, yes.**

2          Q.  Do you know whether the recommendations

3     that you were provided with respect to how to

4     recruit were the same recommendations provided to

5     other associates of World Financial Group around the

6     country?

7          **A.  Around the country, I do not know.  But in**

8     **the Las Vegas office, yes.**

9               (Mr. Tompkins exits)

10    BY MR. BLACK:

11         Q.  But outside of the Las Vegas office.

12         **A.  The recruiting part was exactly the same,**

13    **yes.  I don't know about the focus of the other**

14    **teams in the country.**

15         Q.  My question was:  I understand you to be

16    saying that you were provided with certain

17    recommendations --

18         **A.  Right.**

19         Q.  -- about how to recruit.

20         **A.  Correct.**

21         Q.  Tactics, strategy, that sort of thing,

22    right?

23         **A.  Uh-huh.**

24         Q.  Do you know whether individuals associated

25    with World Financial Group in other parts of the

1    country may have been provided different tactics or

2    different recommendations?

3         **A.  I don't know.**

4         Q.  You don't know.  Do you have any personal

5    knowledge of how anyone associated with World

6    Financial Group functioned or performed any

7    responsibilities outside of your team in Las Vegas?

8         MR. WOLFE:  Objection.

9         **A.  No, I don't know.**

10   BY MR. BLACK:

11        Q.  Do you know whether there are other teams

12   or hierarchies within World Financial Group for whom

13   the focus is not life insurance and recruiting, but

14   instead might be securities and recruiting?

15        **A.  I'm assuming yes, I just don't know.**

16        Q.  But it may very well be.

17        **A.  I would not be surprised if obviously each**

18   **team has a different focus and each office has a**

19   **different focus, yes.**

20        Q.  One of the documents that you produced was

21   a cover page, I don't think we got the whole thing,

22   but it was a cover page to a document the author of

23   which was an individual named Xuan Nguyen.  Do you

24   recall providing that document?

25        **A.  Yes, it's actually two books, two manuals.**

1        Q.  Do you know who Xuan Nguyen is?

**2        A.  Absolutely not.**

3        Q.  Do you have any understanding about where

4    that book came from?

**5        A.  I bought it.**

6        Q.  Poorly worded question.  Do you have any

7    knowledge of how that book was written or put

8    together?

**9        A.  I read the book, yes, but I don't know how**

**10   it got put together.**

11       Q.  Do you know if Xuan Nguyen is an associate

12   of World Financial Group?

**13       A.  Well, he's representing the company, that's**

**14   for sure.**

15       Q.  In the sense that World Financial Group was

16   written on his book.

**17       A.  Correct, and it followed the technique that**

**18   we had to do.**

19       Q.  Do you know if there were techniques that

20   were recommended throughout different hierarchies of

21   individuals associated with World Financial Group

22   that differed from the technique that Mr. Win

23   recommended?

**24       A.  Yes, sir.**

25       Q.  There were?

 1          A.  Yes, sir.

 2          Q.  Were you knowledgeable of those?

 3          A.  No.

 4          Q.  But you were aware that there were.

 5          A.  Yes.

 6          Q.  The reason that there were is because there

 7     are individuals at the top of some of these

 8     hierarchies who have personal strategies and ideas

 9     on how to build their own business, correct?

10          A.  Yes.

11              (Mr. Tompkins enters).

12     BY MR. BLACK:

13          Q.  And they offer those to you and other

14     associates as recommendations on how to build your

15     business, correct?

16          A.  Well, they tell you to follow a certain

17     path.

18          Q.  Right, in an effort to do that, correct?

19          A.  Well, in an effort for you to become

20     successful within the company, yes.

21          Q.  Right.  If you wanted to -- strike that.

22              You mentioned here on page 4 that another

23     individual who has knowledge regarding the

24     allegations in the complaint is Michael Cohen, do

25     you see that?

```
 1        A.  Yes.

 2        Q.  What does Mr. Cohen have knowledge of?

 3        A.  He's aware of the lawsuit.

 4        Q.  Understanding that he's aware of the

 5   lawsuit, but you've said here that he would have

 6   knowledge regarding allegations in the complaint.

 7   You've read the complaint, right?

 8        A.  Right.

 9        Q.  What knowledge does Mr. Cohen have about

10   the allegations in the complaint?

11        A.  Well, that's formally his complaint.

12        Q.  He is the lead plaintiff in this case,

13   correct?

14        A.  He was.

15        Q.  Do you understand -- is it your

16   understanding that Mr. Cohen is no longer a part of

17   this case?

18            MR. WOLFE:  Objection, don't answer that if

19   you --

20        A.  I'm not sure.

21            MR. WOLFE:  -- can't answer without talking

22   to your lawyers.

23        A.  I'm not sure.

24   BY MR. BLACK:

25        Q.  Well, let me ask you this:  Who, as you
```

 1   understand it, is Michael Cohen?

 2        **A.   Michael Cohen is the person to me that**

 3   **initially started the lawsuit.**

 4        Q.   Have you ever spoken to Mr. Cohen?

 5        **A.   No.**

 6        Q.   Have you ever met Mr. Cohen?

 7        **A.   No.**

 8        Q.   Have you ever communicated with Mr. Cohen

 9   via e-mail?

10        **A.   No.**

11        Q.   Do you have any knowledge of what it is

12   Mr. Cohen may or may not know about the allegations

13   in the complaint?

14        **A.   I don't.**

15        Q.   And I'll ask you the same question for the

16   other individuals that are listed here:  Adam

17   Edwards, Golaleh Kamran, Herbert Russell and Regina

18   Sanders.  As you sit here do you have any

19   information with respect to what it is they know

20   about the allegations in the complaint?

21        **A.   I don't.**

22        Q.   Jennifer and Stefan, elsewhere in these

23   interrogatories and other documents you provided you

24   indicated that you, to use your words, worked at the

25   Las Vegas office five to six days a week, five to

```
 1    six hours a day, correct?
 2         A.   Correct.
 3         Q.   And I just want to understand:  Were these
 4    individuals people that you worked alongside --
 5         A.   Yes, sir.
 6         Q.   -- during those hours?
 7         A.   Yes, sir.
 8         Q.   But you don't know their last names.
 9         A.   I don't know their last names, and as you
10    know we had different schedules, obviously, so I
11    will see them in and out of the offices.
12         Q.   You talked about, in some of the documents
13    you provided, you talked about mandatory meetings,
14    correct?
15         A.   Correct.
16         Q.   Were all the individuals that you've
17    identified required to be at those meetings?
18         A.   Yes, sir.
19         Q.   So you would have been there at the same
20    time?
21         A.   Yes, sir.
22              MR. WOLFE:  If you could give us a
23    five-minute break when you get to a stopping point.
24              MR. BLACK:  Sure.
25    BY MR. BLACK:
```

```
 1        Q.  I want to focus your attention, if I can,

 2   on Interrogatory Number 2.  And this interrogatory

 3   asks you to identify every current or former

 4   employee, associate, there are a number of terms

 5   there if you want to take a look at it, of defendant

 6   whom you or your lawyers have communicated with

 7   regard to the complaint.

 8            And if you'll look at the next page, the

 9   answer says, It is impossible -- plaintiff states

10   that it is impossible for him to recall every

11   specific communication he had with whom during his

12   employment with WFG, do you see that.

13        A.  Yes.

14        Q.  As I understood it earlier, your testimony

15   was that you have not spoken to any one of -- any of

16   your former -- again, to use your term, team

17   members, with regard to the lawsuit, correct?

18        A.  Correct.

19        Q.  Other than your communication with Aline to

20   try and recovery documents.

21        A.  Correct.

22            MR. BLACK:  You want to take that break,

23   Steve?

24            MR. WOLFE:  If you don't mind.

25            THE VIDEOGRAPHER:  Stand by, please.  And
```

1    we're off the record, the time is 2:15.

2           (Recess)

3           THE VIDEOGRAPHER:  And we are back on the

4    record, the time is 2:27.  You may continue, sir.

5    BY MR. BLACK:

6       Q.  Mr. Destin, before we took a break we were

7    looking at what has been marked as Exhibit 8, and I

8    want to focus your attention back on this document,

9    if I can.

10          Take a look at page 6 of the document, if

11   you will.  And this is Interrogatory Number 5 that I

12   want to focus your attention on.  And Interrogatory

13   Number 5 asks you for a certain period of time to

14   identify quote each and every period of time you

15   allege that you, quote, worked, end quote, as a,

16   quote, financial product marketer, financial product

17   marketer associate or cold caller, end quote,

18   associated with defendant, as that phrase has been

19   used by you in the complaint.

20          Do you see that?

21      **A.  Yes, sir.**

22      Q.  And in the response n the second line of

23   the response you say, Plaintiff states that he was

24   only employed by WFG as a financial product

25   marketer, associate or cold caller, do you see that?

1      **A.  Yes, sir.**

2          Q.  Those titles that have been included, did

3      you provide those titles to counsel?

4      **A.  Yes, sir.**

5          Q.  All right.  And do you understand those to

6      be different titles from one another?

7      **A.  To me they're actually the same.**

8          Q.  They're all the same.

9      **A.  Yes, sir.**

10         Q.  They're synonymous with one another?

11     **A.  Well, for me it's the same title, either**

12     **financial advisor, product marketer, associate, will**

13     **define my position at World Financial Group.**

14         Q.  Were you given one of these positions by

15     anyone who recruited you?

16     **A.  Of course, yes, sir.**

17         Q.  What position were you -- what title were

18     you given by someone who recruited you?

19     **A.  Financial advisor.**

20         Q.  Financial advisor.

21     **A.  Yes, sir.**

22         Q.  And who provided you with that title?

23     **A.  Christian.**

24         Q.  Now, that's not one of the titles that's

25     listed here.  These other titles, did anyone ever

1    call you a financial product marketer?

**2          A.   No, sir.**

3          Q.   Did anyone ever call you a cold caller?

**4          A.   No, sir.**

5          Q.   And the term associate, that is the term,

6    in fact, that is used in the AMA agreement, correct?

**7          A.   Correct.**

8          Q.   And do you understand that the -- in formal

9    terms the title that you would have had as a result

10   of your having signed that AMA and become a member

11   of World Financial Group is associate, correct?

**12         A.   To me the title were all the same.**

13         Q.   So the financial advisor title and the term

14   associate to you are the same.

**15         A.   Financial advisor was a title I was giving**

**16   myself, that they told me to give to the customer,**

**17   okay.**

18         Q.   So that's the title you were using when you

19   would talk to a potential customer or potential

20   recruit.

**21         A.   Correct.**

22         Q.   Do you have any information to suggest that

23   anyone associated with WFG at the corporate level

24   told Christian to give you that title?

**25         A.   I don't know, sir.**

1      Q.  Did anyone at World Financial Group at the

2    corporate level give you that title?

3      **A.  Yes.**

4      Q.  Who?

5      **A.  Oh, I'm sorry, at the corporate, no.**

6      Q.  No one did, right?

7      **A.  No, no one at the corporate.**

8      Q.  Do you have any information to suggest that

9    World Financial Group at the corporate level

10   controlled at all how individuals who were

11   associates referred to themselves?

12     **A.  I would not know that.**

13     Q.  You have no information to suggest that

14   they did, though, correct?

15     **A.  I don't know -- yeah, I don't have any**

16   **knowledge.**

17     Q.  You mentioned earlier that you had a cell

18   phone that the provider for which was Cricket that

19   you used during the time that you were associated

20   with World Financial Group, correct?

21     **A.  Yes, sir.**

22     Q.  How did you -- did you have to pay a

23   monthly fee for that service?

24     **A.  Through my phone provider, you mean?**

25     Q.  Yes.

1       A.   Yes.

2       Q.   Okay.  And did you pay for service on your

3   cell phone through Cricket on a monthly basis?

4       A.   Yes, sir.

5       Q.   Did you pay for that?

6       A.   Yes, sir.

7       Q.   Were you reimbursed by anyone associated

8   with World Financial Group?

9       A.   No.

10      Q.   You testified earlier that in the course of

11  your work at World Financial Group your association

12  with World Financial Group, that you utilized a

13  personal computer, correct?

14      A.   Yes.

15      Q.   I think that was a Toshiba laptop, right?

16      A.   Correct.

17      Q.   Is that a laptop that you purchased

18  yourself?

19      A.   Yes.

20      Q.   Were you reimbursed by anyone associated

21  with World Financial Group for that laptop?

22      A.   No, sir.

23      Q.   You mentioned in one of your interrogatory

24  responses that -- strike that.

25           I assume -- am I correct to assume that

1    during that same period of time you also had home

2    Internet service?

3         **A.   Yes, sir.**

4         Q.   Did you have a hard line or wifi?

5         **A.   Wifi.**

6         Q.   And the wifi, am I correct that you would

7    use that Internet service sometimes in connection

8    with your association with World Financial Group?

9         **A.   Yes, sir.**

10        Q.   Did you pay for that wifi service?

11        **A.   Yes.**

12        Q.   Were you ever reimbursed for that wifi

13   service by anyone associated with World Financial

14   Group?

15        **A.   No.**

16        Q.   Did you have an expectation that you would

17   be reimbursed for either your cell phone, your

18   laptop or your Internet service by anyone associated

19   with World Financial Group or World Financial Group?

20        **A.   Yes.**

21        Q.   You did think you would be reimbursed?

22        **A.   Yes, sir.**

23        Q.   Who told you that you would be reimbursed?

24        **A.   Well, that's what they made me believe;**

25   **that, you know, basically if you're part of the**

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1     **company and like you come with your own car, you pay**

2     **for your own gas, you get reimbursed at some point.**

3          Q.  Did you have an automobile back then?

4          **A.  Yes.**

5          Q.  And did you sometimes drive from place to

6     place to meet with prospective customers or

7     potential recruits?

8          **A.  Yes, sir.**

9          Q.  And what kind of car were you driving at

10    that time?

11         **A.  It was a Dodge Stratus.**

12         Q.  Did you have the same car throughout the

13    entire time that you were associated with World

14    Financial Group?

15         **A.  Yes.**

16         Q.  So it was the Dodge Stratus the whole time?

17         **A.  Yes.**

18         Q.  Did you lease or purchase the document?

19              MR. WOLFE:  Do we need to go off a minute

20    and get some towels?

21              MR. BLACK:  Go off for a second.

22              THE VIDEOGRAPHER:  We're off the record,

23    the time is 2:34.

24              (Recess)

25              THE VIDEOGRAPHER:  And we are back on the

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

 1   record, the time is 2:35, you may continue.

 2   BY MR. BLACK:

 3       Q.  The question I asked was:  Did you lease or

 4   purchase the Dodge Stratus?

 **5       A.  I bought it.**

 6       Q.  Okay.  So you owned the Dodge Stratus, or

 7   at least were making payments at that time?

 **8       A.  I owned it.**

 9       Q.  You owned it, okay.  Had you bought it

10   outright or had you made payments?

**11       A.  I bought it -- bought it out.**

12       Q.  And you purchased that automobile entirely

13   on your own?

**14       A.  Yes, sir.**

15       Q.  Did anyone associated with World Financial

16   Group reimburse you for the cost of that vehicle?

**17       A.  No.**

18       Q.  And I believe you mentioned a second ago

19   that you would from time to time drive from location

20   to location to meet with potential customers or

21   potential recruits, correct?

**22       A.  Correct.**

23       Q.  Did anyone from World Financial Group

24   reimburse you for any of your expense associated

25   with your automobile, including your gas?

1      **A.   No.**

2           Q.   When you would go to meet with a potential

3      customer or recruit, how did you dress?

4      **A.   Professionally.   We were required to wear**

5      **tie and business attire.**

6           Q.   So a tie, a suit, dress shirt?

7      **A.   Yes.**

8           Q.   Did you have your suits and dress shirts

9      laundered?

10     **A.   Yes.**

11          Q.   Did anyone associated with World Financial

12     Group or World Financial Group reimburse you for the

13     cost of your dry cleaning?

14     **A.   No.**

15          Q.   At some point you had business cards made

16     up, correct?

17     **A.   Yes.**

18          Q.   That you used in connection with your

19     efforts to both reach out to potential customers and

20     to seek out potential recruits, correct?

21     **A.   Correct.**

22          Q.   How did you obtain those business cards?

23     **A.   Through the company called Vistaprint.**

24          Q.   And Vistaprint is an outfit that's Internet

25     based and through which you can order personal

 1   business cards relatively cheaply and quickly,

 2   correct?

 3          **A.   Correct.**

 4          Q.   And that's something that you decided to

 5   do?

 6          **A.   Correct.**

 7          Q.   Did you pay for those business cards?

 8          **A.   Yes.**

 9          Q.   Why did you decide to put together business

10   cards?

11          **A.   Well, I think that when you represent a**

12   **company such as World Financial Group, you try to do**

13   **your best to show that you're somebody, you know,**

14   **that's legit, first of all, that you have a local**

15   **phone number, that if you recruit or don't recruit**

16   **people, at least they have a way to contact you and**

17   **get in touch with you.  A few days to follow up**

18   **behind, you know?**

19          Q.   Fair enough.  And so obtaining business

20   cards was something that you thought you could do to

21   enhance your ability to both make contact with and

22   keep contact with potential recruits and potential

23   customers?

24          **A.   Right, and improve my status in the**

25   **company, basically.**

1      Q.   And hopefully improve the extent to which

2   you could develop a team, correct?

3      **A.   Correct.**

4      Q.   How did you describe yourself on your

5   business cards, if you recall?

6      **A.   Associate.**

7      Q.   What are some of the other things that you

8   did when you were associated with World Financial

9   Group to further your ability to meet or retain

10   potential recruits or customers, like your business

11   cards?

12      **A.   Business card was the most important.**

13   **Doing a followup on people cases is very important.**

14   **And one of the most important thing was to invite**

15   **the people to a presentation.**

16      Q.   Would you on occasion set up a presentation

17   to which you would invite people?

18      **A.   Yes.**

19      Q.   And would you be the person to give the

20   presentation?

21      **A.   Yes.**

22      Q.   Would you choose the location?

23      **A.   Each case is different, but nine times out**

24   **of ten, 90 percent of the time, was in the office.**

25      Q.   Okay.  So the office was available to you

```
 1   to make a presentation?

 2        A.  Yes, sir.

 3        Q.  Okay.  But other occasions you could choose

 4   to give a presentation outside the office?

 5        A.  Right, yes, because if it, you know, helps

 6   out for some people because they're not able to come

 7   to the office or they're like located in another

 8   part of town, yes.

 9        Q.  Could you choose, for example, to hold a

10   presentation at a restaurant?

11        A.  No.

12        Q.  Okay.  If you didn't hold it at the office,

13   where might you hold a presentation?

14        A.  It will be at people's home.

15        Q.  At home.  When you conducted one of the

16   presentations would you provide food or drink or

17   anything like that?

18        A.  Drinks, as always.

19        Q.  You would?

20        A.  Yes.

21        Q.  And did you pay for those drinks?

22        A.  Yes.

23        Q.  Did anyone from World Financial Group or

24   anyone associated with World Financial Group

25   reimburse you for those drinks?
```

```
 1          A.   No.

 2          Q.   To the extent that you didn't become

 3    licensed, and as I understand it you didn't, there

 4    was the potential that you had this outlay of

 5    expense associated with your phone or your laptop or

 6    your business cards or your drinks for a meeting,

 7    and if you ultimately didn't become licensed and

 8    made commissions back that would represent a loss,

 9    correct?

10          A.   Yes, sir.

11          Q.   And in fact, you did suffer that loss,

12    correct?

13          A.   Yes, sir.

14          Q.   And if by the same token, if you were to

15    have become licensed and developed a team and

16    perhaps the members of your team themselves

17    developed teams, you might, in fact, ultimately turn

18    a profit over your expenses that you incurred in

19    growing and building that team, correct?

20          A.   I didn't get a chance to see it.

21          Q.   I'm saying hypothetically, if you had

22    become licensed and built a team, you could, in

23    fact, have made commissions over and above the

24    expenses that you incurred, correct?

25          A.   Yes.
```

1      Q.  And that was part of the risk associated

2   with being associated with World Financial Group

3   that you learned of, correct?  That you may either

4   have a profit or a loss, ultimately for you it was a

5   loss, right?

6      **A.  It was a loss for me, yes.  But the thing**

7   **to remember is every sales speech or every meeting**

8   **or one-on-one coaching that I attended, they never**

9   **talked about loss, never.**

10     Q.  That would be sort of negative, right?

11     **A.  It will be negative, as well for your**

12  **teammates, as well for your clients.**

13     Q.  So the focus was on how to develop your

14  business to recruit others, to recruit customers, so

15  that, in fact, you were making money, right?

16     **A.  Well, the focus was to develop World**

17  **Financial Group business.**

18     Q.  Were you solely involved in this endeavor

19  to help World Financial Group make money or were you

20  hoping to make money?

21     **A.  I was hoping to make money, but I knew they**

22  **were making money too.**

23     Q.  But at the end of the day your interest

24  was, as I would imagine it should be, and I don't

25  use this term in a negative way, a selfish one in

1    the sense that you were hoping you would make money,

2    correct?

3         **A.   Yes.**

4         Q.   You might turn a profit.

5         **A.   Yes, sir.**

6         Q.   Besides the presentations that we talked

7    about, business cards, what other things did you

8    do -- were there any creative things that you tried

9    to do to either attract recruits or obtain

10   customers?

11        **A.   PowerPoint.**

12        Q.   You put together PowerPoint?

13        **A.   PowerPoint documents, yes.**

14        Q.   And what was subject of those PowerPoints?

15        **A.   How to become financially independent.**

16        Q.   And did you put that PowerPoint together?

17        **A.   Yes, sir.**

18        Q.   Did you put it together based on some of

19   the information that was shared with you by those

20   higher in your hierarchy?

21        **A.   Well, I put it, the PowerPoint, together**

22   **based on the product World Financial Group was**

23   **presenting, I would have learned about the company,**

24   **you know and the whole same technique, basically.**

25        Q.   Was part of the PowerPoint not only how to

1    become financially independent through investing,

2    but also to recruit them to join World Financial

3    Group?

4         **A.  Of course it was.**

5         Q.  When you met with recruits did you discuss

6    the fact that you were spending some of your own

7    money and hadn't yet seen a profit?

8         **A.  No, I never discussed that.**

9         Q.  That might have discouraged them from

10   participating?

11        **A.  Yes, sir.**

12        Q.  I understand that you also posted

13   advertisements in Craig's List.

14        **A.  Yes, sir.**

15        Q.  And posted an advertisement, at least one,

16   on Jobs.com?

17        **A.  Yes, sir.**

18        Q.  Let's take them one at a time.  The Craig's

19   List post, did you draft and create the post?

20        **A.  Yes, sir.**

21        Q.  Did you put it up on your own?

22        **A.  Yes, sir.**

23        Q.  Was that your idea to do so?

24        **A.  No.**

25        Q.  Okay.  Were you instructed to do that?

1      **A.   Yes, sir.**

2      Q.   By whom?

3      **A.   People I worked with.**

4      Q.   When you say people you worked with, was

5      that the people higher than you in your hierarchy?

6      **A.   Right, people on my team.**

7      Q.   Christian, Aline, people like that?

8      **A.   And all the people in the offices, yes,**

9      **sir.**

10     Q.   And so is it your testimony that you were

11     not given the option of using Craig's List or not,

12     you were told you had to use Craig's List?

13     **A.   I was not told I had to, I was told that it**

14     **is the best -- a good way to contact people.  Any**

15     **jobs website is good, so Craig's List, Indeed.com,**

16     **Jobs.com, website.**

17     Q.   So Craig's List, Indeed.com, Jobs.com?

18     **A.   Correct.**

19     Q.   Did you ever use anything like Monster.com?

20     **A.   I don't remember.**

21     Q.   So I just want to make sure your testimony

22     is clear.  You testified a few minutes ago that you

23     were required to do it, but I think you've changed

24     that to these were things that were recommended as

25     ways to attract new recruits, and those were things

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   that you chose to do based on that recommendation.

 2        A.  Well, I was -- yes, I chose to do my own

 3   posting, correct.  But it was strongly suggested by

 4   the company that you do so.

 5        Q.  Okay.  When you say strongly suggested by

 6   the company, you mean strongly suggested by those

 7   with whom you were associated on your team in Las

 8   Vegas, correct?

 9        A.  Yes, people in the Las Vegas office,

10   correct.

11        Q.  All right.  You've used that term a number

12   of times, the Las Vegas office.  Do you know who

13   paid the rent on that office space?

14        A.  All of us.

15        Q.  Y'all did?

16        A.  Yes.

17        Q.  So everyone kicked into the rent for that

18   office space?

19        A.  From my knowledge, yes.  Because we were

20   asked to pay, I believe it was $20 a month at the

21   time.

22        Q.  And then as far as you know that $20 a

23   month covered the office expense?

24        A.  Yes.

25        Q.  And do you have any information to suggest
```

1    that World Financial Group, that is the corporate

2    entity, provided any reimbursement to anyone for

3    that office space?

4         **A.  I would not know.**

5         Q.  Do you know if somebody who becomes

6    associated with World Financial Group is required to

7    open an office space as a formal office space as

8    opposed to working out of their home or something

9    like that?

10        **A.  They are not required to.**

11        Q.  All right.  You worked out of an office

12   space that you shared with a number of other people

13   associated with World Financial Group, though.

14        **A.  Yes.**

15        Q.  Were there supplies in that office?

16        **A.  Yes, sir.**

17        Q.  Were there computers?

18        **A.  There was personal computers, yes.**

19        Q.  As you understood it, were those the

20   personal computers of the individuals who were

21   associated with World Financial Group?

22        **A.  Yes.**

23        Q.  Those were not necessarily corporate

24   computers.

25        **A.  They were not corporate computers.**

1          Q.   Were there office supplies like printers,

2     paper, pens, that sort of thing?

3          **A.   Printers, pen, table, coffee machine,**

4     **conference room, white board.**

5          Q.   How were those paid for?

6          **A.   Us.   We were -- that's part of the**

7     **contribution we were making every month.**

8          Q.   So the individual associates who were

9     affiliated with World Financial Group were paying

10    for all the office supplies as well.

11         **A.   Yes.**

12         Q.   It wasn't being reimbursed or paid for by

13    World Financial Group.

14         **A.   I don't know who was really paying for it,**

15    **but I know we were contributing to it.**

16         Q.   You don't have any information or evidence

17    to suggest that World Financial Group was paying for

18    it, though.

19         **A.   Well, the name was on the door and all this**

20    **information relating to World Financial Group like**

21    **our business location was on World Financial Group**

22    **websites, so, I mean, World Financial Group was**

23    **involved.**

24         Q.   But my question was:  You don't have any

25    information or evidence to suggest that World

1   Financial Group was, in fact, paying for the office

2   space or the office supplies.  You have inferred

3   that based on the fact that it said World Financial

4   Group on the door.

**5        A.  Right.**

6        Q.  But you don't know of any information to

7   suggest that that was true.

**8        A.  I -- I would not know.**

9        Q.  We've talked now about business cards and

10  postings on websites like Indeed.com and Jobs.com.

11  Were there any other things that you personally did

12  of a creative nature to try and attract customers or

13  recruits during the time you were associated with

14  World Financial Group?

**15       A.  That's about it, PowerPoints, on-line**

**16  posting, presentation, team meeting.**

17       Q.  Team meetings, you mentioned earlier and

18  elsewhere in some of the documents that you provided

19  that you were required to attend team meetings,

20  correct?

**21       A.  Yes, sir.**

22       Q.  Did you receive any correspondence from

23  World Financial Group corporate in Johns Creek,

24  Georgia that told you that you had to attend

25  meetings?

1      **A.   I received a phone call from people who**

2   **represent World Financial Group, yes.**

3      Q.   Who called you?

4      **A.   But to know their location, like I've**

5   **mentioned, Mr. Chang.**

6      Q.   Oh, okay.  All right.

7      **A.   Christian.**

8      Q.   All right.  So Christian and Don Chang

9   would have informed you that you had to attend

10   meetings, correct?

11      **A.   Correct.**

12      Q.   My question was:  Are you aware of having

13   ever received a -- an instruction to anyone who was

14   an employee of World Financial Group at the

15   corporate level that you had to attend a meeting?

16      **A.   No, sir.**

17      Q.   Or that you had to work a certain number of

18   hours.

19      **A.   Well, I was not contacted directly by the**

20   **headquarters, corporate office.**

21      Q.   That's my question.

22      **A.   So no.**

23      Q.   Any instructions that you would have been

24   given with respect to hours that you were present,

25   meetings that you have attended, were all provided

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   to you by the folks that we've talked about today

 2   specifically, right?  Don Chang, Laura Chang,

 3   Christian, Stefan, people like that, correct?

 4       A.  Yes.

 5       Q.  One thing I wanted to ask you before we

 6   move on, Mr. Destin, is how many different

 7   presentations would you say that you gave during the

 8   course of the time that you were associated with

 9   World Financial Group?

10       A.  How many presentation total?

11       Q.  Yeah.

12       A.  I would not know the exact number.

13       Q.  Can you estimate?

14       A.  Of course.  At least three presentation

15   day.  So multiply by five times a week on after.

16       Q.  And how soon after you became associated

17   with World Financial Group did you start giving

18   presentations?

19       A.  On my own?

20       Q.  Let's take with someone else first, and

21   then you can tell me on your own.

22       A.  With someone else, within the first two

23   weeks, at least within the first week, with someone

24   else.

25       Q.  Who was the someone else?
```

1       **A.  Same people we talked before.**

2       Q.  Aline, Christian, Stefan, Jennifer?

3       **A.  Yes, correct.  And on my own, about two**

4       **weeks after I started, three weeks.**

5       Q.  You've mentioned in a couple different

6       documents that you spent time cold calling.

7       **A.  Yes.**

8       Q.  But as I understand it, in addition to

9       making any calls you also spent -- sounds like you

10      spent some time making presentations, including

11      within the first two weeks after you became

12      associated with World Financial Group, right?

13      **A.  Yes.**

14      Q.  And some of the time you spent was also

15      spent in meetings, correct?

16      **A.  Yes.**

17      Q.  And some of the time you also spent a

18      significant amount of time outside the office,

19      either at home or on the road, trying to make sales,

20      correct?

21      **A.  Yes.**

22      Q.  Was it fair to say that you understood one

23      of your primary responsibilities in connection with

24      your affiliation with World Financial Group, to try

25      and sell products, either of a securities variety

1   or, sounds like in your case, life insurance?

2         **A.   If it's fair?  A fair statement?  Well,**

3   **it's fair to say that yes, sales was an important**

4   **focus for the company, yes.  But again, I'd like to**

5   **add to that that the recruiting part was part of it.**

6         Q.   Sure.  One of the things that you did as a

7   primary focus was to sell, correct?

8         **A.   Yes.**

9         Q.   In fact, you were also selling association

10  with World Financial Group, in a manner of speaking,

11  correct?

12        **A.   Yes.**

13        Q.   At any point in time did you submit any

14  sort of expense report for any of the expenses that

15  you incurred in the course of your efforts to sell

16  or to recruit in connection with your association

17  with World Financial Group?

18        **A.   I did not submit it.**

19        Q.   Did anyone ever tell you that you could?

20        **A.   Yes.**

21        Q.   They did tell you that you could?

22        **A.   Yes, sir.**

23        Q.   Who told you that you could submit an

24  expense report?

25        **A.   Aline.**

```
 1        Q.  Aline did?

 2        A.  Uh-huh.

 3        Q.  Did you try to?

 4        A.  I just didn't do it.  I had a shoe box full

 5   of receipt, gas receipt, expenses, anything that

 6   could be related to my work.

 7        Q.  Do you know if Aline ever submitted an

 8   expense report?

 9        A.  I don't know, sir.

10        Q.  Did she tell you who to submit an expense

11   report to?

12        A.  No.

13        Q.  Did she give you an address?

14        A.  No.

15        Q.  Or a contact?

16        A.  No.

17        Q.  When the Aline tell you this?  Was it when

18   she was recruiting you or was it later?

19        A.  That was at the time I got recruited, yes.

20   That was supposedly one of the perqs.

21        Q.  So Aline told you when she was recruiting

22   you that if you incurred expense you could be

23   reimbursed for it?

24        A.  Yes, sir.

25        Q.  After you became associated with World
```

1    Financial Group did you do anything to investigate

2    that?

3          **A.  Not really.**

4          Q.  And you came to understand that you would

5    have to incur these expenses on your own?

6          **A.  Of course at some point, yes, I understood**

7    **that.**

8          Q.  Do you recall when in connection with your

9    association with World Financial Group you found

10   that out?  Was that a month in?  Two months in?

11         **A.  By the end of the year.**

12         Q.  By the end of 2010.

13         **A.  By the end of 2010.**

14         Q.  So that was something that you knew for

15   the -- for all of 2011 while you were associated

16   with World Financial Group.

17         **A.  Yes, sir.**

18         Q.  Through June of 2011.

19         **A.  (Nods head affirmatively.)**

20         Q.  Mr. Destin, I'd like to show you what's

21   been marked as Exhibit Number 9.  And Exhibit Number

22   9, I will represent to you, are your responses to

23   World Financial Group's requests for documents.  And

24   I don't want to spend a lot of time walking through

25   every single request.  There were quite a few of

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1   them, more than 40 different requests for documents.

2          We've only received a handful of documents

3   from you.  And as I understand it, the documents

4   that we've gotten from you are the welcome e-mail, a

5   pair of W-2s for 2011 and 2012, correct?

6       A.  2011, yes.

7       Q.  I think we received two of them.

8       A.  Did you?

9       Q.  I believe so.  Well, we'll check.

10      A.  Right.

11      Q.  We've got those here.  But W-2s.

12      A.  Uh-huh.

13      Q.  Your resume.

14      A.  Yes.

15      Q.  We received the cover page to a book.

16      A.  Yes.

17      Q.  Written by Xuan Nguyen.

18      A.  Uh-huh.

19      Q.  We've received a document that is called

20   Business Format System.

21      A.  Correct.

22      Q.  That was a document that you provided,

23   about 100 pages in length.

24      A.  Yes.

25      Q.  And that book, the Business Format System,

1  that is a book that you purchased?

**2**          **A.  Yes, sir.**

3          Q.  And the other book written by Xuan Nguyen,

4  that is a book that you purchased?

**5**          **A.  Yes, sir.**

6          Q.  Were you reimbursed for that purchase at

7  all?

**8**          **A.  No, sir.**

9          Q.  And you were not provided those books by

10  World Financial Group, correct?

**11**          **A.  I bought them from the World Financial**

**12**  **Group website.**

13          Q.  What I meant was you were not gifted those

14  by World Financial Group.  You had to pay for them

15  yourself.

**16**          **A.  I had to pay for it, yes, sir.**

17          Q.  There are a number of different requests in

18  this set of doc requests, and my question to you,

19  Mr. Destin, is:  Aside from the documents that we

20  have received, and I just went through the list, the

21  two books, one of which was just a cover page, the

22  welcome e-mail, the resume and the W-2s, are there

23  any other documents that you have located relating

24  to your association with World Financial Group?

**25**          **A.  No, sir.**

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1      Q.  And I just want to be clear on this,

2   because you're under oath and I'm going to -- I've

3   had some concerns about the extent to which we've

4   received everything.  You were associated with World

5   Financial Group for going on nine months, and I just

6   want to be sure that your testimony is clear, that

7   the only documents that you still possess that

8   relate in any way to your association with World

9   Financial Group are the documents that I just

10  listed; is that correct?

11      **A.  Yes, it is correct.**

12      Q.  Did you provide to your counsel any other

13  documents relating to your association with World

14  Financial Group?  And I will provide one caveat.

15  Mr. Wolfe provided to me today a copy of a

16  solicitation that you received relating to the

17  lawsuit, which to some degree bears on your

18  association with World Financial Group.

19          Aside from those documents are there any

20  documents that you provided to your counsel that

21  relate to your association with World Financial

22  Group?

23      **A.  No, there is no other documents.**

24      Q.  At any time did -- did you receive an

25  instruction that related to your obligations to

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1   preserve documents as a party in this case?

2        MR. WOLFE:  Objection, privileged.  Don't

3   answer the question.

4   BY MR. BLACK:

5        Q.  I'm not asking for any communications you

6   had with your counsel, but has anyone ever told you

7   that you had any obligations to preserve documents

8   in connection with your role in this case?

9        MR. WOLFE:  Other than his lawyers?

10       MR. BLACK:  Other than his lawyers.

11       MR. WOLFE:  All right, you can answer that.

12       **A.  No.**

13  BY MR. BLACK:

14       Q.  Do you have an understanding of whether you

15  have an obligation to preserve documents in

16  connection with this lawsuit?

17       MR. WOLFE:  Same objection, it's the same

18  question, just asked another way.

19       **A.  I want to keep the documents.**

20       Q.  Do you understand whether you have a legal

21  obligation to do so?

22       MR. WOLFE:  Objection.

23       **A.  I don't know if I have a legal obligation**

24  **to do so.**

25       Q.  As you sit here you don't know if you have

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    one?

 2              MR. WOLFE:  Objection.

 3         A.  I'm not required to -- I was not required

 4    to.

 5    BY MR. BLACK:

 6         Q.  And we've talked on a number of occasions

 7    today about your efforts to look for documents.  Is

 8    there anything else that you've done to look for

 9    documents or to try to preserve documents that

10    relate to your association with World Financial

11    Group?

12         A.  I did, went through boxes, everything,

13    everything possible, my desk.  I had a nametag at a

14    certain point, World Financial Group nametag with my

15    name on it.

16         Q.  Yes.

17         A.  That I can't -- I probably toss it.

18         Q.  We talked at the very beginning of the day

19    about how it was you learned about this lawsuit, and

20    I believe you told me you received an e-mail from

21    Mr. Ambinder; is that right?

22         A.  Yes, sir.

23              MR. BLACK:  Could we go off for just a

24    second.

25              THE VIDEOGRAPHER:  We're off the record,
```

```
 1    the time is 3:03.

 2          (Recess)

 3          THE VIDEOGRAPHER:  And we are back on the

 4    record, the time is 3:04.  You may continue, sir.

 5    BY MR. BLACK:

 6       Q.  Mr. Destin, you told us earlier that you

 7    received an e-mail solicitation from Mr. Ambinder

 8    informing you about the lawsuit.

 9       A.  Yes.

10       Q.  I want to show you --

11          MR. BLACK:  Well, let's mark this, please.

12          (Defendants' Exhibit 14 marked)

13    BY MR. BLACK:

14       Q.  Mr. Destin, I'm showing you what's been

15    marked as Exhibit Number 14.  This was a document

16    provided to us today by your counsel, Mr. Wolfe, and

17    our understanding is this is a copy of the e-mail

18    that you received from Mr. Ambinder.  Can you look

19    at this document and tell me if you recognize it as

20    such?

21       A.  Yes, sir.

22       Q.  And your testimony earlier was that you

23    contacted Mr. Ambinder within I think 48 hours of

24    receiving the notice?

25       A.  Yes.
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1        Q.  And you had a conversation with

 2   Mr. Ambinder after receiving the notice?

 3        A.  Yes, sir.

 4        Q.  And during that conversation, which as I

 5   understand it lasted about 20 minutes, you spoke to

 6   Mr. Ambinder about the lawsuit?

 7             MR. WOLFE:  Objection, privileged.  Don't

 8   answer that question.

 9        A.  We didn't talk about the lawsuit.

10             MR. WOLFE:  Jordan, don't answer that

11   question.

12   BY MR. BLACK:

13        Q.  During the call with Mr. Ambinder did you

14   ask him questions about the lawsuit?

15             MR. WOLFE:  Same objection, privileged.

16   I'm going to instruct him not to answer any

17   questions that go to the subject matter of the

18   communications he's had with his attorney.

19   BY MR. BLACK:

20        Q.  At the time that you had this call with

21   Mr. Ambinder had you retained him as your counsel?

22        A.  Yes.

23        Q.  As I understand it, you received the e-mail

24   and then you made contact with Mr. Ambinder,

25   correct?
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1        A.  Yes.

 2        Q.  And within the first minute of that call,

 3   I'd say, had you already retained Mr. Ambinder to

 4   represent you?

 5        A.  No.

 6        Q.  Were you asking Mr. Ambinder questions

 7   about the lawsuit?

 8        A.  I wanted to know what it was about.

 9        Q.  You had a 20-minute phone call?

10        A.  About 20 minutes, that would be fair.

11        Q.  And as I understand it, growing out of that

12   phone call Mr. Ambinder sent to you a draft of a

13   declaration for you to review?

14        A.  Yes.

15        Q.  There was a declaration signed by you that

16   has been filed in support of a motion that's been

17   filed in the case, it's called a motion for

18   conditional certification.  Do you know whether the

19   declaration that you signed was provided to the

20   court in support of that motion?

21        A.  I don't know the answer to that question.

22        Q.  This document that I have in front of you,

23   did you receive -- is this the only e-mail of this

24   sort that you received from Mr. Ambinder or did you

25   receive others?
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1      **A.  From Mr. Ambinder that's the only e-mail I**

2  **received.**

3      Q.  Did you receive an e-mail from anyone else

4  that looked like this one?

5      **A.  I received other e-mail, but nothing like**

6  **this one.**

7      Q.  What other e-mail did you receive?

8      **A.  The followup of the document, once I was**

9  **doing the complaint.**

10         MR. WOLFE:  Don't answer --

11         MR. BLACK:  And I want to be clear, Steve.

12  BY MR. BLACK:

13      Q.  I do not want you to -- if that was a

14  communication with Mr. Ambinder providing that draft

15  declaration, I don't want you to disclose the

16  contents of that communication.

17      **A.  Of course.**

18      Q.  So my question is:  This document here,

19  which, I think, using your own words, you described

20  this morning as a solicitation.

21      **A.  Yes.**

22      Q.  Is this the only solicitation that you

23  received in connection with this lawsuit, or did you

24  receive any other solicitations, whether by e-mail

25  or by regular mail?

1       **A.   That would be the only one I received.**

2       Q.   Okay.  At any time did you receive any

3    solicitations by telephone?

4       **A.   No, sir.**

5       Q.   And you read this document and became

6    interested enough to call counsel and find out more

7    about the lawsuit?

8       **A.   That is correct.**

9       Q.   So this was sent to you on June 27th of

10   2013, correct?

11      **A.   Correct.**

12           (Defendants' Exhibit 15 marked)

13   BY MR. BLACK:

14      Q.   Mr. Destin, I'm showing you what's been

15   marked as Exhibit 15.  Can you look at this document

16   and tell me if you recognize it?

17      **A.   That's me, right here, yeah.**

18      Q.   All right.  And the very last page of this

19   document is a document that is captioned consent to

20   join FLSA collective action, do you see that?

21      **A.   Yes, I do see that.**

22      Q.   And your name is signed there?

23      **A.   It is.**

24      Q.   Is that your handwriting?

25      **A.   It's my handwriting.**

1          Q.   And that's your signature?

2          **A.   It's my signature.**

3          Q.   When you originally provided this document

4     were your address, ZIP Code, phone number, e-mail

5     address all legible?

6          **A.   Yes.**

7          Q.   And so to the extent they're blacked out on

8     this document, you did not black that out?

9          **A.   I did not black that out.**

10         Q.   You signed this on July 1st of 2013,

11    correct?

12         **A.   Yes.**

13         Q.   So you decided to become a participant in

14    this lawsuit within three to four days after

15    receiving the initial solicitation from

16    Mr. Ambinder?

17         **A.   Yes.**

18         Q.   And am I correct to understand that between

19    the time you received the solicitation and your

20    consent to opt in, you had had only one 20-minute

21    conversation with Mr. Ambinder?

22         **A.   That's the only conversation I can recall,**

23    **yes.**

24         Q.   And that's the conversation during which

25    you asked questions about the lawsuit and had a

1    draft declaration provided to you following the

2    conversation.

**3         A.  Yes, sir.**

4         Q.  If you would, just set numbers 14 and 15

5    just to the side for a moment, just to keep things

6    organized.  And I just want to show you one more

7    document before I return back to those.

8              Mr. Destin, I'm showing you what's been

9    marked as Exhibit Number 10.  I showed you earlier a

10   set of responses to requests for documents.

**11        A.  Yes.**

12        Q.  This is, in fact, a set of responses to

13   requests for documents that were provided after that

14   set that I showed you.  That set had been marked as

15   Exhibit, I believe as Exhibit 9.  This is a

16   supplemental set, and I will ask you for this the

17   same question that I asked before, and that is:  Is

18   it the case that every single document that you have

19   that relates in any way to your association with

20   World Financial Group, you have searched for and

21   provided to your counsel?

**22        A.  Yes, sir.**

23        Q.  If you will, take a look at page 7 of this

24   document, that is the document marked as Exhibit 10.

25   There is a request here that asks you to provide,

1   quote, all documents created at any time from June

2   18th, 2008 to the present describing or identifying

3   your alleged, quote, work, end quote, experience, or

4   the tasks that you claim to have performed while

5   associated with defendant, or any other entity, at

6   any time during the period from June 18th, 2008 to

7   the present, including but not limited to, and then

8   it lists a whole range of examples of documents.

9           Do you see that request?

**10**      **A.   I do.**

11      Q.   And in response to that request there are

12   objections.  And then there is a response, do you

13   see that?

**14**      **A.   Uh-huh.**

15      Q.   Now, the first question that I want to ask

16   you is the same question I asked you earlier with

17   respect to your interrogatories.

18           Are you aware that your counsel -- and when

19   I say your counsel let me be clear, that I

20   understand it to be the New York counsel that is

21   representing you -- did not provide responses to

22   these interrogatories in a timely fashion such that

23   any objections that you might have asserted to

24   producing certain of this information was, in fact,

25   waived?

1          MR. WOLFE:  Objection.

2    BY MR. BLACK:

3          Q.  Did you know that before today?

4          MR. WOLFE:  Objection.

**5          A.  I didn't know.**

6    BY MR. BLACK:

7          Q.  You didn't know.  Now, with respect to this

8    request, number 10, asking you to provide any

9    documents that might describe or identify your

10   alleged work experience or the tasks you claim to

11   have performed, you refer defendant to Exhibits J, H

12   and D.  Do you see that?

**13         A.  Yes.**

14         Q.  Do those numbers or letters mean anything

15   to you?

**16         A.  No, sir.**

17         Q.  Okay.  I will represent to you that when

18   your documents were produced to World Financial

19   Group as part of this lawsuit they were produced

20   with an exhibit letter.

**21         A.  Okay.**

22         Q.  Exhibit J is the document called Business

23   Format System.

**24         A.  Okay.**

25         Q.  About 100-page document that you provided.

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1        A.  Which is the book.

 2        Q.  The book.

 3        A.  Which is one of the book, okay.

 4        Q.  Exhibit H is your resume.

 5        A.  Okay.

 6        Q.  And Exhibit D is your declaration.

 7        A.  Okay.

 8        Q.  So I just want to ask you -- I have you

 9   here under oath -- is it your testimony that the

10   only documents that you have that describe or

11   identify your alleged work experience or the tasks

12   that you claim to have performed while you were

13   associated with World Financial Group are the

14   Business Format System document, your resume, which

15   I assume you wrote?

16        A.  Correct.

17        Q.  And your declaration.

18        A.  Well, that's not it.

19        Q.  Oh, well, what else is there?

20        A.  The other book, second book.

21        Q.  Okay.  So the --

22        A.  Which we mentioned earlier.

23        Q.  And when you say the other book, that is a

24   document that is the book authored by Xuan Nguyen?

25        A.  Correct.
```

1       Q.  Okay.  What else is there?

2       **A.  And the tax return, I don't know if it**

3    **should be included as an exhibit too.**

4       Q.  Any other documents that relate to or would

5    describe the work or the tasks that you performed?

6       **A.  No, sir.**

7       Q.  The request after this one asks you to

8    produce any and all documents which reflect

9    communications between you and any actual or

10   prospective customers and/or clients, do you see

11   that?  It's at the bottom of this page 7, number 11.

12      **A.  Correct.**

13      Q.  In response to this request you have

14   identified at the top of page 8, or your counsel has

15   identified the document labeled as Exhibit J, do you

16   see that?

17      **A.  Yes.**

18      Q.  I will represent to you that is that

19   welcome e-mail.

20      **A.  Okay.**

21      Q.  That's the only document that you've

22   identified here.  Is it the case that you do not

23   possess any documents that would reflect

24   communications between you and any of your actual or

25   prospective customers or clients other than that

 1   welcome e-mail?

 **2        A.  It is correct.**

 3        Q.  So any of the solicitations that you might

 4   have sent, communications you sent to prospective

 5   customers, you don't possess those anymore.

 **6        A.  I do not possess those.**

 7        Q.  Did you during the course of your

 8   association with World Financial Group send any

 9   letters or e-mail communications to prospective

10   customers?

**11        A.  Customers?**

12        Q.  Prospective customers or recruits.

**13        A.  Yes, sir.**

14        Q.  How did you decide to do that?

**15        A.  It's a followup, mainly.  So when we meet**

**16   up with the person it's always good to do a followup**

**17   e-mail just to remind them that we are -- even if**

**18   they were not interested in joining the company in**

**19   the first place, then we can always, you know, join**

**20   the actual group meeting.**

21        Q.  And so you thought it was a good idea after

22   you met with someone to send a followup

23   communication that would simply reiterate maybe what

24   you had said during the meeting?

**25        A.  Yes, that is correct.**

1          Q.   And did you write those communications

2     yourself?

3          **A.   No, I was following a template.**

4          Q.   And what template were you following?

5          **A.   Just a basic draft e-mail, business format.**

6          Q.   Is that something that was provided to you

7     by the folks higher than you in your hierarchy?

8          **A.   It was the e-mail we were supposed to --**

9     **yeah, yeah.**

10          Q.   Was that provided to you by Christian?

11          **A.   It was provided to me by my team members.**

12     **To tell you who, I don't recall, but it was them**

13     **that provided it to me, yes.**

14          Q.   That document was not provided to you by

15     anyone associated with World Financial Group at the

16     corporate level, that is, anyone located in Johns

17     Creek, Georgia.

18          **A.   No, it was not.**

19          Q.   You mentioned earlier in the deposition

20     that from time to time you would call individuals

21     whose contact information was on lists provided to

22     you, right?

23          **A.   Yes, sir.**

24          Q.   Those were lists provided to you by others

25     in your hierarchy?

1      **A.   They were provided to me by the same team**

2   **people, yes.**

3      Q.   Not by World Financial Group at the

4   corporate level, but by the people in Las Vegas with

5   whom you had an association.

6      **A.   It was provided, yes, by the office in Las**

7   **Vegas.**

8      Q.   And as you sit here today do you have any

9   of those lists still?

10     **A.   No, sir.**

11     Q.   Did you keep any of those lists after you

12   ended your association with World Financial Group?

13     **A.   No, sir.**

14     Q.   Did you keep any documents relating to your

15   relationship with World Financial Group after you

16   ended that relationship?

17     **A.   No, sir.**

18     Q.   You left everything behind?

19     **A.   I discarded everything, yes.**

20     Q.   You did.  And that was in June 2011 when

21   you ended your relationship with World Financial

22   Group?

23     **A.   It was right after when I moved out, I just**

24   **did a massive cleanup and --**

25     Q.   This is when you moved out of the condo

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

 1    that was between REDACTED

 2         A.  And I bought my house, correct.

 3         Q.  Turn, if you will, to page 12 of this

 4    document, please.  And I want to focus your

 5    attention on the document request number 24, it's in

 6    the middle of the page.

 7         A.  Okay.

 8         Q.  And this asks that you produce any

 9    documents that comprise, reflect or include any

10    communication, complaint or inquiry made by you to

11    defendant, that is World Financial Group, or any

12    other individual about the classification of your

13    relationship with defendant as an independent

14    contractor.  Do you see that?

15         A.  Yes, I do.

16         Q.  At any point did you attempt to contact

17    World Financial Group to clarify or to ask questions

18    about the nature of your relationship?

19         A.  With the company?

20         Q.  Yes.

21         A.  I didn't call anybody, no.

22         Q.  Did you make any complaint to the company

23    about how you were classified?

24         A.  Yes.

25         Q.  To whom at World Financial Group did you

1    complain?

2         **A.   The person in charge of the office.**

3         Q.   That is, the person in Las Vegas above you

4    in the hierarchy who was in charge of the office.

5         **A.   That was the person in charge of the**

6    **office, and he was in charge of -- the office, so he**

7    **was in charge of all the teams in the Las Vegas**

8    **office, yes.**

9         Q.   Who was that person?

10        **A.   His name is Daniel -- his name was Daniel.**

11   **I don't know his last name.**

12        Q.   And do you know by whom Daniel was

13   employed, if anyone?

14        **A.   I would assume World Financial Group.**

15        Q.   Do you know for certain he was employed by

16   World Financial Group?

17        **A.   I would not know.**

18        Q.   Could he have been employed by someone in

19   your hierarchy who hired him to manage the office?

20        **A.   I don't know.**

21        Q.   You don't -- as you sit here, you don't

22   know by whom Daniel was employed.

23        **A.   Correct.**

24        Q.   What was Daniel's last name?

25        **A.   I don't know.**

1     Q.  Was Daniel in charge of the office for the

2     entire time that you were associated with World

3     Financial Group?

**4          A.  Correct.**

5          Q.  And you said you complained to Daniel about

6     the fact that you were classified as an independent

7     contractor?

**8          A.  No, I complained to him to know what**

**9     exactly was my job position.**

10         Q.  You complained to him to find out what your

11    proper title was?

**12         A.  What my proper title was, yes.**

13         Q.  What -- did Daniel tell you anything?

**14         A.  He told me I was an associate.**

15         Q.  And was your concern that you had been told

16    by, I think by Aline that you would be called a

17    financial advisor?

**18         A.  Not only by Aline, but that's what -- how**

**19    people were calling themselves, not only me but**

**20    other people in the offices, yes.**

21         Q.  And you clarified that with Daniel, who

22    told you that you were an associate, correct?

**23         A.  Correct.**

24         Q.  Did you push back on Daniel at all when he

25    told you that or did you just accept his answer?

1          A.  I just took his answer, yes.

2          Q.  Did you make any complaints to Daniel about

3     the fact that you were classified as an independent

4     contractor?

5          **A.  No, but I made complaint to Daniel that I**

6     **wanted to switch teams.**

7          Q.  Okay.  So you asked Daniel to switch

8     teams --

9          **A.  Correct.**

10          Q.  -- that is to get away from your hierarchy

11     and to work instead with another group of

12     individuals who were associates with World Financial

13     Group?

14          **A.  Correct, or at least not work with**

15     **Mr. Christian.**

16          Q.  When did you complain to Daniel that you

17     wanted to no longer work with Christian?

18          **A.  It was as well at the end of 2010, at the**

19     **end of the year, 2010.**

20          Q.  Did Daniel tell you one way or the other

21     whether you could stop working with Christian?

22          **A.  He told me, You can't.**

23          Q.  And did he tell you why?

24          **A.  Yes.**

25          Q.  Why?

```
 1          A.  Because once you are inside that pyramid
 2    you cannot basically jump a level, you cannot remove
 3    people either, it's one -- and even if you -- you
 4    sell your product, you make your commission, even if
 5    it benefit the person above you, if you do not get
 6    along with that person, that's the way it's supposed
 7    to be.
 8          Q.  And so you had been recruited to become an
 9    associate with World Financial Group by someone whom
10    Christian had recruited, and therefore you were part
11    of that hierarchy, correct?
12          A.  Yes.
13          Q.  And that was the nature of your
14    relationship with -- at World Financial Group,
15    regardless of how long you were affiliated with
16    them.
17          A.  Yes.
18          Q.  The same way that if you had recruited
19    someone and then they had recruited someone, they
20    would always be down the line in the hierarchy to
21    you.
22          A.  Always related to me, yes.
23          Q.  And you would end up providing instruction
24    to them.
25          A.  Correct.
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1        Q.  Based on whatever philosophy you thought
 2   would best suit the ability to recruit customers and
 3   recruit additional associates, correct?
 4        A.  Yes.
 5        Q.  Okay.  I want to turn your attention back,
 6   Mr. Destin, to what we marked as Exhibit 15, which
 7   is your notice of consent to join.  You've got that
 8   in front of you?
 9        A.  I do.
10        Q.  We've already confirmed that that is your
11   signature on the last page.  When you signed this
12   document did you have any understanding of what it
13   meant to become an opt-in plaintiff in a lawsuit
14   like this?
15        A.  Yes.
16        Q.  What was your understanding?
17        A.  My understanding is I will be the person
18   representing the other people.
19        Q.  You understood that as an opt-in plaintiff
20   in a lawsuit you would be representing other people?
21        A.  Well, I would --
22            MR. WOLFE:  Jordan, before you answer, let
23   me just -- if you have an understanding, an answer
24   to Rich's questions that comes from something other
25   than conversations with us, go ahead and answer, but
```

1   don't tell Rich anything that you've talked about

2   with the attorneys.

3          MR. BLACK:  Yeah, and I'm not looking for

4   you to -- consistent with what we talked about

5   earlier, I'm not looking for you to share any

6   conversations you had with counsel.

7   BY MR. BLACK:

8          Q.  My question is:  What did you understand

9   your role to be as an opt-in plaintiff in this case?

10  If you had that understanding?

11         **A.  Well, to me, opt-in would be that I'm**

12  **actually joining a lawsuit already in place.**

13         Q.  And now more recently, you have sought to

14  become the named plaintiff in this lawsuit.

15         **A.  Correct, yes.**

16         Q.  And do you have an understanding of what

17  your responsibilities are as a named plaintiff

18  should the court grant the motion that would permit

19  you to do so?

20         **A.  I'm not following you.**

21         Q.  Sure.  Let me rephrase that.

22         Do you understand right now that there is a

23  request before the court for you to be able to file

24  a complaint that identifies yourself as the named

25  plaintiff in the case?

1      **A.  Yes.**

2          Q.  Do you know whether the court has granted

3      that request yet?

4      **A.  I don't know.**

5          Q.  I will represent to you that the court has

6      not yet.

7      **A.  Okay.**

8          Q.  And so my question is:  Insofar as you are

9      seeking to become the named plaintiff in this

10     lawsuit, what do you understand your

11     responsibilities to be as a named plaintiff in the

12     lawsuit?

13     **A.  My responsibilities is to provide as much**

14     **information as possible about my previous employment**

15     **with World Financial Group and represent people that**

16     **may have been in my situation.**

17         Q.  And we talked earlier about some language

18     that was in one of your documents, I think an

19     interrogatory response that referred to similarly

20     situated individuals, do you recall that?

21     **A.  Yes.**

22         Q.  And I think your testimony was the folks

23     that you were associated with in Las Vegas up to but

24     not including Don Chang are the groups of people

25     that you think you would be representing in this

1   lawsuit; is that right?

2          MR. WOLFE:  Objection.

3       **A.  I would represent whoever worked for the**

4   **company at the same time I did, and that falls under**

5   **the same loss that I did, that were part of that**

6   **pyramid scheme.**

7       Q.  In the same role that you were in, that is

8   the role of associate?

9          MR. WOLFE:  Same objection.

10      **A.  That is the role of people who never got**

11  **paid for what they worked for.**

12         MR. BLACK:  Why don't we go ahead and take

13  a break, we'll change the tape and maybe take 10, 15

14  minutes.

15         MR. WOLFE:  Whatever you need.

16         THE VIDEOGRAPHER:  Stand by, please.  We're

17  off the record, the time is 3:29, this is the end of

18  Tape 2.

19         (Recess)

20         THE VIDEOGRAPHER:  And we are back on the

21  record, the time is 3:54.  This is the beginning of

22  Tape 3 of the videotaped deposition of Jordan

23  Destin.

24         You may continue, sir.

25         (Defendants' Exhibit 11 marked)

1    BY MR. BLACK:

2        Q.  Mr. Destin, I want to show you what's been

3    marked as Exhibit 11.

**4        A.  Thank you.**

5        Q.  Mr. Destin, you testified earlier that you

6    had provided a tax return in connection with this

7    case, and the document I've provided to you which

8    has been identified to us as Exhibit T is a tax

9    return for 2011.  Do you see that?

**10       A.  Yes, sir.**

11       Q.  Is this, in fact, your tax return for 2011?

**12       A.  It is my tax return.**

13       Q.  The first question I have is we talked

14   before the break about the fact that you had loss

15   associated with your association with World

16   Financial Group.  You had certain expenses, you

17   ultimately didn't recoup those because you didn't

18   become licensed and didn't receive commissions.  Did

19   you take that loss or declare that loss on any of

20   your tax returns?

**21       A.  No.**

22       Q.  You did not, okay.  And you were affiliated

23   with World Financial Group in 2010 as well, correct?

**24       A.  Yes.**

25       Q.  And you have not, though, provided your tax

1   return for 2010.  Why is that?

2        **A.  I can't find it.**

3        Q.  You've searched for it?

4        **A.  I did search for it, yes.**

5        Q.  What did you do to search for it?

6        **A.  I keep all my tax returns together, and I**

7   **don't have 2010 and previous years.**

8        Q.  So the most recent year for which you have

9   a tax return is 2011?

10       **A.  Yes.**

11       Q.  And I note on this tax return there are

12  three W-2 forms for Abercrombie & Fitch, Travelscape

13  and BNC Entertainment.

14       **A.  Correct.**

15       Q.  I don't see any forms relating to World

16  Financial Group.  You did not receive any, certainly

17  didn't receive a W-2 form for World Financial Group,

18  correct?

19       **A.  Correct.**

20       Q.  And did you receive any kind of 1099 or

21  other form for World Financial Group?

22       **A.  No, sir.**

23       Q.  Is it usually your experience, Mr. Destin,

24  that when you are an employee of a company they

25  provide you with a W-2 at the end of the year for

1    tax reporting purposes?

**2         A.   They do provide me with a W-2, yes.**

3         Q.   Have you ever had an employment situation

4    where you have not been provided with a W-2?

**5         A.   No.**

6         Q.   My understanding is that you worked for

7    Abercrombie & Fitch at the same time that you worked

8    for -- I'm sorry, same time that you had been

9    associated with World Financial Group; is that

10   right?

**11        A.   That's correct.**

12        Q.   And what was your role at Abercrombie &

13   Fitch?

**14        A.   I was an assistant store manager.**

15        Q.   Was that a full-time or a part-time

16   position?

**17        A.   It was a full-time position.**

18        Q.   And so during the time that you were

19   associated with World Financial Group you also had a

20   full-time employment relationship with Abercrombie &

21   Fitch.

**22        A.   It is correct.**

23        Q.   And what is Travelscape LLC?

**24        A.   Expedia.**

25        Q.   You are currently employed by Expedia,

1    correct?

**2        A.   Yes, sir.**

3        Q.   Is that on a full-time basis?

**4        A.   It is a full-time.**

5        Q.   And back in 2011 when you were employed by

6    Expedia and received a W-2 from Travelscape was that

7    full-time employment?

**8        A.   It was full-time employment.**

9        Q.   Were you employed on a full-time basis with

10   Expedia during the time that you were associated

11   with World Financial Group or did that only occur

12   after?

**13       A.   Only after.**

14       Q.   And what is BNC Entertainment?

**15       A.   It's a promoting company in Las Vegas.**

16       Q.   What was your association with BNC

17   Entertainment?

**18       A.   I was a nightclub promoter.**

19       Q.   How long did that association last?

**20       A.   Not too long.   Two months.**

21       Q.   And you were employed by BNC?

**22       A.   I was employed by BNC, yes.**

23       Q.   And it looks like you received wages in the

24   amount of $66.   Was that a very short-term

25   relationship?

1      **A.  It was really short-term relationship, yes.**

2      Q.  How were you compensated by BNC

3   Entertainment?

4      **A.  Based -- it was a commission job, based on**

5   **how many people you can get inside a nightclub.**

6      Q.  What did you do to try to get people into

7   the nightclub?

8      **A.  Well, you can have like to talk them into**

9   **the idea that the nightclub you're promoting is the**

10  **best in town.  And I was working for the Bellagio,**

11  **Aria, Caesar's Palace and the Wynn.  So those are**

12  **among the biggest properties in Las Vegas.**

13     Q.  Is BNC Entertainment owned by those

14  companies?

15     **A.  BNC Entertainment is actually a third party**

16  **company.**

17     Q.  And that's by whom you were employed?

18     **A.  Yes.**

19     Q.  At the onset of that relationship did they

20  represent to you that you were an employee?

21     **A.  Yes.**

22     Q.  Did you complete the paperwork that usually

23  you fill out when you became employed by a company?

24     **A.  Yes, sir.**

25     Q.  And just so I understand, Travelscape, that

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1   is Expedia?

2       **A.   That's the actual -- that's the biggest**

3   **company.   They own --**

4       Q.   When I see on your resume that you're

5   employed by Expedia, Travelscape is not a different

6   entity or some kind of a successor or predecessor

7   entity, it would be the same.

8       **A.   Well, Travelscape would be the equivalent**

9   **of Aegon, Aegon USA, and then Expedia falls under.**

10      Q.   Travelscape is the parent company of

11  Expedia.

12      **A.   Yes.**

13      Q.   Before we took a break we were talking

14  about your having consented to join the lawsuit, do

15  you recall that?

16      **A.   Yes.**

17      Q.   Other than the conversation you had with

18  Mr. Ambinder -- and I'm not asking you to disclose

19  the contents of that -- did you have a discussion

20  with anyone else regarding the possibility of

21  joining this lawsuit as an opt-in plaintiff?

22      **A.   Well, I talked to Ms. Suzanne Leeds, which**

23  **is Mr. Lloyd's associate.**

24      Q.   Understood.   And I'm not asking you for the

25  contents of that conversation either.

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1            Other than your lawyers did you speak to
 2   anyone else regarding the possibility of joining
 3   this lawsuit?
 4        A.  No, sir.
 5        Q.  Did you talk to any other individuals who
 6   had already opted into this lawsuit?
 7        A.  No, sir.
 8        Q.  Did you make any effort to communicate with
 9   Michael Cohen, who was the named plaintiff in this
10   lawsuit?
11        A.  No, sir.
12        Q.  Did you discuss joining this lawsuit with
13   any of the individuals with whom you were associated
14   in Las Vegas in connection with World Financial
15   Group?
16        A.  No, sir.
17            (Defendants' Exhibit 12 marked)
18   BY MR. BLACK:
19        Q.  Mr. Destin, I'm showing you what's been
20   marked as Exhibit 12.  Can you tell me if you
21   recognize this document?
22        A.  No, sir.
23        Q.  You've never seen this document before?
24        A.  No, sir.
25        Q.  I will represent to you that this is a copy
```

1  of the complaint in the case, the original complaint

2  that was filed in this case and was the operative

3  complaint at the time that you opted into the

4  lawsuit.

5          Is it the case, Mr. Destin, that you opted

6  into this lawsuit as a party without having read the

7  complaint in this case first?

8      **A.  I read my complaint.**

9      Q.  You've read the complaint that I referred

10 to earlier as the proposed amended complaint that

11 identifies you as the named plaintiff.

12     **A.  Yes.**

13     Q.  But you've not read any other complaint.

14     **A.  No, sir.**

15     Q.  And hadn't at the time that you opted into

16 the lawsuit.

17     **A.  No.**

18     Q.  If you hadn't read it at the time how did

19 you know what claims Mr. Cohen was pursuing?

20         MR. WOLFE:  Objection.  Don't answer that

21 if that requires you to talk about a conversation

22 you've had with any of the attorneys.  But

23 otherwise, you can answer that.

24     **A.  I'm not answering this question.**

25 BY MR. BLACK:

1      Q.  Because you would have to disclose

2  communications with counsel?

3      **A.  Yes, sir.**

4      Q.  And at the time you opted into this lawsuit

5  what did you understand your claims to be?

6          MR. WOLFE:  Same objection.  You can answer

7  that, but not by talking about anything you've

8  talked about with the attorneys.

9      **A.  Well, I can't really answer that question**

10 **either.**

11     Q.  Did you not have an understanding of what

12 your claims were outside of conversations with

13 counsel?

14     **A.  I understood my rights.**

15     Q.  I didn't ask you that.  My question is:

16 Did you have an understanding of what your claims

17 were in this lawsuit when you opted in, outside of

18 what you might have been told by counsel?

19     **A.  Yes.  I knew what I was signing for.**

20     Q.  What did you understand you were signing

21 for?

22     **A.  That it was a lawsuit going on, a class**

23 **action.**

24     Q.  At the time that you opted in did you

25 understand that this was already a class action?

```
 1            MR. WOLFE:  Same objection, just -- without

 2   talking about anything you've talked about with the

 3   lawyers, go ahead and answer.

 4       A.  I was confused with the different terms, to

 5   be honest with you.

 6   BY MR. BLACK:

 7       Q.  When you say different terms, what terms

 8   were confusing to you?

 9       A.  Class action, lawsuit, opted in, what's the

10   other term you used, named plaintiffs, to me it's

11   all the same.

12       Q.  You used the term class action a minute

13   ago.  What do you understand that to mean?

14       A.  To me the meaning of a class action is a

15   lawsuit already in place with different entities and

16   different people.

17       Q.  And at the time you opted into this lawsuit

18   did you understand that this lawsuit was a class

19   action?

20       A.  It was my belief so, yes.

21       Q.  And at the time you opted in you had

22   received the solicitation from Mr. Ambinder on June

23   27th and had a 20-minute conversation with him,

24   correct?

25       A.  Yes.
```

1    Q.  And the question that I asked you a few

2   minutes ago that I'm not sure I got an answer to

3   yet, at the time you opted into this lawsuit did you

4   have an understanding of what your claims were in

5   the lawsuit outside of what you may have been told

6   by counsel?  And I'm not asking you to tell me about

7   your communications with counsel.

8        **A.  Yes, I knew what it was.**

9    Q.  Okay.  I'm not asking if you knew what the

10   lawsuit was.  I'm asking you if you had an

11   understanding of what your specific claims were in

12   the lawsuit, outside of what you may have been told

13   by counsel.

14       **A.  Not really.**

15   Q.  Prior to seeing the proposed amended

16   complaint with your name on it, you had not seen any

17   version of a complaint in this case, is that

18   accurate?

19       **A.  It is accurate, yes, sir.**

20   Q.  How long ago did you see that proposed

21   amended complaint?

22       **A.  Define the -- complaint, you mean, are you**

23   **referring to the original complaint?**

24   Q.  I'm referring to the complaint that has

25   your name on it as the identified plaintiff on the

 1   front page.  When did you see that for the first

 2   time?

 3        **A.  It was among the paperwork I received.  I**

 4   **could not give you an exact day.  But it was**

 5   **definitely between June 27th up to today.**

 6        Q.  Well, I understand that.  Was it in the

 7   last two weeks?  Was it in the last three weeks?

 8        **A.  The last month.**

 9        Q.  Within the last month you saw that draft

10   complaint.

11        **A.  (Nods head affirmatively.)**

12        Q.  Did you review that draft complaint?

13        **A.  I did review the draft complaint, yes.**

14        Q.  Did you propose any changes to the draft

15   that you looked at?

16             MR. WOLFE:  Objection.  Calls for

17   privileged.  Don't answer it.

18             MR. BLACK:  I'm not sure that it does,

19   Steve.  My question is simply:  Did you ask for any

20   changes be made to that proposed amended complaint

21   after you read it?

22             MR. WOLFE:  Objection, privileged.  Don't

23   answer that question.

24             MR. BLACK:  I'm not asking him what the

25   substance of it is, Steve, just whether he did.

 1    You're going to instruct him not to answer?

 2          MR. WOLFE:  I'm going to instruct him not

 3    to answer.

 4    BY MR. BLACK:

 5      Q.  Did I understand your testimony earlier,

 6    Mr. Destin, to be that at no point since joining

 7    this lawsuit have you communicated with any other

 8    individuals who were associated with World Financial

 9    Group as an associate regarding this lawsuit?

10      **A.  It is correct.**

11      Q.  You've not communicated with them by --

12    verbally or by written communication, no

13    communications whatsoever?

14      **A.  No communication at all.**

15          (Defendants' Exhibit 16 marked)

16    BY MR. BLACK:

17      Q.  Mr. Destin, I'm showing you what's been

18    marked as Exhibit 16.  Can you tell me if you've

19    seen that document before, or any document that

20    looks like it?

21      **A.  Yes, sir, I did.**

22      Q.  This is an e-mail from Lloyd Ambinder to

23    another individual at a Yahoo account dated

24    Thursday, June 27th.  This is an e-mail

25    solicitation, right?

```
 1          A.  It is.

 2          Q.  If you would, take out Exhibit 14 in your

 3   pile, which should be just a few down from that.

 4   And I know that they are laid out slightly

 5   differently, but if you would take a look at these

 6   two documents and tell me if as you look at these,

 7   these are identical to one another in substance.

 8   14, of course, being the solicitation that you

 9   received.

10          A.  I'm sorry, I'm just --

11          Q.  Take your time.

12          A.  Beside the layout, I do not see any

13   difference.

14          Q.  And that was my read of them as well,

15   Mr. Destin.  And so the solicitation that I've shown

16   you as Exhibit 16 looks identical to the

17   solicitation that you received on the 27th of June

18   from Lloyd Ambinder, correct?

19          A.  It is, yes, sir.

20          Q.  Okay.  Let me mark one more document.

21              (Defendants' Exhibit 17 marked)

22   BY MR. BLACK:

23          Q.  Mr. Destin, I'm showing you what's been

24   marked as Exhibit 17.  And my question is:  Have you

25   seen that document before or any document like it?
```

```
 1        A.  I did not see this document before.

 2        Q.  And I think you testified earlier that you

 3   received one solicitation from Mr. Ambinder, and

 4   that was on the 27th of June?

 5        A.  It is correct.

 6        Q.  Okay.  Mr. Destin, you have recently asked

 7   the court to become the named plaintiff in this

 8   lawsuit, correct?

 9        A.  Yes.

10        Q.  As such, you realize that you would, in

11   effect, be the face of the lawsuit?

12        A.  Uh-huh.

13        Q.  Is that right?

14        A.  I did not know I would be the face of the

15   lawsuit.

16        Q.  But you would be the lead plaintiff in the

17   lawsuit.

18        A.  But I would be the -- yes.

19        Q.  Are you aware, Mr. Destin, that the federal

20   judge who is presiding over this lawsuit just about

21   two weeks ago issued an order finding that the New

22   York counsel that represents you in this lawsuit

23   issued solicitations, including the June 27

24   solicitation that you received, that were improper

25   and misleading?
```

 1          MR. WOLFE:  Objection.

 2     **A.   I didn't know that.**

 3          (Defendants' Exhibit 18 marked)

 4     BY MR. BLACK:

 5          Q.  Mr. Destin, let me show you what's been

 6     marked as Exhibit 18, and if you would, turn to page

 7     3.  At the bottom of the third page, do you see the

 8     section with the Roman numeral II which says

 9     Emergency Motion to Cease and Desist?

10     **A.   Yes.**

11          Q.  Right below that it says on June 27, 2013

12     and August 12, 2013 the Plaintiffs' counsel sent

13     e-mail solicitations to 400 recipients regarding

14     this lawsuit.

15          Do you see that.

16     **A.   I do see that.**

17          Q.  The next line says both e-mails were in

18     violation of local Rule 23.1C2, which prohibit

19     precertification communications prior to a

20     conference with opposing parties and a report to the

21     court.  Do you see that?

22     **A.   I do see that.**

23          Q.  Before today were you aware that New York

24     counsel who sent you that solicitation and who

25     represents you had committed that violation?

1          MR. WOLFE:  Objection.

**2          A.  I didn't know.**

3     BY MR. BLACK:

4          Q.  Take a look at the next page, if you will.

5     And I want to draw your attention to the start of

6     the first full paragraph on page 4, which says, In

7     addition to being a rule violation, the e-mail

8     communications were misleading.  The June 27th, 2013

9     e-mail was misleading because, and if you look at

10    the rest of page 4 and the top of page 5 there are

11    five enumerated clauses.

12          If you would, read through those, please.

**13          A.  Okay.  Number one --**

14          Q.  Oh, you don't have to read them into the

15    record.

**16          A.  I'm sorry.**

17          Q.  Read them to yourself.

**18          A.  Okay, thank you.**

**19          Okay.**

20          Q.  Before today, Mr. Destin, are you aware of

21    the court's finding that the e-mail communications

22    sent by your New York counsel were misleading?

23          MR. WOLFE:  Objection.

**24          A.  I didn't know.**

25          Q.  Have you ever seen this document before

1    today?

**2        A.   I've never seen this document before.**

3        Q.   It was after -- this document was issued on

4    September 20th of this year.

**5        A.   Okay.**

6        Q.   It was after September 20th of this year

7    that you were asked to assume the role of the lead

8    plaintiff in this case, isn't it?

9            MR. WOLFE:  Objection, calls for privilege.

**10       A.   I don't recall the day I've been asked.**

11   BY MR. BLACK:

12       Q.   At any time before you committed to

13   becoming a lead plaintiff in this case did New York

14   counsel advise you of this finding?

15           MR. WOLFE:  Objection.  He can't answer the

16   question.

17           Don't answer that question, he's asking you

18   for an attorney/client communication.

19           I've instructed him not to answer.

20   BY MR. BLACK:

21       Q.   Are you going to answer my question?

**22       A.   I won't, I'm sorry.**

23       Q.   Let me ask you this:  At any point before

24   you committed to becoming the lead plaintiff in this

25   case were you aware of this finding?

```
 1        A.  I wasn't aware.

 2        Q.  Earlier we talked about the fact the

 3   discovery responses, in response to the requests

 4   that World Financial Group made, were served on your

 5   behalf late, such that all of the objections that

 6   you might have otherwise asserted in response to

 7   them had been waived.  You learned that for the

 8   first time today too; is that right?

 9        A.  I -- yes.

10        Q.  Does that fact and this order give you any

11   concern about the counsel who's representing you?

12            MR. WOLFE:  Objection.

13   BY MR. BLACK:

14        Q.  You're under oath.

15        A.  I mean, ask your question one more time,

16   please.

17        Q.  Yeah.  My question is:  As you sit here

18   under oath does the fact that the discovery

19   responses to requests posed to you were served late

20   such that all of the objections you might have

21   propounded were waived, and the fact that this

22   federal court before whom you are seeking to become

23   the lead plaintiff in this case issued this order,

24   does that give you concerns about the counsel that's

25   representing you in this case?
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1              MR. WOLFE:  Objection.
 2         A.  It doesn't.
 3         Q.  It gives you no concern?
 4         A.  It does not give me a concern, sir.
 5         Q.  Would you like to have known about this
 6    before you committed to being the lead plaintiff in
 7    this case?
 8              MR. WOLFE:  Objection.
 9         A.  Yes.
10    BY MR. BLACK:
11         Q.  And, in fact, it was on the basis of the
12    solicitation that the federal court has found was
13    misleading that you joined the case; is that right?
14         A.  Well, define misleading.
15         Q.  Well, the court has defined misleading,
16    Mr. Destin.
17         A.  Right.
18         Q.  And so my question is:  It was on the basis
19    of a solicitation that the federal judge has found
20    was misleading that you joined this case in the
21    first place, isn't that right?
22              MR. WOLFE:  Objection.
23         A.  That is correct.
24    BY MR. BLACK:
25         Q.  And yet you have no concerns as you sit
```

```
 1   here.

 2       A.  I mean, that's the attorney that's

 3   representing me, so I'm not going to go against

 4   them.  They did their best.  And as of today they're

 5   still doing their best.  I'm not going to go against

 6   them.

 7       Q.  If and when you talk to anyone about

 8   joining this case or participating in this case do

 9   you plan to advise them of these facts?

10       MR. WOLFE:  Objection.

11       A.  What fact, exactly?

12   BY MR. BLACK:

13       Q.  The fact of the judge's order that is

14   Exhibit 18 and the fact that Plaintiffs' counsel

15   missed the deadline to file your responses and

16   waived all of your objections.

17       A.  I mean, I'll be honest with you, to me it's

18   not misleading.  Filing paperwork late, I mean --

19       Q.  I didn't suggest that that was misleading.

20   I suggested that by doing so they waived all of the

21   objections that you might have otherwise asserted in

22   response to discovery.

23       You're asking to become the lead plaintiff

24   in the case.

25       A.  Correct.
```

1      Q.  Do you consider part of your role as the

2  lead plaintiff to let others who might join this

3  case know about this order and the fact of the

4  waiver of your objections?

5           MR. WOLFE:   Objection.

6      **A.  I don't know the answer to that question,**

7  **to be honest with you.**

8      Q.  Will you let other people know?

9           MR. WOLFE:   Same objection.

10     **A.  I will let other people know, yes.**

11  BY MR. BLACK:

12     Q.  Now, at some point recently we've already

13  covered that you decided to become the named

14  plaintiff in the case.

15     **A.  Yes.**

16     Q.  Why did you do so?

17     **A.  To represent all the people, the other**

18  **workers.**

19     Q.  Was becoming the named plaintiff in the

20  case your idea?

21     **A.  No, it wasn't my idea.**

22     Q.  Was it the idea of Mr. Cohen?

23     **A.  No.**

24     Q.  Can you tell me whose idea it was without

25  disclosing communications that you had with your

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

 1   counsel?

 **2        A.   It was my attorney.**

 3        Q.   It was your attorney's idea.

 **4        A.   Yes.**

 5        Q.   Specifically, Mr. Ambinder?

 6             MR. WOLFE:  Objection.  You're getting into

 7   privilege.  You've established that, that's enough,

 8   Jordan, don't answer that question.

 9   BY MR. BLACK:

10        Q.   Will you answer that question, Mr. Destin?

**11        A.   No, I won't answer that question.**

12        Q.   Is it your understanding that in becoming

13   the lead plaintiff in the case you will be replacing

14   Michael Cohen or that you will be joining Mr. Cohen

15   as a named plaintiff in this case?

16             MR. WOLFE:  Jordan, answer that only to the

17   extent you can do it without talking about anything

18   that you've talked about with your lawyers.

**19        A.   I will be joining the lawsuit.**

20   BY MR. BLACK:

21        Q.   Do you know if Mr. Cohen is going to

22   continue to participate in the lawsuit if, in fact,

23   this proposed amended complaint that identifies you

24   as the plaintiff is entered by the court?

**25        A.   I do not know if Mr. Cohen will still be**

```
 1    part of the lawsuit.

 2        Q.  So as you sit here today your testimony is

 3    that you have no idea whether Mr. Cohen will still

 4    participate in the lawsuit?

 5        A.  It is correct.

 6        Q.  Before today -- well, strike that.

 7            As you sit here are you aware of any

 8    requests by Mr. Cohen to leave the lawsuit?

 9        A.  No, sir.

10        Q.  If I told you that the proposal to the

11    court is to substitute you as the plaintiff in this

12    case for Mr. Cohen and that he will leave the

13    lawsuit, would that be a surprise to you?

14        A.  It would not be a surprise to me.

15        Q.  So you're aware that Mr. Cohen is seeking

16    to leave the lawsuit.

17        A.  No, I didn't know it until you tell me that

18    Mr. Cohen.

19        Q.  Before I told you that, was that a surprise

20    to you that Mr. Cohen is seeking to leave the

21    lawsuit?

22        A.  Yes, I didn't know.

23        Q.  And you don't know why Mr. Cohen is seeking

24    to leave the lawsuit.

25        A.  I do not.
```

1        Q.  Do you plan to ask Mr. Cohen why he's

2   seeking to leave the lawsuit?

3            MR. WOLFE:  Objection.

4        **A.  I would.**

5        Q.  Does the fact that Mr. Cohen is seeking to

6   leave the lawsuit after having been the plaintiff

7   since it was originally filed give you any cause for

8   concern?

9            MR. WOLFE:  Same objection.

10       **A.  It does give me concern, yes.**

11  BY MR. BLACK:

12       Q.  Are you concerned that you were never

13  notified of that fact by your lawyers?

14           MR. WOLFE:  Objection.  Rich, you're

15  getting into potential privilege, you're getting

16  into case strategy, you're getting into --

17           MR. BLACK:  Are you going to instruct him

18  not to answer?

19           MR. WOLFE:  Yep.

20  BY MR. BLACK:

21       Q.  I asked you a moment ago whether you were

22  concerned that your counsel didn't let you know

23  about Mr. Cohen, it drew an objection from

24  Mr. Wolfe.  Are you concerned that no one has ever

25  let you know that Mr. Cohen is seeking to withdraw

```
 1   from the lawsuit?

 2        A.   I didn't know until you tell me.

 3        Q.   And are you concerned that no one ever

 4   notified you of that fact?

 5        A.   I'm concerned, yes.

 6             (Defendants' Exhibit 19 marked)

 7   BY MR. BLACK:

 8        Q.   Mr. Destin, I'm showing you what's been

 9   marked as Exhibit 19.  Can you look at this

10   document, Mr. Destin, and tell me if you've ever

11   seen this before?

12        A.   Yes, I do recall seeing this document

13   before.

14        Q.   What is this document, as far as you know?

15        A.   It's a collective action complaint with my

16   name on it.

17        Q.   We've referred a couple times today to a

18   complaint that has your name on it, which I've

19   referred to as the proposed amended complaint.

20        A.   Okay.

21        Q.   Is this the version of the complaint that

22   you have seen that has your name on it?  And if you

23   need to take a minute to thumb through it, please

24   do.

25        A.   Yes, I did see this document.
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1      Q.  And did you review it before it was

2    provided to the court as a proposed amended

3    complaint?

4      **A.  I reviewed the draft, yes.  I reviewed the**

5    **draft that was sent to me.**

6      Q.  And when you reviewed it did you believe

7    that this represented the claims that you wanted to

8    assert in this lawsuit?

9      **A.  Yes, it's pretty clear.**

10     Q.  If you would, take a look at page 3.  And

11   this document has numbered paragraphs, so I'm going

12   to direct you to certain numbered paragraphs.  And

13   on page 8, I want to direct you to paragraph 3.

14         Do you see where it says, Plaintiff Jordan

15   Destin is an individual who is currently a resident

16   of Las Vegas, Nevada and was employed by defendants

17   as an associate and cold caller?

18     **A.  Uh-huh, correct.**

19     Q.  I asked you earlier about position titles.

20   Am I correct that from your perspective associate

21   and cold caller are effectively the same thing?

22     **A.  Associate is a title.**

23     Q.  What is cold caller, then?

24     **A.  It would be an action.**

25     Q.  Okay.  You were an associate, correct?

1          **A.  I was an associate.**

2          Q.  Per the terms of the AMA, right?

3          **A.  Yes.**

4          Q.  Take a look, if you will, at paragraph 31

5      on page 7.  And in paragraph 31, Mr. Destin, there

6      is a reference to you that differs still from the

7      paragraph that we looked at earlier, paragraph 8.

8      This refers to you as an associate/financial product

9      marketer.

10             We talked about a couple different titles

11     earlier, but just to be clear again, that's not your

12     accurate -- that was not your accurate title in your

13     association with World Financial Group either, is

14     it?

15         **A.  Are you referring to financial product**

16     **marketer?**

17         Q.  Yes.

18         **A.  No, it wasn't.**

19         Q.  Associate, again, was your proper title.

20         **A.  Associate, financial advisor, yes.**

21         Q.  Take a look at paragraph 33, if you will.

22     Or, I'm sorry, take a look at paragraph 32, it's on

23     the top of the next page.  The last line of

24     paragraph 32 says you were required to attend

25     mandatory meetings several times each week, do you

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

 1   see that?

 2         A.  Yes, sir.

 3         Q.  Are those the same meetings that you allege

 4   were mandatory that we discussed earlier today?

 5         A.  Hold on, what meeting are you referring to?

 6         Q.  At the bottom of paragraph 32, the last

 7   sentence.

 8         A.  Okay, the mandatory meeting several times a

 9   week was the team meeting.

10         Q.  We talked about meetings earlier that

11   you've said were mandatory, and I asked you a series

12   of questions about who set up the meetings, who told

13   you they were mandatory.  Are these the same

14   meetings that we were referring to earlier?

15         A.  These are the same meeting, yes.

16         Q.  Okay.

17         A.  And if I can just underline something, it's

18   also including meetings as the presentation, which

19   takes place every Tuesday at 6:00 p.m. and Saturday

20   at 10:00 a.m.

21         Q.  When you say "the presentation," what are

22   you referring to?

23         A.  So the presentation is where you have to

24   bring people, at least two guests, for each

25   presentation so they can -- they can attend, let's

1    say, a better presentation where there is more

2    people involved, and the presentation is being given

3    by somebody higher up in the company.

4        Q.  Okay.  And your role was to go out on your

5    own and try to convince people to come to this

6    presentation, correct?

7        A.  It is correct.

8        Q.  And in doing so you would utilize some of

9    the tools we talked about earlier, like running ads

10   on Craig's List or Indeed.com or Jobs.com or making

11   calls, correct?

12       A.  Yes.

13       Q.  And your hope in getting people to come to

14   those meetings was that if you recruited them to

15   come to the meeting and they joined World Financial

16   Group, they would then be below you in the

17   hierarchy, correct?

18       A.  They would then be below me, yes.

19       Q.  And you mentioned earlier that one of your

20   goals was to build a team in that fashion, correct?

21       A.  That's correct.

22       Q.  If you take a look at paragraph 33, please,

23   the first line says you were required to make cold

24   calls for the purposes of soliciting sales of

25   financial products, do you see that?

```
 1        A.  Yes, I do.

 2        Q.  When you were making calls you were not

 3   only talking to people about potential financial

 4   products, but you were also recruiting them at the

 5   same time, right?

 6        A.  Yes.

 7        Q.  Okay.  You said that recruiting was one of

 8   the things that went hand in hand with those calls,

 9   correct?

10        A.  It is correct.

11        Q.  And so to the extent that this allegation

12   in the complaint simply references you trying to

13   solicit sales of financial products, it's

14   incomplete, correct?  That is, you were also calling

15   people to recruit.

16        A.  It is correct, yes.

17        Q.  And the next sentence says, If recipients

18   expressed interest, Plaintiff Destin was required to

19   hand the call along to a senior broker, do you see

20   that?  It's in the very next line.

21        A.  Yes, it is correct.

22        Q.  Now, if on one of those calls you recruited

23   someone to join World Financial Group and they

24   joined World Financial Group, they would sit below

25   you in the hierarchy, correct?  You would have been
```

1   the recruiter, right?

**2        A.  I would have been the recruiter, yes.**

3        Q.  And to the extent that they became licensed

4   and you became licensed and they sold products, you

5   could potentially see a commission based on their

6   having sold products.  I think the term that World

7   Financial Group uses is override.  You would have

8   been a position to receive overrides.

**9        A.  It is correct.**

10       Q.  And so the idea that in making these calls,

11  which included recruiting, that you may not see any

12  compensation as a result, that's not completely

13  accurate, correct?

**14       A.  Can you ask your question again?**

15       Q.  Sure.  The tenor of the allegation here is

16  that if you called somebody to try to sell a product

17  or to recruit them and they were interested, you had

18  to hand them over to somebody else.  But the fact of

19  the matter is if they joined World Financial Group,

20  they would be under you in the hierarchy, such that

21  if you and they both became licensed, you would

22  stand to benefit financially, correct?

**23       A.  Yes.**

24       Q.  And if, in fact, they joined and y'all

25  became licensed and you sold financial products to

1    them, you would benefit financially, correct?

**2         A.  I would benefit, yes.**

3         Q.  Okay.  The next line of this says, However,

4    that, if a call resulted in the sale of financial

5    products, Plaintiff Destin did not receive a

6    percentage of the commission because he was not

7    eligible until he obtained his license.

8              Do you see that?

**9         A.  Uh-huh.**

10        Q.  It's your understanding was, and was at all

11   times, that if you were not licensed you were not

12   eligible to receive a commission, correct?

**13        A.  Yes.**

14        Q.  Do you understand that there are federal

15   regulations that govern whether you can sell

16   securities?

**17        A.  Yes.**

18        Q.  And if you were not -- had not received

19   your license or been regulated to sell securities,

20   you couldn't, correct?

**21        A.  I couldn't.**

22        Q.  Okay.  And therefore you wouldn't be able

23   to receive a commission from those, right?

**24        A.  It is correct.**

25        Q.  And that's not -- that was not news to you

1   when you joined World Financial Group, right?  You

2   understood that.

3       **A.  Well, they finally told me that I will get**

4   **paid once I get my license.**

5       Q.  You understood that once you received your

6   license you would be eligible to receive

7   commissions, correct?

8       **A.  It is correct.**

9       Q.  And working toward your licensing was

10  something that you were trying to do in addition to

11  recruiting, correct?

12      **A.  Uh-huh.**

13      Q.  In hopes that if you could do both of those

14  things you could build a platform with people below

15  you in the hierarchy through whom you would receive

16  override commissions in addition to your own

17  commissions, correct?

18      **A.  Correct.**

19      Q.  And then that way you could build your own

20  group, correct?

21      **A.  Correct.**

22      Q.  That was the goal, right?

23      **A.  It is the goal, yes.**

24      Q.  In the same way that, you know, Christian

25  did that and had you as a member of his group,

```
 1   correct?
 2       A.  Yes.
 3       Q.  And Stefan did that by recruiting
 4   Christian, right?
 5       A.  Yes.
 6       Q.  Mr. Destin, let me show you a document that
 7   we'll mark, and I will show it to you.
 8           MR. BUCKLEY:  Can we go off the record for
 9   just a minute?
10           THE VIDEOGRAPHER:  Stand by, please.  We're
11   off the record, the time is 4:38.
12           (Recess)
13           THE VIDEOGRAPHER:  And we are back on the
14   record, the time is 5:00.  You may continue, sir.
15   BY MR. BLACK:
16       Q.  Mr. Destin, I want to show you what's been
17   marked as Exhibit Number 4.  And it's a little
18   confusing because there's a sticker on the bottom
19   that says Exhibit 4 but then there's a big label on
20   the page that says Exhibit H.
21       A.  Okay.
22       Q.  I'm directing your attention to the blue
23   label.  Exhibit H is a cover page I think that was
24   put on this document by your counsel.  Do you
25   recognize this document, Mr. Destin?
```

1          **A.   I do.**

2          Q.   Is this your resume?

3          **A.   It is my resume.**

4          Q.   Did you create this resume?

5          **A.   I had some help to do it.**

6          Q.   Who helped you in creating it?

7          **A.   A friend of mine.**

8          Q.   Who is that friend?

9          **A.   His name is Longay, L-O-N-G-A-Y.**

10         Q.   What's his last name?

11         **A.   Shahi, S-H-A-H-I.**

12         Q.   Longay Shahi?

13         **A.   It is correct.**

14         Q.   And what role did Mr. Shahi play in

15    creating this resume?

16         **A.   Only as far as the format of the resume,**

17    **how to put the things together.**

18         Q.   As far as the substance of the resume, did

19    you draft the substance?

20         **A.   I did.**

21         Q.   So the language that I see here in the

22    bullet points and the words that I see on the page

23    were drafted by you.

24         **A.   It is correct.**

25         Q.   And to your understanding was everything on

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1   this document accurate at the time that you created

2   it?

**3        A.  I do.**

4        Q.  And is it accurate as we sit here today?

**5        A.  It is accurate.**

6        Q.  That is, you are still employed by Expedia,

7   correct?

**8        A.  Correct, yes.**

9        Q.  Are you employed by anyone other than

10  Expedia right now?

**11       A.  No.**

12       Q.  Do you recall when you created this

13  document?

**14       A.  I do not recall when I created this**

**15  document.**

16       Q.  It looks like it was created sometime after

17  July of 2011, because that's the last date that your

18  employment is listed with Expedia.  So using that as

19  a frame of reference, do you have any idea if this

20  was put together in the last year?  Was it put

21  together in the last six months?

**22       A.  I usually update my resume when I'm**

**23  applying for a new position, so I had no need to**

**24  modify my resume since July 2011.  So that will be**

**25  the last day that the resume has been drafted.**

```
 1        Q.  So you likely created this in July of 2011?
 2        A.  Yes, before I get my employment -- let's
 3   say June, before I get my employment for Expedia.
 4        Q.  And you ended your relationship with World
 5   Financial Group in June of 2011, correct?
 6        A.  Correct.
 7        Q.  Do you remember the specific date in June
 8   2011 that you ended your relationship with World
 9   Financial Group?
10        A.  No, sir.
11        Q.  And just to be clear, since June of 2011
12   when you ended your relationship with World
13   Financial Group you have not engaged in any
14   activities whatsoever that relate to World Financial
15   Group; is that right?
16        A.  It is correct.
17        Q.  So going back to your employment with
18   Expedia, you became employed by them in July of
19   2011?
20        A.  Yes.
21        Q.  And what is your role at Expedia?
22        A.  So I'm a lead agent, so I take care of
23   escalation.
24        Q.  And so if a customer tries to book travel
25   through Expedia and they have an issue, that
```

1    escalation would go to you; is that correct?

2        A.  It will go to an agent first, and mostly my

3    job is to reply to customers' e-mail.  So I started

4    as an agent, yes, bilingual sales agent, French and

5    English, Canada and United States for Expedia.  And

6    I've been promoted to be lead agent, so taking care

7    of escalation, customers' issue, complaints, refund.

8        Q.  When were you promoted?

9        A.  I was promoted six months after I started

10   working with Expedia.  So that will be the end of

11   2011.

12       Q.  And when you began your association with

13   Expedia were you informed that you would be an

14   employee?

15       A.  I was informed that I will be an employee,

16   yes.

17       Q.  And was that a full-time position?

18       A.  It was a full-time position, yes.

19       Q.  And do you receive any benefits from

20   Expedia?

21       A.  Yes.

22       Q.  And have you received benefits from Expedia

23   since the start of your relationship with Expedia?

24       A.  I did.

25       Q.  Under your responsibilities you identify

Cohen vs. World Financial Group        Jordan Destin        10/08/2013

1    that you provide detailed legal scripts.

**2        A.  Uh-huh, correct.**

3        Q.  What legal scripts do you provide?

**4        A.  So prime example, for me to respond to a**

**5    customer complaint I cannot write my own words, I**

**6    have to follow a certain guideline.**

7        Q.  Okay.  And you draft those up based on the

8    guidelines?

**9        A.  Correct.**

10       Q.  And so when you say legal script, you're

11   not saying you're drafting legal documents.  You're

12   providing a script -- you're provided with a

13   guideline and then you draft a script.

**14       A.  I have to follow the script still.**

15       Q.  Does anybody review those scripts?

**16       A.  I will -- the original script, the company,**

**17   yes, is taking care of it.**

18       Q.  You also said that you manage front line

19   professionals' performance, do you see that?  That

20   is the fourth bullet point down.

**21       A.  Correct.**

22       Q.  When you say front line professional, are

23   you referring to the agents?

**24       A.  I'm referring to the agents, yes.**

25       Q.  Now, how long were you in the agent

1    position before you were promoted?

**2          A.  Six months.**

3          Q.  Six months.

**4          A.  Uh-huh.**

5          Q.  So does that help refresh your recollection

6    at all as to when you may have updated this resume?

7    Because you're referring here to management of

8    agents, which I assume is in your lead roll.

**9          A.  It is correct.**

10         Q.  But you wouldn't have had the lead roll

11   until January or February of 2012; is that right?

**12         A.  I'll be honest with you, when I joined the**

**13   company first I wanted to be a manager.  So I had**

**14   this role as a manager but not the title of it**

**15   officially.**

16         Q.  So you were managing front line

17   professionals' performance when you very first

18   started?

**19         A.  Well, not the day I started, but easily**

**20   three weeks after, yes.**

21         Q.  So it may well be that this was last

22   updated in July of 2011?

**23         A.  Yes, sir.**

24         Q.  Am I correct that you have not updated this

25   resume at any time since then?

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1        **A.   That is correct.**

2        Q.   Had you updated this -- did you retain the

3    version of this resume that was updated to create

4    this version?

5        **A.   I always keep the same track, yes.**

6        Q.   My question was:  Am I correct to assume

7    you had a resume before you created this version of

8    the resume?

9        **A.   Correct.**

10       Q.   All right.  What did you do with that

11   version of the resume when you created this version

12   of the resume?

13       **A.   Update some key points, such as my national**

14   **line professional performances, different key points**

15   **in my resume, I updated that, yes.**

16       Q.   Did you maintain or preserve the prior

17   version?

18       **A.   Yes, sir.**

19       Q.   Where is that?

20       **A.   Oh, no.  The prior version, if you're**

21   **referring to the original document --**

22       Q.   I am.

23       **A.   The original resume, no.  I always have one**

24   **resume, that's the one I go by.**

25       Q.   So is it your testimony that you updated

1   the version and it became this, but you did not keep

2   the old version?

3        **A.  It is correct.**

4        Q.  You also identify Abercrombie & Fitch on

5   this resume, and we've talked about Abercrombie &

6   Fitch a couple times.  Your association with

7   Abercrombie & Fitch was as an employee, correct?

8        **A.  It is correct.**

9        Q.  And you understood that at the time you

10  began to be associated with them?

11       **A.  It is correct.**

12       Q.  And that started in December of 2010 after

13  you had already been associated with World Financial

14  Group?

15       **A.  It is correct.**

16       Q.  That was a full-time position, correct?

17       **A.  It was a full-time position.**

18       Q.  What type of hours were you maintaining at

19  Abercrombie & Fitch?

20       **A.  At least 32 hours.**

21       Q.  And was it ever the case that you worked

22  more than 32 hours?

23       **A.  Yes, because it's a salary base.**

24       Q.  So you were paid a salary as an assistant

25  store manager at Abercrombie?

1      A.  It is correct, yes.

2      Q.  And so it was your understanding that you

3  would be paid a particular salary for all hours that

4  you worked in a week, regardless of how many hours

5  you worked?

6      **A.  It is correct.  I had to do at least 32**

7  **hours to be considered a full-time and have**

8  **benefits.  I was trying to stay below 40 hours, but,**

9  **you know, when you're running a store that big, it's**

10  **the flagship store in Las Vegas so it's a big store,**

11  **I was going over 40 hours.**

12      Q.  How many hours a week do you estimate you

13  were working on average?  Between 40 and 50?

14  Between 50 and 60?

15      **A.  For Abercrombie & Fitch only?**

16      Q.  Abercrombie & Fitch.

17      **A.  Only?  Well, average 40 hours.**

18      Q.  You averaged 40 hours?

19      **A.  Yes.**

20      Q.  Were there weeks when you only worked 32

21  and weeks when you worked as many as 50?

22      **A.  I don't recall the last time I worked only**

23  **32 hours, but 36 hours up to 42, yes.**

24      Q.  So as little as 36 with an average of 40 is

25  your recollection?

```
 1        A.  Yes.

 2        Q.  And were there particular shifts that you

 3   worked at Abercrombie?

 4        A.  So the shift could change, you can actually

 5   switch shift with your co-workers, either early

 6   morning or late afternoon.  Late evening, I should

 7   say.

 8        Q.  And do you recall the hours of those

 9   shifts?

10        A.  There was a shift starting at or convening

11   around 7:00 a.m. that required me to be in the store

12   at least until 2:00 or 3:00 p.m. in the afternoon,

13   and there was another shift starting at 6:00 p.m. as

14   I recall, 5:30, 6:00 p.m.ish and I was in like till

15   past midnight, 1:00 o'clock, 2:00 o'clock in the

16   morning.  I was the closing shift manager.

17        Q.  You ended your relationship with World

18   Financial Group in or about June of 2011, right?

19        A.  It is correct.

20        Q.  Is it fair to say that at the time that you

21   ended that relationship you had stopped putting in

22   as many hours with World Financial Group as you had

23   at the start of your relationship with World

24   Financial Group?

25        A.  It is correct.
```

1      Q.  And so let's take June 2011, for example.

2   In the weeks prior to you ending that relationship

3   were you going to meetings anymore?

4      **A.  I was going to meetings, yes, sir.**

5      Q.  Were you doing anything else outside of

6   that?

7      **A.  I was my best to maximum myself my time in**

8   **the office because it was not really convenient to**

9   **go from work to work to home, so I was trying to**

10  **maximize my time at World Financial Group.  So if I**

11  **could do, you know, five hours a day would be great,**

12  **but I could not manage both working at the same**

13  **time.**

14     Q.  And I take it there were a lot of days when

15  you couldn't manage five hours and work at

16  Abercrombie in your full-time job.

17     **A.  That is correct.**

18     Q.  Was that true for that entire time that you

19  were also -- you were working at Abercrombie on a

20  full-time basis, that you would put in as many hours

21  as you could, but you couldn't quite put in all the

22  hours that you were previous to that?

23     **A.  That's correct.**

24     Q.  So that's from December of 2010 on that you

25  were doing that, right?

1    **A.  Until July 2011, yes.**

2    Q.  How many hours do you think you were able

3    to put into World Financial Group realistically say

4    in the June timeframe right before you finally ended

5    the relationship?

6    **A.  Well, I was going to the team meetings**

7    **because those were required, presentation as well,**

8    **followup with customers.  I was on an average, 10**

9    **hours a week.**

10    Q.  10 hours a week.

11    **A.  10 hours a week.**

12    Q.  And was that generally true during the time

13    that you were trying to -- well, not when you were

14    trying to, when you were working full-time managing

15    the Abercrombie store?

16    **A.  Well, the 10 hours a week was towards the**

17    **end of June when I left World Financial Group, but**

18    **during that time between December, let's say January**

19    **2011 up to June 2011, that six months' timeframe, I**

20    **was working 70 hours a week both combined.**

21    Q.  Okay.  So it's your testimony that toward

22    the end of your relationship with World Financial

23    Group, you were down to about 10 hours a week, just

24    attending what you regarded as the mandatory

25    meetings.

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1       A.  Correct.

2       Q.  But prior to that, you were still putting

3   in, if I do the math correctly, 30 hours a week for

4   World Financial Group?

5       A.  Yes, an average of 25.

6       Q.  25.

7       A.  Yeah.  Between 25, 30.

8       Q.  Were there occasions when the shift that

9   you had, you were required to be working at

10  Abercrombie, ran over on top of meetings at World

11  Financial Group?

12      A.  Yes, sir.

13      Q.  And so it was the case that you had to miss

14  meetings at World Financial Group because you had to

15  be at Abercrombie, right?

16      A.  That is correct.

17      Q.  That is not infrequent, that happened

18  relatively often during that December to June

19  timeframe, right?

20      A.  Well, anywhere between December up to June,

21  one of the mandatory meeting was supposed to be on

22  Saturday, and as you know in the retail business

23  Saturday is actually the busiest day of the week, so

24  I had to be present -- I had to find a way to either

25  be at World Financial Group or be at Abercrombie &

1    **Fitch.  So I was basically switching hours if**

2    **possible and combining the whole day together as**

3    **much as possible.**

4        Q.  But sometimes you would miss that mandatory

5    meeting, correct?

6        **A.  Yes.**

7        Q.  Was there any consequence to you missing

8    the mandatory meeting?  Did World Financial Group --

9    did the other folks on your team sever your

10   relationship?

11       **A.  I will be talked to about it, yes.**

12       Q.  So the folks on your team might talk to you

13   about it, but was there any financial consequence to

14   you for missing a meeting and being at Abercrombie?

15   That is, were you penalized?

16       **A.  Well, I mean, I will be penalized.  I will**

17   **basically penalize myself too, because if I'm not**

18   **able to either follow up with a customer or miss a**

19   **team meeting where we have an update on the product**

20   **it's kind of penalizing myself being at work so**

21   **much.**

22       Q.  Because what you were doing at World

23   Financial Group ultimately was up to you, right?  It

24   was if you put in the time and you put in the effort

25   you could build this team, but you penalized

1   yourself by missing the meetings and missing those

2   followups because you wouldn't develop that team.

3   Is that essentially what you're saying?

4        **A.  Well, as simple as Abercrombie & Fitch was**

5   **paying me for me to be showing up in their store,**

6   **right.  World Financial Group did not.  So either I**

7   **would not show up to the meeting and I would be**

8   **talked to and I would be pressurized, that's the**

9   **word, like I'd be pressured by my higher people**

10  **above me, or I would simply lose my job at**

11  **Abercrombie for not being there on time.**

12       Q.  You were not in danger of losing your

13  affiliation with World Financial Group but you were

14  at risk of losing your job at Abercrombie, correct?

15       **A.  That is correct.**

16       Q.  With regard to the pressure that you say

17  was imposed on you, that pressure was imposed on you

18  by those in your team and above you in the

19  hierarchy, correct?

20       **A.  By my team, yes.**

21       Q.  And they were imposing pressure on you to

22  be present at meetings and do followups and to

23  recruit?

24       **A.  That's correct, because if I'm not showing**

25  **up to the meeting it means I don't have any guests**

1    **to invite to the meeting, to the presentation, and**

2    **it's not a good way to promote the business.  They**

3    **wanted us to be there when we invite people.  So if**

4    **I have two guests coming either on a Tuesday or a**

5    **Saturday it would be required for me to be there to**

6    **welcome them in the office, give them a little tour,**

7    **let them sit down for an hour or two, time for the**

8    **presentation to take on, and then I will follow up**

9    **with them right after the presentation, so yes.**

10       Q.  And so to the extent that you had to make a

11   choice between Abercrombie and being at a meeting at

12   World Financial Group say on a Saturday where you

13   had real conflicts, that also was detrimental to you

14   in your effort to build your team, because if you

15   weren't there to be present with someone with whom

16   you were following up, they may be less likely to

17   sign on.

18       **A.  It is correct.**

19       Q.  But you had to make a choice between your,

20   lack of a better term, your paying job, your

21   employment with Abercrombie and your association

22   with World Financial.

23       **A.  Correct.**

24       Q.  And as I am hearing you, you would err on

25   the side generally of choosing Abercrombie if you

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1   had to choose one or the other.
 2       A.  Well, again, Abercrombie was paying my
 3   bills.
 4       Q.  One of the things that you mentioned that
 5   was your responsibility for Abercrombie was to
 6   manage real estate growth to compete effectively
 7   across markets.  What about your role as an
 8   assistant store manager involved managing real
 9   estate growth to compete effectively across markets?
10       A.  So I mean by managing real estate growth is
11   compare our store to the other stores, basically,
12   the other Hollister or Abercrombie that we were
13   leading in our department to see which one would be
14   the best, basically, as far as sales targets, sales
15   calls, how many people we have to recruit, because
16   we had to recruit people for Abercrombie & Fitch as
17   well.
18       Q.  When you say "recruit people," you mean you
19   were hiring individuals to be employed at
20   Abercrombie?
21       A.  Hiring is the right term, but it's also --
22   it's a recruiting position, too, because they
23   actually -- well, I'm not here to brag about
24   Abercrombie, but long story short is they send you
25   on the field, either UNLV, university, anywhere,
```

```
 1    where you have young people that could potentially

 2    join the company, and you recruit them, too, based

 3    on their work.

 4         Q.  Did you do that?

 5         A.  I had to, yes.

 6         Q.  When you recruited people to come to

 7    Abercrombie & Fitch did you talk to them about

 8    compensation?

 9         A.  No.

10         Q.  You didn't talk to them about whether

11    they'd be paid to join Abercrombie & Fitch?

12         A.  It was not a good way to do a recruiting

13    job.

14         Q.  What would you tell them?

15         A.  Well, we would tell them that, you know, if

16    they are looking for a position and we have open

17    position, it would be part-time, so it could be 5,

18    10, 20 hours a week, I will decide on that, and if

19    they fit the look of the company and the style of

20    the brand, then they can come for an interview.

21         Q.  And if someone asked you how they would be

22    paid or if they would be paid by Abercrombie &

23    Fitch, what did you tell them?

24         A.  Well, I will tell them that it is the

25    minimum wage for part-timers.
```

1        Q.   And you let them know that this was an

2    employment relationship, correct?

3        **A.   Yes.**

4        Q.   When you recruited people to become

5    associated with World Financial Group, you didn't

6    give them any information about an hourly rate,

7    right?

8        **A.   It is correct.**

9        Q.   And you didn't tell them that there was an

10   employment relationship, correct?

11       **A.   It is correct.**

12       Q.   One thing I wanted to explore with you is

13   earlier today I asked you when you first became

14   affiliated with World Financial Group.  We looked at

15   your AMA, which you had signed and dated in October

16   of 2010.  Do you recall that?

17       **A.   Correct.**

18       Q.   But you recall that you were affiliated

19   with World Financial Group in September of 2010.

20       **A.   Correct.**

21       Q.   What was the nature of this affiliation

22   that you mentioned before you actually signed the

23   AMA?

24       **A.   A lot of presentation, a lot of team**

25   **meeting too, going to the office, being on the**

1    field, learning the product, just basically for the

2    new hire to feel comfortable with the company and to

3    know who they're going to be joining with, you know.

4         Q.  Was part of that your recruiting process,

5    that is the process where you were being recruited?

6         A.  That's been the process when I was

7    recruited.

8         Q.  I see.

9         A.  And it took about a week for the background

10   check to come back, so by the time I fill paperwork

11   and everything, yes.

12        Q.  So if I understand correctly, this -- we

13   have this period of time from September until

14   October when you signed the AMA, that was a period

15   of time during which, A, you were being recruited,

16   you were attending meetings to learn more about

17   World Financial Group and you were filling out

18   paperwork to see if you would have an affiliation

19   with World Financial Group; is that right?

20        A.  That is correct.

21        Q.  And that's what was going on in that

22   September timeframe?

23        A.  Yes.

24        Q.  For purposes of the associate management

25   agreement, membership agreement, you don't dispute

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1    that that document was submitted in October, though,

2    correct?

3         **A.  I don't.**

4         Q.  Okay.  The company that you list prior to

5    listing World Financial Group on your resume is

6    Connor located in Melbourne, Australia, correct?

7         **A.  It is, correct.**

8         Q.  Is that a job that you held while you were

9    going to school?

10        **A.  That's a job I held -- no, I went to school**

11   **in Sidney.**

12        Q.  I was just going to ask you that.  So you

13   went to school for six months in Sidney, earned your

14   Associate's Degree, moved to Melbourne, worked

15   for --

16        **A.  Connor.**

17        Q.  It was almost a year for Connor Group.

18        **A.  Correct.**

19        Q.  And then went back to the United States.

20        **A.  It is correct, yes.**

21        Q.  Directly to Las Vegas.

22        **A.  Directly to Las Vegas.**

23        Q.  And there was a gap of time between June

24   2010 and when you first became affiliated with World

25   Financial Group.

1        **A.   Uh-huh.**

2        Q.   Were you working at all during that period?

3        **A.   I worked for a company called Holiday**

4    **System International.**

5        Q.   Holiday System International?

6        **A.   Correct.**

7        Q.   What was Holiday System International?

8        **A.   It's a time share company.**

9        Q.   What did you do?

10       **A.   I was a sales agent for a time share**

11   **company.**

12       Q.   Were you employed by them?

13       **A.   I was employed, yes, sir.**

14       Q.   And what was your role?

15       **A.   Sales agent.**

16       Q.   Who were you paid?

17       **A.   Hourly.**

18       Q.   Hourly plus commissions or just hourly?

19       **A.   Just hourly.**

20       Q.   And did you work for Holiday System

21   International from the time you came back from

22   Australia until the time that you became affiliated

23   with World Financial Group, or was there a period of

24   time where you were working for Holiday Systems

25   International and had started your affiliation with

1   World Financial Group?

**2          A.   No, I didn't do both together.**

3          Q.   The only thing that you did simultaneous to

4   World Financial Group was Abercrombie & Fitch.

**5          A.   It is correct.**

6          Q.   Are you familiar with Silver Trading Group?

**7          A.   Yes.**

8          Q.   What is Silver Trading group?

**9          A.   It's a company I used to have.**

10          Q.   It was your company?

**11          A.   It was my company, yes.**

12          Q.   And I don't see that on the resume here.

13   When did you form Silver Trading Company?

**14          A.   About two and a half years ago.**

15          Q.   And what was Silver Trading Company?

**16          A.   It was supposed to be an investment**

**17   company.**

18          Q.   Of what type?  What type of investment?

**19          A.   Well, it was supposed to be real estate**

**20   investment.  But we just formed the name of the**

**21   business and we just let it sit like that.  We never**

**22   used it for any purposes.**

23          Q.   When you say "we," who are you referring

24   to?

**25          A.   Me and my business partner.**

1      Q.  Mr. Lucas?

2      **A.  Mr. Lucas, it is correct.**

3      Q.  Is Silver Trading Company still a viable

4    entity?

5      **A.  No.**

6      Q.  And at some point you formed Destin &

7    Lucas, correct?

8      **A.  Correct.**

9      Q.  Is Destin & Lucas effectively the successor

10   to Silver Trading Company or are they totally

11   different companies?

12     **A.  Well, it's a different company, yes, it's a**

13   **different name, different tax ID, number so it's a**

14   **different company.**

15     Q.  And what does Destin & Lucas do?

16     **A.  So we do real estate management, so we buy**

17   **investment properties in Las Vegas, Nevada.  We rent**

18   **them out, manage the properties, find renters,**

19   **that's what we do.**

20     Q.  When is the last time that Destin & Lucas

21   sold a property?

22     **A.  We didn't sell property yet.**

23     Q.  You simply invest in properties and then

24   rent them out?

25     **A.  It is correct.**

1      Q.  How many properties does Destin & Lucas

2   own?

**3      A.  Three.**

4      Q.  I mentioned some properties earlier and I

5   think you mentioned that you own them as investment

6   properties.

**7      A.  Correct.**

8      Q.  Are those the investment properties of

9   Destin & Lucas or are they the investment properties

10   of you personally?

**11      A.  They were my investment personally, first**

**12   under my name, and then I transferred my name to the**

**13   business company.**

14      Q.  We talked about two of them.  You said

15   there are three?

**16      A.  There is three, yes.  Actually, I think you**

**17   gave me the addresses for the three.**

18      Q.  We talked about REDACTED                    ?

**19      A.  Correct.**

20      Q.  We talked about REDACTED                 ?

**21      A.  Correct.**

22      Q.  We talked about REDACTED        ?

**23      A.  Correct.**

24      Q.  Is that the third address?

**25      A.  It is.**

```
 1        Q.  You live in the REDACTED         address.

 2        A.  Yes.

 3        Q.  Is that where you live with your wife?

 4        A.  Yes.

 5        Q.  Does Mr. Lucas live in any of those

 6   properties?

 7        A.  No.

 8        Q.  And the other two you rent out, correct?

 9        A.  It is correct.

10        Q.  Destin & Lucas was incorporated in or about

11   December of 2012, correct?

12        A.  It is correct.

13        Q.  And are you employed by anyone presently?

14        A.  Expedia.

15        Q.  Oh, I'm sorry.  Besides Expedia and

16   Destin & Lucas.

17        A.  No.

18        Q.  So you own Destin & Lucas and you're

19   employed by Expedia, but you have no other

20   employment relationship?

21        A.  It is correct.

22        Q.  Do you have any relationship with any other

23   company, whether it be an independent contractor or

24   any other type of relationship?

25        A.  Not that I would know of, no.
```

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1          Q.  If you would, please take out Exhibit 8.

2     And actually, I think I want to show you a different

3     exhibit.  No, Exhibit 8 is the right one.  And turn,

4     if you will, to page 9 and interrogatory 8.

5          Now, in this interrogatory you were asked

6     to identify and fully describe all entities or

7     persons for whom you have been employed, performed

8     work, sought to obtain employment or to enter an

9     independent contractor relationship with since June

10    18th of 2008, do you see that.

11         **A.  I do see that, yes.**

12         Q.  If you look at the answer below, can you

13    find for me where you have identified Silver Trading

14    Company?

15         **A.  I did not.**

16         Q.  Okay.  Can you find for me where you

17    included Holiday Systems International?

18         **A.  I don't.  It's not in there.**

19         Q.  Why are those two not identified as part of

20    your interrogatory response?

21         **A.  Silver Trading group is not a valid entity,**

22    **like I told you, so no longer the needs to mention**

23    **that company.  And Holiday Systems International, I**

24    **just didn't work for them long enough to mention**

25    **them.**

1     Q.  Did you understand that there was a -- you

2   were only asked to identify employers or companies

3   with whom you had relationships only over a certain

4   period of time?

5     **A.  That's my understanding, yes.**

6     Q.  So you understood that your relationship

7   with Holiday was too short to mention?

8     **A.  I just -- to be honest with you, I just**

9   **skipped it.  I didn't put that version in it.**

10    Q.  As you sit here today and look at this, and

11  look at this interrogatory do you understand that,

12  in fact, you should have provided that?

13    **A.  Yes, sir.**

14    Q.  And the same with respect to Silver

15  Trading?

16    **A.  But I was not employed by Silver Trading**

17  **group.**

18    Q.  Well, you identified Destin & Lucas in this

19  response, but you are owner.

20    **A.  Right, because it is an active company, it**

21  **is correct.**

22    Q.  At one time Silver Trading Company was an

23  active company, correct?

24    **A.  It was an active company, yes.**

25    Q.  And during the time that it was an active

```
 1    company you were either employed by it or you owned

 2    it.

 3         A.  Correct.

 4         Q.  Okay.  But yet you didn't identify it here.

 5         A.  Correct.

 6         Q.  You also, you worked for Tommy Hilfiger at

 7    some point, correct?

 8         A.  I did work for Tommy Hilfiger, yes.

 9         Q.  In Nevada.

10         A.  In Las Vegas, Nevada, yes, sir.

11         Q.  Between about September of 2010 and October

12    of 2010?

13         A.  That sounds about right, yes.

14         Q.  What was your role with Tommy Hilfiger?

15         A.  I was just a sales associate.

16         Q.  Was it a part-time or a full-time position?

17         A.  It was a part-time position.

18         Q.  How many hours a week were you working for

19    Tommy Hilfiger?

20         A.  About three to five.

21         Q.  When you were working for -- you were

22    working three to five hours a week?

23         A.  Yes.

24         Q.  Okay.  Were you scheduled by anyone to work

25    certain hours at Tommy Hilfiger?
```

```
 1          A.  Correct.

 2          Q.  I asked you earlier whether you were

 3     employed by anyone else other than Abercrombie &

 4     Fitch during the period that you were associated

 5     with World Financial Group and you told me you were

 6     not.

 7          A.  Correct.

 8          Q.  But Tommy Hilfiger in the September to

 9     October 2010 timeframe does fit within that window;

10     doesn't it?

11          A.  That's correct.  And that's the reason why

12     I quit Tommy Hilfiger, because I was actually

13     joining World Financial Group officially in October.

14          Q.  And did you overlap between the two at all?

15          A.  Not too much, not enough time for me to

16     combine both work together.  Tommy Hilfiger was like

17     a short time, maybe three weeks.

18          Q.  Were there any other employers for whom --

19     any other companies by whom you were employed

20     between 2008 and the present that we haven't talked

21     about?

22          A.  Orlando Disneyworld.

23          Q.  Okay.  When were you employed by Orlando

24     Disneyworld?

25          A.  I started over there in April 2008, I'm
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

 1   thinking.  And I worked there for about three weeks.

 2        Q.  That would have been before June of 2008.

 3        A.  It would have been before June 2008, yes.

 4        Q.  Were you employed by Disneyworld?

 5        A.  I believe I was, yes.

 6        Q.  In what capacity?

 7        A.  I was a -- I was working in the French

 8   bakery at the Epcot Center.

 9        Q.  When you sought employment with Expedia did

10   you use a version of the resume that you provided to

11   us in this litigation?

12        A.  Yes, sir.

13        Q.  And this resume has some information

14   blacked out at the top of it.  When you provided

15   this to counsel was that information blacked out?

16        A.  No, it wasn't.

17        Q.  Do you know why it's blacked out?

18        A.  Privacy matter, I'm assuming.

19        Q.  What is that information?  Is that an

20   address?

21        A.  Yes.

22        Q.  It's the same address you provided in your

23   interrogatory answers and in other documents?

24        A.  Right, and e-mail address too and phone

25   number.

1        Q.   Which is all information that you've

2   otherwise provided.

3        **A.   It is correct, yes.**

4        Q.   The Associate's Degree that you received

5   from Victoria University in Melbourne, Australia,

6   what was the -- you list your major on page 2 as

7   international business, marketing and management.

8   What did that encompass?

9        **A.   Well, I joined Victoria University in**

10   **Melbourne because I was able to actually finish a**

11   **degree over there that I was not able to finish it**

12   **in the United States or in France.**

13           **The interesting thing about Australia is**

14   **they have a working and a school visa at the same**

15   **time, so you can go to school and you can work over**

16   **there.  And the associate degree will be the**

17   **equivalent of -- well, it will be an associate**

18   **degree over here.**

19        Q.   Okay.  It lasted -- it was about six

20   months, correct?

21        **A.   It is correct, yes.**

22        Q.   Now, you had much earlier in the deposition

23   referred to yourself I think as a training associate

24   when you first became affiliated with World

25   Financial Group, correct?

1      A.  It is correct.

2      Q.  What kind of training did you receive when

3  you first became affiliated with World Financial

4  Group?

5      **A.  Well, the type of training I received was**

6  **the technique, the sales speech, how to sell the**

7  **product, how to promote the company too, and**

8  **obviously how to recruit people.**

9      Q.  Were you also provided training with regard

10  to particular products?

11      **A.  Yes.**

12      Q.  Were you provided training with regard to

13  the nature of those products, whether they be

14  securities or insurance policies?

15      **A.  Yes.**

16      Q.  And the training that you were provided, it

17  was provided to you by whom?  Those in your

18  hierarchy above you?

19      **A.  Yes, but also people from the office, and**

20  **when I call people from the office I mean the Las**

21  **Vegas office.  So whoever else is in charge of the**

22  **office.**

23      Q.  Right.  And so when you say that, you mean

24  others who were associates with World Financial

25  Group though they may have been higher in the

 1   hierarchy than you.

 **2**      **A.   Yes, and they were higher, yes.**

 3      Q.   And they provided the training.

 **4**      **A.   It is correct.**

 5      Q.   At any point during your association with

 6   World Financial Group did you ever travel to World

 7   Financial Group headquarters in Johns Creek,

 8   Georgia?

 **9**      **A.   No, sir, I did not.**

10      Q.   Did you ever attend any national

11   conferences or conventions?

**12**      **A.   I was invited to one, yes.**

13      Q.   Did you attend one?

**14**      **A.   I did not.**

15      Q.   You said you traveled to Anaheim.  That was

16   to meet with Don and Laura Chang?

**17**      **A.   It is correct.**

18      Q.   Did you do any traveling outside of Nevada

19   with respect to your affiliation with World

20   Financial Group other than the Anaheim trip?

**21**      **A.   No.**

22      Q.   All of your other affiliation with World

23   Financial Group was in Nevada?

**24**      **A.   Yes.  The person I recruited was actually**

**25**   **based in Florida, Miami.**

1      Q.   So Mr. Lucas.

2      **A.   Mr. Lucas.**

3      Q.   Is located in Florida.

4      **A.   Correct.**

5      Q.   And so did you go to physically meet with

6    Mr. Lucas or did you talk with Mr. Lucas over the

7    telephone?

8      **A.   Oh, I met with him a couple times.**

9      Q.   You met with him in person?

10     **A.   Yes.**

11     Q.   So in the process of talking to Mr. Lucas,

12   you -- and trying to -- well, strike that.

13          When you were talking to Mr. Lucas were you

14   both trying to sell him on the idea of purchasing

15   products and on joining World Financial Group?

16     **A.   Yes, sir.**

17     Q.   And you traveled to Florida to do that?

18     **A.   No, he came to Las Vegas to do that.**

19     Q.   So you did not travel to Florida.

20     **A.   I went to Florida a couple of times just to**

21   **locate the World Financial Group office, because**

22   **when he came to Las Vegas we explain him what was**

23   **the roles and that he had to attend meeting, and the**

24   **closest meeting from Miami was -- I think it's in**

25   **Fort Lauderdale, if I'm not mistaken.**

1     Q.  So you traveled to Florida as part of your

2     recruitment and attempt to sell to Mr. Lucas.

3     **A.  I would not say it was part of the**

4     **recruitment, no.  I traveled there for my personal**

5     **needs.**

6     Q.  But it had nothing to do with -- but it did

7     have to do with your association with World

8     Financial Group, correct?

9     **A.  Why would it be?**

10    Q.  Well, I thought you testified that when you

11    traveled to Florida it was to try and locate a World

12    Financial --

13    **A.  Yes.**

14    Q.  -- an office occupied by those associated

15    with World Financial Group.

16    **A.  It is correct.  Yes, yes, yes.**

17    Q.  So in that regard your travel to Florida

18    did relate to your association with World Financial

19    Group.

20    **A.  That was not my prime concern, obviously,**

21    **but yes, as I was employed, I would look up and see**

22    **where the office is located at.**

23    Q.  And was that related to Mr. Thibaud?

24    **A.  It was related to Mr. Thibaud, yes.**

25    Q.  Whom you had recruited.

1       A.  Yes.

2       Q.  And whom you were trying to sell product

3   to.

4       A.  Yes.

5       Q.  When you traveled to Florida did you pay

6   for the flight?

7       A.  Yes, sir.

8       Q.  And were you reimbursed for that flight at

9   all by World Financial Group?

10      A.  No, sir.

11      Q.  Or by anyone associated with World

12  Financial Group?

13      A.  No, sir.

14      Q.  When you went to Florida did you rent a

15  car?

16      A.  I can't recall if I rented a car on that

17  day, but probably, yes.

18      Q.  If you -- do you recall being reimbursed

19  for any car rental by World Financial Group?

20      A.  No, sir.

21      Q.  When you traveled to Anaheim, how did you

22  travel?

23      A.  I took my own car.

24      Q.  Were you reimbursed for the gas associated

25  with your travel to Anaheim?

1          **A.   No, sir.**

2          Q.   You paid for that yourself?

3          **A.   Correct.**

4          Q.   So returning back to training that you

5     received by those who were also associated with

6     World Financial Group in this office space that you

7     shared, you received training about products that

8     you could market and try to sell?

9          **A.   It is correct.**

10         Q.   And did you receive training generally on

11    the idea of marketing securities and insurance?

12         **A.   It is a fair statement, yes.**

13         Q.   And to the extent that you were provided

14    with that training, that's training that would have

15    benefited you in connection with your continued

16    association with World Financial Group?

17         **A.   Yes.**

18         Q.   And would have potentially benefited you

19    outside of that relationship, had you affiliated

20    with another organization and sought to sell

21    securities or insurance, correct?

22         **A.   No.**

23         Q.   No?

24         **A.   Because we were not able to sell for**

25    **another company, we were required to sell for World**

1   **Financial Group only.**

2       Q.  The training that you received, was it

3   specific to World Financial Group products that you

4   could offer as an associate of World Financial

5   Group, or did it also have to do generally with the

6   idea of selling?

7       **A.  Well, it was related to World Financial**

8   **Group product, yes.**

9       Q.  But you also received training on how to

10  sell and to recruit, correct?

11      **A.  It is correct, yes.**

12      Q.  And those general concepts of sell and

13  recruiting are concepts and training that could have

14  benefited you outside of your association with World

15  Financial Group, correct?

16      **A.  It is correct.**

17      Q.  In fact, you were recruiting for

18  Abercrombie & Fitch, correct?

19      **A.  Correct, but it's not the same type of**

20  **recruiting.**

21      Q.  Understood.

22      **A.  And something I'd like to clarify as well,**

23  **it's -- I forgot what I was about to say.  It was**

24  **not recruiting -- yes, so the meeting we had for**

25  **World Financial Group, we had obviously the**

```
 1    presentation meeting where we talked about but we

 2    also had the actual vendors coming in into the

 3    office, such as World Life Insurance, TransAmerica,

 4    Lifelock, we had Lifelock too.  So these people were

 5    coming to us to let us know what kind of update they

 6    had on their products.

 7         Q.  The -- so you were receiving training on

 8    particular products.

 9         A.  Correct, yes.

10         Q.  That product, the training you received for

11    products also benefited you in the sense that you

12    may personally want to invest in some of those

13    products, correct?

14         A.  Correct.

15         Q.  And it also benefited you in your ability

16    to try and sell those products to other people,

17    correct?

18         A.  Correct.

19         Q.  Was some of the training -- some of the

20    training was, I think you just testified, relating

21    to sales and recruitment generally, correct?

22         A.  Yes.

23         Q.  Could you have, if you wanted to, have

24    taken a course outside of World Financial Group on

25    the idea of selling?
```

1      A.  Yes.

2      Q.  That's the type of training you could get

3   in a school, for example, if you wanted to have that

4   training, correct?

5      A.  It is correct.

6      Q.  You could also get similar kind of training

7   on selling securities, for example, correct?

8      A.  Correct.

9      Q.  The vendor products that you were trained

10  on, the training on those vendor products, you could

11  have used that training if, for example, you chose

12  to become affiliated with an organization other than

13  World Financial Group who also sold those same

14  vendors' products, correct?

15     A.  Well, as you would be trained on the

16  product, yes, because you would know the product, of

17  course.

18     Q.  When you came to -- when you became

19  associated with World Financial Group and were, as

20  you describe it, a training associate, you didn't --

21  as a result of your joining World Financial Group,

22  other members of World Financial Group, those in

23  your office, didn't leave, correct?  In fact, they

24  stayed on and supervised you and provided you with

25  that training, correct?

1      **A.  Correct, yes.**

2          Q.  All right.  And during the time when you

3      were a training associate, you could not actually

4      make a sale, right, in the sense of selling the

5      product because you were not licensed yet, right?

6      **A.  Correct.**

7          Q.  So in that sense during that training

8      period you couldn't really benefit World Financial

9      Group or anyone else by selling a product until you

10     became licensed.

11     **A.  Well, World Financial Group would still get**

12     **the commission out of the sale regardless of me**

13     **being licensed or not.**

14         Q.  But you couldn't sell because you weren't

15     licensed.

16     **A.  That's why we had a senior recruiter with**

17     **us, so basically the other agent is taking over the**

18     **sale so they can make the sale for you.**

19         Q.  Right.  During this period when you were

20     training, just so I'm clear, you could not make the

21     sale yourself.

22     **A.  Correct.**

23         Q.  And were you guaranteed to be licensed at

24     the end of the period during which you were

25     training?

1      **A.   I've never been guaranteed anything.**

2      Q.   There was no guarantee.  In fact, you did

3  not obtain licensing, correct?

4      **A.   Correct.**

5      Q.   So when you came to WFG as an associate

6  when you signed the AMA, you didn't displace anyone,

7  correct?  In other words, your joining World

8  Financial Group didn't result in someone leaving

9  World Financial Group.

10      **A.   Not I would be aware of, no.**

11      Q.   And at some point during that period when

12  you were training, you understood that you were not

13  entitled to receive any hourly or salaried wages,

14  correct?

15      **A.   It's -- I learn it, yes.**

16      Q.   And I think you testified earlier, you

17  didn't understand that immediately when you started,

18  but at some point while you were training --

19      **A.   Later on.**

20      Q.   -- you learned that, correct?

21      **A.   Yes.**

22      Q.   When you were at World Financial Group, did

23  anyone from -- to your knowledge did anyone from

24  corporate headquarters in Georgia travel to Nevada

25  to provide training?

1        A.   I would not remember that.

2        Q.   You don't have a recollection of that

3   happening, right?

4        A.   I remember having people coming that

5   actually worked for World Financial Group to Las

6   Vegas, Nevada to show us how an amazing company it

7   could be to work for.

8        Q.   Who was that?

9        A.   I don't remember the name of the person,

10  but every time we had somebody from the outside

11  office coming in, they were always like higher

12  position, because they can basically show that, you

13  know, they made money and everything.  And yeah,

14  they were giving the same sales speech, like sales

15  is important, yes, but recruiting is even more

16  important.

17       Q.   And as you sit here do you know if those

18  were people who were employed by World Financial

19  Group or if those were people who were also

20  associates but who may be high up the chain in a

21  hierarchy from another state or another location?

22            MR. WOLFE:   Objection.

23  BY MR. BLACK:

24       Q.   Do you know?

25       A.   I have no idea.

1        Q.   At any point did you apply to get your

2   insurance license?

3        **A.   Yes, sir.**

4        Q.   You did?

5        **A.   Yes.**

6        Q.   When did you apply?

7        **A.   As soon as I started.**

8        Q.   Before undertaking any training?

9        **A.   Are you referring to the class I took or**

10   **the actual test?**

11        Q.   Actual -- I'm asking you if you actually

12   ever applied to get your license to sell insurance.

13        **A.   If the question is no, I never took the**

14   **test.  I never applied to get it.**

15        Q.   Never applied, okay.  Did you ever apply to

16   get registered to sell securities?

17        **A.   No.**

18             MR. BLACK:  Can we go off for just a

19   second, Terry?

20             THE VIDEOGRAPHER:  Stand by, please.  And

21   we're off the record, the time is 5:48.

22             (Recess)

23             THE VIDEOGRAPHER:  And we are back on the

24   record, the time is 6:08, you may continue.

25   BY MR. BLACK:

1      Q.  Mr. Destin, it is true, correct, that you

2    are fluent in English, both written word and spoken

3    language?

4        **A.  Yes, sir.**

5        Q.  And you were, in fact, fluent in English,

6    both written and spoken, at the time that you joined

7    World Financial Group?

8        **A.  It is correct.**

9        (Defendants' Exhibit 20 marked)

10   BY MR. BLACK:

11       Q.  Mr. Destin, I want to show you what has

12   been marked as Exhibit Number 20.  Before I ask you

13   that, to look at that document, Mr. Destin, at any

14   point today have you had any trouble understanding

15   my questions?

16       **A.  No, sir.**

17       Q.  Okay, great.  I'm showing you this document

18   that's been marked as Exhibit 20, and like some of

19   the documents I've shown you, it has a label that

20   says Exhibit J on the front.  Again, that's a

21   document that was provided to you -- provided to us

22   by your attorneys.

23       If you look at this document, is this the

24   welcome e-mail that you've referred to several times

25   today?

1        A.  Yes, sir.

2        Q.  This is a document that you received from

3    Aline, as I recall?

4        A.  It is correct.

5        Q.  And there's a date here of Tuesday,

6    September 17th, 2013 at the top of the e-mail.  Is

7    that the date on which Aline provided it to you?

8        A.  It is correct.

9        Q.  The "to" line is blacked out.  I take it

10   this was Aline's e-mail to you forwarding the

11   e-mail?

12       A.  Yes, it is.

13       Q.  And I just want to confirm, do you have an

14   independent recollection of receiving this e-mail

15   when you joined World Financial Group?

16       A.  I don't have -- I don't have the home copy

17   of it, no, I don't.

18       Q.  You don't have a home copy, but you recall

19   getting an e-mail when you joined World Financial

20   Group?

21       A.  Yes.  It is correct.

22       Q.  In substantially the same form as this?

23       A.  Correct.

24       Q.  With the same words as this?

25       A.  Same thing.

1      Q.  And did you read it when you received it?

2      **A.  Well, yes, I did -- I read it because I was**

3   **looking for my agent ID number in it, yes.**

4      Q.  And when you received this was there any

5   part of this that you didn't understand?

6      **A.  No.**

7          (Defendants' Exhibit 21 marked)

8   BY MR. BLACK:

9      Q.  All right.  Mr. Destin, I want to show you

10  what has been marked as Exhibit 21.

11     **A.  Thank you.**

12     Q.  Mr. Destin, do you recognize this as a copy

13  of your sworn declaration submitted in this case?

14     **A.  Yes, sir.**

15     Q.  If you will look at the very last page of

16  the document, do you see a signature line that reads

17  Jordan Destin with a written signature above it?

18     **A.  Yes, it is.**

19     Q.  Is that your signature?

20     **A.  It is my signature.**

21     Q.  And this document is dated August, I

22  believe it's August 15th of 2013 or August 5th of

23  2013, do you see that?

24     **A.  Yes, sir.**

25     Q.  Do you recall when you signed this?

1    A.  It was in August for sure, beginning of

2    August, maybe.

3    Q.  You have no doubt that this is, in fact,

4    your declaration with your signature.

5    A.  It is mine.

6    Q.  If you will turn back to the first page of

7    the document, I'm going to ask you some questions

8    about it.  Before I get into the substance of the

9    document, is this the document that you indicated

10   much earlier today for which Mr. Ambinder drafted --

11   strike that.

12        Is it correct that Mr. Ambinder drafted

13   this document?

14   A.  It was sent to me by the same e-mail

15   address.

16   Q.  It was sent to you by the same e-mail

17   address that sent you the e-mail solicitation to

18   join the lawsuit.

19   A.  No, it was sent to me by Ms. Suzanne Leeds.

20   Q.  Okay.  So this declaration was sent to you

21   by Suzanne Leeds?

22   A.  Correct.

23   Q.  Had you drafted it and sent it to her, or

24   was the first draft of this you ever saw the one

25   that came from Suzanne Leeds?

```
 1              MR. WOLFE:  I'm going to object to that.  I
 2   think it calls for privilege and work product.  Ask
 3   you not to answer that question.
 4        A.  I'm not going to answer that question.
 5   BY MR. BLACK:
 6        Q.  Okay.  Let me ask you this:  Did you draft
 7   this?
 8        A.  I did not.
 9        Q.  But it was sent to you by Suzanne Leeds.
10        A.  Yes, sir.
11        Q.  Did you review it?
12        A.  Yes, sir.
13        Q.  Did you review it to ensure that it was 100
14   percent accurate?
15        A.  Yes, sir.
16        Q.  And did you believe all the statements in
17   it to be truthful at the time that you signed it?
18        A.  Yes, sir.
19        Q.  And you understood that you were signing it
20   under penalty of perjury?
21        A.  Yes, sir.
22        Q.  Did you request that any changes be made to
23   the document?
24              MR. WOLFE:  Objection, calls for privilege.
25   Don't answer the question, please.
```

1        **A.  I'm not answering the question.**

2    BY MR. BLACK:

3        Q.  Well, I asked you earlier if you drafted

4    this and you said no, correct?

5        **A.  It is correct.**

6        Q.  And you reviewed it, correct, for accuracy?

7        **A.  Uh-huh.**

8        Q.  When you reviewed it for accuracy did you

9    find anything that you thought to be inaccurate?

10       **A.  No, it's pretty clear to me.**

11       Q.  Okay.  And so I take it then that you did

12   not ask that any changes be made to the document.

13           MR. WOLFE:  Objection, calls for privilege.

14   Please don't answer the question.

15       **A.  Can you ask me a different question?**

16   BY MR. BLACK:

17       Q.  I can ask you a lot of different questions.

18   My question is simply:  You did not see anything

19   inaccurate about this when you reviewed it; is that

20   correct?

21       **A.  It is correct.**

22       Q.  If you would, take a look at paragraph 5 of

23   this document.  And that says, Throughout my

24   employment I typically worked five days each week

25   from five to six hours each day.

1          Now, when you say throughout my employment

2     are you referring to throughout your association

3     with World Financial Group.

**4**          A.  Yes, sir.

5          Q.  I asked you about the hours that you worked

6     earlier today.

**7**          A.  Uh-huh.

8          Q.  My recollection was that your testimony was

9     that toward the end of your relationship with World

10    Financial Group you only worked about 10 hours a

11    week, correct?

**12**         A.  That's correct.

13         Q.  And for a substantial period of time during

14    which you were also employed by Abercrombie & Fitch,

15    you were working perhaps 25 hours a week or 30 hours

16    a week, correct?

**17**         A.  It is correct.

18         Q.  And so this statement, to the extent it

19    says that throughout your association with World

20    Financial Group you worked five days a week, five to

21    six hours each day, that would not be true as to the

22    end of your relationship with World Financial Group,

23    correct?

**24**         A.  It is correct.

25              MR. WOLFE:  Objection, mischaracterizes the

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1    language in the dec.

 2    BY MR. BLACK:

 3         Q.  Paragraph 6 says, Although I sometimes

 4    worked more than 40 hours each week, I did not

 5    receive any overtime compensation.  Do you see that?

 6         A.  Yes, sir.

 7         Q.  Between -- certainly true that in June of

 8    2011 you weren't working more than 40 hours a week,

 9    correct?

10         A.  Correct.

11         Q.  You weren't spending more than 40 hours on

12    your association with World Financial Group?

13         A.  It is correct.

14         Q.  And between December and June when you were

15    also employed -- when you were employed by

16    Abercrombie & Fitch as an assistant store manager on

17    a full-time basis, you were not working or putting

18    in 40 hours or more a week in connection with World

19    Financial Group, correct?

20         A.  I was not putting more than 40 hours.

21         Q.  And so between the time that -- and let me

22    ask this:  When you first became associated with

23    World Financial Group, so in the September and

24    October timeframe, when you were engaging in

25    training, attending presentations, were you putting
```

1    in more than 40 hours a week at that time?

**2        A.   I was putting at least four hours a day.**

3        Q.   At least four hours a day?

**4        A.   Right.**

5        Q.   And was there ever an occasion when you

6    were there more than five or six days a week?

**7        A.   Not I can remember of, no.**

8        Q.   Okay.  And so at most if you were doing

9    four hours a week during those initial couple

10   months, that was 24 hours, 28 hours a week, correct?

**11       A.   It would be close to, yeah, 28, 30 hours,**

**12   because again I was working just for Tommy Hilfiger**

**13   and it was like only three or four hours a week, so**

**14   I had a lot of time that I could obviously go to the**

**15   office and do that, yes.**

16       Q.   And so I think we've covered the great

17   majority of that nine-month period when you were

18   associated with World Financial Group, and during

19   none of that period did you work more than 40 hours

20   a week.  So my question is when you say here that

21   you sometimes worked more than 40 hours each week,

22   when was that?

**23       A.   Well, it's included all of the meeting, the**

**24   team meeting, what else, presentation.**

25       Q.   Right.

```
 1        A.  Because those could last for about two

 2   hours, easily two hours, including as well the time

 3   spent outside of work, you know, recruiting people,

 4   going to people's houses.  I was prospecting.  I was

 5   still carrying my World Financial Group badge and my

 6   business card and representing the company

 7   whatsoever.

 8        Q.  I'm not asking what you did with your time.

 9   We've covered that earlier today.

10        A.  Right.

11        Q.  I'm asking you, when you say I sometimes

12   worked more than 40 hours each week, in how many

13   weeks when you were associated with World Financial

14   Group, understanding that it didn't happen in the

15   first couple months you were associated with World

16   Financial Group and it didn't happen from December

17   on, in how many weeks did you work more than 40

18   hours a week?

19        A.  That would be until the end of December.

20        Q.  All right.  So between the -- after your

21   initial training and up to the end of December, so

22   we're talking about a window from sometime in

23   October --

24        A.  Four months.

25        Q.  -- to sometime in December.
```

1        **A.   Uh-huh, correct.**

2        Q.   That would be a total of maybe eight to

3   twelve weeks of time?

4        **A.   Eight --**

5        Q.   From October to December?

6        **A.   About 12 weeks, yeah.**

7        Q.   And how many of those 12 weeks did you work

8   40 hours or more or put in more than 40 hours in

9   connection with World Financial Group?

10        **A.   To be honest with you, I would not know.**

11        Q.   Okay.  In the course of your time

12   associated with World Financial Group, you didn't at

13   any point track the number of hours that you spent,

14   did you?

15        **A.   No.**

16        Q.   And to your knowledge no one at World

17   Financial Group, nobody in that office where you

18   were associated tracked your hours, did they?

19        **A.   I'm not sure.  I don't know, to be honest**

20   **with you.**

21        Q.   In fact, in paragraph 7 of this document

22   you mention that there was no punch clock, sign-in

23   sheet, scanning or apparatus to record your hours,

24   correct?

25        **A.   Correct, yes.**

1      Q.  And so as you sit here today, you've said

2   in this sworn declaration that you sometimes worked

3   more than 40 hours each week, but you can't identify

4   any particular week in which you worked more than 40

5   hours; is that right?

6      **A.  It is correct.**

7      Q.  As you sit here today do you know for sure

8   that there were any weeks where you worked more than

9   40 hours, given that you didn't track your hours?

10     **A.  To be honest with you, I would not be able**

11  **to give you a special week or specific week or**

12  **specific date for that, but I can definitely recall**

13  **the time where I spent a lot of hours in the office.**

14     Q.  Understanding that you recall weeks when

15  you spent a lot of time in the office, can you as

16  you sit here today identify for me any week where

17  you worked 40 hours or more in your association with

18  World Financial Group?

19     **A.  No, I can't give you a certain week.**

20     Q.  You do understand, though, that you've made

21  a sworn statement that --

22     **A.  Correct.**

23     Q.  -- sometimes worked more than 40 hours each

24  week.

25     **A.  Correct.**

Cohen vs. World Financial Group        Jordan Destin        10/08/2013

 1      Q.  That's not an accurate statement then,

 2   correct?

 3           MR. WOLFE:  Objection.

 4      **A.  Well, to me it is.  I mean, if you get up**

 5   **at 7:00 a.m. and you don't get home until 1:00**

 6   **o'clock in the morning, yes, it is, 40 hours a week**

 7   **in or outside the office.**

 8   BY MR. BLACK:

 9      Q.  And, again, you can't identify for me any

10   week in which you actually did that.

11      **A.  It is correct, yes, sir.**

12      Q.  The time that you just mentioned when you

13   talked about working from 7:00 a.m. to some other

14   time during the day, are you including in that time

15   that you would have spent getting ready to go in and

16   commuting into the office?

17      **A.  Yes, I'm including that time too, yes.**

18      Q.  If you exclude that time, can you identify

19   any week in which you worked 40 hours?

20      **A.  I can't give you a specific week, no.**

21      Q.  In paragraph 10 of this document, you've

22   made the statement, Associates were required to sign

23   an agreement known as the Associate Membership

24   Agreement to accept employment with WFG in addition

25   to paying $100 out of pocket.

1          Do you see that?

**2     A.  Yes.**

3     Q.  As you sit here today, you testified

4  earlier that you've not spoken to any associates

5  outside of those in the office in which you spent

6  time about their association with World Financial

7  Group, correct?

**8          A.  Rephrase your question, please.**

9     Q.  Sure.  I asked you earlier today if you had

10  any conversations with anyone -- any associate

11  outside of this Las Vegas office where you spent

12  time with regard to your or their association with

13  World Financial Group, right?

**14     A.  Correct.**

15     Q.  And you told me that you had not.

**16     A.  Uh-huh.**

17     Q.  Is that accurate?

**18     A.  Yes, it is accurate.  But I want to specify**

**19  something.  I did not talk to any other associate at**

**20  different offices, but I talked to associate coming**

**21  from New York, coming from Miami, coming from Utah,**

**22  coming from California, in our offices.  So they**

**23  were maybe relocating at different places, different**

**24  offices throughout the country.  I don't know if it**

**25  was temporary or not for them to be in Las Vegas,**

1    but I did talk to people -- they were from outside

2    of the Las Vegas office.

3         Q.  When you talked to those people did you ask

4    them how many hours a week they were working?

5         A.  We talked about hours, yes, we did talk

6    about it.

7         Q.  You talked to people from other offices

8    about the hours they worked in a week?

9         A.  Correct.

10        Q.  Who did you talk to?

11        A.  I don't know their names.  I mean, it's

12   been three years, to be honest with you.  But yeah,

13   there was a young guy, he was from New York, he was

14   from Brooklyn, and he worked for the World Financial

15   office in New York and he went to Las Vegas, and

16   that's when we had big team meeting and people

17   coming from other offices, and people were

18   mentioning that they did work for the company for a

19   long time and they were putting hours into, you

20   know, to the daily basis.

21        Q.  They told you specifically how many hours a

22   week they were spending?

23        A.  I don't recall the specific conversation if

24   they told me exactly how many hours, I don't know.

25        Q.  And did they tell you specifically -- do

1   you remember anything specific that any of those

2   individuals told you about their hours or what it

3   was they were doing?

4        **A.  Well, I know for a fact that they were**

5   **representing World Financial Group, that's for sure;**

6   **that they were either a training associate or senior**

7   **associate.  That's usually what people do, they --**

8   **when they introduce themselves they kind of give a**

9   **short resume of their experience, and what title**

10  **they currently have with the company.**

11       Q.  But you can't identify any of those

12  individuals.

13       **A.  I mean, if I see a picture I could show**

14  **you, but I don't know their names.**

15       Q.  When you talked to them about their hours

16  or what they were doing did you record any of that,

17  either in notes or electronically?

18       **A.  No, sir.**

19       Q.  This statement in paragraph 10 that

20  associates were required to sign an agreement known

21  as the Associate Membership Agreement, that's true

22  for you, correct?

23       **A.  Yes, sir.**

24       Q.  As you sit here today how do you know

25  whether that is, in fact, true for other associates?

1   Or are you speculating?

2          **A.  I'm not speculating.  The truth is you**

3   **cannot work for World Financial Group until you sign**

4   **that agreement and you pay that $100 fee.**

5          Q.  You used the term associates very broadly

6   here.  Are you using that to refer to every

7   associate of World Financial Group nationwide?

8          **A.  I could say employees, if it sounds better.**

9          Q.  I'm asking, you used the term that's in

10  this document, the term that you used in your

11  declaration.

12         **A.  Yes, sir.**

13         Q.  And my question is:  When you say

14  associates, are you referring to all associates,

15  everyone associated with World Financial Group

16  nationwide?

17         **A.  To the best of my knowledge I would refer**

18  **to associate nationwide, yes, representing World**

19  **Financial.**

20         Q.  And what is the source of your knowledge

21  that every associate nationwide had a signed AMA?

22         **A.  Well, they were representing the company as**

23  **much as I was, you had to sign the AMA agreement.**

24         Q.  I didn't ask you if, I asked you what is

25  the source of your knowledge.  What personal

1   knowledge do you have that every associate

2   associated with World Financial Group nationwide

3   signed an AMA?

4       **A.  I don't know, I haven't talked to everybody**

5   **nationwide.**

6       Q.  You haven't, and you don't have personal

7   knowledge of what happened nationwide, correct?

8       **A.  I don't have personal knowledge of what**

9   **happened nationwide, correct.**

10      Q.  In paragraph 11 you say, As associates our

11  primary job duties consisted of making cold calls

12  for the purpose of soliciting sales of financial

13  products.

14          Again, you don't have knowledge, personal

15  knowledge, of what happened with associates

16  nationwide, correct?

17      **A.  It is correct, sir.**

18      Q.  In paragraph 12 you say, My supervisor

19  frequently critiqued my work and exercised

20  substantial oversight, do you see that?

21      **A.  Yes, sir.**

22      Q.  Are those your words?

23      **A.  Those are not my words.**

24      Q.  And what supervisor are you referring to?

25      **A.  Mr. Christian.**

1      Q.  And in what way did Christian critique your

2   work?

3      A.  Well, pointing me out, you know, whenever

4   we had a team meeting he would tell everybody the

5   reason why I didn't do good or why I'm not reaching

6   my goal or what's the next goal to reach, and that

7   would come along with if I was missing one of -- or

8   two or three team meeting or whatever meeting we had

9   going on, and if I was not showing up then he would

10  obviously criticize that too, because his goal was

11  to have everybody licensed and to have all the

12  people basically recruited.  So --

13     Q.  And we talked about Christian earlier.  You

14  don't know of any information to suggest that

15  Christian was employed by World Financial Group,

16  correct?

17     A.  Well, I mean, to me it came as he was part

18  of World Financial Group.

19     Q.  He was, like you, someone who signed an AMA

20  and was higher than you in the hierarchy, correct?

21     A.  Yes, sir.

22     Q.  And no one from World Financial Group

23  corporate critiqued your work, either in person or

24  in a mobile way, either over the telephone or e-mail

25  or otherwise, correct?

1      A.  Correct.

2      Q.  And no one from World Financial Group

3  corporate or employed by World Financial Group

4  exercised substantial oversight over your work too,

5  right?

6          MR. WOLFE:  Objection.

7      A.  No.

8      Q.  If you look at paragraph 15, you say, While

9  working for WFG, associates were not paid any

10  compensation for the hundreds of hours we worked.

11          And again, just to be clear, you don't have

12  personal knowledge of how associates other than

13  yourself were compensated, correct?

14      A.  Well, I have personal knowledge of people I

15  talked to that did share their experiences with me.

16      Q.  Who did you talk to?

17      A.  Jennifer, new recruits.  I can recall two

18  recruits, two new recruits actually that were

19  recruited by Jennifer when I worked there.

20      Q.  These were recruits in Las Vegas.

21      A.  Yes, correct.

22      Q.  You don't have any personal knowledge of

23  how any associates outside of Las Vegas were

24  compensated, correct?

25      A.  I would not know.

1      Q.  Nor do you have any knowledge of the number

2   of hours that associates put in in connection with

3   their affiliation with World Financial Group outside

4   of Las Vegas.

5      **A.  That's correct.**

6      Q.  In fact, you don't have personal knowledge

7   of precisely how many hours associates who were

8   located in Las Vegas worked, because not only were

9   you not tracking your hours but you weren't tracking

10   theirs either, correct?

11     **A.  But you can tell who's coming in and who's**

12   **leaving, right.**

13     Q.  But you don't have any personal knowledge

14   of how many hours they precisely worked, do you?

15     **A.  I agree with you, I don't.**

16     Q.  If you take a look at paragraph 17, you

17   say, I know that WFG treated other workers in a

18   similar manner to me in part because associates

19   reporting to the Las Vegas office discussed these

20   circumstances among ourselves.  Do you see that?

21     **A.  Yes, sir.**

22     Q.  And again, your statement in 17 pertains

23   only to associates in Las Vegas, correct?

24     **A.  Correct.**

25     Q.  You don't have any personal knowledge as

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

```
 1   you sit here of how WFG quote treated other workers

 2   outside of Las Vegas, correct?

 3        A.  Correct.

 4        Q.  And the individuals who you discussed the

 5   circumstances with in Las Vegas were Jennifer --

 6        A.  Jennifer.

 7        Q.  Anyone else?

 8        A.  Yeah, two new people.

 9        Q.  Two new people.

10        A.  Yeah, trainee associates.  I think they

11   were a part of her team, actually.  They were, I

12   mean, like in their 20s, trying to work out, you

13   know, they just got to Las Vegas so they were trying

14   to work to get money.

15        Q.  And when you talk about the treatment,

16   you're talking about the idea that if you were not

17   licensed you would not earn a commission, correct?

18        A.  No.  The idea is it's not about being

19   licensed or not, it's about being required to show

20   up at work and to follow a certain schedule, to

21   follow a certain track, to follow a technique.  That

22   is provided by World Financial Group, it is.  And

23   that's what I refer to.  So these people did not

24   understand why they had to keep working and keep

25   doing that job if they were not basically getting
```

1   paid.

2       Q.   And we talked earlier about having to

3   attend mandatory meetings.

4       A.   Correct.

5       Q.   Having to work a certain schedule.

6       A.   Correct.

7       Q.   Having to undertake a certain technique.

8       A.   (Nods head affirmatively.)

9       Q.   These were all things that were dictated to

10  you by individuals in Las Vegas who were higher than

11  you in your hierarchy, correct?  Or individuals in

12  Anaheim who were higher than you in your hierarchy,

13  correct?

14          MR. WOLFE:  Objection.

15      A.   And also coming along the documents that

16  were provided to me by World Financial Group, such

17  as the different groups manual, that you were able

18  to take a look at it where they typically explained

19  the pyramid, the way it works.  Even on the World

20  Financial Group website you have that same pyramid,

21  tells you how it works, how you can recruit people.

22  So it's not only the people in my team, it is

23  definitely the World Financial Group along with the

24  people in my team.

25          Q.   Who from World Financial Group -- and when

 1    I say that I mean corporate, okay -- who from World

 2    Financial Group corporate ever told you that you had

 3    to attend mandatory meetings, work a certain

 4    schedule or engage in a certain technique?

 5        **A.  I don't have -- I don't have an answer to**

 6    **your question.  I just don't know anybody I had**

 7    **contact with.**

 8        Q.  None of them did, correct?

 9        **A.  From World Financial Group corporate?**

10        Q.  Yes.

11        **A.  No.**

12        Q.  And the books that you purchased, those

13    provided recommendations to you on how you might

14    build your business, correct?

15        **A.  Well, it shows you how you can build a**

16    **better business for World Financial Group, that is**

17    **correct.**

18        Q.  And it made recommendations to you on how

19    you might sell and recruit to create the team that

20    you talked about earlier wanting to build, correct?

21        **A.  It is correct.**

22        Q.  The team that you wanted to build because

23    if you built it and became licensed, you could make

24    money through commissions and overrides, correct?

25        **A.  And that same team that obviously benefit**

1    **World Financial Group, correct, yes.**

2         Q.  My question is:  No one associated with

3    World Financial Group at the corporate level, right,

4    I'm talking about people actually employed by World

5    Financial Group, ever dictated to you that you had

6    to work a certain number of hours, attend certain

7    meetings or engage in particular techniques without

8    your ability to change that, correct?

9         **A.  Correct.**

10         MR. WOLFE:  Objection.

11    BY MR. BLACK:

12         Q.  And then, finally, paragraph 19, the last

13    line of paragraph 19 says, I anticipate that other

14    current and former employees of the company will

15    join this litigation if they are given notice of it

16    and an opportunity to join.  Do you see that?

17         **A.  Yes, sir.**

18         Q.  How do you know that?

19         **A.  How do I know what?**

20         Q.  How do you know that that statement is

21    true; that other current and former employees of the

22    company will join this litigation if they are given

23    notice of it and an opportunity to join?

24         MR. WOLFE:  Objection.

25         **A.  I'm anticipating.**

```
 1   BY MR. BLACK:

 2        Q.  You're speculating, correct?

 3        A.  Anticipating, that would be the right word.

 4   As it states right here, I anticipate that all the

 5   current and former employees of the company will

 6   join this litigation, if they are given notice of it

 7   and an opportunity to join.

 8             So to me my understanding is if people --

 9   people are free to do whatever they want.  If they

10   want to join, fine.  If they don't want to, that's

11   fine.  But my goal is if they're aware of it and if

12   they're in the same situation, of course, go for it.

13        Q.  You testified earlier that you've not

14   spoken to any associate of World Financial Group

15   about this lawsuit, correct?

16        A.  Correct.

17        Q.  And as such, what knowledge do you have

18   that anyone else wants to join this lawsuit?

19        A.  I mean, people could be interested in

20   joining the lawsuit even if it doesn't come directly

21   from me, because like I said, I'm not disclosing

22   anything about the particular case.

23        Q.  I'm not asking you to speculate whether

24   people might.  I'm asking you as you sit here today

25   what personal knowledge do you have that anyone else
```

1    who was associated with World Financial Group wants

2    to join this lawsuit?

3          **A.   Can you reformulate your question?**

4          Q.   I'll repeat the question.

5          **A.   Yes.**

6          Q.   Which is, as you sit here today --

7          **A.   Correct.**

8          Q.   What personal knowledge do you have that

9    any particular individual or anyone at all who is

10   associated with World Financial Group wants to join

11   this lawsuit?

12         **A.   I don't know if they want to join the**

13   **lawsuit.**

14         Q.   You don't know anyone who wants to join the

15   lawsuit, do you?

16         **A.   I don't know everybody, correct, so I don't**

17   **know anybody.**

18         Q.   Okay.  Let's go off for a second.

19              THE VIDEOGRAPHER:  And we are off the

20   record, the time is 6:36, this is the end of Tape 3.

21         (Recess)

22              THE VIDEOGRAPHER:  And we are back on the

23   record, the time is 6:38, this is the beginning of

24   Tape 4 of the videotaped deposition of Jordan

25   Destin.  You may continue, sir.

```
 1          MR. BLACK:  Mr. Destin, thank you for your

 2   time today.

 3       A.  No problem.

 4          MR. BLACK:  That is all the questions that

 5   I have for you for right now.

 6          THE WITNESS:  It was a pleasure, thank you.

 7          MR. BLACK:  Thank you.

 8          MR. WOLFE:  I apologize in advance, I do

 9   have a little bit of redirect for you.

10                          EXAMINATION

11   BY MR. WOLFE:

12       Q.  Jordan, do you still have the AMA in front

13   of you?  It's Exhibit 13.

14       A.  Yes, I do.

15       Q.  Okay.  Would you turn to the second page of

16   it?  It's -- the little Bates number at the bottom

17   is 001504.

18       A.  Yes.

19       Q.  Now, Mr. Black asked you, in reference to

20   your declaration, he asked you if you had any

21   knowledge that all associates were required to sign

22   the AMA, and I think you said you had no knowledge

23   or no personal knowledge of that, do you remember

24   that?

25       A.  Yes.
```

```
 1        Q.  All right.  Look at -- and this is a copy

 2   of the AMA that you signed; is that correct?

 3        A.  Yes, it is.

 4        Q.  All right.  Look at the -- do you see the

 5   words in the big box at the bottom?  I'll just read

 6   them aloud.  It says, Be sure to complete all

 7   sections of this AMA and provide documentation if

 8   required.  Do you see that direction?

 9        A.  Yes, sir.

10        Q.  All right.  And do you see right above in

11   the black box above the World Financial Group title,

12   it says, All applicants/associates must send all

13   required documents to World Financial Group?

14        A.  Yes, sir.

15        Q.  All right.  As you see that, does that give

16   you some basis for believing that all associates

17   were required to sign the Associate Membership

18   Agreement?

19        A.  Yes, sir.

20        Q.  And was it your understanding --

21             MR. BLACK:  Before you go on, I'm going to

22   object to the question, the prior question.

23             MR. WOLFE:  Okay.

24   BY MR. WOLFE:

25        Q.  Was it your understanding that this was
```

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

1    the -- this agreement controlled your relationship

2    with World Financial Group?

3          MR. BLACK:  Objection.

4          **A.  My answer is yes.**

5    BY MR. WOLFE:

6          Q.  Okay.  When you recruited Thibaud Lucas,

7    did he enter into a contract with you or with World

8    Financial Group?

9          **A.  It was the World Financial Group.**

10         Q.  Did he sign an Associate Membership

11   Agreement that was just like yours except for the

12   fact that his name was different?

13         **A.  It is.**

14         MR. BLACK:  Objection.

15   BY MR. WOLFE:

16         Q.  Now, Mr. Black also asked you -- you can

17   put that exhibit away, thank you -- Mr. Black asked

18   you questions about the number of hours you worked

19   and asked you to identify which particular weeks you

20   may have worked over 40 hours.  And he was asking

21   you about the time period during which you worked

22   for World Financial Group.  Would you just remind me

23   what that time period was?

24         **A.  That I worked for World Financial Group,**

25   **between September 2010 up to June 2011.**

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

1        Q.  And you were asked if you could identify

2   any particular weeks during which you worked more

3   than 40 hours, and you said you could not.

4             MR. BLACK:  Objection.

**5        A.  That's correct.**

6   BY MR. WOLFE:

7        Q.  Can you remember any particular weeks in

8   the fall or winter of 2010 when you wore a white

9   shirt?

**10        A.  When I wore a white shirt?**

11       Q.  Yeah.  Can you say as you sit here now

12   thinking back any particular exact week when you

13   wore a white shirt three years ago?

**14        A.  I -- no, I could not remember the exact day**

**15   I did that.**

16       Q.  Okay.  Does the fact that you can't

17   remember an exact day or week when you wore a white

18   shirt three years ago mean that you never wore a

19   white shirt three years ago?

**20        A.  Well, it is a fair statement.**

21       Q.  Let me ask you the question again.  Does

22   the fact that you can't remember a specific week

23   when you wore a white shirt mean that you never wore

24   a white shirt?

**25        A.  No.**

1        Q.   Okay.  Do you know, from any of your

2   conversations with the associates from the other

3   offices that you mentioned, do you know of any of

4   them who had not signed an Associate Membership

5   Agreement?

**6        A.   No.**

7        Q.   All right.  Now, you were asked a number of

8   questions about discovery responses being served

9   late and objections being waived.  You were asked

10  about Michael Cohen withdrawing as the lead

11  plaintiff.  You were shown a copy of the court's

12  order making various findings about the conduct of

13  the New York lawyers in this case.

14        Do you remember being shown and told about

15  all that?

16        MR. BLACK:  Objection.

**17        A.   I remember being shown that.**

18  BY MR. WOLFE:

19        Q.   All right.  Did anything that you heard or

20  saw in this deposition change your mind about

21  wanting to be the lead plaintiff in this lawsuit?

**22        A.   No.**

23        Q.   Did anything that you heard or saw today

24  change your faith and confidence in the attorneys

25  who represent you?

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

```
 1          A.  No.

 2              MR. WOLFE:  Nothing more.

 3              MR. BLACK:  I have nothing else.

 4              MR. WOLFE:  Okay.

 5              THE VIDEOGRAPHER:  Stand by, please.

 6              This concludes this videotaped deposition

 7      of Jordan Destin.  The time is 6:44, we're off the

 8      record.

 9              (Deposition concluded at 6:44 p.m.)

10              (Signature reserved)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           CERTIFICATE

 2

 3   STATE OF GEORGIA:

 4   COUNTY OF FULTON:

 5

 6          I hereby certify that the foregoing

 7   transcript was taken down, as stated in the

 8   caption, and the colloquies, questions, and

 9   answers were reduced to typewriting under my

10   direction; that the transcript is a true and

11   correct record of the evidence given upon said

12   proceeding.

13          I further certify that I am not a

14   relative or employee or attorney of any party, nor

15   am I financially interested in the outcome of this

16   action.

17          This the 23rd day of October 2013.

18

19

20

21

22

23          VALERIE N. ALMAND, RPR, CRR, CSR-B-531

24

25
```

VIA EMAIL


Date: 10/23/2013

To: Steven Wolfe

Re: Signature of Deponent Jordan Destin


Greetings:

The deponent has reserved the right to read and sign. Please
have the deponent review the attached .pdf transcript,
noting any changes or corrections on the attached .pdf
Errata.  The deponent may fill out the Errata electronically
or print and fill out manually.

Once the Errata is signed by the deponent and notarized,
please mail it to the offices of Tiffany Alley (below).

When the signed Errata is returned to us, we will seal and
forward to the taking attorney to file with the original
transcript.  We will also send copies of the Errata to all
ordering parties.

If the signed Errata is not returned within the time below,
the original transcript may be filed with the court without
the signature of the deponent.


Date Errata due back at our offices: 11/23/2013


Please send completed Errata to:
Tiffany Alley Reporting & Video
3348 Peachtree Rd NE, Tower 200, Ste 700
Atlanta, Georgia 30326
(770) 343-9696

Cohen vs. World Financial                    Jordan Destin                                    10/8/13

ERRATA

JOB NUMBER: 53839

I, the undersigned, do hereby certify that I have read the transcript of my
testimony, and that

☐   There are no changes noted.

☐   The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA
9-11-30(e), any changes in form or substance which you desire to make to your
testimony shall be entered upon the deposition with a statement of the reasons
given for making them.  To assist you in making any such corrections, please
use the form below. If additional pages are necessary, please furnish same and
attach.

❖  PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

❖  PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

❖  PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

❖  PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

❖  PAGE _____ LINE _____ CHANGE _____

_____

REASON FOR CHANGE _____

Cohen vs. World Financial                    Jordan Destin                              10/8/13

❖   PAGE_____LINE_____CHANGE   _____

_____

REASON FOR CHANGE   _____

❖   PAGE_____LINE_____CHANGE   _____

_____

REASON FOR CHANGE   _____

❖   PAGE_____LINE_____CHANGE   _____

_____

REASON FOR CHANGE   _____

❖   PAGE_____LINE_____CHANGE   _____

_____

REASON FOR CHANGE   _____

❖   PAGE_____LINE_____CHANGE   _____

_____

REASON FOR CHANGE   _____

❖   PAGE_____LINE_____CHANGE   _____

_____

REASON FOR CHANGE   _____

_____
                    DEPONENT'S SIGNATURE

Sworn to and subscribed before me this _____ day of

_____, _____.

_____
NOTARY PUBLIC

My Commission Expires:_____



# DISCLOSURE

Pursuant to Article 10(b) of the Rules and Regulations
of the Georgia Board of Court Reporting, Tiffany Alley
Reporting & Video makes the following disclosure:

The reporter for this proceeding is not disqualified
for a relationship of interest under the provisions of
OCGA 9-11-28(c).  The reporter for this proceeding is
a Georgia Certified Reporter, here as a representative
of Tiffany Alley Reporting & Video to report this
matter.

Tiffany Alley Reporting & Video is not taking this
deposition under any contract that is prohibited by
OCGA 15-14-37(a)and(b).

Cohen vs. World Financial Group        Jordan Destin        10/08/2013

---

**"**

**"members** 64:7

---

**$**

**$100** 55:16 56:1
296:25 300:4
**$20** 166:20,22
**$66** 207:24

---

**0**

**001504** 311:17
**001510** 63:25

---

**1**

**1** 7:1,9 22:16
100:2 124:20,23
125:2
**10** 7:5 187:9,24
189:8 203:13
250:8,10,11,16,23
256:18 290:10
296:21 299:19
**100** 176:23 288:13
**100-page** 189:25
**1099** 205:20
**10:00** 232:20
**10:25** 7:8
**11** 24:16 191:11
203:25 204:3
301:10
**11th** 23:3
**12** 195:3 210:17,
20 219:12 294:6,7
301:18
**12:00** 95:6
**12:01** 95:10
**12:06** 100:2
**13** 45:10,13 54:11,
13,17 123:1
311:13
**14** 181:12,15
187:4 217:2,8
**15** 51:22 185:12,
15 187:4 200:6

203:13 303:8
**15-14-37** 6:15
**15-minute** 51:23
53:8
**1500** 6:7
**15th** 286:22
**16** 216:15,18
217:16
**17** 217:21,24
304:16,22
**17th** 285:6
**18** 24:24 219:3,6
224:14
**18th** 188:2,6
265:10
**19** 229:6,9 308:12,
13
**1989** 24:16
**1:00** 248:15 296:5
**1:25** 100:6
**1st** 22:19 23:5
186:10

---

**2**

**2** 7:2 22:25 100:7
148:2 203:18
270:6
**20** 17:14,20 182:5
183:10 256:18
284:9,12,18
**20-minute** 18:25
183:9 186:20
213:23
**2000** 97:5
**2008** 25:3,4 188:2,
6 265:10 268:20,
25 269:2,3
**2009** 37:20
**2010** 36:4 45:6
46:13 47:4,18,19,
24 74:23 80:5,18
84:1 175:12,13
198:18,19 204:23
205:1,7 246:12
249:24 257:16,19
259:24 267:11,12
268:9 313:25
314:8

**2011** 26:21 31:1,3,
4 37:22,23,25
41:11,20 42:10
76:19 80:15 84:2
97:5 99:12,15
108:11,16,21
175:15,18 176:5,6
194:20 204:9,11
205:9 207:5
240:17,24 241:1,5,
8,11,19 242:11
244:22 248:18
250:1,19 291:8
313:25
**2012** 27:15,18
84:11 85:8 97:21,
24 108:8,9,10,14,
24 176:5 264:11
**2013** 7:12 12:23,
24 13:1 22:19
40:4 43:12 90:6,
12,13,16 91:3,12
92:14 108:6,7
123:4 186:10
219:11,12 220:8
285:6 286:22,23
**20s** 305:12
**20th** 221:4,6
**21** 286:7,10
**21st** 22:18
**23.1C2** 219:18
**24** 24:22 195:5
292:10
**2451** 27:9
**24th** 21:17,20
**25** 251:5,6,7
290:15
**26th** 23:11
**27** 218:23 219:11
**27th** 185:9 213:23
215:5 216:24
217:17 218:4
220:8
**28** 292:10,11
**2:00** 248:12,15
**2:15** 149:1
**2:27** 149:4
**2:34** 155:23

**2:35** 156:1
**2nd** 123:4

---

**3**

**3** 7:2 15:15 22:18
23:9 203:22 219:7
230:10,13 310:20
**3/3/30** 88:20
**30** 88:21 251:3,7
290:15 292:11
**30326-4803** 6:8
**31** 231:4,5
**32** 231:22,24
232:6 246:20,22
247:6,20,23
**33** 231:21 233:22
**3344** 6:6
**36** 247:23,24
**3:00** 248:12
**3:03** 181:1
**3:04** 181:4
**3:29** 203:17
**3:54** 203:21

---

**4**

**4** 7:2 15:15 54:19
124:10,20 144:22
220:6,10 238:17,
19 310:24
**40** 176:1 247:8,11,
13,17,18,24 291:4,
8,11,18,20 292:1,
19,21 293:12,17
294:8 295:3,4,9,
17,23 296:6,19
313:20 314:3
**400** 219:13
**404.233.9339** 6:9
**40s** 110:22
**42** 247:23
**4200** 27:7
**48** 17:11 181:23
**4923** 25:9 26:12
**4:38** 238:11

---

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

---

**5**

**5** 7:3 117:18,19
118:23 149:11,13
220:10 256:17
289:22
**50** 247:13,14,21
**5224** 26:13
**5:00** 238:14
**5:30** 248:14
**5:48** 283:21
**5th** 286:22

---

**6**

**6** 7:3 117:18
118:14 119:1,4,6,7
123:15 149:10
291:3
**60** 247:14
**6:00** 232:19
248:13,14
**6:08** 283:24
**6:30** 104:6
**6:36** 310:20
**6:38** 310:23
**6:44** 316:7,9

---

**7**

**7** 7:4 119:15 121:4
123:15 187:23
191:11 231:5
294:21
**70** 250:20
**7:00** 248:11 296:5,
13

---

**8**

**8** 7:4,12 149:7
191:14 230:13
231:7 265:1,3,4
**89031** 25:9
**8th** 23:14

---

**9**

**9** 7:5 175:21,22
187:15 265:4
**90** 159:24
**9th** 46:13 47:4

---

**A**

**A-l-i-n-e** 35:15
**a.m.** 7:8 232:20
248:11 296:5,13
**Abercrombie**
62:15 77:1 205:12
206:7,12,20 246:4,
5,7,19,25 247:15,
16 248:3 249:16,
19 250:15 251:10,
15,25 252:14
253:4,11,14
254:11,21,25
255:2,5,12,16,20,
24 256:7,11,22
261:4 268:3
277:18 290:14
291:16
**abilities** 89:18
**ability** 11:17
158:21 159:9
200:2 278:15
308:8
**Absolutely** 143:2
**accept** 197:25
296:24
**access** 36:15,19
38:17 107:18
113:15
**accessed** 38:12
**accessible** 36:16,
17
**account** 32:3,7
34:6 36:11,12,16
38:13,14 51:10
93:5,6,10,11,21,23
94:1,9 107:15
216:23
**accounts** 38:12,
107:17

---

**accuracy** 289:6,8
**accurate** 121:12
214:18,19 231:12
235:13 240:1,4,5
288:14 296:1
297:17,18
**achieve** 135:25
**acknowledges**
82:1
**acquire** 37:19
42:11
**acquired** 37:16
**Act** 24:6
**action** 24:5 117:24
125:5 126:6
185:20 212:23,25
213:9,12,14,19
229:15 230:24
**active** 266:20,23,
24,25
**actively** 88:2
**activities** 86:1
241:14
**actual** 77:23
120:16 191:9,24
192:20 278:2
283:10,11
**ad** 49:1,10,14,18,
55:20
**Adam** 146:16
**add** 173:5
**addition** 55:14
116:25 172:8
220:7 237:10,16
296:24
**additional** 10:25
200:3
**address** 13:15
17:3 25:8,12,
26:16,22,24 27:4,
14,17,24 28:2,4,5
30:10,12,15,16,18,
20 31:6,13,17
32:25 33:4,16,17,
22 34:6,14,21
36:3,5 99:10,11
174:13 186:4,5
263:24 264:1
269:20,22,24
287:15,17

---

**addresses** 27:1
30:8 33:20 35:24,
25 263:17
**ads** 233:9
**advance** 311:8
**advertisement**
164:15
**advertisements**
164:13
**advice** 75:25
**advise** 221:14
224:9
**advisor** 57:18,25
75:13,15,19,23
76:1,8 150:12,19,
20 151:13,15
197:17 231:20
**Aegon** 209:9
**affiliated** 53:21
75:1,21 76:13
77:19 78:11
80:13,17 88:16
93:17,24 168:9
199:15 204:22
257:14,18 259:24
260:22 270:24
271:3 276:19
279:12
**affiliation** 76:18
80:2 81:12 108:22
109:3 116:9
172:24 253:13
257:21 258:18
260:25 272:19,22
304:3
**affirmatively**
175:19 215:11
306:8
**afternoon** 100:12
248:6,12
**age** 24:21
**agenda** 98:23
**agent** 60:21
241:22 242:2,4,6
243:25 260:10,15
280:17 286:3
**agents** 243:23,24
244:8
**agree** 304:15

---

Cohen vs. World Financial Group        Jordan Destin                    10/08/2013

**agreeable** 10:22

**agreeing** 23:25

**agreement** 45:6, 15 46:16 47:9,21 55:6,9,12,15,25 56:6,7,22 57:10,13 62:1, 68:3 76:11 82:7,8,11, 128:16 151:6 258:25 296:23,24 299:20, 21 300:4,23 312:18 313:1,11 315:5

**agreements** 64:7

**ahead** 99:14,21 113:1 200:25 203:12 213:3

**aliases** 9:5

**Aline** 35:15 38:21 39:5 48:7,10,18,22 49:12 55:21 57:5, 6 59:18,19,24 61:4 62:2 65:1 66:3 70:9,18 72:25 73:20 77:7 78:2, 14 94:18,22 109:17,18 111:15 112:3,7,9 113:10, 13 114:2 115:12, 17 126:1 127:5,11, 13 132:8 135:13 148:19 165:7 172:2 173:25 174:1,7,17,21 197:16,18 285:3,7

**Aline's** 48:8 60:1 285:10

**allegation** 234:11 235:15

**allegations** 125:11 126:7 144:24 145:6,10 146:12, 20

**allege** 149:15 232:3

**alleged** 188:3 189:10 190:11

**allowing** 136:8

**alongside** 147:4

**aloud** 312:6

**AMA** 80:4 151:6, 10 231:2 257:15, 23 258:14 281:6 300:21,23 301:3 302:19 311:12,22 312:2,7

**amazing** 282:6

**Ambinder** 7:25 12:10,13,22 13:2, 8,13 15:22 17:6,8, 10,13,16,19 18:25 21:15 102:20 103:9,20,22 104:7, 13,16 114:20 180:21 181:7,18, 23 182:2,6,13,21, 24 183:3,6,12,24 184:1,14 186:16, 21 209:18 216:22 217:18 218:3 226:5 287:10,12

**amended** 23:10 105:7,16,24 106:21 211:10 214:15,21 215:20 226:23 229:19 230:2

**amount** 55:16,19 172:18 207:24

**Anaheim** 110:6 130:22 272:15,20 275:21,25 306:12

**and/or** 191:10

**answering** 100:19 211:24 289:1

**answers** 9:13 18:16 120:3 121:11 122:14 123:21 124:7 269:23

**anticipate** 308:13 309:4

**anticipating** 308:25 309:3

**anymore** 76:23 192:5 249:3

**AOL** 36:14,24 37:4 38:13

**apologize** 311:8

**apparatus** 294:23

**apparently** 80:25

**APPEARANCES** 6:1

**applicants/ associates** 312:12

**applied** 283:12,14, 15

**apply** 65:19 283:1, 6,15

**applying** 240:23

**approached** 130:9

**approximately** 7:8

**April** 268:25

**arbitration** 23:23

**Aria** 208:11

**arrested** 24:13

**asks** 125:2 148:3 149:13 187:25 191:7 195:8

**assert** 230:8

**asserted** 188:23 222:6 224:21

**assistant** 8:8 206:14 246:24 255:8 291:16

**associate** 20:14,15 21:1 29:12 45:5, 14 46:15 47:9 52:3 55:5,9,11,15, 25 56:6,22 57:9 59:25 60:10,17,19 61:1,25 64:3 66:21 67:14,22 76:10 81:1,18 82:1,2,4,10 88:22, 23 128:15 143:11 148:4 149:17,25 150:12 151:5,11, 14 159:6 197:14, 22 199:9 203:8 209:23 216:9 230:17,20,22,25 231:1,19,20 258:24 267:15 270:16,17,23 277:4 279:20 280:3 281:5 296:23 297:10,19,

20 299:6,7,21 300:7,18,21 301:1 309:14 312:17 313:10 315:4

**associate's** 66:22 81:25 82:5 259:14 270:4

**associate/financial** 231:8

**associates** 71:2 141:5 144:14 152:11 168:8 198:12 200:3 271:24 282:20 296:22 297:4 299:20,25 300:5, 14 301:10,15 303:9,12,23 304:2, 7,18,23 305:10 311:21 312:16 315:2

**association** 31:8, 10,21 32:1 35:21 38:24 43:14 47:17 53:2 85:13 89:20 94:2,14 97:25 98:15 109:10 134:12 153:11 154:8 173:9,16 175:9 177:24 178:8,13,18,21 180:10 187:19 192:8 194:5,12 204:15 207:16,19 231:13 242:12 246:6 254:21 272:5 274:7,18 276:16 277:14 290:2,19 291:12 295:17 297:6,12

**associations** 95:24 111:4

**assume** 153:25 190:15 196:14 221:7 244:8 245:6

**assuming** 130:2 142:15 269:18

**ate** 95:1

**Atlanta** 6:8 21:11 101:23

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

| | | | |
|---|---|---|---|
| **attached** 6:18 | **average** 247:13, | 131:24 132:1 | **bit** 54:14 311:9 |
| **attempt** 109:7 | 17,24 250:8 251:5 | 137:24 158:25 | **black** 7:16 8:17,21 |
| 138:15 195:16 | **averaged** 247:18 | 163:24 199:2 | 9:24 10:3,7,10 |
| 274:2 | **avoid** 140:21 | 252:1,17 255:11, | 12:18,19 14:15 |
| **attempting** 86:3 | **Aw** 134:5 | 14 258:1 280:17 | 15:13,18,19 16:12, |
| **attend** 21:5 70:15 | **aware** 115:23 | 302:12 305:25 | 13 18:7,10 20:19, |
| 73:12 169:19,24 | 116:3,8,14,18,25 | **basis** 77:10,14 | 20 25:18,22,23 |
| 170:9,15 231:24 | 121:14,24 122:1 | 81:21 207:3,9 | 45:11 50:20 73:11 |
| 232:25 272:10,13 | 126:3 132:18 | 223:11,18 249:20 | 95:4,11 99:21 |
| 273:23 307:3 | 144:4 145:3,4 | 291:17 298:20 | 100:9,25 103:3,6 |
| 308:6 | 170:12 188:18 | 312:16 | 119:7 121:25 |
| **attendance** 130:6 | 218:19 219:23 | **Bates** 46:2,6,10 | 122:5 127:1,10,16, |
| **attended** 162:8 | 220:20 221:25 | 311:16 | 21 128:5 129:6 |
| 170:25 | 222:1 227:7,15 | **bears** 178:17 | 133:1 142:10 |
| **attending** 250:24 | 281:10 309:11 | **began** 47:17 | 144:12 147:24,25 |
| 258:16 291:25 | **awhile** 82:20 | 242:12 246:10 | 148:22 149:5 |
| **attention** 63:25 | | **beginning** 7:9 | 155:21 156:2 |
| 66:14 117:19 | | 13:4 60:3,6,12 | 179:4,10,13 180:5, |
| 148:1 149:8,12 | **B** | 83:9 100:6 108:14 | 23 181:5,11,13 |
| 220:5 238:22 | | 128:19 180:18 | 182:12,19 184:11, |
| **attesting** 124:7 | **B-a-l-a** 48:9 | 203:21 287:1 | 12 185:13 186:8,9 |
| **attire** 157:5 | **back** 15:20 26:17 | 310:23 | 189:2,6 201:3,7 |
| **attorney** 6:4 8:21 | 29:13,18 44:4 | **behalf** 6:2 222:5 | 203:12 204:1 |
| 182:18 226:2 | 47:15 51:13 54:19 | **belief** 213:20 | 210:18 211:25 |
| **attorney's** 226:3 | 82:20 95:9 100:5 | **believed** 69:25 | 213:6 215:18,24 |
| **attorney/client** | 107:4 108:21 | 125:3 | 216:4,16 217:22 |
| 221:18 | 149:3,8 155:3,25 | **believing** 312:16 | 219:4 220:3 |
| **attorneys** 121:23 | 161:8 181:3 187:7 | **Bellagio** 208:10 | 221:11,20 222:13 |
| 201:2 211:22 | 197:24 200:5 | **belonged** 96:2,5 | 223:10,24 224:12 |
| 212:8 284:22 | 203:20 207:5 | **benefit** 87:13,15, | 225:11 226:9,20 |
| 315:24 | 238:13 241:17 | 16,25 199:5 | 228:11,17,20 |
| **attract** 163:9 | 258:10 259:19 | 235:22 236:1,2 | 229:7 238:15 |
| 165:25 169:12 | 260:21 276:4 | 280:8 307:25 | 282:23 283:18,25 |
| **audible** 9:18 | 283:23 287:6 | **benefited** 276:15, | 284:10 286:8 |
| **August** 22:18 | 310:22 314:12 | 18 277:14 278:11, | 288:5 289:2,16 |
| 37:25 40:13 84:10 | **background** 258:9 | 15 | 291:2 296:8 |
| 85:8 97:21,24 | **badge** 293:5 | **benefits** 242:19,22 | 308:11 311:1,4,7, |
| 109:18 111:15 | **bakery** 269:8 | 247:8 | 19 312:11,21 |
| 219:12 286:21,22 | **bankruptcy** 24:11 | **big** 95:1 138:9 | 313:3,14,16,17 |
| 287:1,2 | **base** 246:23 | 238:19 247:9,10 | 314:4 315:16 |
| **Australia** 29:2,5, | **based** 12:16 88:10 | 298:16 312:5 | 316:3 |
| 7,15,20,22,25 30:2 | 110:5 135:21 | **bigger** 87:16 | **blacked** 186:7 |
| 259:6 260:22 | 157:25 163:18,22 | **biggest** 73:22 | 269:14,15,17 |
| 270:5,13 | 166:1 169:3 200:1 | 208:12 209:2 | 285:9 |
| **author** 142:22 | 208:4 235:5 243:7 | **bilingual** 242:4 | **blog** 92:5 |
| **authored** 190:24 | 256:2 272:25 | **bills** 255:3 | **blogs** 91:24 |
| **authorized** 64:8 | **basic** 84:19 193:5 | **Binder** 12:8 | **blue** 238:22 |
| **automobile** 155:3 | **basically** 14:23 | **birth** 24:15,19,20 | **BNC** 205:13 |
| 156:12,25 | 17:24 57:17 60:4 | | 207:14,16,21,22 |
| | 63:15 69:18 71:19 | | 208:2,13,15 |
| | 80:22 81:2 87:18 | | **board** 168:4 |

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

**Bob** 8:5
**book** 143:4,7,9,16
  176:15,25 177:1,3,
  4 190:1,2,3,20,23,
  241:24
**books** 106:6,22
  133:23 142:25
  177:9,21 307:12
**born** 24:17
**bottom** 45:23
  191:11 219:7
  232:6 238:18
  311:16 312:5
**bought** 41:22
  156:5,9, 177:11
  195:2
**Boulevard** 27:7,
  10,14,16 263:18,
  20
**box** 174:4 312:5,
  11
**boxes** 180:12
**Brad** 7:19
**BRADLEY** 6:3
**brag** 255:23
**brand** 44:18,19
  66:6 256:20
**break** 11:7,9,10
  99:22,23 100:10
  107:24 147:23
  148:22 149:6
  203:13 204:14
  209:13
**breaks** 11:8
**Brighton** 29:8
**bring** 47:15
  232:24
**broadly** 300:5
**broker** 234:19
**Brooklyn** 298:14
**Brown** 114:22
**Brunton** 6:11 8:5
  95:8
**Buckley** 7:22 8:1,3
  102:24,25 103:1,9
  104:3,17 114:18
  238:8
**build** 144:9,14
  233:20 237:14,19

252:25 307:14,15,
  20,22
**building** 161:19
**built** 161:22
  307:23
**bullet** 239:22
  243:20
**busiest** 251:23
**business** 57:20
  64:9 68:17,18
  69:6,7,16,19,22
  92:6,19 93:12
  95:24 96:8,9
  108:7, 144:9,15
  157:5,15,22 158:1,
  7,9,19 159:5,10,12
  161:6 162:14,17
  163:7 168:21
  169:9 176:20,25
  189:22 190:14
  193:5 251:22
  254:2 261:21,25
  263:13 270:7
  293:6 307:14,16
**businesswise**
  85:20
**buy** 133:24 262:16

---

## C

**cadence** 124:24
**Caesar's** 208:11
**calendar** 98:12,16,
  18,24 99:4 108:1,
  4,11
**calendars** 107:25
**California** 53:17,
  18 110:6 130:19,
  20 297:22
**call** 16:4,14 17:10,
  19 51:12,14,18,20,
  21,23 53:8,13
  88:20 133:22
  134:2 151:1,3
  170:1 182:13,20
  183:2,9,12 185:6
  193:20 195:21
  234:19 236:4
  271:20

**called** 16:4,5,18
  17:6 39:25 103:2
  138:24 157:23
  170:3 176:19
  183:17 189:22
  235:16 260:3
**caller** 149:17,25
  151:3 230:17,21,
  23
**calling** 51:24
  71:20 87:2 172:6
  197:19 234:14
**calls** 20:17 50:18
  51:19 85:12,15,16,
  17,18 86:13,15
  90:8 111:23 172:9
  215:16 221:9
  233:11,24 234:2,8,
  22 235:10 255:15
  288:2,24 289:13
  301:11
**Canada** 242:5
**capacity** 16:25
  52:3 269:6
**caption** 121:6
**captioned** 185:19
**car** 155:1,9,12
  275:15,16,19,23
**card** 159:12 293:6
**cards** 157:15,22
  158:1,7,10,20
  159:5,11 161:6
  163:7 169:9
**care** 241:22 242:6
  243:17
**carry** 52:25
**carrying** 293:5
**case** 12:4 14:9,19,
  23 15:9 16:16
  20:6,8 21:6 40:5,
  19 47:16 83:18
  90:13 100:16
  101:2 111:6
  114:25 115:6,8,10,
  14,21 116:9,16
  133:18 145:12,17
  159:23 179:1,8
  183:17 187:18
  191:22 201:9,25
  204:7 211:1,2,5,7

214:17 221:8,13,
  25 222:23,25
  223:7,13,20 224:8,
  24 225:3,14,20
  226:13,15 227:12
  228:16 246:21
  286:13 309:22
  315:13
**cases** 159:13
**caused** 82:7
**caveat** 178:14
**cease** 37:21 219:9
**cell** 44:9,12 82:21
  85:11 86:5,8
  89:14 90:23 91:4,
  21 152:17 153:3
  154:17
**Center** 269:8
**CEO** 53:23,24,25
  54:1 131:2,5
**certification**
  183:18
**chain** 282:20
**chance** 161:20
**Chang** 53:19 70:7
  71:8,10,13,16,23
  72:16 73:20,24
  109:21,24 110:2,7
  127:22,25 128:2,
  11,23 129:20,21
  130:1,4,15 132:3
  170:5,8 171:2
  202:24 272:16
**change** 30:1
  83:24,25 140:9
  203:13 248:4
  308:8 315:20,24
**changed** 83:16
  165:23
**charge** 50:22 51:2,
  7,25 196:2,4,5,6,7
  197:1 271:21
**cheaply** 158:1
**check** 34:21 176:9
  258:10
**Chief** 8:6
**choice** 254:11,19
**choose** 159:22
  160:3,9 255:1

**choosing** 254:25
**chose** 166:1,2 279:11
**Christian** 35:16 38:22 39:5 56:24, 25 57:9,13,16,24 58:6 59:19,20,24 60:18 61:11,16 62:2 65:1 66:3,18 70:5,18 72:2,13, 19,23 73:19 77:7 78:13,20,21,25 79:17 109:14 125:25 127:17 129:15 131:8 132:4,8 135:14 137:18,19 139:12, 15 150:23 151:24 170:7,8 171:3 172:2 193:10 198:15,17,21 199:10 237:24 238:4 301:25 302:1,13,15
**Christian's** 139:13
**Christopher** 8:13, 25
**church** 96:2
**circumstances** 304:20 305:5
**City** 28:20,21,23, 24 29:1
**civil** 117:24
**claim** 188:4 189:10 190:12
**claims** 211:19 212:5,12,16 214:4, 11 230:7
**clarification** 10:20,21 56:12,23 66:18
**clarified** 197:21
**clarify** 89:3 195:17 277:22
**class** 76:5 212:22, 25 213:9,12,14,18 283:9
**classification** 195:12

**classified** 195:23 197:6 198:3
**clauses** 220:11
**cleaning** 157:13
**cleanup** 194:24
**clear** 15:4 67:7,11 68:2,7 75:14 86:1 115:3 116:5 165:22 178:1,6 184:11 188:19 230:9 241:11 280:20 289:10 303:11
**client** 69:17 133:21
**clients** 90:1 162:12 191:10,25
**clock** 294:22
**close** 134:24 292:11
**closest** 273:24
**closing** 248:16
**clubs** 96:5
**co-workers** 248:5
**coaching** 162:8
**Code** 186:4
**coffee** 168:3
**Cohen** 7:10 144:24 145:2,9,16 146:1,2,4,6,8,12 210:9 211:19 225:22 226:14,21, 25 227:3,8,12,15, 18,20,23 228:1,5, 23,25 315:10
**cold** 71:20 149:17, 25 151:3 172:6 230:17,21, 233:23 301:11
**collection** 24:5
**collective** 185:20 229:15
**combine** 268:16
**combined** 250:20
**combining** 252:2
**comfortable** 258:2
**commission** 79:11 80:7,10,23 81:4,6,

9 82:11 88:10 136:19 208:4 235:5 236:6,12,23 280:12 305:17
**commissions** 82:7 135:21 136:8 137:7 161:8,23 204:18 237:7,16, 17 260:18 307:24
**committed** 219:25 221:12,24 223:6
**common** 18:12
**commonly** 18:14 120:24
**communicate** 210:8
**communicated** 33:20,21,25 146:8 148:6 216:7,11
**communication** 52:9 65:23 148:11,19 184:14, 16 192:23 195:10 216:12,14 221:18
**communications** 53:5,7,14 54:3 98:2 179:5 182:18 191:9,24 192:4,9 193:1 212:2 214:7 216:13 219:19 220:8,21 225:25
**commuting** 296:16
**companies** 62:11, 21 208:14 262:11 266:2 268:19
**company** 20:11, 15,23 50:4,11 57:14,23 58:10,18, 20 59:11,12,15 62:6 68:8,13,16 74:21 75:11 89:6 90:4 92:7 128:8,9 137:23 143:13 144:20 155:1 157:23 158:12,25 163:23 166:4,6 173:4 192:18 195:19,22 203:4 205:24 207:15 208:16,23 209:3,

10 233:3 243:16 244:13 256:2,19 258:2 259:4 260:3,8,11 261:9, 10,11,13,15,17 262:3,10,12,14 263:13 264:23 265:14,23 266:20, 22,23,24 267:1 271:7 276:25 293:6 298:18 299:10 300:22 308:14,22 309:5
**compare** 255:11
**compensated** 88:6 136:15 208:2 303:13,24
**compensation** 81:21,25 82:6 136:16,20 235:12 256:8 291:5 303:10
**compete** 255:6,9
**complain** 78:13 196:1 198:16
**complained** 197:5, 8,10
**complaint** 105:2, 3,8,11,14,17,23,24 106:20,21 120:16, 19 125:11 126:8 144:24 145:6,7,10, 11 146:13,20 148:7 149:19 184:9 195:10,22 198:5 201:24 211:1,3,7,8,9,10, 13 214:16,17,21, 22,23,24 215:10, 12,13,20 226:23 229:15,18,19,21 230:3 234:12 243:5
**complaints** 198:2 242:7
**complete** 55:25 59:23 208:22 312:6
**completed** 55:9,11
**completely** 235:12

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

**completing** 55:3, 14

**composed** 64:6

**comprise** 195:9

**computer** 37:7,9 38:7,11,18 39:3,14 41:13,16,17,21 42:18 43:2,4,5,8,9, 13 96:12, 97:13 98:17 107:9 153:13

**computers** 167:17,18,20,24, 25

**concepts** 277:12, 13

**concern** 197:15 222:11 223:3,4 228:8,10 274:20

**concerned** 228:12, 22,24 229:3,5

**concerns** 178:3 222:24 223:25

**concluded** 316:9

**concludes** 316:6

**conclusion** 20:18 50:19

**conditional** 183:18

**conditions** 82:10

**condo** 27:3 99:11, 13,17 194:25

**conduct** 35:9 315:12

**conducted** 38:8 160:15

**conference** 168:4 219:20

**conferences** 272:11

**confidence** 315:24

**confidential** 25:17 109:1

**confirm** 285:13

**confirmed** 200:10

**conflicts** 254:13

**confuse** 54:19

**confused** 213:4

**confusing** 213:8 238:18

**connection** 31:13 80:7 94:2 97:13 154:7 157:18 172:23 173:16 179:8,16 184:23 204:6 210:14 276:15 291:18 294:9 304:2

**Connor** 259:6,16, 17

**consent** 17:17,22 19:16 185:19 186:20 200:7

**consented** 209:14

**consequence** 252:7,13

**considered** 247:7

**consisted** 301:11

**consistent** 201:4

**cont'd** 6:1

**contact** 12:21 13:2 31:5 32:12 34:11 36:14,24 85:1 90:10,11,17 91:18 110:9,11 112:15 158:16,21,22 165:14 174:15 182:24 193:21 195:16 307:7

**contacted** 32:22 36:25 78:2,5 90:6 135:5 170:19 181:23

**contacting** 30:21 32:19

**contacts** 85:2,3,6 134:14

**contained** 82:10 121:12

**content** 56:11

**contents** 16:10 39:16 40:6 184:16 209:19,25

**continue** 100:8,11 149:4 156:1 181:4 203:24 226:22 238:14 283:24 310:25

**continued** 80:13 81:11 276:15

**contract** 313:7

**contractor** 52:21 66:23 67:6,17,18 68:14,16,20 69:4, 5,12,15 195:14 197:7 198:4 264:23 265:9

**contractors** 64:7

**contributing** 168:15

**contribution** 168:7

**controlled** 152:10 313:1

**convenient** 95:3 249:8

**convening** 248:10

**conventions** 272:11

**conversation** 182:1,4 186:21,22, 24 187:2 209:17, 25 211:21 298:23

**conversations** 17:15 121:22 200:25 201:6 212:12 297:10 315:2

**convince** 115:9 233:5

**copied** 33:21

**copy** 22:3 45:14 108:1,4 113:15,23 119:17 178:15 181:17 210:25 285:16,18 286:12 312:1 315:11

**corner** 45:23

**corporate** 48:25 49:9,13,17,21,22 50:1,2,11,15 51:5, 6 52:10,17 65:11, 24 66:8 73:7,8,15 91:19 132:22 135:6 151:23 152:2,5,7,9 167:1, 23,25 169:23 170:15,20 193:16

194:4 281:24 302:23 303:3 307:1,2,9 308:3

**correct** 11:25 13:14 15:6,9,10, 12,24 17:21 18:24 21:22,23 24:10,23 30:4 32:3 33:10, 17 39:1 44:3,8 46:19,20,25 47:1, 5,6,11,22 52:13, 22,23 53:5,10,12 54:23 55:6,21 61:5 62:8,11 63:18,22,23 65:8, 25 66:1,4,5,18,19 67:9 68:17 71:8 73:16,17 75:2 78:3 79:14 80:11, 15 81:9 87:1 89:12,13 90:14 92:16,21 97:9,10 99:20 101:3 102:4,6 104:4 105:5 107:20,23 108:1 111:4,5,13 114:11,16,17 116:7 117:15 120:4,6,9,12 121:9 123:21 124:5,8,22 128:13 129:15,16 130:19 133:8,9 134:6,9,14,21,22 135:1,22 136:10, 11 137:8,9,12,13 139:18 140:11,15, 16 141:20 143:17 144:9,15,18 145:13 147:1,2,14, 15 148:17,18,21 151:6,7,11,21 152:14,20 153:13, 16,25 154:6 156:21,22 157:16, 20,21 158:2,3,6 159:2,3 161:9,12, 19,24 162:3 163:2 165:18 166:3,8,10 169:20 170:10,11 172:3,15,20 173:7, 11 176:5,21 178:10,11 182:25 185:8,10, 186:11,

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

18 190:16,25
191:12 192:2,25
195:2 196:23
197:4,22,23 198:9,
14 199:11,25
200:3 201:15
204:23 205:14,18,
19 206:11,22
207:1 213:24
216:10 217:18
218:5,8 223:23
224:25 227:5
230:18,20,25
233:6,7,11,17,20,
21 234:9,10,14,16,
21,25 235:9,13,22
236:1,12,20,24
237:7,8,11,17,18,
20,21 238:1
239:13,24 240:7,8
241:5,6,16 242:1
243:2,9,21 244:9,
24 245:1,6,9
246:3,7,8,11,15,16
247:1,6 248:19,25
249:17,23 251:1,
16 252:5 253:14,
15,19,24 254:18,
23 257:2,8,10,11,
17, 258:20 259:2,
6,7,18,20 260:6
261:5 262:2,7,8,25
263:7,19,21,23
264:8,9,11,12,
266:21,23 267:3,5,
7 268:1,7,11
270:3,20,21,25
271:1 272:4,17
273:4 274:8,16
276:3,9,21 277:10,
11,15,16,18,19
278:9,13,14,17,18,
21 279:4,5,7,8,14,
23,25 280:1,6,22
281:3,4,7,14,20
284:1,8 285:4,8,
21,23 287:12,22
289:4,5,6,20,21
290:11,12,16,17,
23,24 291:9,10,13,
19 292:10 294:1,
24,25 295:6,22,25
296:2,11 297:7,14

298:9 299:22
301:7,9,16,17
302:16,20,25
303:1,13,21,24
304:5,10,23,24
305:2,3,17 306:4,
6,11,13 307:8,14,
17,20,21,24 308:1,
8,9 309:2,15,16
310:7,16 312:2
314:5
**correctly** 24:8
31:19 44:4 251:3
258:12
**correspondence**
52:16 169:22
**cost** 156:16 157:13
**counsel** 6:1,17
7:14 8:6,9,10
101:6,8,11 103:16
106:3 109:7
114:8,11,24
116:11 117:2
118:3,21 119:19
122:1 150:3
178:12,20 179:6
181:16 182:21
185:6 187:21
188:18,19,20
191:14 201:6
212:2,13,18 214:6,
7,13 218:22
219:12,24 220:22
221:14 222:11,24
224:14 226:1
228:22 238:24
269:15
**country** 141:6,7,
14 142:1 297:24
**couple** 172:5
229:17 231:10
246:6 273:8,20
292:9 293:15
**court** 6:17 8:11
9:14 18:15 22:3,
12 23:21 25:9
26:12,22 27:24
28:3 99:19 183:20
201:18,23 202:2,5
218:7 219:21
222:22 223:12,15

226:24 227:11
230:2 263:22
264:1
**court's** 220:21
315:11
**cover** 142:21,22
176:15 177:21
238:23
**covered** 166:23
225:13 292:16
293:9
**Craig's** 48:3,11
49:1,9,14,18 55:20
164:13,18 165:11,
12,15,17 233:10
**create** 134:15,16
164:19 239:4
245:3 307:19
**created** 93:15
240:1,12,14,16
241:1 245:7,11
**creating** 239:6,15
**creative** 163:8
169:12
**Creek** 50:9 133:4,
13 135:7 169:23
193:17 272:7
**Cricket** 44:15
83:2 84:3,5 85:4
89:14 90:6,11,17
91:2,4,14, 152:18
153:3
**criticize** 302:10
**critique** 302:1
**critiqued** 301:19
302:23
**current** 25:8
148:3 308:14,21
309:5
**customer** 85:16,17
91:19 95:13
151:16,19 157:3
241:24 243:5
252:18
**customers** 86:20
94:6 130:10 155:6
156:20 157:19
158:23 159:10
162:14 163:10
169:12 191:10,25

192:5,10,11,12
200:2 250:8
**customers'** 242:3,
7

---

### D

**daily** 298:20
**danger** 253:12
**Daniel** 8:3 196:10,
12,22 197:1,5,13,
21,24 198:2,5,7,
16,20
**Daniel's** 196:24
**date** 7:11 23:4,13
24:15 45:8,9
46:13 123:4
240:17 241:7
285:5,7 295:12
**dated** 22:17 23:3,
11 47:21 216:23
257:15 286:21
**dating** 44:4
**day** 10:19 11:8
13:1 68:12 71:19
77:16 107:3
122:23 123:12
140:22 147:1
162:23 171:15
180:18 215:4
221:10 240:25
244:19 249:11
251:23 252:2
275:17 289:25
290:21 292:2,3
314:14,17
**days** 17:11 88:16,
21 113:6 146:25
158:17 249:14
289:24 290:20
292:6
**deadline** 224:15
**dec** 291:1
**December** 74:24
246:12 249:24
251:18,20 264:11
291:14 293:16,19,
21,25 294:5
**decide** 158:9
192:14 256:18

Cohen vs. World Financial Group       Jordan Destin       10/08/2013

decided 158:4
225:13
declaration 18:19
19:3,9,12,20,22
21:8 183:13,15,19
184:15 187:1
190:6,17 286:13
287:4,20 295:2
300:11 311:20
declare 204:19
declared 24:11
defendant 6:2
7:17,20 8:22 24:2
125:9,15,21
126:16 128:25
148:5 149:18
188:5 195:11,13
defendants 230:16
defendants' 7:1,2,
3,4,5 121:7 125:9
185:12 203:25
210:17 216:15
217:21 219:3
229:6 284:9 286:7
define 50:2 101:8
150:13 214:22
223:14
defined 64:5,11
223:15
degree 29:11,12
178:17 259:14
270:4,11,16,18
deleted 34:7
Delta 9:2
demonstrate
65:10
department
255:13
deposition 6:18
7:10 9:7,10 10:12,
24 12:3,14 17:24,
25 18:11,14 21:6,
8,9,12,22,24
22:16,17,19,25
23:3,5,10,13,17
46:4 54:16 100:7,
15 101:7,13 102:7
103:22 104:20,24
106:12,18,24
107:3 109:8,12

111:16 114:8
115:5 116:6
117:18 120:10,11
193:19 270:22
310:24 315:20
316:6,9
derail 16:8
derive 87:25
describe 110:21
159:4 189:9
190:10 191:5
265:6 279:20
describing 188:2
designated 25:16
designates 25:19
desires 64:3
Desist 219:9
desk 180:13
desktop 37:12
41:23
Destin 7:10 8:13,
18,25 9:2,5 10:11
11:15 12:2 15:16
21:3,25 22:5,15,
17,23 23:9,11,18
24:15 30:7 37:5
45:12 47:7 48:24
69:9 82:20 91:24
92:8,11,17 93:18
95:23 98:6 100:8,
10,14 109:6
115:23 117:17
119:14 120:1
121:14 122:6
124:11 171:6
175:20 177:19
181:6, 185:14
187:8 200:6
203:23 204:2,5
205:23 210:19
211:5 216:6,17
217:15,23 218:6,
19 219:5 220:20
223:16 226:10
229:8,10 230:15
231:5 234:18
236:5 238:6,16,25
262:6,9,15,20
263:1,9 264:10,16,
266:18 284:1,11,
13 286:9,12,17

310:25 311:1
316:7
Destin's 121:7
Destin@yahoo.
com 34:21
detail 31:20
detailed 243:1
determine 76:3
detrimental
254:13
develop 134:13
159:2 162:13,16
253:2
developed 161:15,
17
diary 98:6
dictate 140:10
dictated 306:9
308:5
Dictionary 69:13
differed 143:22
difference 87:9
217:13
differently 217:5
differs 231:6
direct 63:25 66:14
129:23 131:3
230:12,13
directed 115:25
116:19
directing 238:22
direction 52:24
128:20 312:8
directions 129:23
133:14
directive 129:19,
20
directives 130:24,
25
directly 33:5 34:1,
3,6,9 90:18 170:19
259:21,22 309:20
director 60:22,23
71:3 85:18
directors 131:5
discard 99:16
discarded 37:24
38:1,6 41:10 84:6

194:19
disclose 184:15
209:18 212:1
disclosing 225:25
309:21
disclosure 6:16
discouraged 164:9
discovery 120:24
121:1 222:3,18
224:22 315:8
discuss 14:11
100:19 164:5
210:12
discussed 138:14
164:8 232:4
304:19 305:4
discussing 38:13
discussion 81:19
95:7 209:19
Disneyworld
268:22,24 269:4
displace 281:6
dispute 258:25
distinct 94:10
doc 177:18
document 14:1,4
15:15 22:21,24
23:1,2,6,11,15
40:18 42:16 45:24
46:5,8 47:12 54:8,
18,21 56:7,9 80:2,
3 97:12 105:20
111:18,20 112:23
116:24 117:22
118:4,6,9,13,15,
16,22 119:6,10,11,
21,23 120:2,4,5,
13,17,20,23 121:3,
12,15 122:8,14
123:1,3,8,14,20,22
124:8,11,25 126:8
142:22,24 149:8,
10 155:18 176:19,
22 181:15,19
183:22 184:8,18
185:5,15,19 186:3,
8 187:7,18,24
189:22,25 190:14,
24 191:15,21
193:14 195:4,5

200:12 204:7
210:21,23 216:19
217:20,25 218:1
220:25 221:2,3
229:10,12,14,25
230:11 238:6,24,
25 240:1,13,15
245:21 259:1
284:13,17,21,23
285:2 286:16,21
287:7,9,13 288:23
289:12,23 296:21
300:10

**documentation**
312:7

**documents** 14:8,
18,23 15:8 21:25
22:12,13 39:10
40:15 43:14
45:16,20 104:23
105:1,19,21 106:1,
2,5,23 107:2,5
112:6,10 117:3,12
118:2,8, 120:11,14
123:9 142:20
146:23 147:12
148:20 163:13
169:18 172:6
175:23 176:1,2,3
177:19,23 178:7,9,
13,19,20,23 179:1,
7,15,19 180:7,9
187:10,13 188:1,8
189:9,18 190:10
191:4,8,23 194:14
195:9 202:18
217:6 243:11
269:23 284:19
306:15 312:13

**Dodge** 155:11,16
156:4,6

**Don** 53:19 54:2
70:7,18 71:8,10,
16,23 72:16
109:20 127:25
128:2,10,23
129:20,21 130:1,4,
15 131:1,2 132:7,
133:11 135:14
170:8 171:2
202:24 272:16

**door** 168:19 169:4
**doubt** 287:3
**draft** 164:19
183:12 184:14
187:1 193:5
215:9,12,13,14
230:4,5 239:19
243:7,13 287:24
288:6

**drafted** 239:23
240:25 287:10,12,
23 289:3

**drafting** 243:11
**draw** 220:5
**dress** 157:3,6,8
**drew** 228:23
**drink** 160:16
**drinks** 160:18,21,
25 161:6

**drive** 38:2,4, 39:7,
9,12,16,23,24,25
40:6,7,15 41:6
42:20,22,23 107:9
155:5 156:19

**driving** 155:9
**dry** 157:13
**duly** 8:14 103:3
**duties** 52:7 53:1
301:11

---

**E**

---

**e-mail** 13:9,10,12,
15,17,21 14:7,17,
25 15:1,6,14,21
16:1,2,3,4 17:9,25
25:15 30:7,10,12,
15,16,19 31:6,13,
17,24 32:3,20,25
34:2,3,5,10 35:1,2,
20,24,25 36:12,15,
22 38:12 39:18
41:3,8 48:19 52:9,
11,12,15,16,19,20,
23,24 53:3,4
106:6,21 107:8,14
111:23 112:2,3
113:14,20,24,25
114:1 116:15
122:13,15,17,20

146:9 176:4
177:22 180:20
181:7,17 183:23
184:1,3,5,7,24
186:4 191:19
192:1,9,17 193:5,8
216:22,24 219:13
220:7,9,21 242:3
284:24 285:6,10,
11,14,19 287:14,
16,17 302:24

**e-mails** 18:9 32:6,
7,12 34:22 36:13,
21 107:2 219:17

**earlier** 11:1, 21:3
39:2 40:21 55:8
63:5 70:24 73:18
76:17 86:2 96:11
107:1 108:17
110:16 126:17
129:10 130:5
148:14 152:17
153:10 169:17
181:6,22 187:9
188:16 190:22
193:19 201:5
202:17 204:5
211:10 216:5
222:2 230:19
231:7,11 232:4,10,
14 233:9,19
257:13 263:4
268:2 270:22
281:16 287:10
289:3 290:6 293:9
297:4,9 302:13
306:2 307:20
309:13

**early** 25:1 31:3
45:6 95:2 248:5

**earn** 29:11 79:3,11
80:7 305:17

**earned** 82:4
259:13

**earning** 80:19
**earns** 82:2
**easily** 244:19
293:2

**eat** 99:25
**Edward** 8:1

**Edwards** 146:17
**effect** 131:16
132:6 218:11

**effectively** 230:21
255:6, 262:9

**effort** 115:9,13,19
139:5 144:18,19
210:8 252:24
254:14

**efforts** 157:19
173:15 180:7

**electronic** 46:12,
23 98:8,16 107:2

**electronically**
46:16 299:17

**eligible** 236:7,12
237:6

**eliminate** 30:18,19
**eliminated** 30:22
31:6 32:3,5

**Emergency** 219:9
**employed** 75:5,8
133:3 149:24
196:13,15,18,22
206:25 207:5,9,21,
22 208:17,23
209:5 230:16
240:6,9 241:18
255:19 260:12,
264:13,19 265:7
266:16 267:1
268:3,19,23 269:4
274:21 282:18
290:14 302:15
303:3 308:4

**employee** 62:4,8,
10,13,15,18,23
65:12 66:9,21
67:8,14,22 68:3,8,
10 70:1 71:23
72:2,8,13,17,20
73:1,4,7 128:25
148:4 170:14
205:24 208:20
242:14,15 246:7

**employees** 50:12,
15 87:6 125:9,14,
21 126:16,23
300:8 308:14,21
309:5

Cohen vs. World Financial Group     Jordan Destin     10/08/2013

**employers** 266:2
268:18
**employment**
112:24 148:12
202:14 206:3,20
207:7,8 240:18
241:2,3,17 254:21
257:2,10 264:20
265:8 269:9
289:24 290:1
296:24
**encompass** 270:8
**encourage** 136:2,3
**end** 13:5,6 64:11
67:14 76:21 80:5
82:13 83:9 100:2
102:1 108:9
149:15,17 162:23
175:11,12,13
188:3 198:18,19
199:23 203:17
205:25 242:10
250:17,22 280:24
290:9,22 293:19,
21 310:20
**endeavor** 162:18
**ended** 76:18
194:12,16,21
241:4,8,12 248:17,
21 250:4
**ending** 249:2
**engage** 10:4 64:9
307:4 308:7
**engaged** 241:13
**engaging** 291:24
**English** 242:5
284:2,5
**enhance** 158:21
**ensure** 288:13
**enter** 34:5 47:8
64:7 265:8 313:7
**entered** 56:5
226:24
**enters** 100:4
144:11
**Entertainment**
205:13 207:14,17
208:3,13,15
**entire** 39:16 83:5,
19 84:3 155:13

197:2 249:18
**entities** 63:10
213:15 265:6
**entitled** 10:12
281:13
**entity** 49:9,14,17
167:2 188:5
209:6,7 262:4
265:21
**enumerated**
220:11
**Epcot** 269:8
**equivalent** 209:8
270:17
**err** 254:24
**ES** 9:2
**escalation** 241:23
242:1,7
**Esquire** 6:3
**essentially** 64:23
126:10 253:3
**established** 226:7
**estate** 69:6 96:9
255:6,9,10 261:19
262:16
**estimate** 171:13
247:12
**evening** 248:6
**events** 18:23 126:7
**eventually** 60:14
**evidence** 65:16
133:17 168:16,25
**exact** 122:23
171:12 215:4
314:12,14,17
**EXAMINATION**
8:16 311:10
**examined** 8:14
**examples** 188:8
**exclude** 296:18
**exercised** 301:19
303:4
**exhibit** 7:1,2,3,4,5
22:4,6,16,25 23:9
45:10,13 54:9,10
117:19 118:14,23
119:1,4,15 121:4
122:7 123:14,15

149:7 175:21
181:12,15 185:12,
15 187:9,15,24
189:20,22 190:4,6
191:3,15 200:6
203:25 204:3,8
210:17,20 216:15,
18 217:2,16,21,24
219:3,6 224:14
229:6,9 238:17,19,
20,23 265:1,3
284:9,12,18,20
286:7,10 311:13
313:17
**Exhibits** 117:18
189:11
**existed** 107:5
**exits** 95:8 141:9
**expectation**
154:16
**expecting** 77:17
**Expedia** 62:18
206:24,25 207:6,
10 209:1,5,9,11
240:6,10,18 241:3,
18,21,25 242:5,10,
13,20,22,23
264:14,15,19
269:9
**expense** 156:24
161:5 166:23
173:14,24 174:8,
10,22
**expenses** 161:18,
24 173:14 175:5
204:16
**experience** 188:3
189:10 190:11
205:23 299:9
**experiences**
303:15
**explain** 89:4
273:22
**explained** 306:18
**explore** 257:12
**expressed** 234:18
**extent** 66:17 87:2,
10,23 159:1 161:2
178:3 186:7
226:17 234:11

235:3 254:10
276:13 290:18
**external** 39:12,23,
24 40:7,15 107:9

---

**F**

**face** 218:11,14
**Facebook** 92:23,
25 93:20,23 94:1,
8,13,22 95:12
112:19
**fact** 25:20 46:25
47:20 55:11 78:21
89:11 124:7
134:11 135:24
137:11 151:6
161:11,17,23
162:15 164:6
169:1,3 173:9
187:12 188:24
197:6 198:3
204:11,14 222:2,
10,18,21 224:11,
13,14 225:3
226:22 228:5,13
229:4 235:18,24
266:12 277:17
279:23 281:2
284:5 287:3
294:21 299:4,25
304:6 313:12
314:16,22
**facts** 109:9 125:4
126:6,12 224:9
**fail** 92:13
**fair** 24:6 130:12
158:19 172:22
173:2,3 183:10
248:20 276:12
314:20
**faith** 315:24
**fall** 314:8
**falls** 203:4 209:9
**familiar** 20:25
61:2 261:6
**fashion** 188:22
233:20
**February** 244:11

Cohen vs. World Financial Group                Jordan Destin                                    10/08/2013

**federal** 62:22
75:24 218:19
222:22 223:12,19
236:14
**fee** 152:23 300:4
**feel** 10:19 11:1
13:25 258:2
**felt** 130:13
**field** 255:25 258:1
**file** 39:10 201:23
224:15
**filed** 17:17 105:2,
3, 126:9 183:16,17
211:2 228:7
**files** 39:18 42:14
**Filing** 224:18
**fill** 62:21,23,25
208:23 258:10
**filling** 116:16
258:17
**finally** 237:3
250:4 308:12
**financial** 7:11,18,
20 8:6,22 14:2
15:9 20:7,15 31:9,
11,14,21,23 32:2
34:16,17,23 35:4,
6,12,22 36:6,13,21
37:6 38:24 40:8,
16,18 42:6,9
43:15,22 44:6,13,
23 45:3,20 46:6
47:14,17,24 48:25
49:2,4,8,13,17,21
50:1,4,6,16 51:3,4,
11 52:1,3,10,16,21
53:2,9,15,22 54:4
55:1,16,24 57:3,4,
18,20,22,25 58:3,
7,12,15 62:2,4
63:1,6,11,13,18,20
64:5,10,22 65:2,
10,18,24 67:8
71:24 72:3,9,11,
14,17,20 73:1,4,7,
15,25 74:3,5,10
75:1,6,8,12,15,17,
18,22,25 76:8,14,
18 77:6,20 78:12
79:2,5,21 80:8,14,
18 81:12,18,20

82:12,17 83:1,6,
20,23 85:11,13
86:3,4,25 87:3,4,6,
7,11,12,25 88:13
89:8,21 91:8
93:24 94:3,11,15,
23 95:14 96:20
97:4,8,12,25 98:3,
15 99:2 109:4,10,
15 110:9,25 111:2,
22 112:11,24
113:11 115:24
116:10 117:1
118:3,21 119:19
121:16 126:9,23
127:9 128:3,11,
130:14 132:22
133:4,13,19,21,23,
25 134:2,4,13,17,
25 135:6,17 138:4,
5,6,8,21 140:20
141:5,25 142:6,
143:12,15,21
149:16,24 150:12,
13,19,20 151:1,11,
13,15 152:1,9,20
153:8,11,12,21
154:8,13,19
155:14 156:15,23
157:11, 158:12
159:8 160:23,24
162:2,17,19
163:22 164:2
167:1,6,13,21
168:9,13,17,20,21,
22 169:1,3,14,23
170:2,14 171:9,17
172:12,24 173:10,
17 175:1,9,16,23
177:10,11,14,24
178:5,9,14,18,21
180:10,14 187:20
189:18 190:13
192:8 193:15
194:3,12,15,21
195:11,17,25
196:14,16 197:3,
17 198:12 199:9,
14 202:15 204:16,
23 205:16,17,21
206:9,19 207:11
210:14 216:8
222:4 231:13,15,

20 233:15,25
234:3,13,23,24
235:7,19,25 236:4
237:1 241:5,9,13,
14 246:13 248:18,
22,24 249:10
250:3,17,22 251:4,
11,14,25 252:8,13,
23 253:6,13
254:12,22 257:5,
14,19 258:17,19
259:5,25 260:23
261:1,4 268:5,13
270:25 271:3,24
272:6,7,20,23
273:15,21 274:8,
12,15,18 275:9,12,
19 276:6,16 277:1,
3,4,7,15,25 278:24
279:13,19,21,22
280:8,11 281:8,9,
22 282:5,18 284:7
285:15,19 290:3,
10,20,22 291:12,
19,23 292:18
293:5,13,16 294:9,
12,17 295:18
297:6,13 298:14
299:5 300:3,7,15,
19 301:2,12
302:15,18,22
303:2, 304:3
305:22 306:16,20,
23,25 307:2,9,16
308:1,3,5 309:14
310:1,10 312:11,
13 313:2,8,9,22,24
**financially** 163:15
164:1 235:22
236:1
**find** 12:2 16:15,18
21:14 34:9 35:20
41:8 43:17 76:7
96:22 117:5 185:6
197:10 205:2
251:24 262:18
265:13,16 289:9
**finding** 220:21
221:14,25
**findings** 315:12
**fine** 309:10,11

**finish** 270:10,11
**firm** 7:17,24 12:5,
6,8,22 13:19,20
15:22 16:5,11,14
17:2 18:6 21:15
**firms** 114:16
**fit** 256:19 268:9
**Fitch** 62:16 77:2
205:12 206:7,13,
21 246:4,6,7,19
247:15,16 252:1
253:4 255:16
256:7,11,23 268:4
277:18 290:14
291:16
**five-minute**
147:23
**flagship** 247:10
**flight** 275:6,8
**flip** 45:15
**Florida** 28:15
272:25 273:3,17,
19,20 274:1,11,17
275:5,14
**FLSA** 185:20
**fluent** 284:2,5
**focus** 117:19
138:2,5,6,7 139:4,
9,11,13,20,21
142:13,18,19
148:1 149:8,12
162:13,16 173:4,7
195:4
**focused** 138:20,23
139:15,16 140:12,
13,14
**focuses** 138:19
140:7,8,10
**focusing** 67:19
**folks** 66:3 110:17
111:1 129:24
134:20 136:2,14
171:1 193:7
202:22 252:9,12
**follow** 68:12
124:24 130:9
132:4 144:16
158:17 243:6,14
252:18 254:8
305:20,21

Cohen vs. World Financial Group          Jordan Destin                          10/08/2013

**followup** 159:13
184:8 192:15,16,
22 250:8

**followups** 253:2,
22

**food** 160:16

**force** 64:4,23

**forgot** 102:1
277:23

**form** 10:1 19:16
205:17,21 261:13
285:22

**formal** 151:8
167:7

**formally** 145:11

**format** 113:22
116:6 176:20,25
189:23 190:14
193:5 239:16

**formed** 261:20
262:6

**forms** 205:12,15

**Fort** 273:25

**forwarded** 113:25

**forwarding**
285:10

**found** 117:6 175:9
223:12,19

**fourth** 243:20

**frame** 240:19

**France** 24:18,20
270:12

**free** 10:20 11:1
309:9

**French** 242:4
269:7

**Frenchie** 92:25

**frequently** 301:19

**friend** 239:7,8

**friends** 94:13,21
95:12

**front** 91:16 121:4
183:22 200:8
215:1 243:18,22
244:16 284:20
311:12

**full** 8:24,25 174:4
220:6

**full-time** 111:3,12
206:15,17,20
207:3,4,7,8,9
242:17,18 246:16,
17 247:7 249:16,
20 250:14 267:16
291:17

**fully** 11:13 265:6

**function** 52:2
92:13

**functioned** 142:6

————————

**G**

————————

**gained** 68:25

**Galaxy** 97:20

**gap** 259:23

**gas** 155:2 156:25
174:5 275:24

**Gateway** 96:14,
15,16

**gather** 114:3

**gave** 18:11 74:19
127:3 171:7
263:17

**general** 8:9 10:4
277:12

**generally** 13:19
126:22 250:12
254:25 276:10
277:5 278:21

**gentleman** 102:22
103:2

**Georgia** 6:8 50:7,9
133:4,13 169:24
193:17 272:8
281:24

**germane** 126:12

**gifted** 177:13

**gigabyte** 40:1

**give** 9:17 17:24
18:16 25:8 113:23
135:7 147:22
151:16,24 152:2
159:19 160:4
174:13 215:4
222:10,24 223:4
228:7,10 257:6
295:11,19 296:20
299:8 312:15

**giving** 9:13 128:20
151:15 171:17
282:14

**gmail** 31:18 32:24
33:3,16 38:13

**goal** 87:19 89:5
136:1 140:16,18
237:22,23 302:6,
10 309:11

**goals** 233:20

**Golaleh** 146:17

**good** 8:18,19
165:14,15 192:16,
21 254:2 256:12
302:5

**Google** 30:21 31:5
32:12,19,22 33:3,
4,11,24 34:11
36:25

**govern** 236:15

**grant** 201:18

**granted** 202:2

**great** 74:20
249:11 284:17
292:16

**grouchy** 95:2

**ground** 9:10

**group** 7:11,18,21
8:6,22 14:2 15:9
20:7,15 31:9,11,
14,21,23 32:2
34:16,17,23 35:4,
12,22 36:6,13,21
37:6 38:24 40:9,
16,18 42:6,9
43:15,23 44:6,13,
23 45:3,21 46:6
47:14,17,24 48:25
49:2,4,8,13,17,21
50:1,4,16 51:3,5,
11 52:1,4,10,17,21
53:2,9,15,22 54:4
55:1,17,24 57:3,4,
20,22 58:12,15
62:2,4 63:1,11,13,
18,20 64:5,6,22
65:2,11,19,24 67:8
70:17 71:24 72:3,
9,11,14,17,20
73:1,4,8,15,25

74:3,4,5,10 75:2,6,
8,18,22 76:14,18
77:7,20 78:12
79:2,5,22 80:8,14,
18 81:12,18,20
82:12,17 83:1,6,
21,24 85:11,13
86:25 87:3,4,6,7,
12 88:13 89:8,21
91:8 93:24 94:3,
11,15,23 95:14
96:20 97:4,9,12,25
98:3,15 99:2
109:4,10,16 110:9,
25 111:2,22
112:11,25 113:11
115:24 116:10
117:1 118:3,21
119:19 121:16
126:9,23 127:5,9,
13,18,22,25 128:3,
12,15 130:14
132:23 133:4,13,
19,21,23,25 134:2,
4,13,17,25 135:6,
17 137:4,21,22
140:20 141:5,25
142:6, 143:12,15,
21 150:13 151:11
152:1,9,20 153:8,
11,12,21 154:8,14,
19 155:14 156:16,
23 158:12 159:9
160:23,24 162:2,
17,19 163:22
164:3 167:1,6,13,
21 168:9,13,17,20,
21,22 169:1,4,14,
23 170:2,14 171:9,
17 172:12,24
173:10,17 175:1,9,
16 177:10,12,14,
24 178:5,9,14,18,
22 180:11,14
187:20 189:19
190:13 192:8,20
193:15 194:3,12,
15,22 195:11,17,
25 196:14,16
197:3 198:11,13
199:9,14 202:15
204:16,23 205:16,
17,21 206:9,19

Cohen vs. World Financial Group    Jordan Destin    10/08/2013

207:11 210:15
216:9 222:4
231:13 233:16
234:23,24 235:7,
19 237:1,20,25
241:5,9,13,15
246:14 248:18,22,
24 249:10 250:3,
17,23 251:4,11,14,
25 252:8,23 253:6,
13 254:12 257:5,
14,19 258:17,19
259:5,17,25
260:23 261:1,4,6,8
265:21 266:17
268:5,13 270:25
271:4,25 272:6,7,
20,23 273:15,21
274:8,15,19 275:9,
12,19 276:6,16
277:1,3,5,8,15,25
278:24 279:13,19,
21,22 280:9,11
281:8,9,22 282:5,
19 284:7 285:15,
20 290:3,10,20,22
291:12,19,23
292:18 293:5,14,
16 294:9,12,17
295:18 297:7,13
299:5 300:3,7,15
301:2 302:15,18,
22 303:2, 304:3
305:22 306:16,20,
23,25 307:2,9,16
308:1,3,5 309:14
310:1,10 312:11,
13 313:2,8,9,22,24
**Group's** 50:7
175:23

**groups** 95:24,25
96:8 140:7 202:24
306:17

**growing** 161:19
183:11

**growth** 255:6,9,10
**guarantee** 281:2
**guaranteed**
280:23 281:1
**guess** 41:11
**guests** 232:24

253:25 254:4
**guideline** 243:6,13
**guidelines** 68:13
82:11 243:8
**guy** 298:13

---

### H

**half** 64:18 79:24
103:12 104:15
261:14
**hand** 22:2 234:8,
19 235:18
**handed** 118:15
129:25
**handful** 176:2
**handle** 92:25
**handwriting**
185:24,25
**happen** 293:14,16
**happened** 251:17
301:7,9,15
**happening** 282:3
**Happiness** 25:9
26:12,22 27:6,24
28:3 99:18 195:1
263:22 264:1
**happy** 11:2
**hard** 38:2,4, 39:7,
9,12,16,23,24,25
40:6,7,15 41:6
42:20,22 60:7
107:9 108:1,4
113:23 115:16
154:4
**head** 9:19 27:5
98:9 175:19
215:11 306:8
**headquarters** 50:7
170:20 272:7
281:24
**hear** 74:3
**heard** 74:7
315:19,23
**hearing** 254:24
**held** 259:8,10
**helped** 239:6
**helps** 160:5

**Herbert** 146:17
**hereinafter** 64:4
**hereto** 6:18
**hesitated** 84:17
**hierarchies**
142:12 143:20
144:8
**hierarchy** 73:25
74:4 132:6,10,19
133:8 134:9,19
137:15 163:20
165:5 193:7,25
196:4,19 198:10
199:11,20 233:17
234:25 235:20
237:15 253:19
271:18 272:1
282:21 302:20
306:11,12
**high** 282:20
**higher** 132:11,18
163:20 165:5
193:7 233:3 253:9
271:25 272:2
282:11 302:20
306:10,12
**highest** 128:22
**Hilfiger** 267:6,8,
14,19,25 268:8,12,
16 292:12
**hire** 258:2
**hired** 196:19
**hiring** 255:19,21
**history** 35:1
**hold** 83:22 160:9,
12,13 232:5
**Holiday** 260:3,5,7,
20,24 265:17,23
266:7
**Hollister** 255:12
**home** 43:19,21,25
85:24 86:5,9
154:1 160:14,15
167:8 172:19
249:9 285:16,18
296:5
**honest** 16:20
44:19 110:4
118:11 119:2
213:5 224:17

225:7 244:12
266:8 294:10,19
295:10 298:12
**hope** 233:13
**hopes** 81:12
237:13
**hoping** 162:20,21
163:1
**hour** 103:12,25
104:14,15 254:7
**hourly** 77:9,13,21,
25 78:6,9,12,15,22
79:4 80:19 81:8
89:9 136:23 257:6
260:17,18,19
281:13
**hours** 17:11
103:12 104:15
147:1,6 170:18,24
181:23 246:18,20,
22 247:3,4,7,8,11,
12,17,18,23 248:8,
22 249:11,15,20,
22 250:2,9,10,11,
16,20,23 251:3
252:1 267:18,22,
289:25 290:5,10,
15,21 291:4,8,11,
18,20 292:1,2,3,9,
10,11,13,19,21
293:2,12,18 294:8,
13,18,23 295:3,5,
9,13,17,23 296:6,
19 298:4,5,8,19,
21,24 299:2,15
303:10 304:2,7,9,
14 308:6 313:18,
20 314:3
**house** 195:2
**houses** 293:4
**HP** 41:22 42:2,5,
11,15 96:11
**huge** 108:24
**hundreds** 303:10
**husband** 53:19
**hypothetically**
161:21

Cohen vs. World Financial Group          Jordan Destin                          10/08/2013

**I**

**ID** 262:13 286:3
**idea** 164:23
  192:21 208:9
  225:20,21,22,24
  227:3 235:10
  240:19 273:14
  276:11 277:6
  282:25 305:16,18
**ideas** 144:8
**identical** 217:7,16
**identification** 90:8
**identified** 40:21
  44:11 71:2 129:14
  147:17 191:14,15,
  22 204:8 214:25
  265:13,19 266:18
**identifies** 201:24
  211:11 226:23
**identify** 7:14 66:8
  125:2 126:4,11
  127:2 129:7 148:3
  149:14 189:9
  190:11 242:25
  246:4 265:6 266:2
  267:4 295:3,16
  296:9,18 299:11
  313:19 314:1
**identifying** 188:2
**II** 219:8
**III** 81:25
**imagine** 11:9
  162:24
**immediately**
  134:24 281:17
**importance** 20:4
  71:17
**important** 9:12,16
  70:13 85:2 138:9,
  13 159:12,13,14
  173:3 282:15,16
**imposed** 130:13
  253:17
**imposing** 253:21
**impossible** 148:9,
  10
**improper** 218:24

**improve** 158:24
  159:1
**inaccurate** 289:9,
  19
**include** 127:5,8,
  13,17,22,25 195:9
**included** 121:15
  122:14 150:2
  191:3 235:11
  265:17 292:23
**includes** 18:9
**including** 64:9
  156:25 172:10
  188:7 202:24
  218:23 232:18
  293:2 296:14,17
**income** 82:2,4
**incomplete** 234:14
**incorporated**
  264:10
**incur** 175:5
**incurred** 161:18,
  24 173:15 174:22
**Indeed.com**
  165:15,17 233:10
**independent**
  52:21 64:4,6,
  66:23 67:5,16,18
  68:14,16,20 69:3,
  5,12, 163:15 164:1
  195:13 197:6
  198:3 264:23
  265:9 285:14
**individual** 13:18
  57:2 61:4 73:6
  135:2 144:23
  168:8 195:12
  216:23 230:15
  310:9
**individuals** 38:23
  53:15 66:9 70:19
  71:11 86:24 87:22
  89:7 94:4 103:14
  128:16,24 130:5
  131:15 132:16
  133:10 134:1
  141:24 143:21
  144:7 146:16
  147:4,16 152:10
  193:20 198:12

202:20 210:5,13
  216:8 255:19
  299:2,12 305:4
  306:10,11
**inferred** 169:2
**information**
  10:15,25 34:5,12
  40:8,18 42:19,23
  43:13 47:15 48:24
  49:8 51:13 54:22,
  23 55:1 56:21
  57:8 62:25 65:9,
  12,15 69:1 84:24
  90:23 91:4,6,7,11,
  96:20 97:8 112:7
  113:8,18 114:3
  125:10 132:21
  133:2,12 135:11,
  12 137:6 146:19
  151:22 152:8,13
  163:19 166:25
  168:16,20,25
  169:6 188:24
  193:21 202:14
  257:6 269:13,15,
  19 270:1 302:14
**informations** 38:5
**informed** 170:9
  242:13,15
**informing** 181:8
**infrequent** 251:17
**inhibit** 11:17
**initial** 186:15
  292:9 293:21
**initially** 146:3
**initiate** 115:16
**inquiry** 195:10
**inside** 199:1 208:5
**instruct** 182:16
  216:1,2 228:17
**instructed** 66:9
  73:8 164:25
  221:19
**instructing** 65:12
**instruction** 52:2,6,
  25 170:13 178:25
  199:23
**instructions** 66:10
  135:8 170:23

**insurance** 59:3
  64:10 80:9 87:24
  138:5,6,9,11
  139:24,25 140:1,
  12,19 142:13
  173:1 271:14
  276:11,21 278:3
  283:2,12
**interact** 53:18
**interaction** 51:9
  73:14
**interest** 162:23
  234:18
**interested** 58:16
  90:2 185:6 192:18
  235:17 309:19
**interesting** 270:13
**international**
  260:4,5,7,21,25
  265:17,23 270:7
**Internet** 154:2,7,
  18 157:24
**interpose** 20:16
**interposed** 124:13
**interpreted** 44:1
**interrogatories**
  115:25 118:18
  119:7,18 121:8
  123:16 124:12,18
  146:23 188:17,22
**interrogatory**
  124:23 125:2
  129:7 148:2
  149:11,12 153:23
  202:19 265:4,5,20
  266:11 269:23
**interrupt** 9:22
  96:24
**interview** 256:20
**introduce** 299:8
**inure** 87:12
**invest** 262:23
  278:12
**investigate** 175:1
**investing** 164:1
**investment**
  261:16,18,20
  262:17 263:5,8,9,
  11

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

**invite** 159:14,17
254:1,3
**invited** 272:12
**involve** 137:1
**involved** 100:17
101:2 125:4 126:6
128:2 162:18
168:23 233:2
255:8
**issue** 125:4 126:6
241:25 242:7
**issued** 218:21,23
221:3 222:23

**J**

**January** 108:21,
24 244:11 250:18
**Jennifer** 35:16
38:22 39:5 59:24,
25 60:24 61:13
73:3,19 77:7
110:14,18,21
126:1 129:3 131:8
139:1 146:22
172:2 303:17,19
305:5,6
**Jennifer's** 110:19
**job** 48:1,11 76:24
77:23 87:17 111:9
128:21 197:9
208:4 242:3
249:16 253:10,14
254:20 256:13
259:8,10 301:11
305:25
**jobs** 111:3,12
165:15
**Jobs.com** 165:16,
17 233:10
**Jobs.com.** 169:10
**Johns** 50:9 133:4,
13 135:7 169:23
193:16 272:7
**join** 19:16 58:9,15
60:5,7 62:5 74:9
86:25 87:4,11
89:5,8 90:3
115:10,14 134:17
137:23 164:2

185:20 192:19
200:7 209:14
225:2 234:23
256:2,11 287:18
308:15,16,22,23
309:6,7,10,18
310:2,10,12,14
**joined** 34:19 43:11
79:21 80:1 90:5,
13 106:7 223:13,
20 233:15 234:24
235:19,24 237:1
244:12 270:9
284:6 285:15,19
**joining** 64:21,23
115:21 134:24
192:18 201:12
209:21 210:2,12
216:6 224:8
226:14,19 258:3
268:13 273:15
279:21 281:7
309:20
**Jordan** 7:10 8:13,
25 18:3 20:1
22:17 23:10 34:21
100:7,18 121:7
182:10 203:22
226:8,16 230:14
286:17 310:24
311:12 316:7
**Jordan.destin@
aol.com.** 36:2
**Jordan.destin@
yahoo.com.** 13:16
30:11
**Jordandestin@
gmail.com** 30:13
**Jordandestin@
gmail.com.** 31:24
**Jordandestin@
yahoo.com** 33:17
34:14
**journal** 98:10
**judge** 218:20
223:19
**judge's** 224:13
**Julie** 6:10 8:8
**July** 27:15 36:18
37:25 40:4 43:12

90:6,12,13,15
91:2,12,13 109:18
111:15 186:10
240:17,24 241:1,
18 244:22 250:1
**jump** 199:2
**June** 12:23,24
13:1,4,6 15:22
24:16 42:10 76:19
80:15 84:2 92:14
175:18 185:9
188:1,6 194:20
213:22 215:5
216:24 217:17
218:4,23 219:11
220:8 241:3,5,7,11
248:18 249:1
250:4,17,19
251:18,20 259:23
265:9 269:2,3
291:7,14 313:25

**K**

**Kamran** 146:17
**key** 35:9,20 40:17,
20,21 41:1 245:13,
14
**keyword** 35:1,3
**keywords** 35:3
**kicked** 166:17
**kind** 44:17 85:15
96:12 97:19 98:16
132:2 140:10
155:9 205:20
209:6 252:20
271:2 278:5 279:6
299:8
**Klein** 7:23 8:2,3,4
104:3 114:18
**knew** 70:24
110:17 132:2
162:21 175:14
212:19 214:8,9
**knowledge** 10:13
65:17 125:4,10
126:5,12 128:7
142:5 143:7
144:23 145:2,6,9
146:11 152:16
166:19 281:23

294:16 300:17,20,
25 301:1,7,8,14,15
303:12,14,22
304:1,6,13,25
309:17,25 310:8
311:21,22,23
**knowledgeable**
144:2

**L**

**L-a-u-r-a** 35:15
**L-o-n-g-a-y** 239:9
**label** 238:19,23
284:19
**labeled** 191:15
**Labor** 24:6
**lack** 254:20
**lady** 50:22 51:2,7,
25 53:8 110:22,23
**laid** 217:4
**land** 44:1,7
**language** 64:2
202:17 239:21
284:3 291:1
**laptop** 37:12,13,
14,17,18,21,24
38:1,6,10 41:11,
23,24 42:2,5,11,
15,24 96:11,17,19
153:15,17,21
154:18 161:5
**largely** 86:12
**larger** 110:22
**Las** 25:7,9 26:14
27:2 28:8,9 29:19
30:3 53:16,17
54:5,6 85:23
129:25 131:20
140:4 141:8,11
142:7 146:25
166:7,9,12 194:4,6
196:3,7 202:23
207:15 208:12
210:14 230:16
247:10 259:21,22
262:17 267:10
271:20 273:18,22
282:5 297:11,25
298:2,15 303:20,

Case 1:13-cv-01092-CAP   Document 126   Filed 12/05/13   Page 339 of 356

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

23 304:4,8,19,23
305:2,5,13 306:10

**lasted** 17:20 182:5
270:19

**lastly** 23:8

**late** 15:22 31:3,4
74:23 80:18 90:15
91:13 122:2
222:5,19 224:18
248:6 315:9

**Lauderdale**
273:25

**launch** 94:25

**laundered** 157:9

**Laura** 35:15 39:2
53:19 54:2 109:23
110:2,5,10,11
127:22 129:21
130:1,4,15 131:1,2
132:3,7, 133:11
171:2 272:16

**law** 6:4 7:24 12:5,
6,8,22 13:19,20
16:5,14 17:2 18:6
21:15 23:21
114:16,22

**lawsuit** 8:22 13:24
16:19 17:16,17,23
19:17,24 24:1,2
32:11 34:20 36:19
43:11 90:6 97:13
105:9,22 106:3
125:5 126:3,10,12
145:3,5 146:3
178:17 179:16
180:19 181:8
182:6,9,14 183:7
184:23 185:7
186:14,25 189:19
200:13,20 201:12,
14 202:10,12
203:1 209:14,21
210:3,6,10,12
211:4,6,16 212:4,
17,22 213:9,15,17,
18 214:3,5,10,12
216:7,9 218:8,11,
15,17,20,22
219:14 226:19,22
227:1,4,8,13,16,
21,24 228:2,6

229:1 230:8
287:18 309:15,18,
20 310:2,11,13,15
315:21

**lawyers** 14:11,12
98:3 101:12,18,22
104:19 114:13
145:22 148:6
179:9,10 210:1
213:3 226:18
315:13

**layout** 217:12

**lead** 58:6 145:12
218:16 221:7,13,
24 222:23 223:6
224:23 225:2
226:13 241:22
242:6 244:8,
315:10,21

**leading** 255:13

**learn** 13:7 21:10
58:20 79:15,17,20,
23 258:16 281:15

**learned** 48:21
79:18 80:6,18
81:10 100:16
115:1 121:22
162:3 163:23
180:19 222:7
281:20

**learning** 258:1

**lease** 155:18 156:3

**leave** 227:8,12,16,
20,24 228:2,6
279:23

**leaving** 281:8
304:12

**Leeds** 7:24 102:18
103:8 104:9,10,13,
16 114:22 117:11,
14 122:18 209:22
287:19,21,25
288:9

**left** 9:15 194:18
250:17

**legal** 6:13 7:12
20:17 50:18
179:20,23 243:1,3,
10,11

**legible** 186:5

**legit** 16:3,23 17:1
158:14

**length** 176:23

**letter** 66:15 82:1
189:20

**letters** 189:14
192:9

**level** 91:19 135:6
151:23 152:2,9
170:15 193:16
194:4 199:2 308:3

**license** 58:8,10
81:6 236:7,19
237:4,6 283:2,12

**licensed** 58:4,12,
24 59:3,6,14 76:4,
7 79:10 80:8,24
81:4,8,13,15 87:23
135:19,20 136:9,
10 137:8,12
138:16 161:3,7,15,
22 204:18 235:3,4,
21,25 236:11
280:5,10,13,15,23
302:11 305:17,19
307:23

**licensing** 237:9
281:3

**life** 63:16 138:9,11
139:24,25 140:1,
12,18 142:13
173:1 278:3

**Lifelock** 138:24
278:4

**limited** 188:7

**lines** 64:18

**Linkedin** 93:7,10,
11,15

**LISA** 6:4

**list** 48:3,11 49:1,9,
14,18 55:20 59:23
77:24 133:21,22
134:1,6,8, 164:13,
19 165:11,12,15,
17 177:20 233:10
259:4 270:6

**listed** 146:16
150:25 178:10
240:18

**listing** 259:5

**lists** 188:8 193:21,
24 194:9,11

**litigation** 8:6
45:21 269:11
308:15,22 309:6

**Littler** 6:5 7:16,19

**live** 28:16,22
264:1,3,5

**lived** 25:11 26:22,
23 27:3,12 28:10,
15,24,25 29:3

**LLC** 206:23

**Lloyd** 17:8 21:15
103:20 216:22
217:18

**Lloyd's** 209:23

**local** 95:23 158:14
219:18

**locate** 36:20 94:3
112:10 115:13,20
273:21 274:11

**located** 50:7,9
53:16 97:12
130:19 160:7
177:23 193:16
259:6 273:3
274:22 304:8

**location** 156:19,20
159:22 168:21
170:4 282:21

**log** 34:4 36:22
51:13

**logged** 51:10

**long** 10:4 17:12
24:19,20 25:11
26:15 28:6,16,22
29:9 32:25 42:2
51:21 76:13 83:4
93:9,20 94:21
99:22 103:11,24
199:15 207:19,
214:20 243:25
265:24 298:19

**Longay** 239:9,12

**longer** 30:15,16,17
34:7 36:17,23
76:15 90:23 92:7,
10 145:16 198:17
265:22

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

**looked** 17:2 69:1 105:14,16 106:24 107:8 184:4 215:15 231:7 257:14

**lose** 253:10

**losing** 253:12,14

**loss** 161:8,11 162:4,5,6,9 203:5 204:14,19

**lost** 125:17

**lot** 86:14,15, 99:16 118:11 123:9 175:24 249:14 257:24 289:17 292:14 295:13,15

**loud** 9:13

**Lu** 132:12,13,19, 22 133:3,11

**Lucas** 69:9 74:14, 18,22 75:4 76:10, 13 92:8,11,17 95:18,20 135:3,9 136:3,4,12 262:1, 2,7,9,15,20 263:1, 9 264:5,10,16, 266:18 273:1,2,6, 11,13 274:2 313:6

**lunch** 11:9 100:11

---

**M**

**M-u-s-s-a** 61:19

**machine** 168:3

**Mackoff** 6:10 8:8

**Macy's** 62:13

**made** 13:2 48:4 67:7 115:8,13,19 154:24 156:10 157:15 161:8,23 182:24 195:10 198:5 215:20 222:4 282:13 288:22 289:12 295:20 296:22 307:18

**mail** 33:3 184:25

**main** 85:19 88:8 89:5

**maintain** 91:23 93:3 98:16 108:3 245:16

**maintained** 92:19 98:6,10,12,24 107:25

**maintaining** 246:18

**maintains** 53:9 65:25

**maintenance** 50:23 51:3,8,25

**major** 71:18 270:6

**majority** 292:17

**make** 10:8 16:2,9, 23 17:1,3 18:1 45:4 59:22 68:2,6 79:7 85:12 87:18 112:15 120:6 158:21 160:1 162:19,20,21 163:1 165:21 172:19 195:22 198:2 199:4 210:8 233:23 254:10,19 280:4,18,20 307:23

**making** 86:13 139:5 156:7 162:15,22 168:7 172:9, 233:10 234:2 235:10 301:11 315:12

**male** 129:13

**man** 63:13

**manage** 76:24 196:19 243:18 249:12,15 255:6 262:18

**management** 47:9 56:6 244:7 258:24 262:16 270:7

**manager** 206:14 244:13,14 246:25 248:16 255:8 291:16

**managers** 125:9

**managing** 244:16 250:14 255:8,10

**mandatory** 147:13 231:25 232:4,8,11, 13 250:24 251:21 252:4,8 307:3

**manner** 82:9 173:10 304:18

**manual** 306:17

**manually** 85:5

**manuals** 142:25

**mark** 22:3 181:11 217:20 238:7

**marked** 7:6 22:5, 16,24 23:9 45:10, 13 54:10,13,15,17 117:18 119:15 149:7 175:21 181:12,15 185:12, 15 187:9,14,24 200:6 203:25 204:3 210:17,20 216:15,18 217:21, 24 219:3, 229:6,9 238:17 284:9,12, 18 286:7,10

**market** 26:5,9 276:8

**marketer** 149:16, 17,25 150:12 151:1 231:9,16

**marketing** 48:1,13 53:23,25 54:1 58:16 60:21,22,23 71:3 85:18 86:2 131:3 270:7 276:11

**markets** 255:7,9

**married** 108:17, 20,21

**massive** 194:24

**math** 24:25 251:3

**matter** 7:10 94:12 182:17 235:19 269:18

**maximize** 249:10

**maximum** 249:7

**meaning** 69:3 135:13 213:14

**means** 95:2 253:25

**meant** 200:13

**media** 92:21

**medications** 11:16

**meet** 101:6,11,15, 20 103:11,19 104:1 155:6 156:20 157:2 159:9 192:15 272:16 273:5

**meeting** 90:2 103:14 130:21,23 161:6 162:7 169:16 170:15 192:20,24 232:5,8, 9, 233:15 251:21 252:5,8,14,19 253:7,25 254:1,11 257:25 273:23, 277:24 278:1 292:23,24 298:16 302:4,8

**meetings** 70:16 73:12 86:13,14 130:6 147:13, 169:17,19,25 170:10,25 172:15 231:25 232:3,10, 12,14,18 233:14 249:3,4 250:6,25 251:10,14 253:1, 22 258:16 307:3 308:7

**Melbourne** 29:3,4, 18 259:6,14 270:5, 10

**member** 55:16 57:4 58:11,20,23 59:2 62:1 64:3 66:20 67:13,22 75:17 77:6 79:4, 22 82:17 95:13, 138:23 151:10 237:25

**members** 87:7 131:12 148:17 161:16 193:11 279:22

**membership** 45:6, 14 46:16 55:6,9, 12,15,25 56:6,22 57:9 62:1 76:11

Cohen vs. World Financial Group          Jordan Destin                          10/08/2013

80:7 128:15
258:25 296:23
299:21 312:17
313:10 315:4
**Mendelson** 6:5
7:17,20
**mention** 45:15
265:22,24 266:7
294:22
**mentioned** 18:1
39:2 49:3,5,6
59:24 69:25 70:17
71:8 96:13 108:17
118:19 137:14
144:22 152:17
153:23 156:18
169:17 172:5
190:22 233:19
255:4 257:22
263:4,5 296:12
315:3
**mentioning**
298:18
**message** 33:11
34:8 112:20
**messages** 90:7
**met** 101:17,21,22,
25 102:5,10,13
103:7,16 104:3,5,
7,12,14,19 114:14
132:15 146:6
164:5 192:22
273:8,9
**Miami** 272:25
273:24 297:21
**Michael** 144:24
146:1,2 210:9
226:14 315:10
**mid** 37:25
**middle** 13:4 41:11
63:13 108:22
195:6
**midnight** 248:15
**mind** 148:24
315:20
**mine** 43:6 105:18
239:7 287:5
**minimum** 256:25
**minute** 39:8
115:3,4 155:19

183:2 213:12
229:23 238:9
**minutes** 17:14,20
51:22 118:7,19
165:22 182:5
183:10 203:14
214:2
**mischaracterizes**
290:25
**misleading** 218:25
220:8,9,22 223:13,
14,15,20 224:18,
19
**missed** 224:15
**missing** 252:7,14
253:1 302:7
**mistake** 108:25
**mistaken** 273:25
**misunderstood**
18:4 65:22
**mobile** 302:24
**modify** 240:24
**moment** 18:3
68:19 187:5
228:21
**money** 79:6
162:15,19,20,21,
22 163:1 164:7
282:13 305:14
307:24
**Monster.com**
165:19
**month** 74:25
79:24 88:18
116:17,21,22,23
117:15 118:5,9,22
166:20,23 168:7
175:10 215:8,9
**monthly** 81:21
152:23 153:3
**months** 27:3,5
28:17 29:10,13,17
41:18 42:3 79:25
80:15 84:11
116:18 122:22
123:12 175:10
178:5 207:20
240:21 242:9
244:2,3 259:13
270:20 292:10

293:15,24
**months'** 250:19
**morning** 8:18,19
101:16,17,20,25
102:5,11,13 103:7
104:14 106:19
114:14 184:20
248:6,16 296:6
**mosque** 96:3
**motion** 183:16,17,
20 201:18 219:9
**move** 28:18,25
29:13,20, 88:22
171:6
**moved** 24:23
28:19 29:2,18
30:3 99:9,10,
108:15 194:23,25
259:14
**moving** 29:24
**multiple** 51:19
**multiply** 171:15
**music** 39:11 42:17
**Mussa** 61:20
**Myspace** 93:3

---

### N

**N-g-a** 57:1
**N.E.** 6:6
**named** 56:24
110:1,5 129:8
133:24 142:23
201:14,17,24
202:9,11 210:9
211:11 213:10
218:7 225:13,19
226:15
**names** 9:4 35:10,
13,14 110:17
115:15 131:13
147:8,9 298:11
299:14
**nametag** 133:24
180:13,14
**Nancy** 9:3
**national** 245:13
272:10

**nationwide** 300:7,
16,18,21 301:2,5,
7,9,16
**nature** 92:19
140:10 169:12
195:18 199:13
257:21 271:13
**necessarily** 97:11
130:16 167:23
**needed** 30:1 58:3
76:4 128:22
**negative** 162:10,
11,25
**negatively** 98:9
**network** 92:2
**Nevada** 25:7,10
29:19 230:16
262:17 267:9,10
272:18,23 281:24
282:6
**news** 236:25
**Nga** 56:25
**Nguyen** 142:23
143:1,11 176:17
177:3 190:24
**nice** 110:22,23
**night** 101:22
103:17,19,22
104:8,14
**nightclub** 207:18
208:5,7,9
**nine-month**
292:17
**nod** 9:18
**nods** 175:19
215:11 306:8
**noon** 95:1
**North** 26:13 27:9
263:20
**note** 45:17 103:1
205:11
**noted** 6:10,12
103:3 130:5
**notes** 299:17
**notice** 22:17 23:3,
10 181:24 182:2
200:7 308:15,23
309:6

**noticing** 23:4
**notified** 21:5,21
   228:13 229:4
**November** 27:18
**number** 22:6,25
   23:9 43:19,21,25
   45:1 46:2,11 54:9,
   11 83:8,10,11,12,
   15,19,24 84:10
   87:19 124:12,18,
   20,23 148:2,4
   149:11,13 158:15
   166:11 167:12
   170:17 171:12
   175:21 177:17
   180:6 181:15
   186:4 187:9 189:8
   191:11 195:5
   220:13 238:17
   262:13 269:25
   284:12 286:3
   294:13 304:1
   308:6 311:16
   313:18 315:7
**numbered** 123:1
   230:11,12
**numbering** 45:18
**numbers** 15:15
   46:7 187:4 189:14
**numeral** 81:25
   219:8

### O

**oath** 11:24 19:13
   23:20 120:3 124:8
   178:2 190:9
   222:14,18
**object** 12:15 288:1
   312:22
**objection** 16:9
   19:25 20:16 50:18
   64:24 67:4,10,15,
   24 68:5 71:25
   72:4 73:10 82:18
   87:8 121:19 122:4
   125:16,23 126:20,
   25 127:7,15,19,23
   128:1,18 129:1,5
   132:24 133:5
   142:8 145:18

179:2,17,22 180:2
182:7,15 189:1,4
203:2,9 211:20
212:6 213:1
215:16,22 220:1,
23 221:9,15
222:12 223:1,8,22
224:10 225:5,9
226:6 228:3,9,14,
23 282:22 288:24
289:13 290:25
296:3 303:6
306:14 308:10,24
313:3,14 314:4
315:16
**objections** 10:1,5
   121:17 122:2
   188:12,23 222:5,
   20 224:16,21
   225:4 315:9
**obligation** 179:15,
   21,23
**obligations** 178:25
   179:7
**obtain** 41:13,15,17
   135:20 136:8
   157:22 163:9
   265:8 281:3
**obtained** 236:7
**obtaining** 158:19
**occasion** 140:2
   159:16 292:5
**occasions** 33:19
   160:3 180:6 251:8
**occupied** 274:14
**occur** 207:11
**OCGA** 6:15
**October** 7:12
   22:19 23:5,14
   45:6 46:13 47:4,
   18,21 123:4
   257:15 258:14
   259:1 267:11
   268:9,13 291:24
   293:23 294:5
**off-the-record**
   95:7
**offended** 103:5
**offer** 144:13 277:4

**offered** 23:20
   64:11
**office** 70:14,15,22
   71:14,18 73:9
   85:23 86:9,12
   104:2 129:18
   130:17,18,23
   131:5,7 132:1
   141:8,11 142:18
   146:25 159:24,25
   160:4,7,12 166:9,
   12,13,18,23 167:3,
   7,11,15 168:1,10
   169:1,2 170:20
   172:18 194:6
   196:2,4,6,8,19
   197:1 249:8 254:6
   257:25 271:19,20,
   21,22 273:21
   274:14,22 276:6
   278:3 279:23
   282:11 292:15
   294:17 295:13,15
   296:7,16 297:5,11
   298:2,15 304:19
**officer** 65:11 66:9
   73:7 132:22
**officers** 50:11,15
**offices** 79:19
   133:20 147:11
   165:8 297:20,22,
   24 298:7,17 315:3
**officially** 128:8,11
   244:15 268:13
**on-line** 47:25
   169:15
**one-on-one** 86:15,
   16,18,19,20 162:8
**online** 36:16
**onset** 45:4 208:19
**open** 167:7 256:16
**operative** 211:2
**opportunity**
   308:16,23 309:7
**opposed** 9:18
   13:19 140:12,13
   167:8
**opposing** 219:20
**opt** 19:16 186:20

**opt-in** 32:10 34:20
   40:5 43:12
   200:13,19 201:9,
   11 209:21
**opted** 36:19 210:6
   211:3,5,15 212:4,
   17,24 213:9,17,21
   214:3
**option** 165:11
**order** 25:19 54:14
   58:2 157:25
   218:21 222:10,23
   224:13 225:3
   315:12
**organization**
   276:20 279:12
**organizations**
   96:6
**organized** 187:6
**original** 33:3
   105:14,23 106:20
   211:1 214:23
   243:16 245:21,23
**originally** 22:18
   186:3 228:7
**Orlando** 28:15,16
   268:22,23
**Orleans** 24:18
**outfit** 157:24
**outlay** 161:4
**outright** 156:10
**overlap** 42:5
   268:14
**override** 235:7
   237:16
**overrides** 235:8
   307:24
**oversight** 301:20
   303:4
**overtime** 291:5
**owned** 156:6,8,9
   208:13 267:1
**owner** 266:19
**owners** 125:10
**owns** 69:16

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

**P**

**P.C.** 6:5

**p.m.** 232:19 248:12,13 316:9

**p.m.ish** 248:14

**pages** 176:23

**paid** 20:11 55:15, 19 76:23 77:4,9, 13,17 80:23 81:6,8 82:4,7,8 136:23 137:2 166:13 168:5,12 203:11 237:4 246:24 247:3 256:11,22 260:16 276:2 303:9 306:1

**pair** 176:5

**Palace** 208:11

**paper** 98:8,22,24 134:4 168:2

**paperwork** 45:7 62:22 116:16 208:22 215:3 224:18 258:10,18

**paragraph** 64:1, 13,15 66:14,20 220:6 230:13 231:4,5,7,21,22,24 232:6 289:22 291:3 296:21 299:19 301:10,18 303:8 304:16 308:12,13

**paragraphs** 230:11,12

**pardon** 54:3

**parent** 209:10

**part** 32:7 45:21 55:5 65:20 71:18 74:20 82:19 83:6 89:10 102:8 105:22 106:3 128:9 131:7,15,21 136:17,19,21,22 137:1 141:12 145:16 154:25 160:8 162:1 163:25 168:6

173:5 189:19 199:10 203:5 227:1 258:4 265:19 274:1,3 286:5 302:17 304:18 305:11

**part-time** 206:15 256:17 267:16,17

**part-timers** 256:25

**participant** 186:13

**participate** 17:17, 23 21:11 23:25 115:9 226:22 227:4

**participated** 24:4

**participating** 164:10 224:8

**parties** 219:20

**partner** 261:25

**parts** 56:12,21 141:25

**party** 19:17 24:1 63:22,23 179:1 208:15 211:6

**Passport** 39:25 41:6 42:19,22

**password** 50:23 51:12

**past** 248:15

**path** 144:17

**pattern** 132:5

**pay** 152:22 153:2, 5 154:10 155:1 158:7 160:21 166:20 177:14,16 275:5 300:4

**paying** 168:9,14, 17 169:1 253:5 254:20 255:2 296:25

**payment** 56:1

**payments** 156:7, 10

**Peachtree** 6:6

**pen** 168:3

**penalize** 252:17

**penalized** 252:15, 16,25

**penalizing** 252:20

**penalty** 288:20

**pendency** 11:11

**pending** 11:4

**pens** 168:2

**people** 56:18 57:19 59:17,21 60:8 66:5 79:8,18 87:19 88:2,4,8,14 89:3 90:1, 110:3 111:8 115:12 125:24,25 126:11, 17,18 127:3,8 131:3,11,16,21 135:22 136:5,9 140:6 147:4 158:16 159:13,15, 17 160:6 165:3,4, 5,6,7,8,14 166:9 167:12 170:1 171:3 172:1 194:2,4 197:19,20 199:3 200:18,20 202:15,24 203:10 208:5,6 213:16 225:8,10,17 232:24 233:2,5,13 234:3,15 237:14 253:9 254:3 255:15,16,18 256:1,6 257:4 271:8,19,20 278:4, 16 282:4,18,19 293:3 298:1,3,7, 16,17 299:7 302:12 303:14 305:8,9,23 306:21, 22,24 308:4 309:8, 9,19,24

**people's** 160:14 293:4

**percent** 159:24 288:14

**percentage** 236:6

**performance** 243:19 244:17

**performances** 245:14

**performed** 142:6 188:4 189:11 190:12 191:5 265:7

**period** 44:22 45:2 82:5,13 83:5 149:13,14 154:1 188:6 258:13,14 260:2,23 268:4 280:8,19,24 281:11 290:13 292:17,19 313:21, 23

**perjury** 288:20

**permit** 201:18

**perqs** 174:20

**person** 32:22 48:19 56:24 68:15,17 69:16,18, 21 81:1,3 94:13 101:18 103:1,17 110:2,5 125:3 128:22 129:9,12, 13,15 137:20 140:14 146:2 159:19 192:16 196:2,3,5,9 199:5, 6 200:17 272:24 282:9 302:23

**personal** 25:16 31:17,24 37:7,9 54:22,25 85:20 91:23 92:18 94:12 125:3 126:5,12 130:22 142:4 144:8 153:13 157:25 167:18,20 274:4 300:25 301:6,8,14 303:12, 14,22 304:6,13, 309:25 310:8 311:23

**personally** 104:21 169:11 263:10,11 278:12

**persons** 265:7

**perspective** 230:20

**pertain** 112:24

**pertains** 304:22

**philosophy** 200:1
**phone** 16:4 18:22
  43:19,21,25 44:9,
  12,17,18,21,24
  53:13 71:22
  82:21,25 83:2,4,8,
  10,12,14,15,18,24
  84:2,5,10,12,13,
  15,20,24,25 85:4,
  7,8,12,16,17,19,21
  86:5,8 89:14
  90:23 91:4,21
  97:16,17,18,19
  98:17 104:21
  111:23 152:18,24
  153:3 154:17
  158:15 161:5
  170:1 183:9,12
  186:4 269:24
**phoned** 17:5
**photos** 42:17
**phrase** 125:14,20,
  22 149:18
**physically** 273:5
**picture** 299:13
**pictures** 39:11
  42:17
**pile** 217:3
**pitch** 136:18
**place** 77:16 155:5,
  6 192:19 201:12
  213:15 223:21
  232:19
**places** 297:23
**plaintiff** 24:2
  32:11 34:20 40:5
  43:12 121:7 125:8
  145:12 148:9
  149:23 200:13,19
  201:9,14,17,25
  202:9,11 209:21
  210:9 211:11
  214:25 218:7,16
  221:8,13,24
  222:23 223:6
  224:23 225:2,14,
  19 226:13,15,24
  227:11 228:6
  230:14 234:18
  236:5 315:11,21

**plaintiffs** 7:23,25
  8:2,4 213:10
**plaintiffs'** 45:10
  219:12 224:14
**plan** 224:9 228:1
**planning** 138:6
**platform** 237:14
**play** 239:14
**pleading** 126:10
**pleasure** 311:6
**pocket** 296:25
**point** 10:24 11:6
  19:15 26:5 28:10
  48:21 58:23 59:2
  90:5 95:3 98:5
  99:6 108:12
  115:24 116:9
  135:5 147:23
  155:2 157:15
  173:13 175:6
  180:14 195:16
  216:6 221:23
  225:12 243:20
  262:6 267:7 272:5
  281:11,18 283:1
  284:14 294:13
**pointing** 302:3
**points** 239:22
  245:13,14
**policies** 271:14
**Poorly** 143:6
**portions** 25:15
**posed** 222:19
**position** 20:23,24
  48:1 77:23 78:3
  150:13,17 197:9
  206:16,17 230:19
  235:8 240:23
  242:17,18 244:1
  246:16,17 255:22
  256:16,17 267:16,
  17 282:12
**positions** 20:12,21
  150:14
**possess** 178:7
  191:23 192:5,6
**possession** 39:9
**possibility** 33:13
  209:20 210:2

**possibly** 58:23
**post** 48:20 164:19
**posted** 48:2 49:1,
  9,14,17 55:20
  164:12,15
**posting** 47:25
  48:4,11 77:24
  166:3 169:16
**postings** 169:10
**potential** 85:16,17
  90:2 130:10
  151:19 155:7
  156:20,21 157:2,
  19,20 158:22
  159:10 161:4
  228:15 234:3
**potentially** 235:5
  256:1 276:18
**Powerpoint**
  163:11,12,13,16,
  21,25
**Powerpoints**
  163:14 169:15
**practice** 10:4
  108:3
**precertification**
  219:19
**precisely** 304:7,14
**predecessor** 209:6
**premark** 22:12
**preparation**
  109:12
**prepare** 100:15
  101:6,12 102:7
  104:20,23 105:11
  106:12,17,24
  109:7
**preparing** 103:21
**present** 6:10,17
  7:14 26:22 44:6
  71:21 103:13
  104:8,10 170:24
  188:2,7 251:24
  253:22 254:15
  268:20
**presentation**
  71:15 137:25
  159:15,16,20
  160:1,4,10,13
  169:16 171:10,14

232:18,21,23,25
  233:1,2,6 250:7
  254:1,8,9 257:24
  278:1 292:24
**presentations**
  160:16 163:6
  171:7,18 172:10
  291:25
**presenting** 163:23
**presently** 264:13
**preserve** 32:6
  179:1,7,15 180:9
  245:16
**presiding** 218:20
**pressure** 138:1
  253:16,17,21
**pressured** 253:9
**pressurized** 253:8
**pretty** 96:24 230:9
  289:10
**previous** 202:14
  205:7 249:22
**previously** 105:9
**primarily** 38:15,
  16
**primary** 172:23
  173:7 301:11
**prime** 243:4
  274:20
**print** 46:24
**printers** 168:1,3
**prior** 26:23 28:1
  54:15 84:8 91:21
  101:17 107:3
  214:15 219:19
  245:16,20 251:2
  259:4 312:22
**Privacy** 269:18
**private** 92:3
  112:20
**privilege** 10:2
  12:17 221:9 226:7
  228:15 288:2,24
  289:13
**privileged** 179:2
  182:7,15 215:17,
  22
**problem** 25:22
  54:20 118:25

311:3

**procedure** 25:19
**proceeding** 18:13
21:4,10 23:18,23
**proceedings** 11:6
**process** 258:4,5,6
273:11
**produce** 14:3,8,19
195:8
**produced** 45:21
46:5 52:12 97:7
142:20 189:18,19
**producing** 188:24
**product** 35:6
57:18,19 65:18
69:17 75:11 79:7
80:23,25 87:3
136:18 138:8,24
149:16,24 150:12
151:1 163:22
199:4 231:8,15
235:16 252:19
258:1 271:7 275:2
277:8 278:10
279:16 280:5,9
288:2
**production** 118:2
**products** 58:3,7
59:3 63:7,15,16,17
64:9, 79:10,11
80:9 86:3,4 87:24
138:4 140:19
233:25 234:4,13
235:4,6,25 236:5
271:10,13 273:15
276:7 277:3
278:6,8,11,13,16
279:9,10,14
301:13
**professional**
243:22 245:14
**Professionally**
157:4
**professionals'**
243:19 244:17
**profile** 55:3 93:7
**profit** 161:18
163:4 164:7
**prohibit** 219:18

**promise** 78:5
**promote** 254:2
271:7
**promoted** 242:6,8,
9 244:1
**promoter** 207:18
**promoting** 207:15
208:9
**prompted** 29:20,
22 31:5 90:25
91:2
**proper** 197:11,12
231:19
**properties** 27:19,
21 208:12 262:17,
18,23 263:1,4,6,8,
9 264:6
**property** 26:2,4,
19 27:8,11 262:21,
22
**proposal** 227:10
**propose** 215:14
**proposed** 105:7,
16,23 106:21
211:10 214:15,
215:20 226:23
229:19 230:2
**propounded**
222:21
**prospecting** 293:4
**prospective** 155:6
191:10,25 192:4,9,
12
**protective** 25:19
**provide** 10:14
14:4,23 15:8 52:1,
6,24 59:12,13,15
65:14 66:10 112:7
113:13,22 135:8
150:3 160:16
178:12,14 187:25
188:21 189:8
202:13 205:25
206:2 243:1,3
281:25 312:7
**provided** 13:23
18:18 68:7 82:9
105:20,21 106:2,
112:3 116:10
117:2,3,9,10,13

118:3,20 119:18
133:20,23 134:2,5,
8 135:11,13
137:10,15,17,19
140:25 141:3,4,16
142:1 146:23
147:13 150:22
167:2 169:18
170:25 176:22
177:9 178:15,20
181:16 183:19
186:3 187:1,13,21
189:25 193:6,10,
11,13,14,21,24
194:1, 204:6,7,25
206:4 230:2
266:12 269:10,14,
22 270:2 271:9,12,
16,17 272:3
276:13 279:24
284:21 285:7
305:22 306:16
307:13
**provider** 44:14
83:19,25 152:18,
24
**providers** 83:16
**providing** 54:25
65:12 75:25
133:14 142:24
184:14 199:23
243:12
**published** 82:12
**pull** 42:23
**punch** 294:22
**purchase** 27:13,16
106:7,23 155:18
156:4 177:6
**purchased** 153:17
156:12 177:1,4
307:12
**purchasing**
273:14
**purpose** 36:20
51:8,14 85:22
87:14 136:7
301:12
**purposes** 62:22
206:1 258:24
261:22

**pursuant** 6:15
82:8
**pursuing** 211:19
**push** 197:24
**pushed** 60:7
**pushy** 60:5
**put** 21:16 48:10
93:12 121:4
135:18 143:7,10
158:9 163:12,16,
18, 164:21 238:24
239:17 249:20,21
250:3 252:24
266:9 294:8 304:2
313:17
**putative** 24:5
**putting** 138:1
248:21 251:2
291:17,20,25
292:2 298:19
**pyramid** 199:1
203:6 306:19,20

---

**Q**

**question** 9:16
10:1,12,13,16,18,
22 11:1,3,4,11,12
14:6,10,13,16 15:1
18:4 20:1,17
22:20,25 49:7
50:14 64:20 66:7
67:20 72:12 76:6
88:8 101:10
115:5,18 116:8
118:16 119:5
121:3,10,21
123:13 124:3
126:2,4 127:11
128:23 141:15
143:6 146:15
156:3 168:24
170:12,21 177:18
179:3,18 182:8,11
183:21 184:18
187:17 188:15,16
202:8 204:13
211:24 212:9,15
214:1 215:19,23
217:24 221:16,17,
21 222:15,17

Cohen vs. World Financial Group        Jordan Destin                    10/08/2013

223:18 225:6
226:8,10,11
235:14 245:6
283:13 288:3,4,25
289:1,14,15,18
292:20 297:8
300:13 307:6
308:2 310:3,4
312:22 314:21
**questions** 9:8
11:18,22 18:16
22:9 45:1 100:12,
19 102:11 113:7
115:25 116:4,6,11,
19,24 117:1,7,10
136:20 182:14,17
183:6 186:25
195:17 200:24
232:12 284:15
287:7 289:17
311:4 313:18
315:8
**quick** 96:24
**quickly** 46:7 113:5
158:1
**quit** 268:12
**quote** 64:2,11
66:20 67:13,14,21
82:1,13 125:8
149:14,15,16,17
188:1,3 305:1

**———— R ————**

**Rainbow** 27:9,16
263:20
**ran** 251:10
**range** 188:8
**rate** 77:25 78:6,9,
12,15,22 79:4
80:19 81:9 257:6
**reach** 112:18
114:2 157:19
302:6
**reaching** 302:5
**read** 16:2,22 19:19
56:7,9 64:17 68:1,
6 143:9 145:7
185:5 211:6,8,9,
13,18 215:21
217:14 220:12,14,

17 286:1,2 312:5
**reading** 82:19
**reads** 67:13,21
125:7 286:16
**ready** 296:15
**real** 69:6 96:9
254:13 255:6,8,10
261:19 262:16
**realistically** 250:3
**realize** 218:10
**reason** 11:20
29:24 54:13 144:6
268:11 302:5
**recall** 11:1 13:17
19:15 28:4,5 31:3,
12,17 33:23 36:4,
7,8,9,10 37:23
41:19 44:17,18,19
45:5,8,9 46:15,17,
18 47:10 48:4
49:19 52:20 54:25
55:3,14 56:20
57:12 62:9 63:3
72:18,21,22,23,24,
25 73:3 77:11
78:10 83:11 84:6,
21,22 89:17,19
97:7 99:8,11
110:19 112:22
115:15 118:4,9,22
119:9 122:19,22
127:4 131:13
142:24 148:10
159:5 175:8
186:22 193:12
202:20 209:15
221:10 240:12,14
247:22 248:8,14
257:16,18 275:16,
18 285:3,18
286:25 295:12,14
298:23 303:17
**recalled** 118:8
**receipt** 174:5
**receive** 15:14
33:4,7 34:2 77:21
78:8,12 80:10
81:20 89:9 137:7,
11 169:22 178:24
183:23,25 184:3,7,
24 185:2 204:18

205:16,17,20
235:8 236:5,12,23
237:6,15 242:19
271:2 276:10
281:13 291:5
**received** 13:12
14:7,17 15:7,21
16:1 18:24 19:3
32:8 33:24 34:8
52:11 89:19
106:11,15 118:11
137:6,20 138:14
170:1,13 176:2,7,
15,19 177:20
178:4,16 180:20
181:7,18 182:23
183:24 184:2,5,23
185:1 186:19
207:6,23 213:22
215:3 217:9,17
218:3,24 236:18
237:5 242:22
270:4 276:5,7
277:2,9 278:10
285:2 286:1,4
**receiving** 17:9
33:11 78:14,22
118:8 181:24
182:2 186:15
278:7 285:14
**recent** 205:8
**recently** 201:13
218:6 225:12
**Recess** 100:3
149:2 155:24
181:2 203:19
238:12 283:22
310:21
**recipients** 219:13
234:17
**reclarify** 101:21
**recognize** 117:23
181:19 185:16
210:21 238:25
286:12
**recollection** 28:2
47:13 54:17 55:10
109:8 123:7 244:5
247:25 282:2
285:14 290:8

**recommendation**
166:1
**recommendations**
140:25 141:2,4,17
142:2 144:14
307:13,18
**recommended**
143:20,23 165:24
**record** 7:8,15 8:24
64:17 95:4,6,10
100:1,6 103:3
113:16 149:1,4
155:22 156:1
180:25 181:4
203:17,21 220:15
238:8,11,14
283:21,24 294:23
299:16 310:20,23
316:8
**recoup** 204:17
**recover** 32:24
33:1,3,6,9,13 34:5,
12 90:22 91:3,10,
20 96:24 111:18,
20,24 112:1
**recoverable** 32:13
34:7 90:9 91:15
**recovering** 34:10
**recovery** 148:20
**recreated** 88:4
**recruit** 57:19 74:9,
18,22 79:8 86:24
87:4,11,22 88:2,21
94:3 115:14
133:22 135:18
136:3,4,18 138:16
140:20,21,25
141:4,19 151:20
157:3 158:15
162:14 164:2
173:16 200:2,3
234:15 235:17
253:23 255:15,16,
18 256:2 271:8
277:10 306:21
307:19
**recruited** 57:3
61:4,8,13,16 71:6
75:4 95:13
129:15,17 131:16,
22 135:3 150:15,

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

18 174:19 199:8,
10,18,19 233:14
234:22 256:6
257:4 258:5,7,15
272:24 274:25
302:12 303:19
313:6
**recruiter** 85:18
235:1,2 280:16
**recruiting** 74:20
82:5 87:18 88:13
89:7 134:17
136:13,14,19
138:10,11,22
139:14,16,22
140:13,23 141:12
142:13,14 173:5
174:18,21 234:4,7
237:11 238:3
255:22 256:12
258:4 277:13,17,
20,24 282:15
293:3
**recruitment**
274:2,4 278:21
**recruits** 85:17
86:21 90:3 130:10
136:22 137:2
155:7 156:21
157:20 158:22
159:10 163:9
164:5 165:25
169:13 192:12
303:17,18,20
**redirect** 311:9
**refer** 18:14 46:2,6,
7 59:21,22 74:4
105:7 120:24
124:17,18 128:22
189:11 300:6,17
305:23
**reference** 45:25
110:1 231:6
311:19
**references** 234:12
**referred** 66:4
73:18,19 85:7
106:22 152:11
202:19 211:9
229:17,19 270:23
284:24

**referring** 12:6,8
20:9,10 38:20
59:23 70:14 78:18
80:4 92:2 97:3
106:2 118:19
124:15 125:20
214:23,24 231:15
232:5,14,22
243:23,24 244:7
245:21 261:23
283:9 290:2
300:14 301:24
**refers** 231:8
**reflect** 46:12
191:8,23 195:9
**reformulate** 310:3
**refresh** 28:1 47:12
55:10 109:8 123:7
244:5
**refund** 242:7
**regard** 36:11 39:7
45:2 57:9 78:2
109:9 133:10
138:3,15 148:7,17
253:16 271:9,12
274:17 297:12
**regarded** 250:24
**Regina** 146:17
**registered** 283:16
**regular** 32:23
81:21 88:22
184:25
**regulated** 236:19
**regulations**
236:15
**regulatory** 75:24
**reimburse** 156:16,
24 157:12 160:25
**reimbursed** 153:7,
20 154:12,17,21,
23 155:2 168:12
174:23 177:6
275:8,18,24
**reimbursement**
167:2
**reinstate** 92:12
**reiterate** 192:23
**relate** 97:11 109:9
178:8,21 180:10

191:4 241:14
274:18
**related** 34:17
35:21 36:6,13,21
40:8,15 85:12
89:20 97:24
111:22 174:6
178:25 199:22
274:23,24 277:7
**relates** 187:19
**relating** 34:22
53:14 96:20
112:10 168:20
177:23 178:13,16
194:14 205:15
278:20
**relation** 134:12
**relationship** 42:8
66:22 130:14
194:15,16,21
195:13,18 199:14
206:20 207:25
208:1,19 241:4,8,
12 242:23 248:17,
21,23 249:2 250:5,
22 252:10 257:2,
10 264:20,22,24
265:9 266:6
276:19 290:9,22
313:1
**relationships**
266:3
**relative** 79:21
**relevant** 40:19
125:10
**religious** 95:25
**relocating** 297:23
**remain** 80:17
**remember** 13:1,3
28:7 32:21 37:16
50:25 61:18 63:2,
4 81:22 82:19
104:5 162:7
165:20 241:7
282:1,4,9 292:7
299:1 311:23
314:7,14,17,22
315:14,17
**remind** 192:17
313:22

**remove** 199:2
**rent** 26:1,19
166:13, 262:17,24
264:8 275:14
**rental** 275:19
**rented** 26:20
275:16
**renters** 262:18
**renting** 27:19
**repeat** 14:13
310:4
**rephrase** 83:22
201:21 297:8
**replacing** 226:13
**replied** 77:22
116:15
**reply** 242:3
**report** 173:14,24
174:8,11 219:20
**reporter** 6:17 8:11
9:14 18:15 22:3,
12
**reporting** 134:20
206:1 304:19
**represent** 7:15
20:6,13,14 45:13
89:8 114:14
118:1, 119:17
126:18,19 128:17
158:11 161:8
170:2 175:22
183:4 189:17
191:18 202:5,15
203:3 208:20
210:25 225:17
315:25
**representation**
16:17
**represented** 63:19
114:10 230:7
**representing** 7:17,
20 63:14 66:5
72:10 75:11
143:13 188:21
200:18,20 202:25
222:11,25 224:3
293:6 299:5
300:18,22
**represents** 8:21
218:22 219:25

**request** 118:2
119:6 187:25
188:9,11 189:8
191:7,13 195:5
201:23 202:3
288:22

**requested** 14:2
112:23

**requests** 15:15
117:2,12 118:8
120:24 121:8
175:23 176:1
177:17,18 187:10,
13 222:3,19 227:8

**required** 37:18
62:21 68:11 70:1,
4,19 71:11 77:15
106:7,23 120:10
130:5,8 147:17
157:4 165:23
167:6,10 169:19
180:3 231:24
233:23 234:18
248:11 250:7
251:9 254:5
276:25 296:22
299:20 305:19
311:21 312:8,13,
17

**requirements**
75:24 130:13
133:14

**requires** 211:21

**requiring** 71:21

**research** 75:23
115:16

**reserve** 9:25

**reserved** 316:10

**reset** 50:23 51:12

**reset all** 51:12

**reside** 24:20 25:6
26:11,15 28:14

**resided** 26:11,13
27:2 28:3

**resident** 230:15

**respect** 141:3
146:19 170:24
188:17 189:7
266:14 272:19

**respond** 9:17
48:18 113:3,5
243:4

**responded** 16:3
47:25 48:15,17
55:20 77:24

**responds** 10:15

**response** 33:4,7,9,
24 124:15 125:7,
17 126:9 149:22,
23 188:11,12
191:13 202:19
222:3,6 224:22
265:20 266:19

**responses** 119:18
121:1,7,15 153:24
175:22 187:10,12
188:21 222:3,19
224:15 315:8

**responsibilities**
53:1 142:7 172:23
201:17 202:11,13
242:25

**responsibility**
255:5

**responsive** 10:13
15:15

**responsiveness**
10:2

**rest** 220:10

**restate** 101:10

**restaurant** 160:10

**result** 151:9
235:12 279:21
281:8

**resulted** 236:4

**resume** 106:11,12
176:13 177:22
190:4,14 209:4
239:2,3,4,15,16,18
240:22,24,25
244:6,25 245:3,7,
8,11,12,15,23,24
259:5 261:12
269:10,13 299:9

**retail** 251:22

**retain** 159:9 245:2

**retained** 182:21
183:3

**return** 11:2 82:23
96:25 97:1,2,3,5,6,
187:7 191:2
204:6,9,11,12
205:1,9,11

**returned** 30:3

**returning** 15:20
276:4

**returns** 204:20
205:6

**reveal** 98:1

**review** 19:5
104:23 105:1
106:12,17 120:2
123:20,22 124:4
183:13 215:12,13
230:1 243:15
288:11,13

**reviewed** 19:9
66:16 230:4,
289:6,8,19

**Rich** 9:22 94:25
201:1 228:14

**Rich's** 200:24

**Richard** 7:16 8:21

**right-hand** 45:23

**rights** 212:14

**risk** 162:1 253:14

**road** 6:6 86:8
87:13 172:19

**Robert** 6:11

**role** 60:1,9,25
61:22 65:2 75:9,
12 179:8 201:9
203:7,8,10 206:12
221:7 225:1 233:4
239:14 241:21
244:14 255:7
267:14

**roles** 70:25 273:23

**roll** 244:8,10

**Roman** 81:25
219:8

**room** 22:11 102:9
168:4

**roughly** 84:1

**rule** 219:18 220:7

**rules** 9:10

**run** 69:18,21

**running** 247:9

**Russell** 146:17

_____

**S**
_____

**S-h-a-h-i** 239:11

**S3** 97:20

**salaried** 77:9,
281:13

**salary** 77:21,25
78:6,9,13,15,23
79:3 80:20 89:9
137:2 246:23,24
247:3

**sale** 82:3 280:4,12,
18,21

**sales** 63:9 64:4,23
65:18 68:12 74:19
75:11 80:10 87:18
88:21 89:10
135:21 136:17
138:7 139:22,23
162:7 172:19
173:3 233:24
234:13 242:4
255:14 260:10,
267:15 271:6
278:21 282:14
301:12

**Samsung** 97:20

**Sanders** 146:18

**Saturday** 107:12
232:19 251:22,23
254:5,12

**save** 38:1 42:16

**scanned** 40:18

**scanning** 294:23

**schedule** 305:20
306:5 307:4

**scheduled** 267:24

**schedules** 82:11
147:10

**scheme** 203:6

**school** 29:5,6,7
259:9,10,13
270:14,15 279:3

**SCHRETER** 6:4

**screwed** 119:1

**script** 243:10,12, 13,14,16

**scripts** 243:1,3,15

**search** 36:12 40:6, 14,20 41:3 107:2, 21 205:4,5

**searched** 43:13 96:19 187:20 205:3

**searches** 35:9,20

**section** 81:24 219:8

**sections** 312:7

**securities** 58:3,7, 24 63:6,10 80:9 87:24 138:21 142:14 172:25 236:16,19 271:14 276:11,21 279:7 283:16

**seek** 56:12 157:20

**seeking** 16:17 20:13 128:17 202:9 222:22 227:15,20,23 228:2,5,25

**selfish** 162:25

**sell** 39:14 57:18 58:2,7,24 59:3 63:6,15 79:7,10 80:9,25 86:3,23 136:18 138:16 140:18 172:25 173:7,15 199:4 235:16 236:15,19 262:22 271:6 273:14 275:2 276:8,20,24,25 277:10,12 278:16 280:14 283:12,16 307:19

**selling** 64:9 80:22 138:4,21 139:16 140:12 173:9 277:6 278:25 279:7 280:4,9

**send** 112:20 113:23 192:8,22 255:24 312:12

**senior** 60:21,22,23 71:3 234:19 280:16 299:6

**sense** 143:15 163:1 278:11 280:4,7

**sentence** 67:13,20, 21 68:2 232:7 234:17

**separate** 20:1 94:9 120:19

**separately** 104:15

**September** 21:17, 20 23:3,11 40:13 41:20 47:19,24 80:2 84:1 221:4,6 257:19 258:13,22 267:11 268:8 285:6 291:23 313:25

**series** 232:11

**served** 115:24 121:16 122:2 222:4,19 315:8

**service** 32:23 44:14 84:2 91:19 152:23 154:2,7,10, 13,18

**services** 32:24 58:7 64:10 86:3, 138:4,5,21

**set** 9:9 22:19 45:4 115:24 116:11 117:2 118:1,17 123:16 125:11 159:16 177:18 187:4,10,12,14,16 232:12

**sets** 23:13

**sever** 252:9

**Shahi** 239:11,12, 14

**shake** 9:19

**shakes** 98:9

**share** 201:5 260:8, 10 303:15

**shared** 163:19 167:12 276:7

**sharing** 133:15

**sheet** 294:23

**shift** 248:4,5,10, 13,16 251:8

**shifts** 248:2,9

**shirt** 157:6 314:9, 10,13,18,19,23,24

**shirts** 157:8

**shoe** 174:4

**short** 255:24 266:7 268:17 299:9

**short-term** 207:24 208:1

**show** 21:25 22:13, 23 23:8 45:17 46:5 54:16,18 68:11 70:1,4,19,21 71:11,13 73:8 137:25 158:13 175:20 181:10 187:6 204:2 219:5 238:6,7,16 253:7 265:2 282:6,12 284:11 286:9 299:13 305:19

**showed** 187:9,14

**showing** 22:5,15 45:12 117:17 119:14 120:20,23 122:6 185:14 187:8 210:19 216:17 217:23 229:8 253:5,24 284:17 302:9

**shown** 217:15 284:19 315:11,14, 17

**shows** 307:15

**sic** 12:8

**side** 58:16 120:13 138:21 187:5 254:25

**sidetracked** 21:7

**Sidney** 29:2,4,17 259:11,13

**sign** 45:7 76:10 120:7,8,10,12,14 121:11 123:20,23, 24 124:6 254:17 296:22 299:20

**sheet** 300:3,23 311:21 312:17 313:10

**sign-in** 294:22

**signature** 46:12, 24 47:2 123:3 186:1,2 200:11 286:16,17,19,20 287:4 316:10

**signed** 17:22 19:10,12,16,20,22 45:5 56:8 61:25 64:21 67:2 79:22 82:16 120:2 128:15 151:10 183:15,19 185:22 186:10 200:11 257:15,22 258:14 281:6 286:25 288:17 300:21 301:3 302:19 312:2 315:4

**significant** 172:18

**signing** 19:13 46:15 62:3 212:19,20 288:19

**Silver** 261:6,8,13, 15 262:3,10 265:13,21 266:14, 16,22

**similar** 279:6 304:18

**similarly** 125:8, 14,20 126:15 128:24 202:19

**simple** 22:20 253:4

**simply** 11:10 51:24 52:20 112:15 140:13,14 192:23 215:19 234:12 253:10 262:23 289:18

**simultaneous** 261:3

**single** 17:19 73:14 175:25 187:18

**sir** 11:19,23 12:1, 11,25 13:22 14:5 18:20 19:14,18 21:19 22:22 23:7,

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

16,22,24 24:3,10,
12,14 27:25 28:12
30:14,23 31:25
32:4,9,14 33:18
34:13,18,24 35:8,
23 36:7 37:1,8,15
38:3 39:6,20 40:3,
10,23 41:5,7,12,24
42:1,7,13,21,25
43:16,18,24 44:8,
10,16,25 45:9
46:1,17 47:3,11,22
48:12,14,16 49:11,
15,24 50:8,10,17
51:1,6,15,17 52:5,
8,14,18 53:6,13,17
54:24 55:2,4,7,18
57:7 58:14 60:23
61:3,6,9 62:12,14,
17,19,24 69:8,10
70:3,23 71:4 73:2
74:6,8,11,15 75:3,
16 76:2,9,20 77:5
78:1,4,24 81:16
82:14 83:3,11,13,
22 84:4,22 85:9,
14,25 86:6 88:1,3
91:22 92:4,6,9,20,
24 93:16,19,25
94:5,7 95:15,19
96:1,4,7,10,21
97:22 98:4,7,11,13
99:5,20 100:8
101:14 103:15,
104:18,22,25
105:10,15,25
106:4,25 107:6
108:5,13,19 109:5
110:12 112:5,8
114:4,6,9,12,15,23
115:2,7 117:8
118:6 121:13
122:3, 124:9
125:19 126:24
129:4 130:11
132:25 134:7,10,
18 135:4,10,15
136:6,25 137:5,16
143:24 144:1
147:5,7,18,21
149:4,21 150:1,4,
9,16,21 151:2,4,25
152:21 153:4,6,22

154:3,9,22 155:8
156:14 160:2
161:10,13 163:5,
17 164:11,14,17,
20,22 165:1,9
167:16 169:21
170:16 173:22
174:9,24 175:17
177:2,5,8,16,25
180:22 181:4,21
182:3 185:4
187:3,22 189:16
191:6 192:13
193:23 194:10,13,
17 203:24 204:10
205:22 207:2
208:24 210:4,7,11,
16,22,24 211:14
212:3 214:19
216:21 217:19
223:4 227:9 232:2
238:14 241:10
244:23 245:18
249:4 251:12
266:13 267:10
269:12 272:9
273:16 275:7,10,
13,20 276:1 283:3
284:4,16 285:1
286:14,24 288:10,
12,15,18,21 290:4
291:6 296:11
299:18,23 300:12
301:17, 304:21
308:17 310:25
312:9,14,19

**sit** 66:7 68:1 133:2
146:18 179:25
194:8 196:21
222:17 223:25
227:2,7 234:24
240:4 254:7
261:21 266:10
282:17 295:1,7,16
297:3 299:24
305:1 309:24
310:6 314:11

**sitting** 9:15 102:22

**situated** 125:8,14,
21 126:16 128:24
202:20

**situation** 18:14
202:16 206:3
309:12

**size** 110:23

**skipped** 266:9

**slightly** 217:4

**smart** 97:17,18

**social** 92:2,21
96:5,6

**sold** 41:11 80:24
87:23 235:4,6,25
262:21 279:13

**sole** 51:14 82:5

**solely** 162:18

**solicit** 234:13

**solicitation** 13:14
14:7,17 15:2,7,14,
21 16:1,22 17:10
18:24 178:16
181:7 184:20,22
186:15,19 213:22
216:25 217:8,15,
17 218:3, 219:24
223:12,19 287:17

**solicitations**
184:24 192:3
218:23 219:13

**soliciting** 233:24
301:12

**sort** 24:4 98:10,12
141:21 162:10
168:2 173:14
183:24

**sorts** 15:7

**sought** 56:21 57:8
66:17 201:13
265:8 269:9
276:20

**sound** 21:17

**sounds** 172:9
173:1 267:13
300:8

**source** 300:20,25

**South** 27:7,13
263:18

**space** 166:13,18
167:3,7,12 169:2
276:6

**span** 83:5

**speak** 9:12 17:7,12
49:20 50:21 90:19
99:14 115:17
134:21 210:1

**speaking** 10:5
173:10

**special** 295:11

**Specialist** 7:13

**specific** 36:20
71:17 127:11
135:7 214:11
241:7 277:3
295:11,12 296:20
298:23 299:1
314:22

**specifically** 13:18
41:3 56:20 57:12
171:2 226:5
298:21,25

**speculate** 309:23

**speculating** 300:1,
309:2

**speech** 74:19
89:10 162:7 271:6
282:14

**spell** 9:1

**spend** 103:21
175:24

**spending** 164:6
291:11 298:22

**spent** 71:19 86:12,
13 172:6,9,10,14,
15,17 293:3
295:13, 296:15
297:5,11

**spoke** 17:13 50:22
78:21 109:13,17,
18,20,23 110:13
111:15 112:9
182:5

**spoken** 49:25
50:15 51:4 114:7,
25 115:4,6,19
146:4 148:15
284:2,6 297:4
309:14

**stand** 95:5 148:25
203:16 235:22
238:10 283:20

316:5
**Standard** 44:18
**Standards** 24:6
**start** 9:10 21:4
54:10 88:13 89:5
171:17 220:5
248:23
**started** 47:19 80:2
94:23 116:16
134:23 146:3
172:4 242:3,9
244:18,19 246:12
268:25 281:17
283:7
**starting** 248:10,13
**state** 8:23 282:21
**statement** 6:16
173:2 276:12
290:18 295:21
296:1,22 299:19
304:22 314:20
**statements** 288:16
**states** 24:23 28:13
29:14,19 125:8
148:9 149:23
242:5 259:19
270:12 309:4
**status** 158:24
**stay** 28:6 247:8
**stayed** 279:24
**Stefan** 61:17,20
70:11,18 71:5,6
129:9,11,13,14
131:8 132:4,7
135:14 139:21
146:22 171:3
172:2 238:3
**Stephanie** 129:8,
11
**steps** 30:18,19
32:2,6 33:12
34:11,20
**Steve** 7:22 9:24
10:4 15:13 148:23
184:11 215:19,25
**Steven** 102:14,16
**sticker** 238:18
**stop** 18:3 198:21

**stopped** 32:1
84:14 248:21
**stopping** 95:3
147:23
**store** 90:18 91:16
206:14 246:25
247:9,10 248:11
250:15 253:5
255:8,11 291:16
**stores** 255:11
**story** 255:24
**strategies** 144:8
**strategy** 130:9
141:21 228:16
**Stratus** 155:11,16
156:4,6
**Strawn** 6:3 7:19
**Street** 26:13,24
27:6
**strike** 38:8 75:19
88:11 89:18
132:16 144:21
153:24 227:6
273:12 287:11
**strongly** 166:3,5,6
**style** 256:19
**subject** 82:9
163:14 182:17
**submit** 56:1
173:13,18,23
174:10
**submitted** 6:16
174:7 259:1
286:13
**subsequent** 17:15
**substance** 11:16
215:25 217:7
239:18,19 287:8
**substantial** 290:13
301:20 303:4
**substantially**
285:22
**substitute** 227:11
**successful** 144:20
**successor** 209:6
262:9
**sued** 24:9
**suffer** 161:11

**suggest** 48:25 49:8
65:9 132:21
133:3,12 151:22
152:8,13 166:25
168:17,25 169:7
224:19 302:14
**suggested** 166:3,5,
6 224:20
**suit** 157:6 200:2
**Suite** 6:7
**suits** 157:8
**summer** 90:15
91:13 108:15
**summertime**
90:16
**Sunday** 107:13
**supervise** 87:17
**supervised** 279:24
**supervising** 53:25
**supervisor** 73:23
78:16,19 301:18,
24
**supplemental**
187:16
**supplies** 167:15
168:1,10 169:2
**support** 183:16,20
**supposed** 68:15
103:4 193:8 199:6
251:21 261:16,19
**supposedly** 174:20
**surprise** 227:13,
14,19
**surprised** 142:17
**Suzanne** 7:24
102:18 104:9
117:11,14 122:18
209:22 287:19,21,
25 288:9
**swear** 8:11
**Sweet** 26:13,23
27:6 28:3 99:18
195:1
**switch** 198:6,7
248:5
**switching** 252:1
**sworn** 8:14 121:11
123:20 124:6

286:13 295:2,21
**synagogue** 96:3
**synonymous**
150:10
**system** 45:18
176:20,25 189:23
190:14 260:4,5,7,
20
**Systems** 260:24
265:17,23

---

**T**

**T-h-i-b-a-u-d**
74:13
**table** 102:1,22
168:3
**tactics** 141:21
142:1
**takes** 232:19
**taking** 11:15
242:6 280:17
**talk** 18:5 20:24
31:20 65:1 73:23
78:16 109:6,11
111:8 115:20
136:22 140:2
151:19 182:9
208:8 210:5
211:21 224:7
252:12 256:7,10
273:6 297:19
298:1,5,10 303:16
305:15
**talked** 35:25 39:8
60:4 63:5,12 86:2
88:7 96:11 107:1
126:17 133:11
137:7 147:12,13
162:9 163:6 169:9
172:1 180:6,18
201:1,4 202:17
204:13 209:22
212:8 222:2
226:18 232:10
233:9 246:5
252:11 253:8
263:14,18,20,22
268:20 278:1
296:13 297:20
298:3,5,7 299:15

Cohen vs. World Financial Group          Jordan Destin          10/08/2013

301:4 302:13
303:15 306:2
307:20
**talking** 16:10 20:3
38:10 82:20
107:14,24 120:18
126:16,18 136:12
140:22 145:21
209:13 212:7
213:2 226:17
234:3 273:11,13
293:22 305:16
308:4
**tape** 7:9 100:2,7
203:13,18,22
310:20,24
**targets** 255:14
**tasks** 188:4 189:10
190:11 191:5
**tax** 62:22 96:25
97:1,2,3,6,7 191:2
204:6,8,11,12,20,
25 205:6,9,11
206:1 262:13
**teacher** 110:24
**team** 56:19 70:15
71:21 87:16,17
111:9 131:4,6,7,
12,15,17,25 132:3,
7 134:15,16
135:18,19 138:3,
23 139:2,8,19
140:16,17,18
142:7,18 148:16
159:2 161:15,16,
19,22 165:6 166:7
169:16,17,19
193:11 194:1
232:9 233:20
250:6 252:9,12,19,
25 253:2,18,20
254:14 292:24
298:16 302:4,8
305:11 306:22,24
307:19,22,25
**teammate** 38:18,
19 77:8 138:23
**teammates** 66:4
73:18,21 88:25
162:12

**teams** 131:4,20,
22,23 132:2
138:19,20 140:3
141:14 142:11
161:17 196:7
198:6,8
**technique** 65:18
68:13 143:17,22
163:24 271:6
305:21 306:7
307:4
**techniques** 143:19
308:7
**telephone** 44:14
53:7 86:13,14
185:3 273:7
302:24
**telling** 72:23,25
73:3 136:22 137:2
**tells** 306:21
**template** 193:3,4
**temporary** 297:25
**ten** 159:24
**tenor** 235:15
**term** 21:8 61:2
74:4,7 82:6
131:15,19 138:3,
19 148:16 151:5,
13 162:25 166:11
213:10,12 235:6
254:20 255:21
300:5,9,10
**terminated** 42:9
**terms** 68:3 82:9
148:4 151:9
213:4,7 231:2
**Terry** 6:13 7:12
283:19
**test** 283:10,14
**testified** 8:14
66:15 68:19
108:12 153:10
165:22 204:5
218:2 274:10
278:20 281:16
297:3 309:13
**testifying** 47:8
**testimony** 23:20
24:8 33:2 35:19
65:22 94:8 97:14

128:10 148:14
165:10,21 178:6
181:22 190:9
202:22 216:5
227:2 245:25
250:21 290:8
**text** 89:15,25 90:7
**texting** 89:17
**texts** 89:20
**Thibaud** 74:13,14,
18,22 95:17,18
135:3,9,12 136:3
274:23,24 313:6
**thing** 45:16 57:21
112:1 113:19
117:14 142:21
159:14 162:6
168:2 171:5
230:21 257:12
261:3 270:13
285:25
**things** 65:5,7
134:11 138:13
163:7,8 165:24,25
169:11 173:6
187:5 234:8
237:14 239:17
255:4 306:9
**thinking** 269:1
314:12
**thought** 75:13,14,
22 158:20 192:21
200:1 274:10
289:9
**threw** 84:20,21,23
108:12
**throw** 99:6
**thumb** 229:23
**Thursday** 216:24
**tie** 157:5,6
**till** 248:14
**time** 6:10,11 7:8
12:20 14:14 17:13
31:12,22 32:10
34:15,19 37:5
42:4,5 43:11,22
44:5,12,22 54:18
58:5 61:25 64:20
68:21 70:15 74:2
77:16 79:13

82:12,13 83:7,20,
23 84:3 85:10
86:11,12,25 95:6,
10 99:1,24 100:6
103:17,21 104:5
109:13,15,17,20,
23 110:8,13,24
111:3 112:25
117:6,20 123:17,
19 138:1 147:20
149:1,4,13,14
152:19 154:1
155:10,13,16,23
156:1,7,19 159:24
164:18 166:21
169:13 171:8
172:6,10,14,17,18
173:13 174:19
178:24 181:1,4
182:20 185:2
186:19 188:1,6
193:20 197:2
203:4,17,21 206:7,
8,18 207:10 211:3,
15,18 212:4,24
213:17,21 214:3
215:2 217:11
221:12 222:8,15
234:5 238:11,14
240:1 244:25
246:9 247:22
248:20 249:7,10,
13,18 250:12,18
252:24 253:11
254:7 258:10,13,
15 259:23 260:8,
10,21,22,24
262:20 266:4,22,
25 268:15,17
270:15 280:2
282:10 283:21,24
284:6 288:17
290:13 291:21
292:1,14 293:2,8
294:3,11 295:13,
15 296:12,14,17,
18 297:6,12
298:19 310:20,23
311:2 313:21,23
316:7
**timeframe** 31:1
47:13 98:14
122:21 250:4,

Case 1:13-cv-01092-CAP   Document 126   Filed 12/05/13   Page 353 of 356

Cohen vs. World Financial Group          Jordan Destin                    10/08/2013

251:19 258:22 268:9 291:24

**timely** 188:22

**times** 140:5 159:23 166:12 171:15 229:17 231:25 232:8 236:11 246:6 273:8,20 284:24

**title** 54:1 60:11,13, 16 128:4 150:11, 17,22 151:9,12,13, 15,18,24 152:2 197:11,12 230:22 231:12,19 244:14 299:9 312:11

**titled** 81:25

**titles** 71:1 150:2,3, 6,24,25 230:19 231:10

**today** 8:20 9:8,14 11:7,22,25 18:12, 13 21:25 22:21 23:2,6,14 30:9 35:19 45:2,17 66:8 68:1,6 69:4 76:17 100:15 101:7,12 104:20, 24 106:13,18 107:1 111:17 116:6 117:18 119:12 133:3 171:1 178:15 180:7 181:16 189:3 194:8 215:5 219:23 220:20 221:1 222:8 224:4 227:2,6 229:17 240:4 257:13 266:10 284:14,25 287:10 290:6 293:9 295:1,7,16 297:3,9 309:24 310:6 311:2 315:23

**today's** 7:11 21:9

**token** 161:14

**told** 12:13,16 15:20 33:5 34:6 57:17,24 58:9 59:11,16 62:5,7

65:3,6 70:25 74:20 75:10 77:8 79:1,3,6 80:21 81:3,5 88:24 107:18,25 110:6 118:7 129:10 151:16,24 154:23 165:12,13 169:24 173:23 174:21 179:6 180:20 181:6 197:14,15, 22,25 198:22 212:18 214:5,12 227:10,19 232:12 237:3 265:22 268:5 297:15 298:21,24 307:2 315:14

**Tom** 9:2 132:12, 13,19,22 133:3,11 135:14

**Tommy** 267:6,8, 14,19,25 268:8,12, 16 292:12

**Tompkins** 100:4 102:3,5 103:8 104:16 141:9 144:11

**tools** 59:13,16 69:17 233:9

**top** 27:4 124:19,20 144:7 191:14 220:10 231:23 251:10 269:14 285:6

**topic** 95:1

**Toshiba** 37:11 38:6,10 41:11 42:15,24 153:15

**toss** 180:17

**total** 131:12 171:10 294:2

**totally** 262:10

**touch** 12:5, 49:12 115:11 140:18 158:17

**tour** 254:6

**towels** 155:20

**town** 71:16, 130:21 160:8

208:10

**track** 245:5 294:13 295:9 305:21

**tracked** 294:18

**tracking** 304:9

**Trading** 261:6,8, 13,15 262:3,10 265:13,21 266:15, 16,22

**trained** 279:9,15

**trainee** 20:14 21:1 88:22 137:23 305:10

**training** 136:17, 21,22 137:1,14,19, 20,21,22 138:14 270:23 271:2,5,9, 12,16 272:3 276:4, 7,10,14 277:2,9,13 278:7,10,19,20 279:2,4,6,10,11, 20,25 280:3,7,20, 25 281:12,18,25 283:8 291:25 293:21 299:6

**Transamerica** 8:9 63:16 278:3

**transcribed** 9:14, 20

**transcribes** 18:15

**transcript** 25:15

**transfer** 39:13,16, 18 42:14

**transferred** 39:12, 15,17,21,22 42:17 84:24 85:3 263:12

**travel** 21:11 241:24 272:6 273:19 274:17 275:22,25 281:24

**traveled** 272:15 273:17 274:1,4,11 275:5,21

**traveling** 272:18

**Travelscape** 205:12 206:23 207:6 208:25 209:5,8,10

**treated** 304:17 305:1

**treatment** 305:15

**triggering** 25:1

**trip** 272:20

**trouble** 284:14

**true** 124:8 169:7 249:18 250:12 284:1 290:21 291:7 299:21,25 308:21

**truth** 300:2

**truthful** 288:17

**truthfully** 11:18, 22

**Tuesday** 23:5,14 232:19 254:4 285:5

**turn** 46:10 136:4 161:17 163:4 195:3 200:5 219:6 265:3 287:6 311:15

**twelve** 294:3

**Twitter** 93:5,6

**type** 14:1,18 37:9 39:24 41:21 96:9 261:18 264:24 271:5 277:19 279:2

**types** 14:8

**typically** 289:24 306:18

---

**U**

**U.S.** 17:3 25:2

**uh-huh** 15:5 32:16 50:13 56:16 59:21 63:8 82:24 85:5 105:15 114:19,21 119:13 121:5 123:6 132:14 141:23 174:2 176:12,18 188:14 218:12 230:18 236:9 237:12 243:2 244:4 260:1 290:7 294:1 297:16

Cohen vs. World Financial Group          Jordan Destin                          10/08/2013

**ultimately** 161:7, 17 162:4 204:17 252:23

**umbrella** 57:23

**unclear** 67:12,21

**uncommon** 111:1

**underline** 232:17

**underlying** 126:7

**understand** 10:19, 21,22 11:17,21,24 14:21,22 15:6 19:13 24:8 25:18 31:19,22 39:8 44:4,11 47:7 48:10 50:3,6 56:10,13 58:2,22 59:1,5 60:1,9,13, 18 65:21 66:17 67:2 71:5,6 79:9 82:2,15 87:10,15 97:23 103:7 104:12 105:8 107:17 114:13 115:18 124:3 140:6 145:15 146:1 147:3 150:5 151:8 161:3 164:12 172:8 175:4 176:3 179:20 182:5,23 183:11 186:18 188:20 201:8,22 202:10 208:25 212:5,20,25 213:13,18 215:6 216:5 236:14 258:12 266:1,11 281:17 286:5 295:20 305:24

**understanding** 18:12 19:23 21:9 60:20,25 61:7,12, 15,22 63:9 68:14, 22,25 69:14 77:12 129:22 131:14,21 137:10 143:3 145:4,16 179:14 181:17 200:12,16, 17,23 201:10,16 206:6 212:11,16 214:4,11 226:12

236:10 239:25 247:2 266:5 295:14 309:8 312:20,25

**understood** 12:18 20:1,2,4 48:11 55:23 58:19 63:6, 21 66:16 75:18 81:7 87:5,21 135:16 148:14 167:19 172:22 175:6 200:19 209:24 212:14 237:2,5 246:9 266:6 277:21 281:12 288:19

**undertake** 52:7 75:19 306:7

**undertaking** 283:8

**United** 24:23 28:13 29:14,18 242:5 259:19 270:12

**university** 29:8 255:25 270:5,9

**UNLV** 255:25

**untimely** 121:16

**update** 240:22 245:13 252:19 278:5

**updated** 92:15 244:6,22,24 245:2, 3,15,25

**upline** 61:2 74:7

**USA** 209:9

**user** 50:24

**Utah** 297:21

**utilize** 233:8

**utilized** 31:13 153:12

─────────────

**V**

**valid** 36:23 265:21

**Valley** 27:7,13

**Valleyview** 263:18

**variety** 172:25

**Vegas** 25:7,10 26:14 27:2 28:8,9 29:19 30:3 53:16, 17 54:5,6 85:23 88:25 93:1 129:25 131:20 140:4 141:8,11 142:7 146:25 166:8,9,12 194:4,7 196:3,7 202:23 207:15 208:12 210:14 230:16 247:10 259:21,22 262:17 267:10 271:21 273:18,22 282:6 297:11,25 298:2, 15 303:20,23 304:4,8,19,23 305:2,5,13 306:10

**vehicle** 156:16

**vendor** 279:9,10

**vendors** 63:14 278:2

**vendors'** 279:14

**verbally** 216:12

**verification** 120:3, 8 121:11 123:21 124:7

**verify** 120:5

**version** 98:22 214:17 229:21 245:3,4,7,11,17,20 246:1,2 266:9 269:10

**versus** 7:11

**viable** 262:3

**Vice-president** 8:5

**Victoria** 270:5,9

**Video** 6:13 7:12

**View** 27:7,13

**violation** 219:18, 25 220:7

**Virginia** 7:25 12:10,13,21 13:2, 7,12 15:22 17:6 114:20

**visa** 270:14

**Vistaprint** 157:23, 24

─────────────

**W**

**W-2** 205:12,17,25 206:2,4 207:6

**W-2s** 106:15 176:5,11 177:22

**wage** 77:21 89:9 136:23 256:25

**wages** 207:23 281:13

**wait** 11:12

**waived** 121:18 122:2 188:25 222:7,21 224:16, 20 315:9

**waiver** 120:7 123:23,25 124:1 225:4

**walk** 40:14 124:24

**walking** 175:24

**wanted** 10:8 54:16 56:22 57:14 58:17 60:4 144:21 171:5 183:8 198:6,17 230:7 244:13 254:3 257:12 278:23 279:3 307:22

**wanting** 307:20 315:21

**ways** 165:25

**wear** 157:4

**website** 34:1,4,9 50:23 51:3,8 52:1 53:9 65:25 69:11 92:3,5,6,10,12,13, 17 165:15,16 177:12 306:20

**websites** 91:23 92:18 168:22 169:10

**week** 32:18 33:2 77:16 146:25 171:15,23 231:25 232:9 247:4,12 250:9,10,11,16,20, 23 251:3,23 256:18 258:9 267:18,22 289:24

290:11,15,16,20
291:4,8,18 292:1,
6,9,10,13,20,21
293:12,18 295:3,4,
11,16,19,24 296:6,
10,19,20 298:4,8,
22 314:12,17,22
**weekend** 107:12
**weekly** 81:21
**weeks** 21:13,16
40:13 55:22
137:24 171:23
172:4,11 215:7
218:21 247:20,21
249:2 268:17
269:1 293:13,17
294:3,6,7 295:8,14
313:19 314:2,7
**welcomed** 52:20
**Wetz** 6:13 7:12
**WFG** 6:10,11
63:24 64:8,11
66:8,20,21,22
67:13,14,22,23
68:4 82:8 148:12
149:24 151:23
281:5 296:24
303:9 304:17
305:1
**WFG'S** 64:3
**WFG_001503**
45:25
**WFG_001506**
54:8,21
**WFG_001511**
66:13
**WFG_001512**
81:24
**WFG_001515**
46:23
**WFG_001521**
46:11
**whatsoever**
216:13 241:14
293:7
**When's** 109:13,
17,20,23
**white** 168:4 314:8,
10,13,17,19,23,24

**wife** 53:20 128:8
264:3
**wife's** 43:8 96:13
107:9
**wifi** 154:4,5,6,10,
12
**William** 26:13,24
27:6 28:3 99:18
195:1
**Win** 143:22
**window** 268:9
293:22
**winter** 314:8
**withdraw** 228:25
**withdrawing**
315:10
**Wolfe** 9:22,25
10:6,8 12:15
14:10 15:17 16:8
18:3,9 19:25
20:16 25:14,21
50:18 64:24 67:4,
10,15,24 68:5
71:25 72:4 73:10
82:18 87:8 94:25
99:24 100:18,22
102:15,16 103:4,8
104:11,13,16
119:6,8 121:19,21
122:4 125:16,23
126:20,25 127:7,
15,19,23 128:1,18
129:1,5 132:24
133:5 142:8
145:18,21 147:22
148:24 155:19
178:15 179:2,9,11,
17,22 180:2
181:16 182:7,10,
15 184:10 189:1,4
200:22 203:2,9,15
211:20 212:6
213:1 215:16,22
216:2 220:1,23
221:9,15 222:12
223:1,8,22 224:10
225:5,9 226:6,16
228:3,9,14,19,24
282:22 288:1,24
289:13 290:25
296:3 303:6

306:14 308:10,24
311:8,11 312:23,
24 313:5,15 314:6
315:18 316:2,4
**woman** 65:25
**Wong** 110:2
**word** 35:9,20
129:23 253:9
284:2 309:3
**worded** 143:6
**words** 9:13 40:17,
20,21 41:1 140:11
146:24 184:19
239:22 243:5
281:7 285:24
301:22,23 312:5
**wore** 314:8,10,13,
17,18,23
**work** 66:10 68:7,
11 70:2,4,19 71:22
74:21 89:4 115:12
136:24 153:11
170:17 174:6
188:3 189:10
190:11 191:5
198:11,14,17
249:9,15 252:20
256:3 260:20
265:8,24 267:8,24
268:16 270:15
282:7 288:2
292:19 293:3,17
294:7 298:18
300:3 301:19
302:2,23 303:4
305:12,14,20
306:5 307:3 308:6
**worked** 20:10
59:17 97:4 109:15
125:24 127:8
146:24 147:4
149:15 165:3,4
167:11 203:3,11
206:6,7 246:21
247:4,5,20,21,22
248:3 259:14
260:3 267:6 269:1
282:5 289:24
290:5,10,20 291:4
292:21 293:12
295:2,4,8,17,23

296:19 298:8,14
303:10,19 304:8,
14 313:18,20,21,
24 314:2
**workers** 20:6,8,9
65:19 126:21,22
225:18 304:17
305:1
**working** 76:22
77:1 110:24 111:9
129:16,18 131:24
167:8 198:21
208:10 237:9
242:10 247:13
249:12,19 250:14,
20 251:9 260:2,24
267:18,21,22
269:7 270:14
290:15 291:8,17
292:12 296:13
298:4 303:9
305:24
**works** 79:1
306:19,21
**workwise** 85:20
**World** 7:11,17,20
8:6,22 14:2 15:8
20:7,15 31:9,10,
14,21,23 32:2
34:16,17,22 35:4,
11,21 36:6,13,21
37:6 38:24 40:8,
16,17 42:6,8
43:14,22 44:5,13,
23 45:3,20 46:5
47:14,17,24 48:25
49:2,4,8,13,16,21,
25 50:3,6,16 51:3,
4,11 52:1,3,10,16,
20 53:2,9,15,21
54:4 55:1,16,24
57:3,4,20,22
58:12,15 60:2
62:1,4 63:1,11,12,
16,17,19 64:5,21
65:2,10,18,23 67:8
71:24 72:3,8,10,
13,17,20 73:1,4,7,
15,25 74:3,4,9
75:1,5,8,17,21
76:14,18 77:6,19
78:11 79:1,4,21

80:8,13,17 81:12,
17,19 82:12,17
83:1,6,20,23
85:11,13 86:25
87:3,4,6,7,11
88:13 89:8,21
91:8 93:24 94:2,
10,15,23 95:13
96:20 97:4,8,11,25
98:3,15 99:2
109:3,10,15 110:9,
25 111:2,22
112:11,24 113:11
115:23 116:10
117:1 118:3,21
119:19 121:16
126:9,23 127:9
128:3,11, 130:14
132:22 133:3,13,
19,21,23,24 134:2,
3,12,17,25 135:6,
17 137:3 140:20
141:5,25 142:5,
143:12,15,21
150:13 151:11
152:1,9,20 153:8,
11,12,21 154:8,13,
19 155:13 156:15,
23 157:11, 158:12
159:8 160:23,24
162:2,16,19
163:22 164:2
167:1,6,13,21
168:9,13,17,20,21,
22,25 169:3,14,23
170:2,14 171:9,17
172:12,24 173:10,
17 174:25 175:9,
16,23 177:10,11,
14,24 178:4,8,13,
18,21 180:10,14
187:20 189:18
190:13 192:8
193:15 194:3,12,
15,21 195:11,17,
25 196:14,16
197:2 198:12
199:9,14 204:15,
23 205:15,17,21
206:9,19 207:11
210:14 216:8
222:4 231:13
233:15 234:23,24

235:6,19 237:1
241:4,8,12,14
246:13 248:17,22,
23 249:10 250:3,
17,22 251:4,10,14,
25 252:8,22 253:6,
13 254:12,22
257:5,14,19
258:17,19 259:5,
24 260:23 261:1,4
268:5,13 270:24
271:3,24 272:6,19,
22 273:15,21
274:7,11,15,18
275:9,11,19 276:6,
16,25 277:3,4,7,
14,25 278:3,24
279:13,19,21,22
280:8,11 281:7,9,
22 282:5,18 284:7
285:15,19 290:3,9,
19,22 291:12,18,
23 292:18 293:5,
13,15 294:9,12,16
295:18 297:6,13
298:14 299:5
300:3,7,15,18
301:2 302:15,18,
22 303:2, 304:3
305:22 306:16,19,
23,25 307:1,9,16
308:1,3,4 309:14
310:1,10 312:11,
13 313:2,7,9,22,24
**write** 193:1 243:5
**written** 6:16
115:25 116:11,19
117:1,7 118:18,20
143:7,16 176:17
177:3 216:12
284:2,6 286:17
**wrote** 48:20
190:15
**Wynn** 208:11

         **X**

**Xuan** 142:23
143:1,11 176:17
177:3 190:24

         **Y**

**y'all** 166:15
235:24
**Yahoo** 38:14
107:15 216:23
**year** 25:1 26:5,18,
23 28:24 29:15
30:2 36:18 76:16
84:8, 93:11,14
97:4 108:10
109:19 175:11
198:19 205:8,25
221:4,6 240:20
259:17
**years** 24:21 25:13,
24 30:25 36:1
83:16 93:22 94:24
95:22 98:5
109:16,22,25
110:15 205:7
261:14 298:12
314:13,18,19
**yesterday** 101:22
**yield** 107:22
**York** 12:9 28:10,
19,20,21,22,24
29:1 188:20
218:22 219:23
220:22 221:13
297:21 298:13,15
315:13
**young** 256:1
298:13

         **Z**

**ZIP** 186:4