IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JORDAN DESTIN, *et al.*

          Plaintiffs,

v.

WORLD FINANCIAL GROUP, INC.,

          Defendant.

CIVIL ACTION NO.
1:13-CV-1092-CAP

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR <u>CONDITIONAL CERTIFICATION</u>

Edward D. Buckley
Steven E. Wolfe
THE BUCKLEY LAW FIRM, LLC.
Promenade, Suite 900
1230 Peachtree Street NE
Atlanta, GA  30309
Tel:  (404) 781-1100
Fax: (866) 589-4089

Jeffrey K. Brown, Michael Tompkins
LEEDS BROWN LAW, P.C.
One Old Country Road, Suite 347
Carle Place, NY  11514
Tel: (516) 873-9550
Fax: (516) 747-5024

Lloyd R. Ambinder, James E. Murphy
Suzanne B. Leeds
VIRGINIA & AMBINDER, LLP
111 Broadway, Suite 1403
New York, NY  10006
Tel: (212) 943-9080
Fax: (212) 943-9082

## I.     INTRODUCTION

### A.     Overview of this Motion

In this FLSA action, Plaintiffs seek collective remedies for WFG's Associates, whom the company misclassified as "independent contractors" and to whom it does not pay minimum wage or overtime.  The case is before the Court on Plaintiffs' motion for conditional certification pursuant to 29 U.S.C. § 216(b).

Plaintiffs overwhelmingly show that they, the Opt-in Plaintiffs, and the putative collective are "similarly situated" under the lenient standard for conditional certification.  The entire collective: (1) is uniformly classified by WFG as "independent contractors"; (2) works under identical contracts; (3) works under identical policies; (4) performs the same job of recruiting and selling; and (5) works under the same compensation plan.  WFG's Rule 30(b)(6) witness, Chief Strategic Officer Susan Davies, perfectly summed up the issues on conditional certification:

> Q.     Can you tell me why WFG has been able to conduct the same FLSA analysis for all of its associates as a group but the court in this case would not be able to do that very same thing? [objection omitted]
> Q.     Can you answer the question?
> A.     No, I can't.

(1st Davies Dep. 102).

1

Plaintiffs respectfully request the Court conditionally certify a collective of all persons who have been WFG Associates at any time beginning January 16, 2010.  Plaintiffs further request the Court direct WFG to produce the names and contact information of the collective members.  Certification will advance the FLSA's remedial purpose and maximize judicial economy by avoiding multiple trials on identical issues in this and other Courts around the country.

**B.     Overview of WFG's Business and Associates' Roles**

WFG's business is to market financial and securities products sold through its affiliated companies.  (Davies Decl. - attached as Exhibit B - ¶ 5; 1st Davies Dep. 32-33).  To conduct its business, WFG created a massive, nationwide pyramid scheme: its Associate workforce.  WFG requires all Associates to pay a $100 membership fee and sign identical, non-negotiable Associate Membership Agreements ("AMAs").  (1st Davies Dep. 50-51; 1st Davies Dep. Ex. 69).  The Associates' job is to recruit more Associates and sell the financial and insurance products offered by WFG's affiliates.[1]  (1st Davies Dep. 32-33).

---

[1] WFG's affiliated insurance products are offered through World Financial Group Insurance Agency, Inc. ("WFGIA").  WFG's affiliated securities products are offered through its securities broker-dealer, which was World Group Securities ("WGS") until 2012 and, following that entity's acquisition by TransAmerica Financial Advisers ("TFA") has been TFA.  WFGIA, TFA, and previously WGS, are "WFG Affiliates" under common control with WFG and are, along with WFG, parties to every Associate's AMA.  (1st Davies Dep. Ex. 69 p. 7, 16 ¶W).  The

2

Under the WFG pyramid scheme, the company's only "employees" are the 186 people at its headquarters. (1st Davies Dep. 45-46; Davies Decl. ¶14).  WFG's 340,000 Associates, who account for 100% of its revenue and do all of its sales and recruiting work, are classified as "independent contractors." (1st Davies Dep. 45-46, 570; Brunton Dep. 167).  Because WFG classifies Associates as "independent contractors" under the FLSA, it pays them no wages. (3rd Davies Dep. 317).  Instead, all of the Associates work exclusively on the WFG commission plan. (Davies Decl. ¶21; 3rd Davies Dep. 313-314, 317, 319).  The great majority does not earn enough to make minimum wage and none receive overtime pay.  Those who do not yet have insurance or securities licenses can earn no income at all because they cannot sell anything.  (3rd Davies Dep. 317-319).  Associates need no prior skill, knowledge, training, or experience (1st Davies Dep. 48-50, 463).  They receive all the training they need on the job.  (1st Davies Dep. 58).

WFG controls all material aspects of the enterprise, establishing a degree of collective similarity far beyond what is required for conditional certification. WFG creates and administers the commission plan under which all Associates are compensated, sets the criteria for promotion, creates marketing and presentation materials (which Associates may not alter), provides written and interactive

companies share, *inter alia,* office space, officers, computing and data storage resources, and funds.  (1st Davies Dep. 11-20, 70-71).

training, provides guidance on obtaining insurance and securities licenses, and establishes the list of products the Associates can sell.  (Davies Decl. ¶21; 3rd Davies Dep. 313-314, 317, 319, 334-335, 366, 445-446; 3rd Davies Dep. Ex. 59, 69 ¶¶III.B; IX.C; 16 ¶P; fn 9, 13).  WFG establishes the performance, logo, audit, and other requirements for the local offices.  (3rd Davies Dep. 531-532; fn 11).  It sets prohibitions on selling competing products, joining other "hierarchical marketing organizations," engaging in various "prohibited outside business activities," and using the internet for any business without WFG's approval.  (1st Davies Dep. 187-188; 2nd Davies Dep. 249; 3rd Davies Dep. 313-314, 323-325, 527, 577; 3rd Davies Dep. Ex. 56, 81, 83).  WFG has the exclusive authority to hire and fire every Associate, and the Associates have no rights to, and are prohibited from taking with them when they leave, any of the other Associates they recruit, any marketing or presentation materials, or customer lists.  (1st Davies Dep. Ex. 69 p.13-14 ¶D.1-3).

Plaintiffs easily meet their light burden. The Court should certify this case.

## II.   THE FACTS

### A.   WFG Uniformly Classifies all Associates as "Independent Contractors"

Though it will protest mightily that it is impossible to make a collective-wide FLSA analysis of all the Associates, WFG has done exactly that. (1st Davies

4

Dep. 98-102).   In performing its own collective-wide FLSA determination, WFG

did none of the individualized analysis it will now insist is required.  (Brunton

Dep. 40, 60-62, 65-66, 100, 162).  It did not conduct time studies or audits to see

whether, even based on a representative sampling of Associates, the company's

uniform classification is consistent with actual duties.  (Brunton Dep. 62, 72, 78,

81, 82, 142, 155-56, 161-62).  It sent no one into the field to observe the

Associates' activities for classification purposes.  (Brunton Dep. 40, 60-62, 100,

162; 3rd Davies Dep. 305).

WFG's Rule 30(b)(6) admissions could not be more strikingly different than

its anticipated opposition to conditional certification:

> Q:     WFG believes that all of the associates are subject to the same
> FLSA analysis; correct?
> A:     Yes.
>
>           ***
>
> Q:     WFG does not believe that associates working in some offices
> might be employees but others might be independent contractors for
> FLSA purposes; correct?
> A:     Correct.
>
>           ***
>
> Q:     WFG doesn't believe the FLSA classification analysis
> applicable to its associates is different depending on what products the
> associates sell, does it?
> A:     No.
>
>           ***
>
> Q:     Now, you've said in your declaration you submitted in support
> of this case that some associates follow the Business Format System,
> some may not.  Is that correct?
> A:     Yes.

Q:      WFG believes, regardless of whether associates follow the Business Format System or not, they are all subject to the same FLSA analysis; correct?

A:      Yes.

Q:      All right.  You've also said in your declaration that some associates spend more time recruiting and some associates spend more time selling; correct?

A:      Correct.

Q:      WFG believes the same FLSA analysis applies to the associates no matter how much of their time they spend on recruiting versus selling for purposes of employee versus independent contractor; correct?

A:      Correct.

Q:      And WFG believes the same FLSA analysis applies to the associates no matter which CEO MD's hierarchy they are a part of; correct?

A:      Correct.

Q.      WFG believes …the same FLSA analysis applies to its associates no matter the income levels of their clients; correct?

A:      Correct.

Q:      Can you tell me why WFG has been able to conduct the same FLSA analysis for all of its associates as a group but the court in this case would not be able to do that very same thing?

Q:      Can you answer the question?

A:      No, I can't.

(1st Davies Dep. 98-102, objections omitted).

**B.      The Putative Collective Members Are Similarly Situated Because They Are All Governed by Identical AMAs**

WFG's relationship with all of its Associates is governed by the AMA (Davies Decl. ¶8).  To join WFG, Associates must sign the AMA, pay $100, and get approval from a Senior Marketing Director.  (1st Davies Dep. 50-51).  All Associates are bound to WFG by this non-negotiable form contract.  (1st Davies

6

Dep. 50, 91, 163-64; 1st Davies Dep. Ex. 69).  There are no material differences among the AMAs of any of the Associates. (1st Davies Dep. 163-64).

The AMA is the "legal foundation" of the Associate's relationship with WFG.  (Brunton Dep. Ex. 6).  It creates the entire system that allows the Associates to work:

> Q.   [T]he AMA creates the affiliations that allow them to do business?
> A.   Yes.
> Q.   And the AMA creates the hierarchy among associates?
> A.   Yes.

(1st Davies Dep. 167).  The AMA makes this case ideal for collective treatment because it establishes an identical employment relationship between WFG and all of its Associates.  Under the AMA:

- WFG Controls and Owns the Customer Relationships

  o WFG owns all of the customer identities, lists, and relationships. (1st Davies Dep. Ex. 69 p. 8 ¶II.B & p. 13 ¶D.2).

  o Associates cannot solicit their customers to reduce or give up coverage under any WFG-affiliated products after they leave the company. (1st Davies Dep. Ex. 69 p. 13 ¶D.2). [2]

  o WFG decides whether to issue refunds to customers or require Associates to reimburse WFG for refunds. (1st Davies Dep. Ex. 69 p. 10 ¶III.G).

- WFG Controls and Owns All Personnel

---

[2] Plaintiff Edwards was warned WFG would take legal action if he took customer accounts with him when he left WFG.  (Edwards Dep. 247).

- o WFG owns all of the Associates.  (1st Davies Dep. Ex. 69 p. 8 ¶B & p.13 ¶D.1).

- o Associates cannot take their "downline" Associates, or any other Associates, with them if they leave WFG. (1st Davies Dep. Ex. 69 p. 13 ¶D.3).

- Associates Must Comply with the AMA and WFG Policy and Ensure that all Associates they Recruit also Comply

  - o Associates must train and supervise everyone they recruit in WFG's rules and policies and ensure their compliance with same.   (1st Davies Dep. Ex. 69 p.7 ¶II.A.12 & p. 8 ¶E)

  - o Associates must comply with the AMA and all AMA Rules incorporated in it.  A breach is grounds for termination.  (1st Davies Dep. Ex. 69 p. 7 ¶II.A.7 & p. 8 ¶I).

- WFG Makes the Business Decisions

  - o All Associates must purchase insurance from a WFG provider. (1st Davies Dep. Ex. 69 p.9 ¶J).

  - o WFG sets the commission schedules for all Associates and may change them at any time. (1st Davies Dep. Ex. 69 p.9 ¶III.B, Ex. 59; 3rd Davies Dep. 334-335; Davies Decl. ¶21).

  - o WFG sets the criteria for promotion.  (1st Davies Dep. Ex. 69 p.11 ¶IX.C).

  - o WFG decides what products Associates can sell. (1st Davies Dep. Ex. 69, p.7 ¶II.A.1-3, p. 16 ¶Q & P).

  - o WFG controls how Associates sell and market products. (1st Davies Dep. Ex. 69 p. 8 ¶II.H).

o WFG has the sole authority to terminate Associates and may do so for any material breach of the AMA or WFG Rules, or for poor sales performance – namely, failure to earn at least $2,000 in commissions annually. (1st Davies Dep. Ex. 69 p.16, ¶T).

### C.    WFG's AMA Rules, Field Manual, and Field Bulletins Further Establish Collective Similarity

WFG's rules and policies, disseminated to all Associates via the company's intranet, MyWFG.com (formerly wfg-online), further Plaintiffs' showing of collective-wide similarity.  (3rd Davies Dep. 472-476; 2rd Davies Dep. Exs. 27, 27A).  WFG's AMA Rules are incorporated by reference into the AMA.  (1st Davies Dep. 138-39; 1st Davies Dep. Ex. 69 p.8 ¶ II.I).  The Rules detail the Associates' commission plan, prohibit Associates from selling competing products or services, prohibit Associates from working with various other companies, and establish the criteria for promotions and transfers.  (3rd Davies Dep. 313-14; 3rd Davies Dep. Ex. 59, 61, 61A).  Associates' failure to comply with AMA Rules is a material breach of the AMA (1st Davies Dep. Ex. 69 p.8 ¶II.I) and can result in termination or discipline. (1st Davies Dep. Ex. 69 p. 16 ¶T; 3rd Davies Dep. 395).

WFG also disseminates its Field Manual to the Associates, which contains more than 1,000 pages of rules and directives. (3rd Davies Dep. p. 475-476 & Ex. 27 & 27A).  WFG regularly updates the Field Manual to ensure it accurately states WFG's expectations.  (3rd Davies Dep. 476).  WFG directs its Associates to first

consult the Field Manual if questions or issues arise, and second to consult their "upline," ensuring a consistent and centralized information flow and further establishing collective similarity.  (3rd Davies Dep. 486-87; 3rd Davies Dep. Ex 28A).   The Field Manual contains "Field Bulletins" with which all Associates must also comply on pain of termination.  (2nd Davies Dep. 249-50, 3rd Davies Dep. 323).  The "Field Bulletins" further establish similarity in the Associates' job activities by, for example, designating certain activities "unapproved outside business activities," prohibiting Associates' involvement with certain other companies, and restricting Associates' use of social media for business purposes. (3rd Davies Dep. 323-26, 523-526, 554-555; 3rd Davies Dep. Ex. 41, 81, 83).

Among the collective-wide controls the Rules, Manual, and Bulletins impose are:

- WFG controls Associates' use of social networking and the manner in which they advertise.  (3rd Davies Dep. 523-524, 541-542; 3rd Davies Dep. Ex. 81, 89).

- Associates need WFG's approval before posting on the internet. (3rd Davies Dep. Ex. 81).

- WFG requires that all Associates comply with WFG's brand manual guidelines and does not allow Associates to create their own sales recruiting presentations. (3rd Davies Dep. 531-34).

10

- Associates must submit all sales contests to WFG Advertising for approval before conducting them.  (3rd Davies Dep. 538-541; 3rd Davies Dep. Ex. 91).

- WFG restricts the information that is allowed on Associates' websites, in client testimonials, and endorsements on social media websites. (3rd Davies Dep. 541-542, 547; 3rd Davies Dep. Ex. 96).

- WFG only allows Associates to have a website if it is through WFG's approved website vendors.  (3rd Davies Dep. 545-56; 3rd Davies Dep. Ex. 98).

### D. Plaintiffs' Testimony Shows That Associates Are Similarly Situated in Their Day to Day Work at WFG

Plaintiffs' testimony shows that the collective similarity WFG creates translates into similarity in the day to day working life of the collective members.[3] Plaintiff Kamran explained, "we were expected to … do the same things and follow the same system."  (Kamran Dep. 13).  Each of the Plaintiffs who have testified said:

- They signed AMAs to become Associates;[4]

- They were not paid for any hours that they worked;[5]

---

[3] The Court dismissed Plaintiff Edwards' FLSA claim on the grounds that he did not have standing to bring his FLSA claim as a result of his filing for bankruptcy. (Doc. 173).  The dismissal occurred after he opted-in and was deposed.  *Id*.  His testimony remains admissible, however.

[4] Edwards Dep. 79, 215; Kamran Dep. 13, 28; Sanders Dep. 210; Russell Dep. 95; Destin Dep.300; McKenzie Decl. ¶3; Moreno Decl. ¶3.

[5] Kamran Dep. 147-148; Edwards Dep. 105; Sanders Dep. 160; Russell Dep. 93-94; Destin Dep. 78; McKenzie Decl. ¶4; Moreno Decl. ¶8.

- They worked to recruit new Associates;[6]

- They attended business or sales meetings at their WFG offices;[7]

- They received training on how to be an Associate after joining the company;[8]

- They used scripts provided to them by WFG;[9]

- They worked at offices with WFG logos and wore WFG nametags;[10]

- They could not post about WFG or its products on the internet without WFG's approval;[11]

- They used WFG-approved marketing materials at presentations;[12]

- They made "cold calls" to market and sell WFG products.[13]

---

[6] Edwards Dep. 118, 122; Kamran Dep. 31, 122; Sanders Dep. 57-59; Russell Dep. 101, 116-17; Destin Dep. 87; McKenzie Decl. ¶8-13, 17; Moreno Decl. ¶6, 7, 9.

[7] Edwards Dep. 123; Kamran Dep. 43, 52 136; Sanders Dep. 45; Russell Dep. 133; Destin Dep. 232; McKenzie Decl. ¶6; Moreno Decl. ¶7.

[8] Edwards Dep. 230-31, 233; Kamran Dep. 217-19, 223, 227, 229; Sanders Dep. 57, 268-69, 284-85, 275; Russell Dep. 53-54, 99-100, 103; Destin Dep. 271, 277; McKenzie Decl. ¶6, 7, 13, 18; Moreno Decl. ¶5, 7, 9.

[9] Edwards Dep. 248; Kamran Dep. 198; Sanders Dep. 52-58; Destin Dep. 74; McKenzie Decl. ¶14, 17; Moreno Decl. ¶7, 9.

[10] Sanders Dep. 278-80 ("it was a [WFG] office"); Russell Dep. 199-200 (offices have WFG logos; applies to all offices he visited); Destin Dep. 133; McKenzie Decl. ¶5; Moreno Decl. ¶5,13.

[11] Edwards Dep. 248; Kamran Dep. 233; Sanders Dep. 216-17; McKenzie Decl. ¶7.

[12] Edwards Dep. 248; Kamran Dep. 52, 136-37, 248; Sanders Dep. 45-46; Russell Dep. 197, 202-03; Destin Dep. 133, 143; McKenzie Decl. ¶14; Moreno Decl. ¶9.

[13] Edwards Dep. 118, 152, 197; Destin Dep. 172, 301; Kamran Dep. 138-39; Sanders Dep. 201, 242; Russell Dep. 38, 106, 108, 115, 124-25; McKenzie Decl. ¶8, 14; Moreno Decl. ¶6.

Plaintiffs also consistently testified that WFG's policies limited their work activities in similar ways:

- When Plaintiffs recruited new Associates, the new Associates contracted with WFG;[14]

- WFG controlled the compensation for new Associates they recruited;[15]

- Plaintiffs could not negotiate the AMA's terms with Associates they recruited;[16]

- WFG decided what products Plaintiffs could sell, and Plaintiffs could not sell any products other than those approved by WFG;[17]

- Plaintiffs could not decide the price of products WFG permitted them to sell;[18]

- Plaintiffs could not sell competing products;[19]

- WFG approved all advertising and marketing materials;[20]

---

[14] Edwards Dep. 245-46; Kamran Dep. 31-32; Sanders Dep. 263; Russell Dep. 194-95; Destin 313; McKenzie Decl. ¶9; Moreno Decl. ¶6.

[15] Edwards Dep. 246; Sanders Dep. 281; Russell Dep. 195-96; McKenzie Decl. ¶9; Moreno Decl. ¶6.

[16] Edwards Dep. 246; Russell Dep. 193, 195-96; Destin Dep. 300; Kamran Dep. 31-33; McKenzie Decl. ¶12; Moreno Decl. ¶9.

[17] Edwards Dep. 228, 245; Kamran Dep. 238; Sanders Dep. 259-60; Russell Dep. 193; Destin Dep. 63; McKenzie Decl. ¶7, 14, 15; Moreno Decl. ¶6, 10.

[18] Edwards Dep. 245; Kamran Dep. 26; Sanders Dep. 261; Russell Dep. 193; McKenzie Decl. ¶15; Moreno Decl. ¶11.

[19] Edwards Dep. 228-29, 245; Sanders Dep. 260-61; Russell Dep. 193; McKenzie Decl. ¶7, 15; Moreno Decl. ¶10.

[20] Edwards Dep. 248; Kamran Dep. 246; Sanders Dep. 95; Russell Dep. 202, 222; McKenzie Decl. ¶7, 14; Moreno Decl. ¶9.

- Plaintiffs could not negotiate prices or terms with customers;[21] and

- When they left WFG, Plaintiffs could not keep marketing materials they bought from WFG, or take their customer accounts with them.[22]

In sum, WFG's uniform classification of the Associates, uniform AMA and policies, and the common experiences of Associates who have joined this action establish a degree of similarity far beyond what the FLSA requires.

## III.   <u>ARGUMENT</u>

The Court should conditionally certify this case for several reasons.  First, Plaintiffs easily meet the low thresholds of collective similarity and interest in joining this case required for certification.  Second, WFG's anticipated counterargument, that its "independent contractor" defense is "too fact specific" for collective treatment, is contrary authority and belied by Davies' 30(b)(6) admissions.  Third, even though the merits should not be considered at this stage, WFG is likely to argue them anyway, and Plaintiffs already have overwhelming evidence that Associates are employees, not independent contractors.   Finally, if the Court finds a single collective of all Associates is inappropriate, then it should

---

[21] Edwards Dep. 245; Kamran Dep. 26; Sanders Dep. 261; Russell Dep. 42-44; McKenzie Decl. ¶15; Moreno Decl. ¶11.
[22] Edwards Dep. 241, 247; Sanders Dep. 265, 268-69; Destin Dep. 194; McKenzie Decl. ¶16.

address that concern by creating subclasses, not by denying conditional
certification.

### A. The "Similarly Situated" Standard is Extremely Low

The Eleventh Circuit adopted a two-tiered approach to certification of
collective actions under the FLSA. *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d
1233, 1261 (11th Cir. 2008). The plaintiffs' burden "is a light one." *See, e.g.,*
*Stevenson v. Great American Dream, Inc.,* 2013 WL 4217128, *2 (N.D. Ga. Aug.
14, 2013) (Thrash, *J.*) ("plaintiff's burden is 'not particularly stringent,' 'fairly
lenient,' and 'not heavy'"); *Alexander v. Cydcor, Inc.*, 2012 WL 1142449, at **2-5
(N.D. Ga. Apr. 6, 2012) ("flexible" standard) (Jones, *J.*).[23] As such, courts
typically grant conditional certification. *See, e.g., Kerce v. West Telemarketing
Corp.*, 575 F.Supp. 2d 1354, 1358 (S.D. Ga 2008).

The merits of the claim – whether WFG's Associates are properly classified
as independent contractors under the FLSA – are irrelevant to conditional
certification. *See, e.g., Kerce*, 575 F.Supp. 2d. 354 ("the Court does not reach the
merits of the case" at conditional certification stage); *Pena v. Handy Wash, Inc.,*
2014 WL 2884559, *9 (S.D. Fla., June 18, 2014) (refused to consider merits at first

---

[23] *See also, e.g., Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F. 3d 1208, 1218-19 (11th
Cir. 2001); *Kreher v. City of Atlanta, Georgia*, 2006 WL 739572, at *3 (N.D. Ga.
Mar. 20, 2006) (Duffey, *J.*); *Lawson v. BellSouth Telecomm., Inc.*, 2011 WL
3608462, at **3-5 (N.D. Ga. Aug. 16, 2011) (Carnes, *J.*).

stage). The ultimate decision whether the collective is similarly situated occurs at the second (decertification) stage. *Morgan*, 551 F.3d at 1261; *Riddle v. SunTrust Bank*, 2009 WL 3148768, at *3 (N.D. Ga. Sept. 29, 2009) (Story, *J.*) (individual differences addressed after discovery and during the second stage).

A plaintiff's burden at the notice stage is even less than for Rule 20(a) joinder of parties. *Grayson v. K-Mart Corp*; 79 F.3d 1086, 1095 (11th Cir. 1996). "Similarly situated" does not remotely mean, as defendants often argue, "identically situated" as to the merits of the FLSA allegation. *Morgan,* 551 F.3d at 1243; *Pena* 2014 WL 2884559, *6 (positions do not need to be identical to putative opt-ins); *Stevenson*, 2013 WL 4217128 at *2 (same). A plaintiff meets his "similarly situated" burden by merely showing that the collective is similarly situated with respect to "job requirements and … pay provisions." *Dybach v. State of Fla. Dept. of Corr.,* 942 F.2d 1562, 1567 (11th Cir. 1991); *Morgan*, 551 F.3d at 1262.

### B.    Plaintiffs and Collective Members are "Similarly Situated"

The evidence here – deposition testimony from five Plaintiffs, declarations from an additional two Opt-in Plaintiffs, admissions from WFG's corporate witnesses, and the corporate documents set out above – is substantially more than in most conditional certification motions and easily satisfies Plaintiffs' "lenient

burden."  The entire collective: (1) is uniformly classified by WFG as "independent contractors" (2) works under identical contracts; (3) works under identical policies; (4) performs the same job of recruiting and selling; and (5) works under the same compensation plan.

### 1. WFG's Uniform Classification of Associates as Independent Contractors Shows the Associates are all Similarly Situated

Plaintiffs' most compelling evidence that all of the Associates are similarly situated for purposes of FLSA classification is that WFG admits this is true. Davies' testimony that WFG subjects all Associates to the same FLSA determination regardless of where they work or their particular job duties, and without any individual inquiry, is incompatible with WFG's anticipated opposition to conditional certification.  (1st Davies Dep. 98-102).  When asked why WFG could collectively classify all Associates but the Court could not, Davies literally had no answer.  (1st Davies Dep. 102).

When an employer uniformly classifies all employees as exempt, and "its exemption decision did not turn on any individualized factors," "there is nothing unfair about litigating a single corporate decision in a single collective action…especially where there is robust evidence … [of] a one-size-fits-all corporate manual." *Morgan,* 551 F.3d at 1264 (affirming denial of decertification

motion under much stricter standard of similarity than is applied at notice stage).

"[WFG's] position is undercut by the fact that [it] classified all the [Associates] as independent contractors itself, indicating that it believed [they] could be classified in a like fashion despite their differences." *Kerce*, 575 F. Supp.2d at 1364.[24] WFG's uniform classification decision and it's "one-size fits-all corporate manual" – the AMA, AMA Rules, Field Manual, and Field Bulletins – are more than enough to show the collective is similarly situated.

### 2.    The AMA Shows Collective Uniformity

As shown in detail above, the AMA is the "legal foundation" of every Associate's relationship with WFG, without which the Associates could not transact business.  (1st Davies Dep. 167; Brunton Dep. Ex. 6).  No matter what it may now claim about alleged differences between the Associates, WFG's belief that all of its Associates are similar enough to work under identical contracts is powerful evidence they are also similar enough for conditional certification. *Morgan,* 551 F.3d at 1264.

Faced with the collective similarity imposed by the AMA, Davies invented, for the first time, the contention that WFG no longer enforces supposed "legacy"

---

[24] *Accord  Ravenell v Avis*, 2010 WL 2921508, at *5 (E.D.N.Y. July 19, 2010) (employer's "attempt to rebut this showing [of a common corporate treatment] by contending that Plaintiffs' claims cannot be assessed collectively is … inconsistent with [defendant's] blanket policy broadly classifying *all* [employees] as exempt."

provisions of the contract.  (1st Davies Dep. 64, 88, 125, 142). Davies, of course, had previously submitted a Declaration stating that the AMA governs every Associate's relationship with WFG without any such caveat.  (Davies Decl. ¶ 8).

When tested, Davies' "legacy" defense, like the rest of WFG's defenses, rapidly crumbled.  Davies admitted WFG:

- has not amended the AMA to remove any of the "legacy provisions";

- still uses the same "legacy" version of the AMA today;

- will not allow Associates to modify their AMAs to remove any of the "legacy provisions";

- has not advised any Associates that it no longer enforces the "legacy provisions";

- has not directed WFG headquarters employees to advise Associates they are no longer bound by the AMA's "legacy provisions";

- has no plans to inform any Associates about the purported "legacy provisions" that it now alleges it will  not enforce;

- has no documentary evidence to support its assertion that it decided not to enforce particular provisions of the AMA;

- has no corporate documents referring to the AMA as a "legacy document"; and

- does not advise Associates which provisions of the AMA it no longer enforces when they join WFG.

(1st Davies Dep. 63-64, 90-91, 123-24, 139, 141; 2nd Davies Dep. 251; 3rd Davies Dep. 393-394, 501). In fact, WFG has never even discussed a need to change the AMA. (Brunton Dep. 49). Associate Edwards thought "he was bound to fulfill all the duties under the terms of the AMA." (Edwards Dep. 227). So did Opt-in Plaintiffs Moreno and McKenzie. (McKenzie Decl. ¶18; Morena Decl. ¶4).

### 3. WFG's AMA Rules, Field Manual and Field Bulletins Further Establish Collective Similarity

As also shown in detail above, WFG's 1,000 page Field Manual, Field Bulletins, and Rules create further collective similarity, defining for the whole collective the same restrictions and requirements regarding competition, advertising, internet activity, logo and brand usage, office setup, promotion, compensation, transfers, and other business activities. Again, WFG's own belief that all Associates may be governed by such a detailed, one-size-fits-all set of policies is compelling evidence that even it believes all Associates are similarly situated. *Morgan,* 551 F.3d at 1264.

### 4. All Collective Members have the Job of Recruiting New Associates and Selling WFG-Affiliated Products

It is essentially undisputed that all Associates' jobs are to recruit new Associates and, if licensed, to sell WFG-affiliated products. (Davies Decl. ¶17-19). It is *entirely* undisputed that whether Associates focus more on recruiting or

selling, and which products from the WFG-approved list they sell, poses no obstacle to collective-wide classification.  (1st Davies Dep. 98-102).  Plaintiffs' testimony, discussed in detail above, establishes that the uniformity evidenced by WFG's collective-wide classification decision, collective-wide use of the AMA, collective-wide Field Manual and Field Bulletins, and collective-wide provision of marketing materials and training translates into a collective of people who are similarly situated in their daily work for WFG.

### 5.   All Associates Have the Same Pay Plan

Associates are further similarly situated because they all work under the same WFG commission plan. (3rd Davies Dep. Ex. 20, 20A; Davies Decl ¶21). WFG does not pay Associates a salary, nor does it pay them by the hour or any overtime wages.  (3rd Davies Dep. 317; Davies Decl. ¶21).  WFG pays all licensed Associates commissions defined by a uniform commission plan, while unlicensed Associates receive no compensation at all. (3rd Davies Dep. 317, 319).

### B.   Courts Routinely Conditionally Certify Independent Contractor Collective Actions

Despite Davies' admissions to the contrary, WFG will likely claim its independent contractor defense is too "fact specific" to permit collective treatment. Courts in this Circuit, however, overwhelmingly certify "independent contractor" cases.  *See, e.g., Allen v. Jobo's Inc.,* No. 1:13-cv-0378 (N.D. Ga. July 3, 2014)

21

(Story, *J.*) (attached as Exhibit A) (conditional certification based on plaintiff's affidavits because they shared job duties and were all classified as independent contractors); *Whitaker v. Kablelink Communications LLC*, 2013 WL 5919351, *3 (M.D. Fla. Nov. 4, 2013) (conditional certification in an independent contractor collective action based on six plaintiffs' declarations); *Clincy v. Galardi South Enterprises, Inc.,* 2010 WL 966639, *3 (N.D. Ga. Mar. 12, 2010) (Story, *J.*) (independent contractor collective action conditionally certified); *Carrera v UPS Supply Chain Solutions, Inc.,* 2011 WL 1303151, *8 (S.D. Fla. Aug. 17, 2012) (same); *Abdul-Rasheed v. KableLink Communications,* LLC, 2013 WL 5954785 (M.D. Fla. Nov. 7, 2013) (same); *Pena*, 2014 WL 2884559 (same); *Stevenson,* 2014 WL 4217128 (Thrash, *J.*) (same).

In *Anish v. Nat'l Sec. Corp.*, 2012 WL 1906500, at *4 (S.D. Fla. May 25, 2012), a case directly analogous to the facts here, the court conditionally certified a collective action of brokers classified as independent contractors, finding that the brokers were similarly situated based on the complaint, plaintiffs' declarations, and defendant's admission that all brokers signed the same agreement:

> The parties do not dispute that each of the putative class members had to sign the same agreement and would be subject to the same policy: namely treating the registered representatives as independent contractors as opposed to employees. This policy, the Court concludes, is sufficient to satisfy the "fairly lenient standard" at the conditional certification stage.

S*ee also Carrera* 2011 WL 1303151, at **5-6 (certifying a collective where the employer had "a very detailed policy and procedure" despite the alleged need for "individualized analysis"); *Vondriska,* 564 F. Supp. 2d at 1335-36.

Courts across the nation also routinely grant conditional certification in independent contractor misclassification cases.  *See, e.g., Labrie v. UPS Supply Chain Solutions, Inc.,* 2009 WL 723599 (N.D. Cal. 2009) (nationwide independent contractor collective action conditionally certified, no consideration of defense merits); *Coats v. Nashville Limo Bus*, 2011 WL 308403 (M.D. Tenn. Jan. 27, 2011) (independent contractor collective action conditionally certified without analysis of merits); *Edwards v. Multiband Corp.*, 2011 WL 117232 (D. Minn. Jan. 13, 2011) (conditionally certified based upon plaintiffs' declarations, refused to address merits); *Lewis v. ASAP Land Express*, 2008 WL 2152049 (D. Kan. May 21, 2008) (same); *Scovil v. FedEx,* 811 F.Supp.2d 516 (D. Me. 2011) (independent contractor case conditionally certified based upon six plaintiffs' affidavits without analysis of defense); *In re Penthouse Exec. Club Comp. Litig.*, 2010 WL 4340255 (S.D.N.Y. 2010) (independent contractor case conditionally certified based upon nine affidavits and allegations in complaint; rejected defendant's individualized analysis argument); *Williams v. XE Services, LLC*, 2011 WL 52353 (E.D.N.C. Jan. 4, 2011) (independent contractor misclassification case conditionally certified).

23

**C.     Plaintiffs Have Shown that Other Collective Action Members Will Likely Participate in This Lawsuit if Notice is Issued**

Although notice has not yet been issued, Associates have opted in from WFG offices in in California, Nevada, Utah,[25] and Georgia.  This is more than sufficient to show a "reasonable basis to believe ...there are other employees of the [d]efendant who desire to opt-in," which is all that is needed.  *Reyes v. AT&T Corp.*, 801 F.Supp.2d 1350, 1355 (S.D. Fla. 2011) (citations omitted); *Rojas v. Garda CL Southeast, Inc.*, 297 F.R.D. 669, 676 (S.D. Fla. 2013) ("The existence of just one other coworker who desire to join is sufficient…").

Judge Thrash granted conditional certification where just a single opt-in signed up while the conditional certification motion was pending.  *Stevenson,* 2013 WL 4217128 at *2; *see also, e.g., Guerra v. Big Johnson Concrete Plumbing, Inc.,* 2006 WL 2290512, at *4 (S.D. Fla. May 17, 2006) (conditional certification granted with only one opt-in).  The Opt-in Plaintiffs in this case suffice in number and in showing national interest.  *Bradford*, 2013 WL 425060, *4 (opt-in plaintiffs from eight of forty-one states in which defendant operated sufficient); *Carerra*, 2011 WL 1303151, at *5 (conditionally certifying a nationwide class of alleged "independent contractors" where opt-in plaintiffs worked at six warehouses in five

---

[25] Edwards' claim was dismissed due to his bankruptcy (Doc. 173) but he showed sufficient interest by opting in, participating in discovery, and being deposed.

states); *Reyes*, 801 F.Supp.2d at 1355-56 (certifying a nationwide class with seven opt-ins).

**D.    If the Court Finds a Single Collective Is Not Appropriate, the Court Should Create Two Sub-Classes, Not Deny Certification**

"The Court has discretion to manage the litigation of collective actions, including the creation of sub-classes as needed."  *White v. NTC Transp., Inc.*, 2013 WL 5874566, at *6 (N.D. Miss. Oct. 31, 2013); *In re Tyson Foods, Inc.*, 694 F.Supp.2d 1372, 1379 (M.D. Ga. 2010) (sub-classes can be used to address differences within the collective).  Courts frequently adopt sub-classes to manage collective actions.  *See, e.g., Bradford*, 2013 WL 425060, at **2, 5-6 (conditionally certified four subclasses); *Lawson*, 2011 WL 3608462, at **2, 10, 13 (conditionally certified two subclasses); *Small v. Univ. Med. Ctr. of S. Nevada*, 2013 WL 3043454, at *1 (D. Nev. June 14, 2013) (court may create subclasses).

As shown above, there is an overwhelming basis for conditionally certifying a collective of all persons who have been WFG Associates at any time from January 16, 2010 to the present.  WFG may argue that its alternative "outside salesman" exemption defense makes collective treatment inappropriate because that defense could apply to Associates who had licenses to sell WFG-affiliated products, but not to unlicensed Associates who could not sell products.  (1st Davies Dep. 116; 3rd Davies Dep. 317; Brunton Dep. 63).

25

WFG's fallback "outside salesmen" defense is as meritless as its independent contractor defense, as Plaintiffs will easily show at a later, appropriate stage of the case.[26]   Additionally, consideration of whether a defense might apply to certain collective members but not others is strictly inappropriate at the conditional certification stage. *Riddle* 2009 WL 314768, at *3 (Story, *J.*) ("The appropriate time to address …whether any particular individual is exempt is after the completion of discovery and during the second stage of the certification determination.").

Notwithstanding all of the above, to the extent the Court has any concern about the distinction between licensed and unlicensed Associates, that concern is ameliorated by the creation of two subclasses: (a) licensed Associates and (b) unlicensed Associates.  Unlicensed Associates undisputedly could not sell WFG-affiliated products and therefore are not even theoretically susceptible to the outside salesman defense.  (3rd Davies Dep. 317, 319).  WFG maintains records of

---

[26] In addition to the fact that WFG never considered the Associates "outside salesmen" before being sued, (Brunton Dep. 52-53), this defense is only available if Associates are *employees* of WFG (not independent contractors).  WFG never analyzed or documented how much time (if any) Associates spent selling products outside of their offices.  (Brunton Dep. 62, 74-75).  Additionally, the outside salesmen "exemption is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that set them apart from the nonexempt workers entitled to overtime pay." *Christopher v. SmithKline Beecham Corp.,* 132 S. Ct. 2156, 2172 (2012).  The Associates do not earn *any* wages from WFG.  (3rd Davies Dep. 317).

Associates' licenses, making identification of members of the subclasses simple.

(3rd Davies Dep. 470-73).

### E.   Though the Court Should Not Consider the Merits at this Stage, Plaintiffs Briefly Address them in Anticipation WFG Will Invite an Inappropriate , Merits-Based Certification Analysis

Though the Court should decline WFG's expected invitation to disregard

binding precedent, if the Court considers the merits now, it will find WFG's

independent contractor defense fails collective-wide.  Whether Associates are

employees protected by the FLSA's overtime and minimum wage provisions, or

exempt independent contractors, turns on the "economic reality" test. *Scantland v.*

*Jeffry Knight, Inc.,* 721 F.3d 1308, 1311-12 (11th Cir. 2013).  The FLSA's

definition of "employee" is exceptionally broad: Associates are only independent

contractors if they are "separate economic entities" from WFG who were "in

business for themselves;" if they depend on finding work with other entities, they

are employees.  *Id.* at 1312.

Courts typically consider six non-exhaustive and non-dispositive factors to

determine whether plaintiffs stand as their own independent businesses:(1) the

nature and degree of the alleged employer's control as to the manner in which the

work is to be performed; (2) the alleged employee's opportunity for profit or loss

depending upon his managerial skill; (3) the alleged employee's investment in the

business relative to that of the defendant; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. *Scantland* at 1312; *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008).

In *Hopkins,* the Fifth Circuit affirmed summary judgment for the *plaintiffs* who, like WFG's Associates, were classified as "independent contractors;" sold financial products and recruited agents in a pyramid scheme very similar to WFG's; and worked under uniform contracts that established restrictions on advertising, hiring and firing, taking recruits when leaving the company, and other items very close to those of the AMA. *Hopkins*, 545 F.3d at 346. The "independent contractor" defense fails here as well.

First, the "control" factor cuts entirely in favor of employee status. WFG controls all meaningful aspects of the business, including: hiring, firing, and promotion; advertising; use of the internet; compensation; the products Associates can sell; the presentation materials Associates use when selling and recruiting; and the rights to the Associates' own recruits and client lists. *See supra,* p. 6-14. *Hopkins*, 545 F.3d at 343-44 (defendant controlled all "meaningful" aspects of business based on similar facts).

28

Second, Associates have no opportunity for profit or loss based on their management skill because WFG makes the management decisions for the enterprise.  WFG selects the products, and it prohibits Associates from selling competing products (1st Davies 187-88; 3rd Davies 577; fn. 19 above) and from engaging in other "outside business activities" the company deems "prohibited." (2nd Davies Dep. 249; 3rd Davies Dep. 323-325, 524, 555; 3rd Davies Dep. Ex. 83).[27]   WFG controls the hiring and firing of "downlines" recruited by each Associate.  (1st Davies Dep. 52, 172-173; 1st Davies Dep. Ex. 69; Edwards Dep. 244-246; Sanders Dep. 264; Russell Dep. 195; McKenzie Decl. ¶15; Moreno Decl. ¶14).  As Davies admitted:

> Q:     [I]f I'm a WFG associate and I discover that one of my downline associates is misrepresenting to clients the nature of WFGIA insurance products, I don't have any ability to terminate that person, do I?
> A.     No.
> Q.     Only WFG can terminate an AMA; correct?
> A.     Correct.
> Q.     [I]f I am a WFG associate and I recruit an associate and he is just a bad performer, can't make any sales, he doesn't recruit well, he's earned no money and I don't want him on my team anymore, I as his upline associate cannot terminate him correct?
> A.     Correct.
> Q.     If I really were my own business and one of the people working for me was not performing up to my standards, I would be able to fire him; right?

---

[27] Associates must follow Field Bulletins prohibiting Associates from engaging in "outside business activities." (2nd Davies Dep. 249).

A.     If you had your own business and they were an employee, yes, you could fire them.

(1st Davies Dep. 172-73).  WFG can even reject an application after an Associate recruits a new Associate into the pyramid scheme.  (1st Davies Dep. 51). Associates cannot establish commission plans for their downlines or change any portion of their downlines' AMAs.  (3rd Davies Dep. 581; fn. 16-18).  Davies had no explanation as to why Associates – *if they were truly independent contractors* – could not enter into contracts with the Associates who they recruited through their own efforts:

Q.     If associates are really running their own businesses, why don't they enter into contracts with the people they recruit direct[ly]?
A.     The contracts are with World Financial Group, Inc.
Q.     Right. Every associate has an AMA with [WFG], correct?
A.     Correct.
Q.     No associates have [AMAs] with the associate who recruits them; correct?
A.     To the best of my knowledge, no.

(1st Davies Dep. 56-57).

Third, the "investment" factor shows employee status because WFG's investment in the business far outweighs that of any of the collective members.  In its Order overruling WFG's objections to Plaintiffs' Rule 30(b)(6) deposition notice, the Court correctly found that WFG's investment *relative* to Plaintiffs' investment in the business is the correct analysis of the "investment" element.

30

(Doc. 164, p. 3). WFG's 2013 operating expenses exceeded $24 million dollars, (2nd Davies Dep. Ex. 76) while, as WFG admitted, no Associate spends anything close to that on "his business":

> Q.    Do you know of any associate of WFG who has invested
> $24,589,000 or more in his business?
> A.    No.

(1st Davies Dep. 74).  Plaintiffs' use of their own cell phones, computers, cars, internet providers, and the like for WFG business does not support an independent contractor finding because they owned those items prior to joining WFG and would have used them for their own personal reasons regardless of having joined the company – they are not "investments" in the business (Edwards Dep. 47, 51-53; Kamran Dep. 66-69, 199, 245; Sanders Dep. 35-36; Russell Dep. 36, 51-52; Destin Dep. 85-86, 153, 156-157, 166; McKenzie Decl. ¶6).

Fourth, Associates do not need any special skill to perform their work, showing employee status.  *Hopkins*, 545 F.3d at 345-46.  (1st Davies Dep. 48-50; 3rd Davies Dep. 457; Russell Dep. 203-04).  WFG's corporate documents confirm that Associates' "current experience level with financial services does not matter." (3rd Davies Dep. 463; 3rd Davies Dep. Ex. 63).  *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1314 (5th Cir. 1976) (reversing district court's finding that plaintiffs were independent contractors because district court "incorrectly" relied

31

on plaintiffs' need for general skills like "business sense, salesmanship, personality and efficiency" where "[a]ll major components open to initiative-advertising, pricing, and most importantly the choice of" companies with which to affiliate, were controlled by the defendant).[28]

Fifth, as to "permanency of relationship," the Associates, like the sales leaders in *Hopkins.* "[can] not easily terminate the relationship and take their 'business organization' elsewhere … [because] …their team …. belong[s] exclusively to [the employer]." *Hopkins*, 545 F.3d at 346 (finding employee status based, in part, on restrictive covenant in agreement); 1st Davies Dep. 194, 1st Davies Dep. Ex. 69, p.13 ¶D – restrictive covenants.

Sixth, the Associates are an "integral part" of WFG's business, a fact weighing strongly in favor of employee status. WFG has 186 employees and 339,336 independent contractors.  (1st Davies Dep. 45-46; 1st Davies Dep. Ex. 68; Davies Decl. ¶14).  WFG "employees" do not recruit or sell; that work is performed exclusively by Associates.  (1st Davies Dep. 32-33; Davies Decl. ¶17-19).  As Davies admitted:

> Q:    How much income would WFG earn if it had no associates?
> A:    None.

---

[28] *Usery* is binding precedent under *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981)

> Q:     Would you agree with me that the associates are an important part of WFG's business?
> A:     Yes.

(3rd Davies Dep. 571; objections omitted).

The ultimate question on the merits is whether the Associates are economically independent entities from WFG or are part of WFG's business. Should the Court reach the merits, it will find the Associates are unquestionably part of WFG's business: they are WFG's only revenue source, they are the only WFG personnel who recruit new Associates, they comprise over 99% of WFG's total workforce, they cannot make their own marketing or advertising materials without approval, they cannot choose their own web providers, they cannot post anything online without WFG's approval, they cannot compete if they want to advance, they cannot engage in any other activity WFG deems "prohibited." (see pp. 6-14 *supra*).  A person who provides the sole source of revenue for another company, who cannot take "his business" with him when he changes jobs, and who cannot choose what to sell or how to sell it, is not an independent business entity; he is an employee.

## F.     The Court Should Compel WFG to Produce Associates' Contact Information

Should the Court grant Plaintiffs' Motion, Plaintiffs will promptly meet and confer with WFG on the form of notice to be sent and how it is disseminated.  For

33

Plaintiffs to provide similarly situated Associates with notice of the action, as

contemplated by the law and routinely done by courts, Plaintiffs request that WFG

be ordered to produce the following within 21 days of its Order:

> A list, in Microsoft Excel or another commonly used electronic
> format, of all persons employed by Defendant as Associates from
> January 16, 2010 to the present including: names, addresses,
> telephone numbers, dates of employment, locations of employment,
> and work and personal e-mail addresses.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court grant this Motion so that

additional Associates can be promptly notified of their right to join this lawsuit.

Respectfully submitted this 29th day of August, 2014.

*/s/ Steven E. Wolfe*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleyklein.com
Steven E. Wolfe
Georgia Bar No. 142441
sewolfe@buckleyklein.com
THE BUCKLEY LAW FIRM, LLC
Promenade, Suite 900
1230 Peachtree Street, N.E.
Atlanta, Georgia  30309
Tel: (404) 781-1100
Fax: (866) 589-4089

Jeffrey K. Brown
Michael Tompkins
*Admitted Pro Hac Vice*
LEEDS BROWN LAW, P.C.

34

One Old Country Road, Suite 347
Carle Place, NY 11514
Tel: (516) 873-9550
Fax: (516) 747-5024

Lloyd R. Ambinder
James E. Murphy
Suzanne B. Leeds
*Admitted Pro Hac Vice*
VIRGINIA & AMBINDER, LLP
111 Broadway, Suite 1403
New York, New York 10006
Tel: (212) 943-9080
Fax: (212) 943-9082

*Attorneys for Plaintiffs and Putative Collective*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as approved by the Court in LR 5.1B.

Respectfully submitted,

THE BUCKLEY LAW FIRM, LLC

By:   /s/ Steven E. Wolfe
Georgia Bar No. 142441
sewolfe@buckleylawatl.com
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleylawatl.com

Promenade, Suite 900
1230 Peachtree Street, N.E.
Atlanta, Georgia  30309
Tel: (404) 781-1100

Fax: (866) 589-4089

/s/ Lloyd R. Ambinder
James E. Murphy
Suzanne B. Leeds
*Admitted Pro Hac Vice*
VIRGINIA & AMBINDER, LLP

111 Broadway, Suite 1403
New York, New York 10006
Tel: (212) 943-9080
Fax: (212) 943-9082

/s/ Jeffrey K. Brown
Michael Tompkins
*Admitted Pro Hac Vice*
LEEDS BROWN LAW, P.C.

One Old Country Road, Suite 347
Carle Place, NY 11514
Tel: (516) 873-9550
Fax: (516) 747-5024

*Attorneys for Plaintiffs and Putative Collective*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| MICHAEL B. COHEN, individually and on behalf of other persons similarly situated who were employed by WORLD FINANCIAL GROUP, INC. and/or any other entities affiliated with or controlled by WORLD FINANCIAL GROUP, INC.,<br><br>          Plaintiff,<br><br>v.<br><br>WORLD FINANCIAL GROUP, INC., and/or any other entities affiliated with or controlled by WORLD FINANCIAL GROUP, INC.,<br><br>          Defendant. | CIVIL ACTION NO.<br>1:13-CV-01092-CAP |

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014, I electronically filed the foregoing

**PLAINTIFFS'    BRIEF    IN    SUPPORT    OF    CONDITIONAL**

**CERTIFICATION AND JUDICIAL NOTICE** with the Clerk of the Court using

the CM/ECF system which will automatically send e-mail notification of such

filing to the following attorneys of record:

Lisa A. Schreter, Bradley E. Strawn
LITTLER MENDELSON, P.C.
3344 Peachtree Rd., NE, Suite 1500
Atlanta, GA 30326-4803

A. Michael Weber
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY  10022

Richard W. Black
LITTLER MENDELSON, P.C.
1150 17th Street, N.W.
Suite 900
Washington, DC 20036

THE BUCKLEY LAW FIRM, LLC

By:   */s/ Steven E. Wolfe*
      Georgia Bar No. 142441
      Counsel for Plaintiff